UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO.  05-11323MLW

CRYSTAL A. ATHERTON and ROBERT W.
ATHERTON,
      Plaintiffs

v.

CITY OF BEVERLY, WILLIAM F.
SCANLON, in his official and individual
capacity, and JOHN DUNN, in his official and
individual capacity,
      Defendants

DEFENDANTS, CITY OF BEVERLY,
WILLIAM F. SCANLON, AND JOHN
DUNN'S, MEMORANDUM IN
SUPPORT OF MOTION FOR
<u>JUDGMENT ON THE PLEADINGS</u>

I.      <u>INTRODUCTION</u>

By this action, the plaintiffs Crystal Atherton ("Atherton") and her husband, Robert Atherton (collectively "the plaintiffs") assert numerous claims against the City of Beverly ("the City") and City officials, all arising out of the termination of her at-will employment as the Confidential Secretary to the former Mayor Thomas Crean ("Mayor Crean").  Atherton asserts various civil rights and tort claims against the City and two of its officials, Mayor William F. Scanlon, Jr. ("Mayor Scanlon") and Finance Director John Dunn ("Finance Director Dunn").

The defendants are entitled to judgment on the pleadings for the following reasons: (1) Atherton has failed to establish that she was entitled to any due process; (2) Atherton has failed to establish any violation or retaliation of her First Amendment rights; (3) Atherton has failed to establish a civil rights violation under the Massachusetts Constitution; (4) Atherton has failed to establish that the defendants threatened, intimidated, and coerced her in violation of federal and state constitutional rights; (5) Atherton has failed to establish a claim of civil rights conspiracy; (6) Atherton has failed to plead any facts to support the outstanding relief in the form of a mandamus action; (7) Atherton has failed to plead any facts to support a declaratory judgment; (8) Atherton has failed to establish "extreme and outrageous" conduct in support of her intentional emotional distress

claim against Mayor Scanlon; (9) the plaintiffs have failed to establish facts to support a loss of consortium claim against Mayor Scanlon; and (10) Mayor Scanlon and Finance Director Dunn are entitled to qualified immunity.

## II.    STATEMENT OF FACTS AS ALLEGED IN THE COMPLAINT[1]

In October 2002, Atherton was appointed former Mayor Thomas Crean's Confidential Secretary.  See Complaint, at ¶¶ 8, 32.  On December 17, 2003, after the former Mayor lost reelection to Mayor Scanlon, Atherton received a letter from Mayor Scanlon requesting that she resign as the Mayor's Confidential Secretary or, if she refused, notifying her that she would be terminated effective January 5, 2004.  See Complaint, at ¶ 9.  Mayor Scanlon informed Atherton that she was being terminated as he wanted to have faith and confidence in his secretary and he wanted to choose that individual.  See Complaint, at ¶ 13.  On January 2, 2004, Atherton's employment with the City was terminated and she received a paycheck which included her accrued sick time, personal days, and unused vacation time.  See Complaint, at ¶ 17.  At the time of her termination, Atherton requested under Section 8-15 of the Home Rule Charter that she be provided with a termination hearing.  See Complaint, at ¶ 14.   The City did not conduct a termination hearing.  See Complaint, at ¶ 15.  In September 2004, Atherton retired from the City.  See Complaint, at ¶ 18.

## III.    ARGUMENT

### A.    Motion for Judgment on the Pleadings Standard

In evaluating a motion for judgment on the pleadings, the court must accept all well-pleaded facts alleged in the Complaint as true and view them in the light most favorable to the plaintiff.  See Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir.1991). The Court may grant a

---

[1] The facts recited herein are taken from the averments of the Complaint, and are accepted as true only for purposes of this motion.  See Coyne v. Somerville, 972 F.2d 440 (1st Cir. 1992).

dismissal on the pleadings if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. See Feliciano v. State of R.I., 160 F. 3d 780, 788 (1st Cir. 1998).

      B.   Atherton Was Not Entitled to Due Process (Count I).

          1.   The Plaintiff Did Not Have A Property Interest In Her Employment As The Mayor's Confidential Secretary.

Atherton's Complaint alleges that she was terminated from her public employment without due process. An essential element of any due process claim (procedural or substantive), under 42 U.S.C. § 1983, is the existence of a right protected under federal law or the United States Constitution. See Parratt v. Taylor, 451 U.S. 527, 536-537 (1981); Martinez v. Colon 54 F.3d 980, 984 (1st Cir.), cert. denied, 116 S. Ct. 515 (1995); Watterson v. Page, 987 F.2d 1, 7 (1st Cir. 1993). In order to establish a protected property right the plaintiff must demonstrate that she had a "legitimate claim of entitlement" to her continued employment, grounded in state law. Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982); Chongris v. Board of Appeals of Andover, 811 F.2d 36, 43 (1st Cir. 1987) (property rights, while protected by the federal constitution, "are creatures of state law"); see also Sanderson v. Village of Greenhills, 726 F.2d 284, 286 (6th Cir. 1984). As a general proposition, the greater the discretion a governmental authority has in the conferral of a benefit or discipline, the less likely it becomes that a plaintiff will be found to possess a protected property interest. See, e.g., Madera v. Secretary of the Exec. Office, 418 Mass. 452, 459, 636 N.E.2d 1326, 1330 (1994) (citing Roslindale Motor Sales, Inc. v. Police Comm'r of Boston, 405 Mass. 79, 82-83, 538 N.E.2d 312, 314-15 (1989)).

Only where "the repeated use of explicit mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected" property interest, can a due process right be inferred. See Davila-Lopes v. Zapata, 111 F.3d 192, 196 (1st

Cir. 1997) (quoting Hewitt v. Helms, 459 U.S. 460, 471, 103 S.Ct. 864, 871 (1983)).  The Davila-Lopes Court indicated that the proper inquiry is, "whether the standards governing the [claimed interest] are so particularized, objective, and defined, and also narrow the [government's] discretion so significantly that [a person in plaintiff's] position could be reasonably confident that he would be" entitled to the privilege asserted.

A property interest in employment can only be created by statutes or contract, and where such an "'independent source' does not supply a property interest, the federal constitution does not offer procedural protections." Kelley v. Action for Boston Community Development, Inc., 419 F. Supp. 511, 518 (D. Mass. 1976).  Here, Atherton incorrectly relies upon Home Rule Charter Section 8-15 for the purpose that she is entitled to a termination hearing.

Atherton's position under former Mayor Crean was as Confidential Secretary, which is a position appointed by the Mayor.  Complaint, ¶8.  As specifically provided in the complaint, "the Confidential Secretary/Administrative Assistant to the Mayor shall be appointed by and responsible only to the Mayor.  The Confidential Secretary/Administrative Assistant shall serve at the pleasure of the Mayor." See Complaint, at ¶ 32. (Emphasis added).    As stated in the Complaint, the above language cited from the Administrative Code was codified in the City Ordinances.   The City Ordinances, Section 3-313(b) define the Mode of Appointment and Term of Office with respect to the Confidential Secretary position.  See Beverly City Ordinances, Section 3-313 attached hereto as Exhibit 1.[2]   As stated below, Section 3-313 specifically provides that the Confidential Secretary

---

[2] The defendants submit that the incorporation of the applicable section of the Beverly City Ordinances do not convert the instant motion for summary judgment.  When the allegations of a complaint are expressly linked to a document, that document effectively merges into the pleadings and the trial court may review it in deciding a motion to dismiss under Rule 12(b)(6).  See Bedall v. State Street Bank and Trust Co., 137 F.3d 12, 17 (1st Cir. 1998); Chatman v. Gentle Dental Center of Waltham, 973 F.Supp. 228, 240 n.6 (D. Mass. 1997).  In this matter, the complaint clearly references the and quotes the language contained in the Beverly City Ordinances.  Complaint ¶32.  Accordingly, the Beverly City Ordinance, Section 3-313 is effectively incorporated into the Complaint, and its attachment to the within motion does not compel conversion to a motion for summary judgment pursuant to Fed. R. Civ. P. 56.

"shall be appointed by and responsible only to the Mayor.  The Confidential Secretary/Administrative Assistant shall serve at the pleasure of the Mayor."  <u>See</u> Exhibit 1. The fact that Atherton could be terminated at any time, for any reason, at the pleasure of the Mayor, negates the finding of a property interest in her employment.

Pursuant to the Home Rule Charter, §§ 3-3 and 3-4, persons appointed by the Mayor can be removed by the Mayor by following a procedure that is set forth in the Charter.[3]  <u>See</u> Home Rule Charter, §§3-3 and 3-4 marked and attached hereto as <u>Exhibit</u> No. 2.  Section 3-3 provides, "[t]<u>he mayor may suspend or remove any person appointed by the mayor</u> in accordance with the procedure established in section 3-4."  (Emphasis added).  Section 3-4 provides, "[t]he mayor may, in writing, remove or suspend any city officer, member of a multiple member body, or the head of any city department appointed by the mayor by filing a written statement . . . setting forth in precise detail the specific reasons for such removal or suspension."  Here, Mayor Scanlon gave Atherton written notice and reasons for her termination.  Therefore, Atherton was granted all process due to her.

Atherton improperly relies on § 8-15 of the Home Rule Charter which provides for removal procedures for any employee <u>not</u> covered under §§ 3-3 and 3-4, civil service law or collective bargaining agreements.  Under § 8-15 an employee may request a public hearing five days after being provided written notice of termination.   Atherton, an employee appointed by the Mayor, was not an employee covered under § 8-15, but rather under §§ 3-3 and 3-4.

It is axiomatic that a statute is to be construed as a whole and "'it is not proper to confine interpretation to the one section to be construed.'"  <u>Wolfe</u> v. <u>Gormally</u>, 440 Mass. 699, 704 (2004), <u>quoting</u> 2A N. Singer, Sutherland Statutory Construction § 46.05, at 154 (6th ed. 2000).

---

[3] For the reasons stated in Footnote 2, supra, the defendants submit that the incorporation of the applicable section of the Home Rule Charter does not convert the instant motion for summary judgment, as it is specifically referenced in the Complaint, ¶¶29-31.  <u>See</u> <u>Bedall</u> v. <u>State Street Bank and Trust Co.</u>, 137 F.3d 12, 17 (1st Cir. 1998); <u>Chatman</u> v. <u>Gentle Dental Center of Waltham</u>, 973 F.Supp. 228, 240 n.6 (D. Mass. 1997).

Furthermore, "it is a basic canon of statutory interpretation that 'general statutory language must yield to that which is more specific.'" TBI, Inc. v. Bd of Health of North Andover, 431 Mass. 9, 18 (2000), quoting Risk Mgt. Found. Of Harvard Med. Insts., Inc. v. Commissioner of Ins., 407 Mass. 498, 505 (1990). Here, the specific language in §§ 3-3 and 3-4 referring to the removal of employees who are appointed by the Mayor trumps the general language of § 8-15 which refers to all other City employees. Accordingly, Atherton's due process claim must be dismissed.

## 2. Procedural Due Process

Atherton's procedural due process claim must fail because she has received all of the process to which she is entitled. As discussed above, and as admitted by the Complaint, Atherton was employed at the pleasure of the Mayor. Complaint, ¶32. Atherton had no property interest in her employment and was not entitled to due process. Nevertheless, in this case, the plaintiff was, prior to her termination, apprised of the grounds for her termination and afforded an opportunity to respond. See Loudermill v. Cleveland Board of Education, 470 U.S. 532, 546, 105 S.Ct. 1487 (1985) (establishing due process rights afforded to a tenured public employee which include notice of the charges against him and an opportunity to respond). Accordingly, Atherton received all due process she was entitled to under the United States Constitution and the Home Rule Charter.

## 3. Substantive Due Process

To the extent Atherton's Complaint is intended to assert a substantive due process claim, such claim will also fail, because Atherton has not identified the deprivation of a "fundamental right" or conduct so egregious as to shock the conscience. See Licari v. Ferruzzi, 22 F.3d 344, 350 (1st Cir. 1994). A substantive due process claim, unlike a procedural due process claim, must be based upon an explicit or judicially recognized fundamental constitutional right. Lamoureux v. Haight, 648 F. Supp. 1169, 1175 (D. Mass. 1986). The Supreme Court has observed that the protections of substantive due process "have for the most part been accorded to matters relating to

marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, 510 U.S. 266, 272, 114 S.Ct. 807 (1994); see also Faerber v. City of Newport, 51 F.Supp.2d 115, 123 (D.R.I. 1999). "Such rights include, for example, the Fourth Amendment right to be free from excessive force; the Fourth Amendment right to be free from unreasonable seizures of personal property; the Eighth Amendment right to be free from cruel and unusual punishment; and the judicially recognized substantive constitutional right 'to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court.'" Lemoureux, 648 F.Supp. at 1175 (citations omitted).

Even if Atherton could argue that she had a property interest in her position, she could not demonstrate that such an interest is the type of "fundamental" right protected by the substantive Due Process Clause. See Faerber, 51 F.Supp.2d at 123. In Faerber, the District Court for the District of Rhode Island, relying on the First Circuit's decision in Coyne v. Somerville, 972 F.2d 440 (1st Cir. 1992) (affirming dismissal of substantive due process claim predicated upon denial of promotion) explicitly held that "the right not to be fired without certain procedures is not a fundamental right that raises issues of substantive due process." 51 F.Supp. at 123 (emphasis added). The Faerber Court went on to note that the plaintiff's "firing may raise procedural due process concerns where the state has mandated a termination process…, but it does not reach the higher threshold of a fundamental right." Id.

If the alleged retaliatory firing of the plaintiff in Faerber and the alleged unlawful denial of promotion to the plaintiff in Coyne did not implicate "fundamental rights" protected under the substantive Due Process Clause, it is clear that Atherton's assertions in this case likewise fail to sustain a substantive due process claim.

Moreover, there are no allegations to support the deprivation of any property or liberty interest in a manner which "shocks the conscience." See, e.g., Licari v. Ferruzzi, 22 F.3d 344, 350

(1st Cir. 1994); <u>Furtado</u> v. <u>Bishop</u>, 604 F.2d 80, 95 (1st Cir. 1979), <u>cert. denied</u>, 444 U.S. 1035 (1980). In order to establish conduct that "shocks the conscience" it is not sufficient to merely allege that the defendants abused their legal authority, or even that they committed outright violations of state law. "In the substantive due process context, the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." <u>Amsden</u> v. <u>Moran</u>, 904 F.2d 748, 754 (1st Cir. 1990), <u>cert. denied</u>, 498 U.S. 1041 (1991). Even if the allegations of the Complaint were believed, it takes more than an illegal action to state a claim for substantive due process. As held by the First Circuit, "[i]t is bedrock law in this circuit…that violations of state law - - even where arbitrary, capricious or undertaken in bad faith - - do not, without more, give rise to a denial of substantive due process under the U.S. Constitution." <u>Coyne</u>, 972 F.2d at 444.

      C.   <u>Atherton Fails to Plead a Cognizable Claim Under Equal Protection Act (Count II).</u>

In Count II of her Complaint, Atherton alleges that the City and Mayor Scanlon deprived her of "equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution and Title 42 USCA § 1983," <u>Complaint</u>, at ¶ 50. This single conclusory allegation is the only reference in the Complaint to a deprivation of equal protection, and Atherton has not made any factual allegations in the Complaint to support such a claim. This failure to plead "facts sufficient to convey specific instances of unlawful discrimination" is reason enough for dismissal of Atherton's equal protection claim. <u>See</u> <u>Correa-Martinez</u> v. <u>Arrillaga-Belendez</u>, 903 F.2d 49, 53 (1st Cir. 1990) (<u>quoting</u> <u>Dartmouth Review</u>, 889 F.2d at 16).

To establish a denial of equal protection, a plaintiff must show: (1) that she was treated differently from others similarly situated; <u>and</u> (2) that the selective treatment was based on impermissible considerations, such as discrimination against members of protected classes or an intent to inhibit or punish the exercise of constitutional rights. "[A]s a general matter, the equal protection clause serves to protect suspect classes and fundamental interests from inequitable

treatment." <u>Yerardis's Moody Street Restaurant & Lounge, Inc</u>. v. <u>Board of Selectmen of Town of Randolph</u>, 932 F.2d. 89, 94 (1st Cir. 1991).

> "Liability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; <u>and</u> (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

<u>Id.</u> at 92 (quotation and citation omitted).

Atherton has not alleged that she was treated differently from any other employee who has been appointed by the Mayor as Confidential Secretary or any other political appointment. Nor has Atherton plead any allegations of intentional or purposeful discrimination. Nor has Atherton alleged that an individual outside of her protected classes was hired to replace her. There are simply no allegations that support claims under the Fourteenth Amendment to the United States Constitution and Title 42 USCA § 1983. Both unequal treatment, and intentional and purposeful discrimination, are required to raise a constitutional claim to denial of equal protection. <u>See</u> <u>Snowden</u> v. <u>Hughes</u>, 321 U.S. 1, 8 (1944) ("The unlawful administration by state officers of a [Home Rule Charter] fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."). Accordingly, Atherton fails to establish a cognizable equal protection claim and it must be dismissed for failure to state a claim.

D. <u>Atherton Fails to Establish that the City and Mayor Scanlon Violated and Retaliated Against Her First Amendment Rights (Counts III and VI).</u>

Atherton alleges that the City violated her First Amendment rights when Mayor Scanlon terminated her based on her political affiliations with former Mayor Crean. <u>See</u> <u>Complaint</u>, at ¶¶ 39, 51-52. To prevail on a First Amendment claim on the basis of political affiliation Atherton must first establish that she was speaking "as a citizen upon matter of public concern." <u>Tang</u> v. <u>State of R.I. Dept of Elderly Affairs</u>, 163 F.3d 7, 12 (1st Cir. 1998). This public concern interest must then

be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Pickering v. Board of Educ. Of Township High Sch. Dist. 205, 391 U.S. 563, 568, 88 S.Ct. 1731 (1968).  The United States Supreme Court has held as one of these interests to be "the effect of the statements on those 'close working relationship for which personal loyalty and confidences are necessary . . . .'" Flynn v. City of Boston, 140 F.3d 42, 47 (1st Cir. 1998) (quoting Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891 (1987)).

In order to determine if Atherton's First Amendment rights have been violated based on political affiliation, this Court must first decide whether the overall function of the employee's department or agency involves "decision making on issues where there is no room for political disagreement on goals of their implementation."  O'Conner v. Steeves, 994 F.2d 905, 910 (1st Cir. 1993); Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-42 (1st Cir. 1986).  The next step is to "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement."  Jimenez Fuentes, 807 F.2d at 242.  When making this determination, the Court should review the power inherent in the particular position and not just the functions that were performed by the particular employee.  Id.  Factors to consider include "authority to speak in the name of policy makers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders."  O'Conner, 994 F.2d at 910 (quoting Ecker v. Coholan, 542 F.Supp. 896, 901 (E.D.N.Y. 1982)).

In this matter, Atherton was former Mayor Crean's Confidential Secretary.  See Complaint, at ¶¶ 8, 32.  As the Mayor's Confidential Secretary, Atherton was to "serve at the pleasure of the Mayor."  See Complaint, at ¶ 32; Exhibit 1.  As specifically provided in Section 3-313, Atherton's duties included organizing and summarizing information for the Mayor; meeting with department

heads regarding daily business; expediting interaction between the Mayor and City departments;

serving as a liaison between the Mayor, the media, public interest groups, business and residents;

reviewing all correspondence received by the Mayor and assembling materials needed by the Mayor

needed to respond to the correspondence; and answering and responding to telephone calls.  See

Complaint, at ¶ 32 and Exhibit 1.  Clearly, Atherton's responsibilities were more than mere

secretarial work and consisted mainly of representing and expressing to the public the Mayor's

political ideals, beliefs, and agenda.  Additionally, Atherton was responsible for representing the

Mayor in meetings with Department Heads and other City Hall employees.  Atherton was also

responsible for reviewing all correspondence and assembling materials for the Mayor to properly

respond to the correspondence.   There can be no dispute that Atherton's position represented the

Mayor to the public and City Hall employees and was privy to confidential information.

      Atherton's position as the Mayor's Confidential Secretary is similar to the plaintiff's

position in Cordero v. De Jesus-Mendez, 867 F.2d 1 (1st Cir. 1989).  In Cordero, the plaintiff was

the Mayor's municipal secretary.  Id. at 10-11.   As municipal secretary the plaintiff was the

custodian of municipal documents, performed auditing functions, purchased office materials, and

reported directly to the Mayor.  Id. at 11.   In its decision, the First Circuit referred to a similar case

before the Supreme Court of Puerto Rico where the Court held, "[t]hese duties, together with the

inherent political nature associated with the office of mayor and with the functions arising from the

deposition taken to Feliciano Rodriguez undoubtedly reveal that the political affiliation is not only a

dynamic and essential requirement for the discharge of the office, but that it was the principal factor

which gave rise to his designation." Id. (quoting Juan Feliciano Rodriguez v. Municipality of

Fajardo and Mayor Hipolito Robles Suarez, 115 D.P.R. 675 (1984)) (Emphasis added).  The First

Circuit continues to hold its position that the common thread of employees who could be politically

discharged "were policymakers or those who are in close working relationships with policymakers." Flynn, 140 F.3d at 45; Duriex-Gauthier v. Lopez-Nieves, 274 F.3d 4, 10 (1st Cir. 2001).

Similarly, Atherton, as the Mayor's Confidential Secretary, worked closely with the Mayor and was ultimately responsible for the administrative interaction between the Mayor's office and City departments as well as the media, public interest groups, businesses, and crucial in executing her duties as the Mayor's Confidential Secretary. The Mayor has a right to place an individual in that position who he can trust and will serve his political agenda. Atherton admits in her Complaint that she was a vocal and active campaign supporter of Mayor Scanlon's opponent – former Mayor Crean. See Complaint, at ¶¶ 35-36. Presumably, former Mayor Crean appointed Atherton as his Confidential Secretary because of her support and similar political ideals and agenda. It is nonsensical to argue that the current administration should continue to employ an individual in a sensitive and confidential position who was a supporter of their opponent.

Since Atherton cannot establish that she her political activities were protected under the First Amendment she cannot state a cognizable claim of retaliation. Accordingly, because of Atherton's political position as the Mayor's Confidential Secretary her First Amendment and retaliation claim must be dismissed for failure to state a claim.

E.    Counts IV and V Must Be Dismissed Because Atherton Fails to Establish That She Was Threatened, Intimidated, and Coerced.

1.    Atherton Fails To State A Claim Under Massachusetts Civil Rights Act, G.L. c.12, § 11I.

Atherton's claim alleging a violation of the Massachusetts Civil Rights Act ("MCRA") must be dismissed for her failure to allege the requisite elements. To establish a claim under the MCRA, the plaintiff must allege facts sufficient to show that her exercise of rights was interfered with by "threats, intimidation, or coercion." G.L. c.12, §§11H-11I; see also Lopes v. Commonwealth, 442 Mass. 170, 184 (2004). As noted in Bally v. Northeastern Univ., 403 Mass. 713, 719-720 (1989),

relief under the MCRA may only be granted where the "threat, intimidation or coercion" involves either a physical confrontation accompanied by a threat of harm, see Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985); Bell v. Mazza, 394 Mass. 176, 183-184 (1985); O'Connell v. Chasdi, 400 Mass. 686, 687-688 (1987), or the loss of a contractual right see Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 95 (1987) (plurality opinion).

In her Complaint, Atherton has not alleged that she had a contract of employment with the City. Absent such a contract, there can be no viable MCRA claim arising out of allegedly wrongful termination. See, e.g., Willits v. Roman Catholic Archbishop of Boston, 411 Mass. 202, 210-11 (1991) (teacher employed under series of one-year contracts had no cause of action under MCRA when school failed to renew her contract on account of her activities seeking to organize teachers' union, since she had no secured right to teaching job); Korb v. Raytheon Corp., 410 Mass. 581, 585 (1991) ("there is no improper interference with secured rights when an employer fires an at-will employee who has become ineffective"); Flesner v. Technical Communications Corp., 410 Mass. 805, 818-19 (1991) (at-will employee stated cause of action for improper termination in violation of public policy with evidence that he was fired for seeking to cooperate with an ongoing governmental investigation of his employer, but his claim under MCRA failed because he had no constitutional right to maintain at-will employment contract).

In addition, Atherton's MCRA claim must fail because she has failed to identify any improper threatening, intimidating or coercive conduct by the Mayor. Here, Atherton alleges that Mayor Scanlon's letter requesting that she resign from the position or she would be terminated involved threats, intimidation, or coercion and in violation of the MCRA. See Complaint, at ¶ 38. Even if this interpretation of the Mayor's statement were accurate, however, it would not comprise an actionable threat, because the Mayor had every right to appoint individuals who he trusts in a confidential position.

Moreover, the only allegation of threats, intimidation or coercion contained within the Complaint is the Mayor's statement that Ms. Atherton would be removed from her position if she chose not to resign. The Mayor's statement does not rise to the level of threatening, intimidating or coercive behavior required to violate the MCRA, as threats, coercion or intimidation require more than providing an individual with the opportunity to resign prior to their termination. See Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, cert. denied, 513 U.S. 868, 115 S.Ct. 188 (1994).

2. Atherton Fails to Establish A Claim Under 42 U.S.C. §§ 1985 and 1986.

In Count V, Atherton also alleges that Mayor Scanlon's request that she resign or be terminated constituted threat, intimidation, and coercion under 42 U.S.C. §§ 1985 and 1986. Section 1985 provides, "if two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office . . . ." To prevail on this claim, Atherton must allege: (1) conspiracy involving two or more persons; (2) for purpose of depriving, either directly or indirectly, person or class of persons of equal protection of laws; and (3) act in furtherance of conspiracy; (4) which causes injury to person or property, or deprivation of any right or privilege of citizen of the United States. Suttles v. U.S. Postal Service, 927 F.Supp. 990 (S.D. Tex. 1996). Being a member of a political party is not a protected class envisioned by Congress which it created the civil rights conspiracy statute. See Duriex-Gauthier, 274 F.3d at 10.

Pursuant to § 1986, liability exists when a person who had knowledge that any of the wrongs conspired to be done were about to be committed and had the power to prevent wrongs and refused to do so. A claim can only be stated under § 1986 if the complaint states a valid claim under § 1985. Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085 (2nd Cir. 1993). Because § 1986 is contingent on § 1985, and because Atherton fails to establish a claim under § 1985, she also fails to establish a claim under § 1986 and her § 1986 claim must be dismissed.

14

3.    Atherton Fails To Establish A Claim Under Article 16 of Declaration of Rights.

Although plaintiff pleads her Article 16 claim separately from her MCRA claim, it must be viewed as duplicative, because the Massachusetts Declaration of Rights does not provide a cause of action independent of the MCRA, and, likewise, the MCRA does not create any independent, substantive rights, but serves as a tool for redressing violations of preexisting rights. See Flesner v. Technical Communications Corp., 410 Mass. 805, 818 (1991) (noting failure to identify secured right under constitution or laws of United States or Commonwealth fatal to MCRA claim); Hobson v. McLean Hosp. Corp., 402 Mass. 413, 418-19 and n.6 (1988).    Atherton must demonstrate not only that the defendants violated her rights under Articles 16, which the defendants submit plaintiff cannot prove, but also that these violations were effected by means of threats, intimidation, or coercion.  G.L. c.12, §11I.  Accordingly, Count IV must be dismissed for failure to state a claim.

F.    Atherton's Request For A Writ of Mandamus Is Improper (Count IX).

Atherton seeks for this Court to issue a mandamus ordering the City to reinstate Atherton to the position of Confidential Secretary.  See Complaint, at ¶¶ 77-78.  A claim for mandamus is only appropriate when there is no other adequate remedy to obtain the relief the plaintiff seeks and the defendants have a clear duty to act.  LeBeau v. Town of Spencer, 190 F.Supp.2d 131, 135 (D. Mass. 2002) (citations omitted).   Mandamus is a discretionary writ that can be denied by this Court even if the plaintiff meets the above requirements.  See id. at 135-36.  Here, both state and federal law afford Atherton many remedies, as evidenced by her Complaint.   For this reason, Atherton's mandamus action must be dismissed.

G.    Atherton Fails To Plead Facts To Support A Declaratory Judgment (Count XI).

Atherton seeks for this Court to declare under G.L. c.231A, § 1 that the City violated her due process rights and failed to compensate her as provided for by the Wage Act.  The purpose of a declaratory judgment is to remove uncertainty and to "enable the parties to deal intelligently with

15

the situation before them, to agree between themselves as far as possible, and to reduce as much as possible the area of future litigation." Town of Oxford v. Oxford Water Co., 391 Mass. 581, 585 (1984) (quoting Cohasset Water Co. v. Cohasset, 321 Mass. 137, 149 (1947)). Where statutory remedies exist, no declaratory judgment relief is available absent special circumstances. Harron Communications Corp. v. Town of Bourne, 40 Mass. App. Ct. 83 (1996). "Special circumstances of public import" are circumstances where there is a "risk of a miscarriage of justice in a matter involving the public interest." Town of Swansea v. Contributory Retirement Appeal Bd., 43 Mass. App. Ct. 402, 406 (1997). In Swansea, the Retirement Board failed to advise the Town of its right of appeal and the mistake did not affect one individual but instead "involves a municipality seeking to adjudicate the rights of the town in an appropriate manner. Thus, 'more persons than the parties to the case' will be affected by the outcome." Id. at 406 (quoting School Comm. of Franklin v. Commissioner of Educ., 395 Mass. 800, 807 (1985)).

In this matter, Atherton has not only been afforded statutory remedies under the Wage Act, G.L. c.151B, MCRA, and federal law, but also she has not alleged any special circumstances that would entitle her to declaratory relief. Therefore, Atherton is not entitled to a declaratory judgment and this claim must be dismissed.

> H.  Atherton Fails to Plead A Cognizable Claim for Intentional Infliction of Emotional Distress Against Mayor Scanlon.
>
> > 1.  Municipal Employees Immune From Intentional Torts Under the Massachusetts Tort Claims Act, G.L. c.258.

Under the Massachusetts Torts Claims Act, municipalities cannot be held liable for "any claim arising out of an intentional tort, including . . . intentional mental distress, . . . ." G.L. c. 258, §10(c), see also Swanset Development Corp v. City of Taunton, 423 Mass. 390, 397 (1996). Claims against municipal employees acting in their official capacities are merely claims against the municipality itself. Tilton v. Town of Franklin, 24 Mass. App. Ct. 110, 112-13 (1987); see also

Hafer v. Melo, 502 U.S. 21, 25 (1991).  In the present case, Atherton alleges that Mayor Scanlon acted in his individual and official capacities.  See Complaint, at ¶ 4.  Furthermore, Atherton specifically alleges that her emotional distress stems from Mayor Scanlon's "refusal to afford [Atherton] a hearing as required and by terminating [Atherton] . . . ."  Complaint, at ¶ 100.  Because Atherton's claim of intentional infliction of emotional distress against Mayor Scanlon is clearly in his official capacity, it is barred by G.L. c. 258, §10(c) and must be dismissed.

> 2.  Atherton Fails To State A Prima Facie Case for Intentional Infliction of Emotional Distress.

In her Complaint, the plaintiff alleges that Mayor Scanlon intentionally inflicted emotional distress upon her when Mayor Scanlon terminated her employment.  In order to state a cognizable claim for this tort, the plaintiff must allege that Mayor Scanlon's conduct "was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community.'"  Vittands v. Sudduth, 49 Mass.App.Ct. 401, 410, 730 N.E.2d 325 (2000), quoting Conway v. Smerling, 37 Mass.App.Ct. 1, 8 (1994).

Atherton's only allegation in support of her intentional infliction of emotional distress claim is that she was terminated and denied a hearing.  As evidenced by the court's decision in  Richey v. American Auto Ass'n, Inc., 380 Mass. 835 (1980), termination without more is not enough to establish a prima facie case of intentional infliction of emotional distress.  In Richey, the plaintiff sued his previous employer for reckless infliction of emotional distress after it terminated his employment.  The court found that the facts supported concluding that the employer made a "bad, unjust, and unkind decision" in terminating the plaintiff after leading the plaintiff to believe that his continued employment was assured.  Nonetheless, the court upheld summary judgment for the defendant holding that the facts, viewed in the light most favorable to the plaintiff, did not establish a "plausible case of outrage."  Id.  As recognized in Ritchey, employers can make decisions, even

unjust and unkind decisions, regarding an employee's continued employment.  Such conduct is not "extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community."  See Vittands, 49 Mass. App. Ct. at  410. Nor does the conduct rise to a level of "reckless ruthlessness or deliberate malevolence."  See Conway, 37 Mass. App. Ct. at 8-9. Accordingly, because none of Mayor Scanlon's alleged actions are sufficient to establish a prima facie case of intentional infliction of emotional distress, this claim must be dismissed.

      I.    Robert Atherton Fails to Plead Facts to Support A Loss of Consortium Claim
           Against Mayor Scanlon.

It is well-recognized that any recovery for loss of consortium requires proof of a tortious act that caused injury to the spouse.  See, e.g., Tauriac v. Polaroid Corporation, 716 F. Supp. 672, 673 (D. Mass. 1989) (quoting Mouradian v. General Electric Co., 23 Mass. App. Ct. 538, 544 (1987)). Presumably from the averments in the Complaint the plaintiff's husband, Robert Atherton, is alleging a loss of consortium claim from Atherton's claim of intentional infliction of emotional distress.  As stated above, Atherton is not entitled to an intentional infliction of emotional distress claim pursuant to G.L. c.258, § 10(c).[4]

Furthermore, assuming that Robert Atherton is also seeking loss of consortium for the alleged civil rights violations this claim must be dismissed.  A claim under federal or state civil rights act, including a claim under G.L. c. 151B is not a tort claim.  See, e.g., Jancey v. School Committee of Everett, 421 Mass. 482, 501 (1995) (citing Whitney v. Worcester, 373 Mass. 208, 216 n.10 (1977)).  The fact that a loss of consortium claim is not available when ancillary to a civil rights claim is supported by analogous Federal case law interpreting the viability of such a claim

---

[4] The loss of consortium claim cannot be brought under a theory of  negligent infliction of emotional distress because it would be barred as against Mayor Scanlon, the individual defendant, pursuant to G.L. c.258, § 2.  Moreover, the Complaint makes no reference to any presentment of the loss of consortium claim as required by G.L. c. 258, §4, which is cause for dismissal of the claim in its entirety.  See Krasnow v. Allen, 29 Mass. App. Ct. 562, 568 n. 8 (1990).

when brought with a spouse's action under the Massachusetts' civil rights statutes. See Tauriac,

supra. In Tauriac, the court dismissed the plaintiff's loss of consortium claim finding that:

> "[g]iven that…the Supreme Judicial Court refused to extend the parameters for
> consortium claims, it is doubtful that Massachusetts would recognize the validity of a
> consortium claim that is ancillary to a state law civil rights action. Rather, this court
> anticipates that, if faced with the issue, the Supreme Judicial Court would agree with
> the logic of the federal decisions cited above, and would reject a claim for loss of
> consortium damages predicated on violations of Massachusetts civil rights statutes."

Tauriac, 716 F.Supp. at 672. This position was affirmed in Staffier v. Sandoz Pharmaceuticals

Corp., 888 F.Supp. 287, 293 (D. Mass. 1995) (holding "a spouse is not entitled to assert a claim for

consortium ancillary to an action under the Massachusetts Civil Rights Act."). Similarly, Federal

law does not recognize a loss of consortium claim brought ancillary to an alleged federal civil rights

violation. See Tauriac, 716 F.Supp. at 672 (citing Jenkins v. Carruth, 583 F.Supp. 613, 616 (E.D.

Tenn. 1982)). Accordingly the plaintiff's husband, Robert Atherton cannot maintain a complaint

for loss of consortium based upon violations of his wife's federal and state civil rights.

J.    The Individual Defendants Are Entitled to Qualified Immunity

Finally, the individual defendants are entitled to dismissal of all of the claims asserted

against them, pursuant to the doctrine of qualified immunity. Pursuant to the doctrine of qualified

immunity, public officials are shielded from civil rights claims predicated upon those officials'

performance of discretionary functions, "insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." Harlow v.

Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). This inquiry is wholly objective, and

the plaintiff must prove that "a reasonable public official could not have believed his actions were

lawful in light of clearly established law and the information the official possessed at the time of his

allegedly unlawful conduct." McBride v. Taylor, 924 F.2d 386, 389 (1st Cir. 1991).

Qualified immunity is applicable in supervisory liability claims, as well as direct deprivation

claims. See Febus-Rodriguez, 14 F.3d at 91-95. It is also applicable to common law tort claims.

Lynch v. City of Boston, 989 F.Supp. 275, 286 (D.Mass. 1997) (Keeton, D.J.) ("Qualified immunity shields a public official from tort liability for an administrative act if she is engaged in the exercise of a discretionary function, or she is privileged and does not exceed or abuse the privilege.") (citing Restatement (Second) of Torts § 895D(3) (1977)).

None of the factual allegations set forth in the Complaint are sufficient to support a claim that the defendants violated any clearly established right of the plaintiff. For instance, no reasonable Mayor would have believed it was inappropriate (let alone a violation of the plaintiff's clearly-established rights) to appoint as his Confidential Secretary an individual who supported his political beliefs and agenda. Furthermore, no reasonable Finance Director would believe that following the guidelines provided for by his employer would have violated the plaintiff's constitutional and statutory rights. Accordingly, the individual defendants are entitled to qualified immunity on all claims. Therefore, all of the claims against Mayor Scanlon should be dismissed for the additional reason that they are barred by the doctrine of qualified immunity.

IV.    CONCLUSION

For the foregoing reasons, the defendants respectfully request that the above claims against them be dismissed.

DEFENDANTS,
By their attorneys,


/s/ David C. Jenkins
David C. Jenkins (BBO# 251000)
Elizabeth R. Corbo (BBO# 640131)
Kopelman and Paige, P.C.
101 Arch Street, 12th Floor
Boston, MA 02110
(617) 556-0007

279506/60700/0580

05-11323-MLW

# EXHIBIT
# 1

## PART II
## THE REVISED ORDINANCES

ARTICLE 1: GENERAL PROVISIONS*................................................................................................................. 2
Article 2: Elective Offices*.............................................................................................................................. 9
ARTICLE 3 ADMINISTRATIVE ORGANIZATION*.......................................................................................... 19
ARTICLE 4: ORGANIZATION INTO DEPARTMENTS* ................................................................................... 76
Chapter 4A  AIRPORT*..................................................................................................................................... 112
Chapter 4B* ANIMALS** ................................................................................................................................. 114
Chapter 5  BUILDINGS AND BUILDING REGULATIONS* ........................................................................... 122
Chapter 6  CIVIL DEFENSE AND EMERGENCY PLANNING* ...................................................................... 126
Chapter 7  ELECTRICITY*................................................................................................................................ 128
Chapter 8  FIRE PREVENTION AND PROTECTION*..................................................................................... 140
Chapter 9  HEALTH*......................................................................................................................................... 151
Chapter 10  HISTORIC DISTRICTS* ............................................................................................................... 157
Chapter 11  LIBRARY ...................................................................................................................................... 166
Chapter 12  LICENSES AND BUSINESS REGULATIONS* ............................................................................ 169
Chapter 13  MOTOR BUSSES AND HACKNEY CARRIAGES........................................................................ 197
Chapter 14  MOTOR VEHICLES AND TRAFFIC* ......................................................................................... 206
Chapter 15  OFFENSES AND MISCELLANEOUS PROVISIONS..................................................................... 268
Chapter 16  PARKS AND RECREATION* ....................................................................................................... 285
Chapter 17  PERSONNEL*................................................................................................................................ 290
Chapter 18  PLANNING* .................................................................................................................................. 304
Chapter 19  POLICE DEPARTMENT*.............................................................................................................. 311
Chapter 20  PUBLIC SERVICES....................................................................................................................... 317
Chapter 21  SEWERS*....................................................................................................................................... 362
Chapter 22  SHELLFISH*.................................................................................................................................. 375
Chapter 23  TREES*.......................................................................................................................................... 377
Chapter 24  WETLANDS PROTECTION* ........................................................................................................ 385
Chapter 25  WEIGHTS AND MEASURES DEPARTMENT ............................................................................. 394
Chapter 26 BOARD OF ASSESSORS OF TAXES............................................................................................. 396

The Director of Community Services shall have the following specific powers and duties:

a)      Provide coordination and direction to the agencies within the department to insure consistent administration and the efficient delivery of services to citizens and taxpayers.

b)      Meet regularly with the Mayor to develop goals and objectives for each of the agencies within the department and to measure and evaluate the performance of functions by the agencies.

c)      Meet with the multiple member bodies which are responsible for the oversight of the agencies' programs to explain the goals and objectives set by the Mayor for each such agency.

d)      Examine the level of services provided in other communities to ensure the City of Beverly provides nothing less than an equivalent service for its citizens.

e)      Assist constituent agencies in the development of annual operating budgets and capital outlay requests.

f)      Provide assistance to the constituent multiple member bodies in personnel-related matters including appointment, discharge, evaluation and supervision.

g)      Serve as liaison between the multiple member bodies, the divisions, the City Council and the Mayor.

h)      Be responsible for the coordination and supervision of the data processing and management information systems for the city and any of its governmental offices and agencies.


**SECTION 3-313. Confidential Secretary/Administrative Assistant to the Mayor**

(a). **Establishment** – There shall be a Confidential Secretary/Administrative Assistant to the Mayor.

(b) **Mode of Appointment, Term of Office** - The Confidential Secretary/Administrative Assistant to the Mayor shall be appointed by and responsible only to the Mayor. The Confidential Secretary/Administrative Assistant shall serve at the pleasure of the Mayor.

(c) **Authorities and Responsibilities** - The Confidential Secretary/Administrative Assistant to the Mayor shall have the following duties:

(1) Organize and summarize information and prepare it for the Mayor's review and action;

(2) Meet with department heads regarding day-to-day business, expediting administrative interaction between the Mayor's office and City departments;

(3) Serve as a liaison officer between the Mayor, the media, public interest groups, businesses and residents;

(4) Be familiar with all aspects of the City government and with the functions and activities of the various offices and employees of the City;

(5) Be familiar with the various services rendered by the City to its residents, in order that callers can be informed of the extent of these services and of the schedule for their performance;

(6) Review all correspondence received in the office of the Mayor, and arrange for its routing and for assembling the materials needed by the Mayor to respond to all such correspondence;

(7) Answer all telephone calls placed to the office, respond in an appropriate fashion and direct as appropriate;

## SECTION 3-314. Constables

*(a) Establishment* - There shall be one or more constables as provided in MGL Chapter 41, Sections 91 through 95.

*(b) Mode of Appointment, Term of Office* - The Mayor shall appoint, subject to the review of the City Council as provided in Section 2-10 of the Beverly Home Rule Charter, one or more constables for a term not to exceed three years each.

*(c) Authorities and Responsibilities* - Constables may serve certain civil writs and processes. They have the powers of sheriffs to require aid in the execution of their duties. Constables take due notice of and prosecute all violations of law, respecting the observance of the Lord's Day, profane swearing and gaming. Constables also serve all processes directed to them by the City, for notification of City meetings, or for other purposes.

## SECTION 3-315. Dog Officer (Animal Control Officer)

*(a) Establishment* – There shall be a Dog Officer as provided in MGL Chapter 140, Section 151 *et seq.*

*(b) Mode of Appointment, Term of Office* - The Mayor shall annually, subject to the review of the City Council as provided in Section 2-10 of the Beverly Home Rule Charter, appoint a Dog Officer and one or more assistants, for a term not to exceed three years. The person appointed to such office shall be known as the Animal Control Officer. (Ord. No. 428, § 1, 10-19-87)

*(c) Authorities and Responsibilities* - The Dog Officer/Animal Control Officer shall be responsible for the enforcement of all laws relating to the care, custody and control of dogs in the

# EXHIBIT 2

## SUBPART A.
### BEVERLY HOME RULE CHARTER*

Art. 1.    Incorporation; Short title; Definitions, §§ 1-1—1-7
Art. 2.    Legislative Branch, §§ 2-1—2-11
Art. 3.    Executive Branch, §§ 3-1—3-9
Art. 4.    School Committee, §§ 4-1—4-3
Art. 5.    Administrative Organization, §§ 5-1—5-8
Art. 6.    Finance and Fiscal Procedures, §§ 6-1—6-9
Art. 7.    Elections; Election Related Matters, §§ 7-1—7-13
Art. 8.    General Provisions, §§ 8-1—8-15
Art. 9.    Transitional Provisions, §§ 9-1—9-7

A TRUE COPY

ATTEST: *Frances A. Macdonald*

City Clerk

---

*Editor's note—Set out herein is the Home Rule charter of Beverly, Massachusetts, as proposed by the Beverly Charter Commission and approve by the voters on Nov. 7, 1995. The former Charter derived from the Acts of 1910, chapter 542; Acts of 1913, chapter 398; Acts of 1920, chapter 26; Acts of 1922, chapter 140; Acts of 1936, chapter 29; Acts of 1943, chapter 198; Acts of 1953, chapter 95; Acts of 1954, chapter 602.

Sections lacking a history note contained in parentheses at the end of the section derive unamended from the Charter of 1995, and sections amended by subsequent legislation are followed by a parenthetical history note. Material in brackets [ ] has been added by the editor for purposes of clarification.

addition to the term for which elected. Persons serving as city councillors under this section shall not be entitled to have the words "candidate for re-election" printed against their names on the election ballot.

## ARTICLE 3. EXECUTIVE BRANCH

### Sec. 3-1. Mayor: qualifications; term of office; compensation.

(a) *Mayor, qualifications:* The chief executive officer of the city shall be a mayor, elected by and from the voters of the city at large. Any voter shall be eligible to hold the office of mayor. The mayor shall devote full time to the office and shall not hold any other elective public office, nor shall the mayor be actively engaged in any other business, occupation or profession during the period of service as mayor.

(b) *Term of office:* The term of office of the mayor shall be two (2) years beginning on the first Monday of January following the biennial city election at which chosen and until a successor is qualified.

(c) *Compensation:* The city council shall, by ordinance, establish an annual salary for the mayor. No ordinance increasing the salary of the mayor shall be effective unless it shall have been adopted in the first twelve (12) months of the term for which councillors are elected and it provides that such salary is to become effective in January of the year following the next biennial city election.

### Sec. 3-2. Executive powers; enforcement of ordinances.

The executive powers of the city shall be vested solely in the mayor, and may be exercised by the mayor either personally or through the several city agencies under the general supervision and control of the office of the mayor. The mayor shall cause the charter, the laws, the ordinances and other orders for the government of the city to be enforced, and shall cause a record of all official acts of the executive branch of the city to be kept.

The mayor shall exercise a general supervision and direction over all city agencies, unless other-wise provided by law, by the charter or by ordinance. Each city agency shall furnish to the mayor, forthwith upon request, any information, materials or otherwise as the mayor may request and as the needs of the office and the interest of the city may require.

The mayor shall be the chief procurement officer for the city responsible for buying, purchasing, renting, leasing, or otherwise acquiring all supplies and all services for all departments and all activities of the city and including all functions that pertain to the obtaining of a supply or a service, including description of requirements, selection and solicitation of sources, preparation and award of all contracts and all phases of contract administration. The mayor may delegate all or any portion of such powers and duties to a subordinate officer, but, no such delegation shall in any way absolve the mayor from the ultimate responsibility for all procurement activities.

The mayor shall supervise, direct and be responsible for the efficient administration of all city activities and functions placed under the control of the mayor by law, by this charter, by ordinance or otherwise. The mayor shall be responsible for the efficient and effective coordination of the activities of all agencies of the City of Beverly and for this purpose shall have authority consistent with law to call together for consultation, conference and discussion at all reasonable times, all persons serving the city, whether elected directly by the voters, chosen by persons elected directly by the voters, or otherwise.

The mayor shall hold no other city office or city employment for which a salary or other emolument is payable from the city treasury. No former mayor shall hold any compensated appointed city office or city employment until one (1) year following the date on which such former mayor's city service has terminated.

### Sec. 3-3. Appointments by the mayor.

The mayor shall appoint, subject to the review of such appointments by the city council as provided in section 2-10, all city officers, department heads and the members of multiple-member bodies for whom no other method of appointment or selection is provided by the charter, excepting

only persons serving under the school committee, and persons serving under the city council. Except as may otherwise be required by the civil service law, appointments made by the mayor shall be for periods not to exceed three (3) years, provided, however, the mayor may appoint the head of a department related to the public safety for a term of not less than three (3) nor more than five (5) years. The mayor may suspend or remove any person appointed by the mayor in accordance with the procedure established in section 3-4. The decision of the mayor in suspending or removing a department head shall be final. All persons categorized as department heads shall, subject to the consent of the mayor, appoint all assistants, subordinates and other employees of the agency for which such person is responsible. The department head may suspend or remove any assistant, subordinate or other employee of the agency for which such person is responsible in accordance with the procedures established in section 8-15. The decision of the department head to suspend or remove any assistant, subordinate or other employee shall be subject to review by the mayor. A person for whom a department head has determined a suspension or removal is appropriate may seek review of such determination by the mayor by filing a petition for review, in the office of the mayor, in writing, within ten (10) days following receipt of notice of such determination. The review by the mayor shall follow the procedures of section 8-15. The decision of the mayor shall be final.

### Sec. 3-4. Removal or suspension of certain officials.

(a) *In general:* The mayor may, in writing, remove or suspend any city officer, member of a multiple member body, or the head of any city department appointed by the mayor by filing a written statement, with the city clerk, setting forth in precise detail the specific reasons for such removal or suspension. A copy of the written statement shall be delivered in hand, or mailed by certified mail, postage prepaid, to the last known address of the said city officer, member of a multiple member body, or head of a department. The said city officer, member of a multiple member body, or head of a department may make a

written reply by filing such a reply statement, with the city clerk, within ten (10) days following the date the statement of the mayor has been filed; but, such reply shall have no effect upon the removal or suspension unless the mayor shall so determine. The said city officer, member of a multiple member body, or head of a department may request permission to appear at a public meeting of the city council to read the written reply concerning removal or suspension. If permission for said city officer, member of a multiple member body, or head of a department to attend a meeting of the city council is granted for such purpose, the mayor may attend the same meeting to read the statement of removal or suspension filed by the mayor in the first instance. The city council shall have no authority to vote or otherwise express its views concerning such removal or suspension.

(b) *Public safety:* The mayor may, in writing, remove or suspend the head of any city department relating to the public safety appointed by the mayor by filing a written statement, with the city clerk, setting forth in precise detail the specific reasons for such removal or suspension. A copy of the written statement shall be delivered in hand, or, mailed by certified mail, postage prepaid, to the last known address of the said head of a department. The said city officer or head of a department may make a written reply by filing such a reply statement, with the city clerk, within ten (10) days following the date the statement of the mayor has been filed; but, such reply shall have no effect upon the removal or suspension unless the mayor shall so determine. The said city officer or head of a department may request permission to appear at a public meeting of the city council to contest the decision of the mayor concerning a removal from office and to read the written reply filed with the city clerk concerning such removal. If permission for said head of a department to attend a meeting of the city council is granted for such purpose the mayor may attend the same meeting to read the statement of removal filed by the mayor in the first instance. The city council shall have the authority to vote to approve or disapprove the action of the mayor, but, it shall have no other power to otherwise express its views concerning such removal or

suspension. The removal shall not take effect unless at least five (5) members of the city council shall vote to confirm the action of the mayor.

### Sec. 3-5. Temporary appointments to city offices.

Whenever a vacancy, either temporary or permanent, occurs in a city office and the needs of the city require that such office be filled, the mayor may designate the head of another city agency or a city officer or city employee, or some other person to perform the duties of the office on a temporary basis until such time as the position can be filled as otherwise provided by law, by the charter or by ordinance. The mayor shall file a certificate in substantially the following form, with the city clerk, whenever a person is designated under this section:

I designate (name of person) to perform the duties of the office of (designate office in which vacancy exists) on a temporary basis until the office can be filled by (here set out the regular procedure for filling the vacancy, or when the regular officer shall return). I certify that said person is qualified to perform the duties which will be required and that I make this designation solely in the interests of the City of Beverly.

(signed)
Mayor

Persons serving as temporary officers under the authority of this section shall have only those powers of the office indispensably essential to the performance of the duties of the office during the period of such temporary appointment and no others. No temporary appointment shall be for more than thirty (30) days and not more than one (1) renewal of a temporary appointment may be made when a permanent vacancy exists in the office.

### Sec. 3-6. Communications; special meetings.

(a) *Communications to the city council:* Within six (6) weeks following the start of each fiscal year, the mayor shall submit to the city council, and make available for public distribution, a complete report on the financial and administrative activities of the city for the preceding fiscal year. The mayor shall, from time to time throughout the year, by written communications, recommend to the city council for its consideration such measures as, in the judgment of the mayor, the needs of the city require. The mayor shall, from time to time throughout the year, but at least quarterly, by written communications, keep the city council fully informed of the financial and administrative condition of the city and shall specifically indicate in any such reports any fiscal, financial or administrative problems of the city.

(b) *Special meetings of the city council:* The mayor may at any time call a special meeting of the city council, for any purpose, by causing a notice of such meeting to be delivered in hand or to the place of business or residence of each member of the city council. Such notice shall, except in an emergency of which the mayor shall be the sole judge, be delivered at least forty-eight (48) weekday hours in advance of the time set and shall specify the purpose or purposes for which the meeting is to be held. A copy of each such notice shall, forthwith, be posted on the city bulletin board.

### Sec. 3-7. Approval of mayor, exception (veto).

Every order, ordinance, resolution or vote adopted or passed by the city council relative to the affairs of the city, except memorial resolutions, the selection of city officers by the city council and any matters relating to the internal affairs of the city council, shall be presented to the mayor for approval. If the mayor approves of the measure, the mayor shall sign it; if the mayor disapproves of the measure, the mayor shall return the measure, with the specific reason or reasons for such disapproval attached thereto, in writing, to the city council. The city council shall enter the objections of the mayor on its records, and not sooner than ten (10) days, nor after thirty (30) days from the date of its return to the city council, shall again consider the same measure. If the city council, notwithstanding such disapproval by the mayor, shall again pass the order, ordinance, resolution or vote by a two-thirds (⅔) vote of the full council, it shall then be deemed in force, notwithstanding the failure of the mayor to approve the same. If the mayor has neither signed a measure nor returned it to the city council within ten (10) days