**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**DOCKET NO.: 05-11323 MLW**

|                                                   |     |
| ------------------------------------------------- | --- |
|                                                   | )   |
| **CRYSTAL A. ATHERTON**                           | )   |
| **and ROBERT W. ATHERTON**                        | )   |
| **Plaintiffs,**                                   | )   |
|                                                   | )   |
| **v.**                                            | )   |
|                                                   | )   |
| **CITY OF BEVERLY, WILLIAM F.**                   | )   |
| **SCANLON, JR., in his official and**             | )   |
| **individual capacity and JOHN DUNN,**            | )   |
| **in his official and individual capacity**       | )   |
| **Defendants.**                                   | )   |
|                                                   | )   |

**OPPOSITION OF PLAINTIFFS', CRYSTAL ATHERTON AND ROBERT ATHERTON,
TO DEFENDANTS, CITY OF BEVERLY, WILLIAM F. SCANLON AND JOHN DUNN'S
MOTION FOR JUDGMENT ON THE PLEADINGS**

I.    INTRODUCTION

In this action, the Plaintiffs, Crystal Atherton (hereinafter "Atherton") and her husband

Robert Atherton assert a number of claims against both William F. Scanlon (hereinafter "Scanlon"),

in his official and individual capacity, John Dunn, in his official and individual capacity (hereinafter

collectively "individual Defendants")[1] and the City of Beverly (hereinafter "the City"), arising out of

the termination of Atherton's position as Executive Secretary for the former Mayor of the City.

Atherton says that the Beverly Home Rule Charter (relevant portions attached hereto as **Exhibit 1**)

---

[1] It should be noted that the individual Defendants' Motion for Judgment on the Pleadings is erroneous as it requests dismissal as to all of the claims made against them. The individual Defendants make no argument for dismissal as to claims of individual liability for Unlawful Discrimination on the Basis of Age and Gender under Mass. G.L. c. 151B (Count VII and Count VIII) and Violation of the Wage Act (Count X). Moreover, only the claim asserted against Defendant John Dunn for Mandamus (Count IX) is addressed by the Defendants' Motion for Judgment on the Pleadings, while there is no argument as to the claim for Violation of the Wage Act (Count X) against Dunn.

1

conferred a property interest in continued employment with the City of Beverly because her employment could only be terminated, by law, for "good cause." Thus, Scanlon's disregard for Atherton's right to Due Process constitutes a violation of 42 U.S.C. § 1983.

As shown herein, the individual Defendants are not entitled to a Motion for Judgment on the Pleadings for the following reasons: (1) Atherton has established that the Charter for the City of Beverly entitled her to a hearing before she was terminated and that the Charter provisions required reinstatement as a remedy for the failure to abide to its provisions; (2) Atherton has established a violation of her due process rights due to the failure of the City to abide by its own Charter provisions; (3) Atherton has stated a claim for a violation of her First Amendment rights; (4) Atherton has established a claim for civil rights pursuant to 42 U.S.C. § 1983; (5) Atherton has plead facts sufficient to support a request for mandamus; (6) Atherton has plead facts sufficient to support a request for a declaration of the respective parties rights and obligations under G.L. c. 231A; (7) Atherton has established "extreme and outrageous" conduct in support of her intentional emotional distress claim against Mayor Scanlon; (8) Atherton's husband has established necessary facts to support a loss of consortium claim against Mayor Scanlon; and (9) the statutory and constitutional rights as described herein were so clearly established that Scanlon is not entitled to qualified immunity.

II.    ARGUMENT

Fed.R.Civ.P. 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." *Id*. Motions for judgment on the pleadings necessarily entail "an extremely early assessment of the merits of the case...."

*Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988). Because the purpose of a motion for judgment on the pleadings is to dispose only of patently meritless cases, a court should accept the factual averments of the non-moving party as true and draws all reasonable inferences in that party's favor. *Id*. Therefore, a motion for judgment on the pleadings, made pursuant to Fed.R.Civ.P. 12(c), tests the legal sufficiency of the complaint.

Motions for judgment on the pleadings ordinarily warrant the same treatment as motions to dismiss for failure to state an actionable claim under Fed.R.Civ.P. 12(b)(6). *Collier v. City of Chicopee,* 158 F.3d 601, 602-03 (1st Cir.1998). Under Rule 12(b)(6), the Court should accept as true "the well-pleaded facts as they appear in the complaint, extending plaintiff every reasonable inference in his favor." *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir.1992) (citing *Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 51 (1st Cir.1990)). A judgment on the pleadings is not permissible "unless it appears beyond a doubt that the nonmoving party can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Feliciano v. State of Rhode Island*, 160 F.3d at 788; *accord Santiago v. Morales Medina*, 943 F.2d 129, 130 (1st Cir.1991). The "standard governing the allowance of a Rule 12(c) motion is generally more generous to the nonmovant" than the standard governing a motion for summary judgment. *McCord v. Horace Mann Ins. Co.*, 390 F.3d 138, 141 (1st Cir.2004). Accordingly, the Court "must accept all of the nonmovant's well-pleaded factual averments as true, and draw all reasonable inferences in his favor." *Pasdon v. City of Peabody*, 417 F.3d 225, 226 (1st Cir.2005) (*quoting Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir.1988)) (internal citations omitted).

A.    *ATHERTON RETAINED A PROPERTY INTEREST IN HER EMPLOYMENT UNDER THE DUE PROCESS CLAUSE AS SHE WAS NEITHER AN OFFICIAL, MEMBER OF A MULTIPLE MEMBER BODY NOR HEAD OF A CITY DEPARTMENT FOR THE CITY OF BEVERLY UNDER THE HOME RULE CHARTER; AND THEREFORE SHE STATES A VIABLE CLAIM UNDER 42 U.S.C. § 1983*

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." Amdt. 14, § 1. In 42 U.S.C. § 1983, Congress created a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." A public employer cannot deprive its employee of a constitutionally recognized liberty interest, or of a substantial property interest in public employment, without affording the employee due process. *Board of Regents v. Roth*, 408 U.S. 564 (1972); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (holding that a public employee classified as a "civil servant" under Ohio law has a property interest in continued employment, of which the State cannot deprive him without due process).   However, the Constitution does not create property interests; instead, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Metivier v. Connor*, 283 F.3d 391 (1st Cir. 2002) (town accountant had no property interest in her job under town charter or Massachusetts law, for town's failure to reappoint her); *Joslyn v. Kinch*, 613 F.Supp. 1168 ( R.I. 1985) (where city charter provided that dismissal of an employee who had completed his probationary period of service had to be for cause, city employee had "property interest" in his job).

Atherton's right and entitlement to continued government employment stems from the Charter provisions for the City of Beverly.  Basically, in accordance with Massachusetts law,  a

4

Charter is the "constitution" of the city, containing the basic provisions that establish the form, structure, and organization of the government and the powers and duties of the various city officials. *See* Mass. G.L. c. 4, § 7, cl. 5; 18 Massachusetts Practice, *Municipal Law*, § 23, fourth ed.; *Mayor of Gloucester v. City Clerk of Gloucester*, 327 Mass. 460 (1951). Inherent in the power of the Charter is the tenet that the terms of a Charter will govern if there is any conflict with city ordinances. *Dos Santos v. City of Peabody*, 327 Mass. 519 (1951).[2]

Section 3-4 of the Charter for the City of Beverly (and by implication § 3-3 due to its references to § 3-4), permitting the mayor to "remove or suspend any city officer, member of a multiple member body, or the head of any city department" is clearly inapplicable to Atherton, as she was employed by the City of Beverly in the capacity as executive secretary to the Mayor and not a "city officer, member of a multiple member body, or the head of any city department." By its plain language, § 3-4 does not apply to employees below the level expressed and does not include the position of Secretary to the Mayor, as this position is not a "city officer, member of a multiple member body, or the head of any city department."

Under § 8-15, Atherton was "any employee of the city, not a city officer or a department head . . . and not subject to the provisions of the civil service law, or covered by the terms of a collective bargaining agreement which provides a different method" who could only be removed for "good cause" which the Charter defines as "inefficiency, insubordination, conduct unbecoming the office and incapacity, other than temporary illness." Furthermore, in accordance with § 8-15, the affected employee is given a right to a public hearing within five days of receiving notice and is

---

[2] In fact, courts in this Commonwealth have recognized the supremacy of charters under Home Rule provisions over conflicting statutes. *See Town Council of Agawam v. Town Manager of Agawam,* 20 Mass.App.Ct. 100, 103-05 (1985).

afforded an opportunity "to present evidence, call witnesses and to question any witness appearing at the hearing." Id. at (b).  Finally, "[f]ailure of the appointing authority to take any action within the time periods stated in this section *shall be deemed to be a rescission of the original notice and the officer or employee shall, forthwith, be reinstated*."  *Id*. at (c) (emphasis added).[3]

While state law may create property interests, it is a separate question of federal law whether those interests rise to the level of a legitimate claim of entitlement sufficient to trigger procedural due process protections.  *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) ("Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether an interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." (*quoting Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).   It is well settled "that public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process."  *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997).

Based upon the foregoing, it is clear that the City improperly terminated Atherton in accordance with §§ 3-3 and 3-4, as Defendant Scanlon noted in his January 5, 2004 letter to Atherton (Exhibit 3 of Atherton's Complaint and Demand for Jury Trial), that he had relied upon these provisions in removing her as secretary.  In fact, soon after Defendant Scanlon notified Atherton of his desire to terminate her from her position, she requested a hearing in accordance with § 8-15.  Since Atherton has sufficiently articulated an expectation of continued employment as set forth in the "good cause" language in § 8-15 of the Beverly Home Rule Charter, she has sufficiently

_____

[3]  Just as a repugnant statute can be voided by the Constitution, in light of this "good cause" Charter provision, Beverly Revised Ordinance § 3-313 should be invalidated to the extent it contradicts the Charter and would certainly mandate Atherton's right to continued employment in a different position for the City of Beverly.

stated a "legitimate claim of entitlement" under the Due Process Clause.

If the employee has such a state property interest, and that property interest rises to the level of a "legitimate claim of entitlement," then the employer cannot dismiss the employee without affording her due process of law.  *See*, *e.g.*, *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 111 (1st Cir. 2003).  The employee must therefore demonstrate that she was deprived of that property interest without the minimum amount of process that was due under the Constitution — in this context, the required process includes "some kind of hearing" and "some pretermination opportunity to respond."[4]  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985);  *see also Gilbert v. Homar*, 520 U.S. 924, 929 (1997).  It is well established that due process requires that a public employee with a property interest in continued employment is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" before she is terminated.  *Loudermill* at 546.

The purpose of the pretermination hearing is to serve as "an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id*. at 545-46. The due process clause does not require an "elaborate" or formal pre-termination hearing, and the hearing need not "definitively resolve the propriety of the discharge."  *Id.* at 545.  All that is required is "notice and an opportunity to respond." *Id*. at 546.  In the present case, Defendant Scanlon and the City of Beverly admit that Atherton was never afforded a pre-termination hearing since the Defendants have maintained that  Atherton never had a sufficient  property interest in her position to

---

[4]  This is not an instance where the need for a pre-deprivation hearing is excused by "the necessity of quick action by the State." *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

be protected by the Due Process Clause.

In order to satisfy constitutional due process requirements, the hearing must take place "at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (citations omitted). These requirements have been interpreted to mean that a hearing should take place prior to the deprivation of the protectable interest, *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972), and that the right to appear and argue against the deprivation should be afforded. *Id.* at 81 ("when a person has an opportunity to speak up in his own defense, and when the State must listen to what he [or she] has to say," erroneous deprivations of liberty and property may be avoided); *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16, 98 S.Ct. 1554, 56 L.Ed. 2d 30 (1978) ("[A] hearing in its very essence demands that he [or she] who is entitled to it shall have the right to support his [or her] allegations by argument however brief, and, if need be, by proof, however informal") (citations omitted).

Since Atherton had a property interest in her employment, the relevant constitutional question concerns what process was due her at the time she was summarily terminated by Defendant Scanlon.[5] Due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652,

---

[5] Even under § 3-4, it should be noted that Mayor Elect Scanlon had no actual authority to remove Atherton when he communicated his intention to terminate her on December 17, 2003 (Complaint Exhibit 1). Specifically, the Charter does not contemplate removal of officers by any other person except for the (previous) Mayor who remained in office until the first Monday in January of 2004. See Beverly Home Rule Charter § 3-1 (b) ("term of office of the mayor shall be two (2) years beginning on the first Monday of January following the biennial city election"); *see also* Beverly Home Rule Charter § 9-6 ("authority of the mayor to make all appointments as provided in the first paragraph of section 3-3 shall take effect as the terms of office of incumbent officials expire").

8

94 L.Ed. 865 (1950), and that affords "the affected individual . . . a fundamentally fair chance to present his or her side of the story." *Puerto Rico Telephone Co. v. Telecommunications Regulatory Bd. of Puerto Rico*, 189 F.3d 1, 19 (1st Cir.1999) (*quoting In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 611 (1st Cir.1992)); *see Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. 893 (requiring for due process purposes "the opportunity to be heard 'at a meaningful time and in a meaningful manner' "). "The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.' " *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978).

This is a case where Atherton's employment was terminated without any meaningful notice or opportunity to respond. *See, e.g., Kercado-Melendez v. Aponte-Roque*, 829 F.2d 255, 263 (1st Cir.1987) (due process violation where Department of Public Instruction dismissed school district superintendent without prior notice or hearing). This is also a case where Atherton was notified of the pending termination but not of the availability of an opportunity to present her objections. *Memphis Light*, 436 U.S. at 14 (finding due process violation, where petitioners were notified that their utility services would be discontinued if payment was not made by a certain date but were not informed of the availability of " 'an opportunity to present their objections' to their bills")(*citing Mullane*, 339 U.S. at 314).

Defendant Scanlon relies upon a line of Supreme Court cases recognizing certain circumstances in which a full post-termination hearing alone is held to satisfy the due process clause. In *Parratt v. Taylor*, 451 U.S. 527, 539-41 (1981) (*overruled on other grounds* by *Daniels v. Williams,* 474 U.S. 327, 330 (1986)), and its progeny, *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), the Supreme Court held that due process did not require predeprivation hearings where there is a

9

need for quick action or where the deprivation is the result of a random and unauthorized act. In circumstances where a predeprivation proceeding is impossible or impracticable, all that due process requires, the Court said, is a post-deprivation "means of redress for property deprivations satisfy[ing] the requirements of procedural due process." *Parratt*, 451 U.S. at 537; *accord Hudson*, 468 U.S. at 533.  The Court there reasoned that post-deprivation remedies satisfy due process in such cases because, "when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson*, 468 U.S. at 533.

Scanlon may attempt to argue that, even if Atherton did not receive an adequate pretermination hearing, the Court can nevertheless affirm under *Parratt* and *Hudson*, because the action of the Mayor in terminating plaintiff without an adequate pretermination hearing was not authorized by the City of Beverly and was a random, unpredictable event; the post-termination hearing was all that was necessary to satisfy due process. The Supreme Court has explained that "Parratt and Hudson represent a special case . . . in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon v. Burch*, 494 U.S. 113, 128 (1990). The Court made it clear that an adequate post-deprivation remedy is a defense to a § 1983 due process claim only where the deprivation is unpredictable, or random and unauthorized.  *Id*. at 136-38.  "In situations where the State feasibly can provide a predeprivation hearing before taking property,  it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Zinermon*, 494 U.S. at 132.

In the present case  there is no evidence by Scanlon that quick action was necessary, that

Atherton's termination was random or unauthorized, or that pretermination process was impracticable or impossible. Clearly, the actions of the Mayor as the Chief Executive of the City of Beverly was neither random nor unforeseeable. As Scanlon believed he had sole discretion in the termination of Atherton, he could certainly foresee that he was terminating Atherton and could prevent a wrongful termination by giving Atherton notice and opportunity to be heard prior to her termination.

At this early stage of litigation as set forth in the Complaint, there is no evidence in the record suggesting that the Charter did not delegate to the Mayor as Atherton's department head and the Chief Executive, "the power and authority to effect the very deprivation complained of here," *Zinermon*, 494 U.S. at 138, that is, the power to terminate Atherton's employment. Therefore, Defendant Scanlon's conduct was not "unauthorized" in the sense that the term is used in *Parratt* and *Hudson*. *Id*. at 138. When the Mayor is an individual charged with ensuring that proper procedures are followed,  and the same individual "fail[s] to provide constitutionally required procedural safeguards to a person whom they deprive of liberty [or property], the state officials cannot then escape liability by invoking *Parratt* and *Hudson*." *Id*. at 135.  Thus it was both practicable and feasible for the City of Beverly to provide a pre-termination process.

Accepting as true the facts in the Complaint and drawing all reasonable inferences in favor of Plaintiff's allegations, Atherton has stated a procedural due process claim under 42 U.S.C. § 1983 for which relief can be granted.  Accordingly, the Motion for Judgment on the Pleadings as to Count I should therefore be denied.

B.    *ATHERTON'S COMPLAINT PROPERLY STATES A CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983 AS ATHERTON HAS SUFFICIENTLY ARTICULATED A CLAIM FOR POLITICAL DISCRIMINATION IN VIOLATION OF BOTH THE FIRST AMENDMENT AND ARTICLE 16*

As stated previously, in order to state a claim cognizable under Section 1983, a plaintiff must allege "that some person has deprived [her] of a federal right." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). To make a prima facie case of political discrimination based upon the First Amendment[6] a plaintiff must state "that [she] engaged in constitutionally protected conduct, and that this conduct was a substantial or motivating factor for the adverse employment decision." *Padilla-Garcia v. Guillermo Rodriguez*, 212 F.3d 69, 74 (1st Cir. 2000).

Atherton alleges in her Complaint that Defendant Scanlon formally removed Atherton on January 5, 2004 under Sections 3-3 and Section 3-4 of the Beverly Home Rule Charter. (Complaint ¶ 12); (A copy of Defendant Scanlon's formal letter of removal is attached to the Complaint as Exhibit 3). According to the letter of termination, Plaintiff, Crystal Atherton, was fired by the newly elected Mayor because of a desire to fill the secretarial position "with a person of my own choosing and in whom I have faith and confidence will perform the duties of such position[s] in an exemplary fashion." (Complaint ¶ 13). During the most recent election prior to her termination from employment on behalf of the City of Beverly, Plaintiff, Crystal Atherton, was a vocal and active supporter of the then incumbent, Mayor Thomas M. Crean. (Complaint ¶ 35). Defendants were familiar with Atherton's vocal support on behalf of Mayor Crean. (Complaint ¶ 36). All of these allegation plainly state a claim of discrimination based on political animus or for retaliation

---

[6] Atherton concedes that the analysis of a cause of action under Article 16 of the Massachusetts Declaration of Rights is the same as that under the First Amendment. *See Opinion of the Justices*, 387 Mass. 1201, 1202 (1982).

based upon Atherton's exercise of her rights under the First Amendment.[7]

      C.     *ATHERTON HAS SUFFICIENTLY DEMONSTRATED INTERFERENCE WITH HER RIGHTS SECURED BY THE CONSTITUTION OR THE LAWS OF THE UNITED STATES AND THE COMMONWEALTH BY THREATS INTIMIDATION OR COERCION IN VIOLATION OF G.L. c. 12, § 11I*

      "To establish a claim under the [MCRA ] the plaintiff... must prove that (1) [his or her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Reproductive Rights Network v. President of the Univ. of Mass.*, 45 Mass.App.Ct. 495, 505, 699 N.E.2d 829 (1998), *quoting* from *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395, 668 N.E.2d 333 (1996). The MCRA is the state "counterpart" to section 1983 and is basically "coextensive with" the federal statute. S*ee Chilson v. Polo Ralph Lauren Retail Corp*., 11 F.Supp.2d 153, 158 (D.Mass.1998); *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 473 N.E.2d 1128, 1130-31 (1985).

---

      [7] In more general terms, a government cannot take an adverse employment action or discriminate against an employee on the basis of that employee's political affiliations and beliefs or the employee's advocacy of political ideas. *Padilla-García v. Guillermo Rodríguez*, 212 F.3d 69, 75 (1st Cir.2000)(reiterating the so-called *Elrod/Branti* test which, in part, states that right to political affiliation does not apply to public employees in policymaking or confidential positions); *Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 55 (1st Cir.1990). At this early stage of litigation it is premature for the Court to dismiss Atherton's First Amendment claims as full discovery will determine whether the position of Secretary to the Mayor is a confidential or policymaking position under the *Elrod/Branti* test. Specifically, only extensive discovery will demonstrate whether the subordinate position of secretary to the Mayor: entails significant supervision or control over other employees; provides any authority to speak in the name of or otherwise significantly represent the Mayor; influences City of Beverly programs or policy initiatives; and whether the position could be reasonably inferred by the public to influence matters subject to partisan political difference. *See Vazquez Rios v. Hernandez Colon*, 819 F.2d 319, 325-26 (1st Cir.1987); *Galloza v. Foy*, 389 F.3d 26, 29 (1st Cir.2004).

Atherton has sufficiently alleged, in the present matter, that Scanlon interfered with her rights to due process under 42 U.S.C. § 1983.  Furthermore, Scanlon admittedly refused to comply with the provisions of the City Charter for removal of an employee under § 8-15, which deprived Atherton of her rights under the laws of the Commonwealth of Massachusetts. Therefore, Atherton has met the first two elements to prove her claim under the MCRA.

In *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-647 (2003),  the Supreme Judicial Court noted that "coercion may take various forms, and we have not limited its scope to actual or attempted physical force."  However, there must be some act by a defendant which, objectively viewed, would cause a person not to exercise a constitutional right or deprive that person of that right.  *See Ayali v. Armstrong*, 56 Mass.App.Ct. 740, 749, 780 N.E.2d 926 (2002) ("Whether conduct constitutes threats, intimidation, or coercion under the statute is tested by a reasonable person standard").

As the SJC more recently explained, "coercion" under the MCRA is "not limited . . .  to actual or attempted physical force." *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646 (2003). Rather, "in certain circumstances, economic coercion, standing alone, may be actionable under the act." *Id*. at 647. *See also id*. at 646 ("For example, we have suggested that coercion may be found where one party deprives another of rights due under a contract.").  Economic coercion, at the very least, can be implied in the instant complaint,[8] since Scanlon refused and otherwise disregarded Atherton's request for a hearing in accordance with the Charter provisions entitling her to a hearing

---

[8]  The Court should remain mindful that, under Fed.R.Civ.P. 8(a), a pleading need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id*.; *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163*, 169 (liberal notice pleading standards for section 1983 claims). The standard enunciated in Fed.R.Civ.P. 8(a) and *Leatherman* should apply equally to Atherton's claim under the MCRA.

as set forth in Charter.  Atherton's summary termination as an employee for the City of Beverly by

Scanlon constitutes  "cancellation of a future economic relationship" that would appear to be

"sufficient to constitute coercion" under the MCRA.  *See Karetnikova v. Trustees of Emerson*

*College,* 725 F.Supp. 73, 77-78 (D. Mass.1989).   Accordingly, Atherton has stated a claim under

the MCRA for which relief can be granted and the Motion for Judgment on the Pleadings as to

Count V should therefore be denied.

> D.    *MANDAMUS IS AN APPROPRIATE REMEDY TO COMPEL*
> *MAYOR SCANLON TO COMPLY WITH THE APPLICABLE*
> *PROVISIONS OF THE BEVERLY HOME RULE CHARTER*

Relief in the nature of mandamus,"lies only against a public official performing

nondiscretionary acts."  *Massachusetts Outdoor Advertising Council v. Outdoor Advertising Bd.*, 9

Mass.App.Ct. 775, 789, 405 N.E.2d 151 (1980).   *See Urban Transp., Inc. v. Mayor of Boston*, 373

Mass. 693, 698, 369 N.E.2d 1135 (1977);  *Lynch v. Police Commr. of Boston*, 43 Mass.App.Ct. 107,

110, 681 N.E.2d 307 (1997).   A civil action in the nature of mandamus in accordance with G.L. c.

249, § 5 is an appropriate remedy "to compel a public official to perform an act she is legally

obligated to perform."  *J & R Investment, Inc. v. City Clerk of New Bedford*, 28 Mass.App.Ct. 1, 7

(1989).   There must be "some particular act or acts" which a court "can order in definite terms and

enforce if necessary."  *Scudder v. Selectmen of Sandwich*, 309 Mass. 373, 375, 34 N.E.2d 708

(1941).  *See Cavanaugh v. United States*, 640 F.Supp. 437, 441 (D.Mass.1986).   Mandamus is

appropriate "[i]n the absence of an alternative remedy ... to compel a public official to perform an

act which the official has a legal duty to perform." *Lutheran Serv. Ass'n of New England, Inc. v.*

*Metropolitan Dist. Comm'n*, 397 Mass. 341, 344, 491 N.E.2d 255 (1986).

As stated previously, the Beverly Home Rule Charter § 8-15 requires that "[f]ailure of the

appointing authority to take any action within the time periods as stated in this section shall be deemed to be a rescission of the original notice and *the officer or employee shall, forthwith, be reinstated." Id*. at (c) (emphasis added). Due to Scanlon's utter disregard of the procedures contained within § 8-15, Atherton's request for a hearing prior to her termination should have resulted in her immediate reinstatement. The remedies historically awarded under 42 U.S.C. § 1983 and the MCRA would not necessarily result in Atherton's reinstatement, so that mandamus is an appropriate remedy to compel Scanlon to perform an act he had a legal duty to perform. Since reinstatement under § 8-15 is clearly ministerial relief specifically contemplated by the Charter (as opposed to a discretionary act), mandamus is an entirely appropriate cause of action in this matter and Count IX should not be dismissed.

> E.    *DECLARATORY JUDGMENT IS APPROPRIATELY SOUGHT BY ATHERTON TO ASCERTAIN THE RIGHTS AND OBLIGATIONS OF THE VARIOUS PARTIES TO THIS LITIGATION, INCLUDING THE RIGHTS OF ATHERTON AND OBLIGATIONS OF SCANLON*

G.L.c. 231A, § 1 allows the Court to "make binding declarations of right, duty, status and other legal relations sought thereby, either before or after a breach or violation thereof has occurred in any case in which an actual controversy has arisen and is specifically set forth in the pleadings."[9] G.L.c. 231A, § 1. "The purpose of this statute is to provide a plaintiff relief from uncertainty and insecurity with respect to rights, duties, status, and other legal relations." *Sahli v. Bull HN Information Systems, Inc.*, 437 Mass. 696, 705 (2002). Also see *Oxford v. Oxford Water Co.*, 391

---

[9] In fact, Section 2 of G.L. c. 231A provides that the declaratory judgment procedure "may be used to secure determinations of right[s] . . . under . . . a *charter*, statute, municipal ordinance or by-law, or administrative regulation, including determination of any question of construction or validity thereof which may be involved in such determination." (emphasis added).

Mass. 581, 584- 85 (1984).  When a complaint seeks declaratory relief, the court should ordinarily

declare the rights of the parties rather than dismissing the action for failure to state a claim.  *See*

*Connery v. Commissioner of Correction*, 33 Mass.App.Ct. 253, 254 n. 4 (1992), *aff'd*, 414 Mass.

1009 (1993); *Whitehouse v. Sherborn*, 11 Mass.App.Ct. 668, 676 (1981).  Thus,  a declaratory

judgment is used to remove uncertainty and to "enable the parties to deal intelligently with the

situation before them, to agree between themselves as far as possible, and to reduce as much as

possible the area of future litigation." *Town of Oxford v. Oxford Water Co.*, 391 Mass. 581, 585

(1984) (*quoting Cohasset Water Co. v. Cohasset*, 321 Mass. 137, 149 (1947)).

In the present case, there appears to be a dispute as to the rights and obligations of the parties

under the Beverly Home Rule Charter.  A declaratory judgment by the Court would properly define

these respective rights and obligations so that Atherton sets forth a claim for a declaratory judgment

pursuant to G.L. c. 231A.  Accordingly, Atherton's request for a Declaratory Judgment should

proceed and Defendants Motion for Judgment on the Pleadings as to Count XI should be denied.

> F.    AT THIS EARLY STAGE, ATHERTON HAS SUFFICIENTLY
>       STATED A CLAIM FOR INTENTIONAL INFLICTION OF
>       EMOTIONAL DISTRESS AGAINST SCANLON

In order to state a cognizable claim for intentional infliction of emotional distress, Atherton

must allege that (1) Scanlon intended to inflict emotional distress or that he knew or should have

known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and

outrageous; (3) the actions of Scanlon were the cause of the plaintiff's distress; and (4) the emotional

distress sustained by the plaintiff was severe and of such a nature that a reasonable person could not

be expected to endure it. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976). Assessing

Atherton's complaint against the elements of the cause of action of intentional infliction of emotional distress, Atherton has alleged sufficient facts to survive a Rule 12(b)(6)motion to dismiss.

Scanlon's reliance upon *Richey v. American Automobile Ass'n*, 380 Mass. 835, 839 (1980) for the proposition that "termination without more is not enough to establish a prima facie case of intentional infliction of emotional distress" is misplaced. Defendants' Memorandum at 17. In *Richey*, the plaintiff sued his employer for reckless infliction of emotional distress arising out of his termination from his at-will probationary employment position. Unlike *Richey*, Atherton was not on probationary status and due to the relevant Charter language, she had a property interest in her continued employment. As stated herein, Scanlon disregarded the Charter provisions which required that Atherton could only be terminated for good cause. Scanlon had an obligation to comply with the Charter provisions. Atherton had a statutory right to reinstatement as set forth in the Charter.

Whether a trier of fact would conclude that the Scanlon's conduct in complete derogation of the Charter was extreme and outrageous, and whether a reasonable person could be expected to endure it, are questions of fact on which reasonable persons could differ. At this early stage, the facts and circumstances alleged in Atherton's complaint provide a sufficient basis to survive the threshold challenge and Atherton's claim for intentional infliction of emotional distress[10] should survive the Defendants' Motion for Judgment on the Pleadings.

---

[10]     Based upon the survival of Crystal Atherton's intentional infliction of emotional distress claim, Robert Atherton's claim for loss of consortium as pendent to the emotional distress claim should likewise survive the Defendants' Motion for Judgment on the Pleadings.

G.    *QUALIFIED IMMUNITY WILL NOT PROTECT MAYOR SCANLON FROM LIABILITY WHEN THE CLEAR LANGUAGE OF THE BEVERLY HOME RULE CHARTER REQUIRED A HEARING FOR ATHERTON;  SHE COULD NOT BE TERMINATED ON THE BASIS OF HER POLITICAL AFFILIATION WITH THE PREVIOUS ADMINISTRATION.*

The doctrine of qualified immunity protects government officials who perform discretionary functions from suit and from liability for monetary damages under 42 U.S.C. § 1983. *See Roldán-Plumey v. Cerezo-Suárez*, 115 F.3d 58, 65 (1ˢᵗ Cir. 1997). This defense is designed to create a rebuttable presumption of immunity from personal liability to cover all executive officers that perform discretionary functions. *See Id.*; *Scheuer v. Rhodes*, 416 U.S. 232 (1974).

The general rule regarding qualified immunity is that government officials are immune from suit when their conduct does not violate clearly established statutory authority or constitutional rights, which a reasonable person should have known of at the time of the conduct at issue. *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Furthermore, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Acevedo-García v. Vera-Monroig*, 204 F.3d 1, 10 (1st Cir.2000).

In other words, the test has two prongs.   First, the Court must determine, as a matter of law, whether the constitutional right in question was clearly established at the time of the alleged violation.   *Hilaire v. Laconia*, 71 F.3d 20 (1ˢᵗ Cir.1995). In the case at bar, Atherton has sufficiently plead that the conduct of the individual Defendants deprived her of numerous federal constitutional rights, including, but not limited to, denial of her First Amendment rights and denial of Due Process.

If the Court finds that the right being violated was clearly established, the second prong of

19

the qualified immunity determination is whether a similarly situated official reasonably "should have understood that the challenged conduct violated" that right. *Id*. at 24.  In the present case, it was clearly established law in the Commonwealth that the language of a Charter trumps any conflicting ordinance.  *See Dos Santos v. City of Peabody*, 327 Mass. 519 (1951).  Any reasonable official in the position of Mayor would have known that the failure to abide by the Charter and provide Plaintiff with a proper hearing would have violated her right to Due Process and that her resulting termination would constitute unlawful retaliation under the First Amendment.  Accordingly, Scanlon's conduct in summarily terminating Atherton is not shielded by the doctrine of qualified immunity and the alleged civil rights violations attributed to Scanlon in his individual capacity should not be dismissed.

III.    CONCLUSION

Based on the foregoing, the Defendants' Motion for Judgment on the pleadings should be denied.

Respectfully Submitted,

CRYSTAL A. ATHERTON AND ROBERT A. ATHERTON

By their Attorney,

/s/ Jordan L. Shapiro
Jordan L. Shapiro
BBO#454240
Shapiro & Hender
640 Main Street
Malden, MA 02148
DATED: July 6, 2006                                        (781) 324-5200

20

EXHIBIT 1

EXHIBIT A

## SUBPART A.
### BEVERLY HOME RULE CHARTER*

Art. 1.    Incorporation; Short title; Definitions, §§ 1-1—1-7
Art. 2.    Legislative Branch, §§ 2-1—2-11
Art. 3.    Executive Branch, §§ 3-1—3-9
Art. 4.    School Committee, §§ 4-1—4-5
Art. 5.    Administrative Organization, §§ 5-1—5-8
Art. 6.    Finance and Fiscal Procedures, §§ 6-1—6-9
Art. 7.    Elections; Election Related Matters, §§ 7-1—7-13
Art. 8.    General Provisions, §§ 8-1—8-15
Art. 9.    Transitional Provisions, §§ 9-1—9-7

A TRUE COPY

ATTEST: _Frances A. Medrall_

City Clerk

---

*Editor's note—Set out herein is the Home Rule charter of Beverly, Massachusetts, as proposed by the Beverly Charter Commission and approve by the voters on Nov. 7, 1995. The former Charter derived from the Acts of 1910, chapter 542; Acts of 1913, chapter 396; Acts of 1920, chapter 26; Acts of 1922, chapter 140; Acts of 1936, chapter 29; Acts of 1943, chapter 198; Acts of 1953, chapter 95; Acts of 1954, chapter 502.

Sections lacking a history note contained in parentheses at the end of the section derive unamended from the Charter of 1995, and sections amended by subsequent legislation are followed by a parenthetical history note. Material in brackets [ ] has been added by the editor for purposes of clarification.

addition to the term for which elected. Persons serving as city councillors under this section shall not be entitled to have the words "candidate for re-election" printed against their names on the election ballot.

## ARTICLE 3. EXECUTIVE BRANCH

### Sec. 3-1. Mayor: qualifications; term of office; compensation.

(a) *Mayor, qualifications:* The chief executive officer of the city shall be a mayor, elected by and from the voters of the city at large. Any voter shall be eligible to hold the office of mayor. The mayor shall devote full time to the office and shall not hold any other elective public office, nor shall the mayor be actively engaged in any other business, occupation or profession during the period of service as mayor.

(b) *Term of office:* The term of office of the mayor shall be two (2) years beginning on the first Monday of January following the biennial city election at which chosen and until a successor is qualified.

(c) *Compensation:* The city council shall, by ordinance, establish an annual salary for the mayor. No ordinance increasing the salary of the mayor shall be effective unless it shall have been adopted in the first twelve (12) months of the term for which councillors are elected and it provides that such salary is to become effective in January of the year following the next biennial city election.

### Sec. 3-2. Executive powers; enforcement of ordinances.

The executive powers of the city shall be vested solely in the mayor, and may be exercised by the mayor either personally or through the several city agencies under the general supervision and control of the office of the mayor. The mayor shall cause the charter, the laws, the ordinances and other orders for the government of the city to be enforced, and shall cause a record of all official acts of the executive branch of the city to be kept.

The mayor shall exercise a general supervision and direction over all city agencies, unless other-

wise provided by law, by the charter or by ordinance. Each city agency shall furnish to the mayor, forthwith upon request, any information, materials or otherwise as the mayor may request and as the needs of the office and the interest of the city may require.

The mayor shall be the chief procurement officer for the city responsible for buying, purchasing, renting, leasing, or otherwise acquiring all supplies and all services for all departments and all activities of the city and including all functions that pertain to the obtaining of a supply or a service, including description of requirements, selection and solicitation of sources, preparation and award of all contracts and all phases of contract administration. The mayor may delegate all or any portion of such powers and duties to a subordinate officer, but, no such delegation shall in any way absolve the mayor from the ultimate responsibility for all procurement activities.

The mayor shall supervise, direct and be responsible for the efficient administration of all city activities and functions placed under the control of the mayor by law, by this charter, by ordinance or otherwise. The mayor shall be responsible for the efficient and effective coordination of the activities of all agencies of the City of Beverly and for this purpose shall have authority consistent with law to call together for consultation, conference and discussion at all reasonable times, all persons serving the city, whether elected directly by the voters, chosen by persons elected directly by the voters, or otherwise.

The mayor shall hold no other city office or city employment for which a salary or other emolument is payable from the city treasury. No former mayor shall hold any compensated appointed city office or city employment until one (1) year following the date on which such former mayor's city service has terminated.

### Sec. 3-5. Appointments by the mayor.

The mayor shall appoint, subject to the review of such appointments by the city council as provided in section 2-10, all city officers, department heads and the members of multiple-member bodies for whom no other method of appointment or selection is provided by the charter, excepting

only persons serving under the school committee, and persons serving under the city council. Except as may otherwise be required by the civil service law, appointments made by the mayor shall be for periods not to exceed three (3) years, provided, however, the mayor may appoint the head of a department related to the public safety for a term of not less than three (3) nor more than five (5) years. The mayor may suspend or remove any person appointed by the mayor in accordance with the procedure established in section 3-4. The decision of the mayor in suspending or removing a department head shall be final. All persons categorized as department heads shall, subject to the consent of the mayor, appoint all assistants, subordinates and other employees of the agency for which such person is responsible. The department head may suspend or remove any assistant, subordinate or other employee of the agency for which such person is responsible in accordance with the procedures established in section 3-15. The decision of the department head to suspend or remove any assistant, subordinate or other employee shall be subject to review by the mayor. A person for whom a department head has determined a suspension or removal is appropriate may seek review of such determination by the mayor by filing a petition for review, in the office of the mayor, in writing, within ten (10) days following receipt of notice of such determination. The review by the mayor shall follow the procedures of section 3-15. The decision of the mayor shall be final.

### Sec. 3-4. Removal or suspension of certain officials.

(a) *In general:* The mayor may, in writing, remove or suspend any city officer, member of a multiple member body, or the head of any city department appointed by the mayor by filing a written statement, with the city clerk, setting forth in precise detail the specific reasons for such removal or suspension. A copy of the written statement shall be delivered in hand, or mailed by certified mail, postage prepaid, to the last known address of the said city officer, member of a multiple member body, or head of a department. The said city officer, member of a multiple member body, or head of a department may make a

written reply by filing such a reply statement, with the city clerk, within ten (10) days following the date the statement of the mayor has been filed; but, such reply shall have no effect upon the removal or suspension unless the mayor shall so determine. The said city officer, member of a multiple member body, or head of a department may request permission to appear at a public meeting of the city council to read the written reply concerning removal or suspension. If permission for said city officer, member of a multiple member body, or head of a department to attend a meeting of the city council is granted for such purpose, the mayor may attend the same meeting to read the statement of removal or suspension filed by the mayor in the first instance. The city council shall have no authority to vote or otherwise express its views concerning such removal or suspension.

(b) *Public safety:* The mayor may, in writing, remove or suspend the head of any city department relating to the public safety appointed by the mayor by filing a written statement, with the city clerk, setting forth in precise detail the specific reasons for such removal or suspension. A copy of the written statement shall be delivered in hand, or, mailed by certified mail, postage prepaid, to the last known address of the said head of a department. The said city officer or head of a department may make a written reply by filing such a reply statement, with the city clerk, within ten (10) days following the date the statement of the mayor has been filed; but, such reply shall have no effect upon the removal or suspension unless the mayor shall so determine. The said city officer or head of a department may request permission to appear at a public meeting of the city council to contest the decision of the mayor concerning a removal from office and to read the written reply filed with the city clerk concerning such removal. If permission for said head of a department to attend a meeting of the city council is granted for such purpose the mayor may attend the same meeting to read the statement of removal filed by the mayor in the first instance. The city council shall have the authority to vote to approve or disapprove of the action of the mayor, but, it shall have no other power to otherwise express its views concerning such removal or

suspension. The removal shall not take effect unless at least five (5) members of the city council shall vote to confirm the action of the mayor.

## Sec. 3-5. Temporary appointments to city offices.

Whenever a vacancy, either temporary or permanent, occurs in a city office and the needs of the city require that such office be filled, the mayor may designate the head of another city agency or a city officer or city employee, or some other person to perform the duties of the office on a temporary basis until such time as the position can be filled as otherwise provided by law, by the charter or by ordinance. The mayor shall file a certificate in substantially the following form, with the city clerk, whenever a person is designated under this section:

I designate (name of person) to perform the duties of the office of (designate office in which vacancy exists) on a temporary basis until the office can be filled by (here set out the regular procedure for filling the vacancy, or when the regular officer shall return). I certify that said person is qualified to perform the duties which will be required and that I make this designation solely in the interests of the City of Beverly.

(signed)
Mayor

Persons serving as temporary officers under the authority of this section shall have only those powers of the office indispensably essential to the performance of the duties of the office during the period of such temporary appointment and no others. No temporary appointment shall be for more than thirty (30) days and not more than one (1) renewal of a temporary appointment may be made when a permanent vacancy exists in the office.

## Sec. 3-6. Communications; special meetings.

(a) *Communications to the city council:* Within six (6) weeks following the start of each fiscal year, the mayor shall submit to the city council, and make available for public distribution, a complete report on the financial and administrative activities of the city for the preceding fiscal year. The mayor shall, from time to time throughout the year, by written communications, recommend to the city council for its consideration such measures as, in the judgment of the mayor, the needs of the city require. The mayor shall, from time to time throughout the year, but at least quarterly, by written communications, keep the city council fully informed of the financial and administrative condition of the city and shall specifically indicate in any such reports any fiscal, financial or administrative problems of the city.

(b) *Special meetings of the city council:* The mayor may at any time call a special meeting of the city council, for any purpose, by causing a notice of such meeting to be delivered in hand or to the place of business or residence of each member of the city council. Such notice shall, except in an emergency of which the mayor shall be the sole judge, be delivered at least forty-eight (48) weekday hours in advance of the time set and shall specify the purpose or purposes for which the meeting is to be held. A copy of each such notice shall, forthwith, be posted on the city bulletin board.

## Sec. 3-7. Approval of mayor, exception (veto).

Every order, ordinance, resolution or vote adopted or passed by the city council relative to the affairs of the city, except memorial resolutions, the selection of city officers by the city council and any matters relating to the internal affairs of the city council, shall be presented to the mayor for approval. If the mayor approves of the measure, the mayor shall sign it; if the mayor disapproves of the measure, the mayor shall return the measure, with the specific reason or reasons for such disapproval attached thereto, in writing, to the city council. The city council shall enter the objections of the mayor on its records, and not sooner than ten (10) days, nor after thirty (30) days from the date of its return to the city council, shall again consider the same measure. If the city council, notwithstanding such disapproval by the mayor, shall again pass the order, ordinance, resolution or vote by a two-thirds (⅔) vote of the full council, it shall then be deemed in force, notwithstanding the failure of the mayor to approve the same. If the mayor has neither signed a measure nor returned it to the city council within ten (10) days

apply to positions covered under the civil service law and rules or if in conflict with the provisions of a collective bargaining agreement.

### Sec. 8-13. Loss of office, excessive absence.

If any person appointed to serve as a member of a multiple member body shall fail to attend three (3) or more consecutive meetings, or all of the meetings held during four (4) calendar months, or one-half (½) or more of all of the meetings of such body held in one (1) calendar year, the remaining members of the multiple member body may, by a majority vote of their number, declare the office to be vacant, provided, however, that not less than ten (10) days prior to the date said vote is scheduled to be taken, the body has given in hand, or mailed, postage prepaid, by registered or certified mail, return receipt requested, notice of such proposed or pending vote to the last known address of the person whose removal is sought.

### Sec. 8-14. Filling of vacancies.

Whenever a vacancy shall occur in the membership of an appointed multiple member body, the remaining members shall, forthwith, give written notice of such vacancy to the appointing authority. If, at the expiration of thirty (30) days following the delivery of such notice to the appointing authority, said appointing authority has not appointed some person to fill the vacancy, the remaining members of the multiple member body shall fill such vacancy for the remainder of any unexpired term by majority vote of its remaining members.

### Sec. 8-15. Removals and suspensions.

Any employee of the city, not a city officer or a department head (hereafter "such person") and not subject to the provisions of the civil service law, or covered by the terms of a collective bargaining agreement which provides a different method; and whether appointed for a fixed or an indefinite term, may be suspended or removed from office by the appointing authority for good cause. The term "cause" shall include, but not be limited to the following: inefficiency, insubordination, conduct unbecoming the office and incapacity, other than temporary illness.

Any such person may be suspended from office by the appointing authority if such action is deemed by the appointing authority to be necessary to protect the interests of the city. However, no suspension shall be for more than fifteen (15) days. Suspension may be coterminous with removal and shall not interfere with the rights of the officer or employee under the removal procedure given below.

The appointing authority when removing any such person shall act in accordance with the following procedure:

(a) A written notice of the intent to remove and a statement of the cause or causes therefore shall be delivered in hand or by certified mail to the last known address of the person sought to be removed.

(b) Within five (5) days of delivery of such notice, the officer or employee of the city may request a public hearing at which such person may be represented by counsel, shall be entitled to present evidence, call witnesses and to question any witness appearing at the hearing.

(c) Between one (1) and ten (10) days after the public hearing is adjourned, or if the officer or employee of the city fails to request a public hearing, between six (6) and fifteen (15) days after delivery of the notice of intent to remove, the appointing authority shall take final action, either removing such person, or, noticing such person that the notice is rescinded. Failure of the appointing authority to take any action within the time periods as stated in this section shall be deemed to be a rescission of the original notice and the officer or employee shall, forthwith, be reinstated.

Nothing in this section shall be construed as granting a right to such a hearing to a person who has been appointed for a fixed term when that term of office expires and such person is not reappointed for another term of office.

## ARTICLE 9. TRANSITIONAL PROVISIONS.

### Sec. 9-1. Continuation of existing laws.

All general laws, special laws, city ordinances, city council votes, and rules and regulations of or

pertaining to city that are in force when this charter takes effect, and not specifically or by implication repealed hereby, shall continue in full force and effect until amended or repealed, or rescinded by due course of law, or until they expire by their own limitation.

### Sec. 9-2. Continuation of government and administration.

All city agencies shall continue to perform their duties until re-elected, re-appointed, or until successors to their respective positions are duly appointed or elected, or until their duties have been transferred and assumed by another city agency.

### Sec. 9-3. Transfer of records and property.

All records, property and equipment whatsoever of any city agency, or part thereof, the powers and duties of which are assigned in whole or in part to another city agency, shall be transferred forthwith to such agency.

### Sec. 9-4. Continuation of personnel.

Any person holding a city office, or a position in the administrative service of the city, or any person holding full time employment under the city, shall retain such office, or position, or employment, and shall continue to perform the duties of such office, position or employment until provision shall have been made for the performance of those duties by another person or agency; provided, however, no person in the permanent full time service of the city shall forfeit his or her pay grade, or time in service of the city. All such persons shall be retained in a capacity as similar to the capacity in which they were serving at the time this charter is adopted as is practicable and any reduction in the personnel needs of the city shall be accomplished through a policy of attrition, unless specific provision is otherwise made in this article.

### Sec. 9-5. Effect on obligations, taxes, etc.

All official bonds, recognizances, obligations, contracts, and other instruments entered into or executed by or to the city before the adoption of this charter, and all taxes, assessments, fines, penalties, forfeitures, incurred or imposed, due or

owing to the city, shall be enforced and collected; and all writs, prosecutions, actions and causes of action, except as herein otherwise provided, shall continue without abatement and remain unaffected by the charter; and no legal act done by or in favor of the city shall be rendered invalid by reason of the adoption of this charter.

### Sec. 9-6. Time of taking effect.

The provisions of this charter shall take full effect following the inauguration of the mayor and the organization of the city government on the first Monday in January in the year following the year in which the charter is adopted, except as is hereinafter provided:

(a) The provisions of section 2-8(a) establishing the position of budget/management analyst under the city council, the provisions of sections 5-4, 5-5, 5-6, 5-7 and 5-8 providing for the establishment, consolidation and coordination of certain administrative functions, the provisions of section 6-8 providing for a five year capital improvement program to be submitted by the mayor, the provisions of section 6-4 providing for copies of administrative rules and regulations to be filed in the office of the city clerk and the provisions of section 8-10 providing for a certificate of election, or appointment, to be issued to certain city officers shall not become fully effective until the first day of July in the year following the year in which the charter is adopted.

(b) It is the intention of the charter that the procedures for budget preparation and budget review of the annual operating budget for the city, established in article 6, shall insofar as possible be followed in the year following the year in which the charter is adopted, recognizing however that full conformity might not be possible until the second year following such adoption.

(c) The members of the school committee who have been chosen for terms of four (4) years each shall serve for the balance of the terms for which they were elected, but, their successors shall be chosen for terms of two (2) years each. If a vacancy shall

occur in any such office for a period longer than two (2) years, it shall be filled as though the term to be filled had been for two (2) years. When the terms of office of the two school committee members at large expire, or otherwise become vacant, such offices shall be deemed abolished and the committee structure shall thereafter be as established in section 4-1.

(d) While the mayor elected at the election at which this charter is adopted is not expected to file a capital improvement plan with the city council in the first year of the term for which elected, the said mayor shall be responsible, forthwith, to set into motion a procedure and a process for the development of a five year capital improvement program which can be submitted in the second year of said term and thereafter updated from year to year. In order to assist the mayor in this process a special commission shall be established to consist of four (4) persons chosen by the mayor and three (3) persons chosen by the city council to assist in the development of the initial capital improvement plan. Persons appointed to such commission by the mayor, or council, may be incumbent city officers or employees or may be other voters, as may be deemed appropriate.

(e) All persons currently serving in a city office or position by election of the city council, which office under the charter is to be filled by some other method, shall continue to serve in such office until the term for which they were chosen expires and until a successor to such office is chosen in accordance with the charter and the powers, duties and responsibilities transferred or assigned to such other person.

(f) The authority of the mayor to make all appointments as provided in the first paragraph of section 3-3 shall take effect as the terms of office of incumbent officials expire or vacancies in city positions otherwise occur.

(g) The authority of the mayor to remove officers or department heads appointed by the mayor

contained in section 3-4, shall not become effective until the first Monday in January in the second year following the year in which the charter is adopted and shall only apply to offices which have been appointed by the mayor pursuant to the provisions of the first paragraph of section 3-3.

(h) The appointment making authority in the second paragraph of section 3-3 shall take effect for each department head appointed by the mayor pursuant to the authority of the first paragraph of section 3-3 upon such appointment.

(i) The incumbent city auditor shall serve in such office until the last day of June in the year following the year in which the charter is adopted, notwithstanding the date on which the term of the incumbent would otherwise expire. The position of city auditor as it has heretofore existed and functioned shall be abolished as of the first day of July in said year. The powers of the office of auditor associated with auditing, including those described in sections fifty, fifty-one, fifty-three and fifty-four A of chapter forty-one of the General Laws, shall be retained for the position of budget/management analyst appointed by the city council. It is the intention of the charter that the day-to-day responsibilities presently performed by the auditor, such as those described in section fifty-two of said chapter forty-one, are to be transferred and assigned to a person in the department of municipal finance established by section 5-4, who shall be known as the city accountant, and who shall have the powers of a town accountant as described in sections fifty-six, fifty-seven, and fifty-eight of said chapter forty-one.

(j) Until such time as the following may be changed by an ordinance adopted by the city council which amends, revises or repeals the same, the following shall have the force of a city ordinance.

(1) Salary of budget/management analyst. The annual salary of the budget/management analyst appointed by the city council pur-

suant to charter section 2-8(a) shall initially be established at twenty-five thousand dollars ($25,000.00) with a proviso that the amount provided for such office shall never be less than one-half ($\frac{1}{2}$) the amount provided for the office of finance director. The city council may, in lieu of expending such sum as salary, expend the said sum as a consultant account paying the certified public accountant, or firm of such accountants retained to provide the annual audit pursuant to section 6-9 from such account to provide periodic oversight services to it throughout the fiscal year.

(2) Information to be given to newly appointed members of multiple member bodies. In order that newly appointed members of multiple member bodies might have the opportunity to become acquainted with the type and variety of matters which are likely to come before the multiple member body during the term of appointment, the chair of each multiple member body shall, forthwith upon receipt of notice of the appointment of a new member, provide such member with copies of the minutes of meetings of the body for the two (2) prior years and copies of all laws, ordinances, rules or regulations governing or otherwise applicable to the office. The chair shall, within thirty (30) days following receipt of notice of the appointment, meet with the new member and provide such orientation to the duties of the office as may be deemed necessary or desirable.

(k) Chapter 142 of the acts of 1936 and chapter 203 of the acts of 1938 placing, respectively, the office of police chief and the office of fire chief under the civil service law and rules are hereby repealed, each repeal to be effective upon the expiration of the period of service of the incumbents of the respective offices. Nothing in this revocation of acceptance of the civil service law and rules shall in any way affect any of the rights, privileges and obligations of either of said chiefs under the said civil service law and rules. The successors to said officers shall however be appointed and shall hold their office without regard to the civil service law and rules. It is the inten-

tion of the charter commission in making this provision that every mayor shall make appointments to these offices on the basis of merit and fitness alone and that the guiding principle shall always be to do that which is best for our city.

(l) Forthwith following the organization of the city government in January of the year following the year in which the charter is adopted, the mayor shall appoint seven (7) persons as a committee to review the ordinances of the city for the purpose of preparing suggested revisions to bring the ordinances into conformity with, and to fully implement the provisions of the charter. At least two (2) such persons shall have been members of the Beverly Charter-Commission. The committee shall submit a report and recommendations within one year following its appointment and may submit interim reports at any time throughout the year. The committee shall give special early attention to revisions necessary to implement the organizational structure contained in article 5 of the charter.

**Sec. 9-7. Disposition of certain special laws.**

(a) *Certain special laws recognized and retained:* The following special acts are hereby especially recognized and retained:

An act passed by the legislature of the Colony of Massachusetts Bay on November 7, 1668 (old style calendar), providing, in part, That Basse River be, henceforth a township of themselves . . . and that it be called Beverly. And an act passed on May 28, 1679 (old style calendar) in which the Boundaries between Beverly, Salem and Wenham are established and clarified. And an act passed by the legislature of the Province of the Massachusetts Bay on September 13, 1753, entitled, An Act for Setting off the Inhabitants, as Also Estates of the Proprietors, of That Part of the Precinct of Salem and Beverly, So-Called, Which Is Part of Salem, to the Town of Beverly. And an act passed by the legislature of the Commonwealth of Massachusetts in 1857, Chapter 90, entitled, an Act to Set Off A Part of the Town of Beverly, and Annex the Same to the Town of Danvers.

(b) *Certain special laws recognized and retained, in part:* The following special acts which