UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05CV11323-MLW

CRYSTAL A. ATHERTON,

      Plaintiff,

v.

CITY OF BEVERLY, WILLIAM F.
SCANLON, Jr., in his official and
individual capacity, and JOHN DUNN, in
his official and individual capacity,

      Defendants

DEFENDANTS' LOCAL RULE 56.1
<u>STATEMENT OF FACTS</u>

The Defendants, City of Beverly ("City"), William F. Scanlon, Jr. ("Scanlon"), and John Dunn ("Dunn") (collectively "the Defendants"), submit this Statement of Facts pursuant to Local Rule 56.1 in support of their Motion for Summary Judgment on the Complaint filed by the plaintiff, Crystal A. Atherton ("Atherton"), which alleges the Defendants unlawfully discharged her on the bases of her political affiliation to the former Mayor, her age and her gender. Atherton also asserts the Defendants denied her constitutional rights to due process by discharging her without a pre-termination hearing and that the Defendants unlawfully violated the Commonwealth's Wage Act, G.L. c. 149, §148, by withholding payments for various benefits and compensatory time. Finally, Atherton claims that Scanlon's termination of her employment without a hearing amounts to intentional infliction of emotional distress.

1.     Crystal A. Atherton ("Atherton") is the plaintiff in this matter. (Complaint, generally) Atherton began her employment with the City as Legal Secretary/Paralegal to the City Solicitor on February 1, 1987. (Exhibit 1, Deposition of Crystal A. Atherton, p. 11, hereinafter "Ex. 1,

Atherton, p. __"; Exhibit 2, Defendant, City of Beverly's Answers to Plaintiff's First Set of

Interrogatories, No. 6, hereinafter "Ex. 2, City's Interrogatories, No.__")  In or about June 1997,

Atherton became Assistant to the City's Purchasing Agent, and on October 28, 2002, she moved

to the Mayor's Office as Executive Secretary to Mayor Thomas Crean ("Crean").  Atherton held

that position until she was terminated in January 2004.  (Ex. 1, Atherton, pp. 12-13; Ex. 2, City's

Interrogatories, No. 6)  While working as Secretary to Crean, Atherton held the position of Clerk

on the Licensing Board.  (Ex. 1, Atherton, pp. 36-37)  Atherton also served on the City's

Retirement Board and continues to serve on that Board today.  (Ex. 1, Atherton, pp. 47-50)

2.      The City is a municipal corporation located in northeast Massachusetts, with a principal

place of business at 191 Cabot Street in Beverly, Massachusetts.  (Complaint, generally)

3.      Scanlon is the Mayor for the City.  Scanlon previously served as Mayor from 1994 until

2001.  Scanlon was re-elected as Mayor and took office again in January 2004.  (Exhibit 3,

Deposition of William F. Scanlon, p. 8, hereinafter "Ex. 3, Scanlon, p. __"; Exhibit 4, Affidavit

of William F. Scanlon, ¶1, hereinafter "Ex. 4, Scanlon Aff., ¶__")

4.      Dunn is the Finance Director for the City and has worked in that capacity since January

2004.  (Exhibit 5, Deposition of John P. Dunn, pp. 5-6, hereinafter "Ex. 5, Dunn, p. __"; Exhibit

6, Affidavit of John Dunn, ¶¶1-2, hereinafter "Ex. 6, Dunn Aff., ¶__")  Dunn also worked for the

City from July 1995 until February 2002, when Crean was elected Mayor.  (Ex. 6, Dunn Aff., ¶2)

As Finance Director, Dunn is in charge of all revenues and expenditures for the City, budgets,

payroll, accounts payable, accounting, assessing, information systems, treasurer/collector, and

telephone operator.  (Ex. 5, Dunn, pp. 6-7; Ex. 6, Dunn Aff., ¶3)

5.      The voters of the City approved a Home Rule Charter ("Charter") in 1995.  Section 1-3

of the Charter, which establishes the distribution of powers within the City government, states, in

pertinent part, that the "administration of the fiscal, prudential and municipal affairs of Beverly, with the government thereof, shall be vested in an executive/ administrative branch headed by a mayor, and a legislative branch to consist of a city council." (Exhibit 7, City of Beverly's Home Rule Charter, Section 1-3, hereinafter "Ex. 7, Charter, Sec. __")

6.      Section 3-2 of the Charter provides, in part, that "[t]he executive powers of he city shall be vested solely in the mayor…The mayor shall cause the charter, the laws, the ordinances and other orders for the government of the city to be enforced, and shall cause a record of all official acts of the executive branch of the city to be kept. The mayor shall exercise a general supervision and direction over all city agencies, unless otherwise provided by law, by the charter or by ordinance . . . The mayor shall supervise, direct and be responsible for the efficient administration of all city activities and functions placed under the control of the mayor by law, by this charter, by ordinance or otherwise . . . . " (Ex. 7, Charter, Sec. 3-2)

7.      Section 3-3 of the Charter provides, in part, that: "[t]he mayor shall appoint, subject to the review of such appointments by the city council as provided in section 2-10, all city officers, department heads and the members of multiple-member bodies for whom no other method of appointment or selection is provided by the charter, excepting only persons serving under the school committee, and persons serving under the city council . . . appointments made by the mayor shall be for periods not to exceed three (3) years, . . . The mayor may suspend or remove any person appointed by the mayor in accordance with the procedure established in section 3-4. The decision of the mayor in suspending or removing a department head shall be final.  All persons categorized as department heads shall, subject to the consent of the mayor, appoint all assistants, subordinates and other employees of the agency for which such person is responsible. The department head may suspend or remove any assistant, subordinate or other employee of the

agency for which such person is responsible in accordance with the procedures established in section 8-15. The decision of the department head to suspend or remove any assistant, subordinate or other employee shall be subject to review by the mayor. …The decision of the mayor shall be final." (Ex. 7, Charter, Sec. 3-3)

8.      Section 3-4 of the Charter provides, in part, that: "(a) In general: The mayor may, in writing, remove or suspend any city officer, member of a multiple member body, or the head of any city department appointed by the mayor by filing a written statement, with the city clerk, setting forth in precise detail the specific reasons for such removal or suspension. A copy of the written statement shall be delivered in hand, or mailed by certified mail, postage prepaid, to the last known address of the said city officer, member of a multiple member body, or head of a department. The said city officer, member of a multiple member body, or head of a department may make a written reply by filing such a reply statement with the city clerk, within ten (10) days following the date the statement of the mayor has been filed; but, such reply shall have no effect upon the removal or suspension unless the mayor shall so determine….The city council shall have no authority to vote or otherwise express its views concerning such removal or suspension." (Ex. 7, Charter, Sec. 3-4)

9.      Section 5-3 of the Charter provides that "[a]ll appointments and promotions of city officers and employees shall be made on the basis of merit and fitness demonstrated by examination, past performance, or by other evidence of competence and suitability. Each person appointed to fill an office or position shall be a person especially fitted by education, training and previous work experience to perform the duties of the office or position for which chosen." (Ex. 7, Charter, Sec. 5-3)

10.    Section 8-3 of the Charter provides "[t]o the extent that any specific provision of this charter may conflict with any other provision expressed in general terms, the specific provision shall prevail."  (Ex. 7, Charter, Sec. 8-3)

11.    Section 8-12 of the Charter, pertaining to the notice of vacancies within the city, provides, in part, "[w]henever a vacancy shall occur . . . the mayor or other appointing authority shall forthwith cause public notice of such vacancy or impending vacancy to be publicly posted on the city bulletin board for not less than ten (10 days . . . Any person who desires to be considered for an appointment to fill such vacancy may, . . . file with the appointing authority a statement setting forth with reasonable clarity and specificity, the qualifications of such person for such appointment . . . ."  (Ex. 7, Charter, Sec. 8-12)

12.    Section 8-15 of the Charter provides, in part, that "[a]ny employee of the city, not a city officer or a department head (hereafter "such person") and not subject to the provisions of the civil service law, or covered by the terms of a collective bargaining agreement which provides a different method, and whether appointed for a fixed or an indefinite term, may be suspended or removed from office by the appointing authority for good cause.  The term "cause" shall include, but not be limited to the following:  inefficiency, insubordination, conduct unbecoming the office and incapacity, other than temporary illness . . . The appointing authority when removing any such person shall act in accordance with the following procedure:  (a) A written notice of the intent to remove and a statement of the cause or causes therefore shall be delivered in hand or by certified mail to the last known address of the person sought to be removed.  (b) Within five (5) days of delivery of such notice, the officer or employee of the city may request a public hearing at which such person may be represented by counsel, shall be entitled to present evidence, call witnesses and to question any witness appearing at the hearing.  (c) Between one (1) and ten (10)

days after the public hearing is adjourned, or if the officer or employee of the city fails to request

a public hearing, between six (6) and fifteen (15) days after delivery of the notice of intent to

remove, the appointing authority shall take final action, either removing such person, or,

notifying such person that the notice is rescinded.  Failure of the appointing authority to take any

action within the time period as stated in this section shall be deemed to be a rescission of the

original notice and the officer or employee shall, forthwith, be reinstated.  Nothing in this section

shall be construed as granting a right to such a hearing to a person who has been appointed for a

fixed term when that term of office expires and such person is note [sic] reappointed for another

term of office."  (Ex. 7, Charter, Sec. 8-15)

13.     Section 9-6, paragraph (l), of the Charter provides, in part, that "following the

organization of the city government in January of the year following the year in which the

charter is adopted, the mayor shall appoint seven (7) persons as a committee to review the

ordinances of the city for the purpose of preparing suggested revisions to bring the ordinances

into conformity with, and to fully implement the provisions of the charter . . . The committee

shall give special early attention to revisions necessary to implement the organizational structure

contained in article 5 of the charter."   (Ex. 7, Charter, Sec. 9-6(l))

14.     City ordinances are voted upon and approved by City Council.  (Ex. 7, Charter, Sec. 2-9)

15.     Section 1-102 of the City's Code of Ordinances ("Ordinances"), entitled "Rules of

Construction and Definitions," provides that "[i]n the construction of this Code, and of all

ordinances, the following rules shall be observed and the following definitions shall apply.

Generally. The provisions of this Code shall be liberally construed to effect the purposes

expressed therein or implied from the expression thereof. Words and phrases shall be construed

and understood according to their common and usual meaning unless the contrary is clearly

indicated. Technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in the law shall be construed and understood according to such peculiar and appropriate meaning."  (Exhibit 8, Code of Ordinances, City of Beverly, Massachusetts, Article 1, Sections 1-101, 1-102, hereinafter "Ex. 8, Ordinances, Sec. __")

16.    Section 1-103 of the Ordinances stipulates the "rules of construction set forth in this ordinance shall not be applied to any ordinance which shall contain any express provision excluding such construction, or when the subject matter or context of such ordinance may be repugnant thereto."  (Ex. 8, Ordinances, Sec. 1-103)

17.    Section 1-105 of the Ordinances entitled, "Conflicting Provisions," provides: "(a) If the provisions of different chapters of these ordinances conflict with or contravene each other, the provisions of each chapter shall prevail as to all matters and questions growing out of the subject matter of such chapter. (b) If conflicting provisions be found in different sections of the same chapter, the provisions of the section which is last in numerical order shall prevail unless such construction be inconsistent with the meaning of such chapter. (c) To the extent that any specific provision of this code expressed in general terms shall conflict with any provision expressed in specific terms, the specific provision shall prevail."  (Ex. 8, Ordinances, Sec. 1-105)

18.    Sections 2-400 through 2-406 of the Ordinances provide for the election of a Mayor, list some of the Mayor's powers and duties as stipulated in Section 3-2 of the Charter, describe the interrelationships of the Mayor with the City Council and other officials, and allow the Mayor to hire a Chief of Staff, a Confidential Secretary, and Other Employees.  Section 2-405 of the Ordinances, pertaining to the position of Confidential Secretary, specifically references Section 3-313 of the Ordinances.  Additionally, Section 2-406 expressly provides, "[t]he Mayor shall employ such persons and in such clerical, secretarial, administrative or other positions as the

Mayor may deem necessary or advisable and as are within the total appropriation made for the office of the Mayor as the Mayor deems to be in the best interest of the City."  (Ex. 8, Ordinances, Secs. 2-400 – 2-406)

19.    Section 3-101 of the Ordinances entitled, "Administrative Organization," provides, in part, that "[t]his part of the City code describes all standing multiple member body appointments made by the Mayor, and further delineates the manner and time of appointment and terms of appointment generally, and authorities, responsibilities and interrelationships with the other Sections of the organization."  (Ex. 8, Ordinances, Sec. 3-101)

20.    Section 3-313 of the Ordinances entitled, "Confidential Secretary/Administrative Assistant to the Mayor," provides, in its entirety:  "(a) Establishment – There shall be a Confidential Secretary/Administrative Assistant to the Mayor.  (b) Mode of Appointment, Term of Office – The Confidential Secretary/Administrative Assistant to the Mayor shall be appointed by and responsible only to the Mayor.  The Confidential Secretary/Administrative Assistant shall serve at the pleasure of the Mayor.  (c) Authorities and Responsibilities - The Confidential Secretary/Administrative Assistant to the Mayor shall have the following duties:  (1) Organize and summarize information and prepare it for the Mayor's review and action; (2) Meet with department heads regarding day-to-day business, expediting administrative interaction between the Mayor's office and City departments; (3) Serve as a officer liaison between the Mayor, the media, public interest groups, businesses and residents; (4) Be familiar with all aspects of the City government and with the functions and activities of the various offices and employees of the City; (5) Be familiar with the various services rendered by the City to its residents, in order that callers can be informed of the extent of these services and of the schedule for their performance; (6) Review all correspondence received in the office of the Mayor, and arrange for its routing

and for assembling the materials needed by the Mayor to respond to all such correspondence; (7) Answer all telephone calls placed to the office, respond in an appropriate fashion and direct as appropriate."  (Ex. 8, Ordinances, Sec. 3-313)

21.    The City's Job Description ("Job Description") for the position of Confidential Secretary to the Mayor includes the same seven essential duties and responsibilities that are listed in Section 3-313 of the Ordinances, but notes that "other duties may be assigned."  (Exhibit 9, Job Description for Confidential Secretary to the Mayor, hereinafter "Ex. 9, Job Description")  The Job Description also provides under "Qualifications" that "[t]he Confidential Secretary to the Mayor shall be a person especially fitted by education, experience and training to perform the duties of the office."  ("Ex. 9, Job Description")  The Confidential Secretary's position is neither a union nor a civil service position.  (Ex. 9, Job Description; Exhibit 10, Affidavit of Linda Giallongo, ¶9, hereinafter "Ex. 10, Giallongo Aff., ¶__")

22.    Section 17-4 of the Ordinances entitled, "Vacations," provides:  "a) All full-time city employees, . . . will have the following vacation schedule:  . . . (3) For more than ten (10) years of service but less than twenty (20) years, the employee shall receive twenty (20) days of vacation; . . . (d) Upon termination of employment, the employee shall receive payment equal to the amount of vacation pay he would have received had the termination not occurred . . . . " (Ex. 8, Ordinances, Sec. 17-4)

23.    Section 17-47 of the Ordinances entitled, "Number of sick leave days allowed per year; how credit computed; accumulation," provides, in pertinent part, "(c) [a]ny sick leave allowed under this section may be accumulated, but such accumulation shall not exceed two hundred (200) days at any time.  (d) Upon retirement, employees will be paid fifty (50) percent of the accrued sick days accrued as severance pay. If termination is by demise, fifty (50) percent of the

accrued sick leave shall be paid to the house, next of kin, to the employee's estate, or to the employee's legally designated beneficiary." (Ex. 8, Ordinances, Sec. 17-47)

24.    Atherton first became familiar with Crean when he was running for Mayor. Crean called Atherton's home to ask her questions about the Charter and Ordinances and to understand what they were and why she was concerned that they were not being passed. Crean told her that if he was elected he would be more than happy to help her accomplish that. (Ex. 1, Atherton, pp. 14, 71) After Crean was elected, he and the City Solicitor agreed to fund an expert attorney to assist the Ordinance Review Committee, of which Atherton was a member. (Ex. 1, Atherton, p. 22)

25.    In or about 2001, Atherton was asked to work on the "Administrative Code" of the Ordinances, which she described as "the organizational structure of the City of Beverly as it then existed written in words instead of just on an organizational chart with what the duties and responsibilities of each department was, who the appointing authority was, what the powers of the office were, and to put that in writing . . . ." (Ex. 1, Atherton, p. 20) Atherton continued to work on the Ordinances until they were passed in December 2003, which she considered a very big accomplishment in her life since she had spent over ten years attempting to have the Charter in place with new Ordinances. (Ex. 1, Atherton, pp. 22-23)

26.    After 2001, Atherton worked on the "Administrative Code" section pertaining to the Mayor's Confidential Secretary. All of the duties and responsibilities that were listed in the "Administrative Code" came from job specs that Atherton obtained from the Human Resource Department. More than fifty percent of Atherton's work on the Code was spent on the "Administrative Code." (Ex. 1, Atherton, pp. 23-24, 25)

27.    There is no official "Administrative Code" for the City. The first four articles of the Ordinances have been informally referred to as the City's "Administrative Code." The City's

Organizational Chart has also been referred to as the "Administrative Code." (Exhibit 11,

Defendants' Responses to Plaintiff's First Request for Production of Documents, No. 7,

hereinafter "Ex. 11, Defendants' Document Responses, No. __"; Exhibit 12, City's

Organizational Chart, hereinafter "Ex. 12, Organizational Chart")

28.     When asked by the Defendants to describe in detail her job duties as Confidential

Secretary to Crean, Atherton referred to the Job Description from the Human Resources

Department and said the Secretary also acts as the Clerk to the Licensing Board, but she was

unaware of a written job description for the Clerk's position. (Exhibit 13, Plaintiff, Crystal

Atherton's Response to Interrogatories Propounded By The Defendants, No. 4, hereinafter "Ex.

13, Atherton Interrogatories, No. __")

29.     Scanlon first met Atherton in early 1994 when he was Mayor, and Atherton was working

for City Solicitor Marshall Handly ("Handly"). (Ex. 3, Scanlon, p. 9) Scanlon and Handly

discussed Atherton's ability to do her job and her unusual filing systems. Scanlon believes

Handly spoke to Atherton about correcting or changing her systems. (Ex. 3, Scanlon, pp. 10-11)

Atherton filed things in such a way that others could not find them later. (Ex. 3, Scanlon, p. 45)

Scanlon had concerns about Atherton being inefficient, and he did not have a good opinion of

her or her work performance based on his observations of her work for the City Solicitor.

Atherton's desk was close to Scanlon's, and he observed her conduct and demeanor at work.

Scanlon observed Atherton frequently not answering the telephone on her desk when it was

ringing and walking away to go to lunch while it was ringing. Atherton was often spoken to

about giving legal advice to people who would call the City Solicitor's office and was told that

was not her purpose. Scanlon also observed what he thought was unproductive and unhelpful

behavior on Atherton's part. (Ex. 3, Scanlon, pp. 20-24, 45-47, 93) Handly also commented to

Dunn that Atherton would sometimes be involved in conversations and did not necessarily pick up the telephone when it was ringing. (Ex. 5, Dunn, p. 23)

30.    From 2001 through 2003, Atherton continually complained to members of the City Council, members of the Ordinance Review Committee, the City Solicitor, members of the League of Women Voters, and anyone else who had an interest in seeing the City Charter fully implemented, and it was Atherton's opinion that Scanlon was the obstacle to implementing the Charter provisions. Atherton stated Scanlon failed to uphold his oath of office by failing to uphold the provisions of the Charter, the Ordinances and the law of the Commonwealth, and she made it her top priority to finish the Ordinances and see them enacted before she left her employment with the City. (Ex. 13, Atherton Interrogatories, Nos. 9, 10)

31.    Atherton first learned that her job as Confidential Secretary to Crean might be in jeopardy after the Mayor's primary election because Crean had done poorly. Scanlon commented to the newspapers that if he won the final election he would replace certain people, and Atherton was one of those persons. Scanlon said he was going to bring back his old secretary. (Ex. 1, Atherton, pp. 25-26)

32.    In or about November 2003, Scanlon informed Dunn that it was his intent to change some positions including Atherton's. Scanlon told Dunn he wanted to bring back his former secretary. Dunn had no recollection of Scanlon mentioning Atherton's work ethic, ability, efficiency or capability. (Ex. 5, Dunn, pp.8-9)

33.    Atherton spoke to a reporter for a newspaper article entitled, "Changes in store at Scanlon's City Hall," published in the *Salem News* on November 14, 2003, the week after Scanlon was re-elected as Mayor. The article stated, in part: "Crystal Atherton, the mayor's secretary, acknowledged she is 'waiting to be terminated,' since Scanlon has already said he

plans to bring back his old secretary, Linda Giallongo.  But she said she knew she was giving up

job security when she left her union job as the secretary for the Purchasing Department last year.

'I knew the risks,' Atherton said, 'I could have sat tight in Purchasing.' "  (Ex. 1, Atherton, pp.

27-28; Exhibit 14, *Salem New*s Article, dated November 14, 2003, hereinafter "Ex. 14, 11/14/03

Article")  Atherton acknowledged making the first statement, but denied making the second

statement about knowing the risks and staying in Purchasing.  Atherton never notified the

newspaper that she was incorrectly quoted.  (Ex. 1, Atherton, pp. 27-28)

34.     In or about mid-December 2003, Scanlon called Atherton at home and informed her that

it was his intention not to keep her in the position of Confidential Secretary to the Mayor.

Scanlon asked Atherton to retire and threatened to discharge her if she refused to resign.  (Ex. 1,

Atherton, pp. 29-31, 72; Ex. 13, Atherton Interrogatories, No. 2)  Atherton responded that she

did not wish to retire and wanted to continue working and earning money for retirement.

Atherton asked Scanlon if he could assign her to the School Department or another job in the

City.  Atherton also told Scanlon that she did not think he had the power under the Charter to

terminate her employment, and he did not answer her.  (Ex. 1, Atherton, pp. 29-31, 55; Ex. 13,

Atherton Interrogatories, No. 2)

35.     Scanlon has no memory of calling Atherton in December 2003 and asking her to submit

retirement papers.  (Ex. 3, Scanlon, p. 42)  Scanlon, however, clearly remembers having a brief

conversation with Atherton in person, which took place in the office outside the Mayor's office,

during which conversation Atherton said she would not resign.  (Ex. 3, Scanlon, pp. 17-18, 43)

36.     On or about December 17, 2003, Scanlon sent Atherton a letter via certified mail, which

indicated that as of January 5, 2004, it was his intention to remove her from her position based

on the Charter provision, which grants to the Mayor the power to remove all persons appointed

by the Mayor.  The letter offered Atherton the opportunity to resign prior to that date.  (Ex. 1,

Atherton, pp. 34, 55-56; Ex. 13, Atherton Interrogatories, No. 2; Ex. 3, Scanlon, pp. 13-14;

Exhibit 15, Scanlon Letter to Atherton, dated December 17, 2003, hereinafter "Ex. 15, Scanlon

12/17/03 Letter")  Scanlon wrote this letter to ask Atherton to resign from her position as

Executive Secretary to the Mayor and to inform her that if she did not she would be removed.

(Ex. 3, Scanlon, pp. 14-15)  Scanlon did not send Atherton a copy of the Charter with this letter.

(Ex. 3, Scanlon, p. 25)  The Executive Secretary's position was appointed by the Mayor and

could be removed or changed by the Mayor, and Scanlon believed that he had the right to request

Atherton's resignation and to replace her.  (Ex. 3, Scanlon, pp. 14, 28, 31)  Scanlon did not

include a reason for Atherton's removal in this letter.  The primary reason that Scanlon did not

rehire Atherton was that he did not have trust or confidence in her.  Scanlon also perceived that

Atherton was closely aligned with Crean and that she had been a strong advocate for Crean

during the election, and given the fact that the position was a confidential executive secretary

Atherton was not a fit for Scanlon.  (Ex. 3, Scanlon, pp. 22-24, 73, 75, 92-93)  When he wrote

the December 17, 2003 letter to Atherton, Scanlon thought about her being inefficient and

unproductive, and he did not think that Atherton could have done a decent job working with him.

Atherton's expected performance going forward based on things he had learned and observed

after years of watching her work was a consideration in his decision to remove her.  (Ex. 3,

Scanlon, pp. 27-28, 47, 75, 92-94)

37.    Atherton failed to resign after Scanlon asked her to do so, which was one of the reasons

that she was removed from her position.  (Ex. 3, Scanlon, p. 94)

38.    On or about December 31, 2003, Atherton sent Scanlon a letter, indicating that she had

received his letter, dated December 17, 2003, that she did not intend to resign, and that she did

not believe that she was subject to removal under the Charter, except possibly for cause. Atherton further indicated that she had decided to take three weeks of vacation and would return to work on January 20, 2004.  (Ex. 1, Atherton, p. 35; Exhibit16, Letter from Atherton to Scanlon, dated December 31, 2003, hereinafter "Ex.16, Atherton 12/31/03 Letter")

39.    Scanlon remembers receiving Atherton's December 31, 2003 letter, reading it, and filing it.  (Ex. 3, Scanlon, p. 17)

40.    Atherton's last paycheck, dated January 2, 2004, was for the gross amount of $3,466.36 and the net amount of $2,127.42.  The gross figure included three weeks of vacation pay (105 hours) per her request in her December 31, 2003 letter at $2,599.77, and one week of regular pay (35 hours) at $866.59.  (Exhibit 17, Atherton paycheck dated January 2, 2004, hereinafter "Ex. 17, 1/2/04 Paycheck"; Ex. 6, Dunn Aff., ¶4)

41.    On or about January 5, 2004, after taking office, Scanlon sent a letter to the City Clerk regarding the removal of Atherton from the positions of the Mayor's Confidential Secretary, in accordance with Sections 3-3 and 3-4 of the Charter and Section 3-313 of the Ordinances, and from the position of Clerk to the City's Licensing Board, in accordance with Sections 3-3 and 3-4 of the Charter.  Scanlon desired to fill these positions with a person of his own choosing and in whom he had faith and confidence would perform the duties of such positions in an exemplary fashion.  The letter further indicated that the removal was effective immediately.  Atherton was sent a copy of this letter by certified mail.  (Ex. 1, Atherton, p. 35; Ex. 2, City's Interrogatories, No. 13; Ex. 3, Scanlon, pp. 28, 38-39, 92; Exhibit 18, Scanlon letter to City Clerk, dated January 5, 2004, hereinafter "Ex. 18, Scanlon 1/5/04 Letter")  This letter made no reference to Section 8-15 of the Charter.  When Scanlon sent out the January 5, 2004 letter, he was complying with

what he said he would do in his letter dated December 17, 2003. (Ex. 3, Scanlon, pp. 29-31; Ex. 18, Scanlon 1/5/04 Letter)

42.     Scanlon met with the City Solicitor prior to sending out his January 5, 2004 letter to the City Clerk pertaining to Atherton, and Scanlon read and signed the letter before it went out. Scanlon referred to Sections 3-3 and 3-4 in his letter after consulting with the City Solicitor. (Ex. 3, Scanlon, pp. 53-54; Ex. 18, Scanlon 1/5/04 Letter)

43.     Scanlon only has one Confidential Secretary/Administrative Assistant to the Mayor, and that individual is the only secretary in the Mayor's office. (Ex. 3, Scanlon, p. 68; Ex. 4, Scanlon Aff., ¶5; Ex. 10, Giallongo Aff., ¶¶3, 6 )

44.     In January 2004, Scanlon sent out four letters similar to the one he sent Atherton on December 17, 2003, including one to Thomas L'Italien ("L'Italien"). (Ex. 3, Scanlon, p. 15) Scanlon has no memory of telephoning any of these individuals. (Ex. 3, Scanlon, p. 43) L'Italien; City Solicitor Peter Gilmore, Planning Director Debra Hurlburt ("Hurlburt"), and Finance Director Thomas Durkin ("Durkin") were removed and/or terminated from their positions in January 2004. (Ex. 3, Scanlon, pp. 43-45; Ex. 4, Dunn, p. 11-12; Exhibit 19, Deposition of Linda P. Giallongo, p. 44, hereinafter "Ex. 19, Giallongo, p. __"; Exhibit 20, Printouts from Human Resources Database for Thomas L'Italien, Thomas Durkin, and Debra Hurlburt, hereinafter "Ex. 20, HR Printouts") Additionally, Scanlon eliminated the position of Chief of Staff to the Mayor held by Robert Valliere. (Exhibit 21, Printout from Human Resources Database for Robert Valliere, hereinafter "Ex. 21, Valliere Printout") Scanlon terminated Hurlburt because he wanted to bring back his previous Director of Planning. (Ex. 5, Dunn, p. 11) Dunn and Scanlon did not discuss whether Hurlburt had supported Crean's

candidacy, and Dunn did not know if L'Italien or Durkin supported Crean's candidacy.  (Ex. 5, Dunn, p. 12)

45.     Atherton was not a union employee at the time of her termination.  (Ex. 2, City's Interrogatories, No. 18; Ex. 9, Job Description; Ex. 10, Giallongo Aff., ¶9)

46.     Atherton was sixty-five and a half when she was terminated from her position as Executive Secretary to the Mayor in January 2004.  (Ex. 1, Atherton, p. 7)

47.     On or about January 12, 2004, Atherton sent Scanlon a letter, which indicated she had received his January 5, 2004 letter.  Atherton requested a public hearing pursuant to Section 8-15 of the Charter and a hearing "as otherwise allowed or required by law."  (Ex. 1, Atherton, pp. 38-39; Exhibit 22, Atherton letter to Scanlon, dated January 12, 2004, hereinafter "Ex. 22, Atherton 1/12/04 Letter")  Atherton looked at the Charter and believes that she complied with the timeframe for requesting a hearing.  (Ex. 1, Atherton, p.39)

48.     On January 23, 2004, the City Solicitor sent a letter to Atherton, responding to her request for a hearing and informing her she was not entitled to a hearing.  (Ex. 1, Atherton, p. 39; Exhibit 23, Letter from Gelineau to Atherton dated January 23, 2004, hereinafter "Ex. 23, Hearing Denial 1/23/04")

49.     Scanlon remembers receiving Atherton's January 12, 2004 letter, reading it, and filing it.  (Ex. 3, Scanlon, p. 32)  Scanlon believed the Charter called for any hearing to be coordinated with the City Council.  (Ex. 3, Scanlon, pp. 25-26, 32-34)  Scanlon does not think that he forwarded Atherton's letter to the City Council.  (Ex. 3, Scanlon, p. 50)  Atherton never pursued the opportunity to have a hearing with the City Council, but instead, as her letter states, she took three weeks of vacation.  Asking Scanlon for a hearing was not the proper process to obtain a hearing, and Atherton was very familiar with the Charter.  (Ex. 3, Scanlon, p. 80)

50. Atherton made three attempts to secure other employment with the City after she was informed that she would be removed as Confidential Secretary to the Mayor:

a. In December 2003, during her telephone call with Scanlon, Atherton asked Scanlon to place her in another position in the City or the School Department. (Ex. 1, Atherton, pp. 30-31, 55; Ex. 13, Atherton Interrogatories, No. 5)

b. In or about December 2003, after her call with Scanlon, Atherton sought the assistance of Gerald Marsella ("Marsella"), President of the City's Municipal Employees Association of City Hall, who initially told her he was aware of no openings in the City Hall union. Subsequently, a week later Marsella told her about a vacant position with the Building Department as a Clerk to the Electrical Inspector. (Ex. 1, Atherton, pp. 31-32; Ex. 13, Atherton Interrogatories, No. 5) Atherton told Marsella sometime later she would be happy to take the position, although she could not recall the exact timeframe. (Ex. 1, Atherton, p. 32) A few days after expressing interest in the position, Marsella told Atherton the position was not going to work out because the Director of Municipal Inspections did not want to "get involved with my mess." (Ex. 13, Atherton Interrogatories, No. 5) Atherton did not submit an application to the Building Department because based on the union contracts and an ordinance pertaining to confidential secretaries that said they were entitled to the same benefits as union members, she believed she was entitled to an opening in the City. (Ex. 1, Atherton, pp. 32-33) Atherton told nobody other than Marsella that she was interested in this position, and she has no knowledge as to whether or not anyone was hired. (Ex. 1, Atherton, p. 33)

18

c.      In or about January 2004, after Scanlon removed her as Confidential

Secretary, Atherton telephoned the City Solicitor and asked him to intercede

with the Mayor to see if the Mayor would let her have the position in the

office of the City Electrician.  The City Solicitor told her he would talk with

the Mayor and get back to her, but she never heard from him again.  (Ex. 1,

Atherton, p. 40; Ex. 13, Atherton Interrogatories, No. 5)

51.      Since January 1, 2004, Atherton made neither written inquiries nor written applications

for full-time, part-time or temporary employment.  (Exhibit 24, Plaintiff's, Crystal Atherton,

Response to requests For Production Of Documents propounded By The Defendants, No. 20,

hereinafter "Ex. 24, Atherton Document Responses, No. __")

52.      Atherton never filed a grievance or appealed her failure to obtain a position in the

Building Department.  (Ex. 1, Atherton, p. 40)

53.      Scanlon did nothing to try to get Atherton reassigned to another job in the City, and to his

knowledge there were no vacancies in secretarial, clerical or paralegal positions.  Scanlon has no

memory of Atherton telling him during their brief conversation about her removal that she would

move to the School Department.  (Ex. 3, Scanlon, pp. 50-51)  Atherton was not transferred to

another position in the City because there were no job openings that matched her skills.  (Ex. 2,

City's Interrogatories, No. 3; Ex. 3, Scanlon, p. 57)  Scanlon has no memory of speaking to

Robert Nelson ("Nelson"), the Building Commissioner, in January 2004 about job openings, and

he has no recollection of a woman named Theresa leaving the City's employ because she had

stolen money from the City.  (Ex. 3, Scanlon, pp. 57, 89-90)  Scanlon had no idea if there was a

position as the assistant to the plumbing inspector or whether there was a secretary's position in

the Building Department that was not filled for a long time in 2004.  Scanlon was not aware of

any openings that existed at that time, and he has no recollection of speaking to the City Solicitor

about Atherton filling a vacancy in the Building Department.  (Ex. 3, Scanlon, pp. 90-92)

Scanlon never spoke to Marsella about trying to find a job for Atherton.  (Ex. 3, Scanlon, p. 58)

Scanlon is generally aware of openings in the City because turnover is not that great, although

the Human Resources Director would be the most knowledgeable.  (Ex. 3, Scanlon, pp. 60-61)

54.     In 2004, Dunn was not aware about a vacancy in the Building Department.  Dunn was

aware that Theresa Gerten ("Gerten") had been employed by the City, but he could not recall the

specific timeframe.  (Ex. 5, Dunn, p. 19)  Gerten was employed in January 2004 when Dunn

returned as Finance Director, but he had no idea when she was hired or why she was terminated.

(Ex. 5, Dunn, p. 20)

55.     On or about August 23, 2004, Atherton filed for retirement from the City, and her

application was immediately approved.  (Ex. 1, Atherton, p. 46; Exhibit 25, Application for

Voluntary Superannuation Retirement, hereinafter "Ex. 25, Retirement Application")

56.     On September 7, 2004, Atherton sent a letter to the City's Human Resource Department,

which requested all payments due to her upon her retirement, including sick pay buy back,

vacation days, personal days, and any other monies due to her.  (Ex. 1, Atherton, pp. 53-54; Ex.

13, Atherton Interrogatories, No. 11; Ex. 5, Dunn, p. 24; Exhibit 26, Atherton Letter to Human

Resources, dated September 7, 2004, hereinafter "Ex. 26, Atherton 9/7/04 Letter")  This letter

was brought to Dunn's attention, after which he reviewed her payroll records and her personnel

file to determine what payments, if any, she was due.  (Ex. 5, Dunn, p. 25; Ex. 6, Dunn Aff., ¶5)

57.     On or about September 16, 2004, the Assistant City Solicitor, Robert Munroe (Mr.

Munroe") sent Atherton a letter informing her that the City calculated her vacation pay at $866

per week for a total of $2,599.77 and three personal days at $519.95.  Atherton disagrees with

Mr. Munroe's calculation, claiming that she was earning a salary of $962.90 per week ($192.58 per day), her vacation pay for three weeks should have been $2,888.70, her three personal days should have been $577.71, and she is owed $19,258 for sick leave buy back for 100 days, in accordance with Ordinances and union contract.  (Ex. 13, Atherton Interrogatories, No. 11)

58.    On or about November 7, 2004, Dunn sent Atherton a letter in response to her September 7, 2004 inquiry.  (Ex. 1, Atherton, pp. 54, 56; Ex. 5, Dunn, p. 25; Exhibit 27, Dunn Letter to Atherton, dated November 7, 2004, hereinafter "Ex. 27, Dunn 11/7/04 Letter"; Ex. 6, Dunn Aff., ¶5)  Dunn informed Atherton that she was entitled to $2,599.77 for unused vacation time and $519.95 for personal days, and she was not entitled to further payments for longevity, other beneficial payments or sick leave buyback.  (Ex. 1, Atherton, pp. 56-61; Ex. 13, Atherton Interrogatories, No. 11; Ex. 6, Dunn Aff., ¶5; Ex. 27, Dunn 11/7/04 Letter)  Dunn calculated the amounts for her vacation time and personal time based on a review of payroll records, which indicated that Atherton's weekly salary was $866.59, and her per diem rate was $173.32.  (Ex. 5, Dunn, pp. 27-28; Ex. 6, Dunn Aff., ¶5)  Dunn utilized a weekly payroll rate of $866.59, which he multiplied times three to obtain the figure, $2,599.77.  (Ex. 5, Dunn, pp. 29-30)  Atherton utilized a different per diem rate in her Non-Payment of Wage Complaint, but Dunn did not know how that rate originated.  (Ex. 5, Dunn, p. 29)  Dunn did not include the $5,000 stipend that Atherton earned as Clerk for the Licensing Board as salary and has never treated stipend money as wages.  (Ex. 5, Dunn, p. 30; Ex. 6, Dunn Aff., ¶6)  Stipends are not included in an employee's per diem rate, nor are they used in calculating an employee's benefits, such as vacation time, personal time, etc.  (Ex. 6, Dunn Aff., ¶6)  If anyone asked Dunn about someone's salary he would refer to the salary line for their position in the City.  (Ex. 5, Dunn, p. 31)  Atherton was not entitled to sick leave buy back because sick leave buyback is only triggered by

retirement or demise, and Atherton ceased active employment with the City on January 2, 2004, but did not retire until September 9, 2004.  As such, the elapsed time period was too long to say that her employment was terminated by retirement.  (Ex. 5, Dunn, pp. 31-32; Ex. 6, Dunn Aff., ¶5)

59.    Atherton disputes the salary that Dunn used to calculate her vacation and personal days payments because she believes that her salary included the stipend that she received as Clerk to the Licensing Board in addition to her salary as Secretary to the Mayor; however, she has no knowledge that anyone else in the City has received vacation payments that include stipends or additional payments outside of their main position salary.  (Ex. 1, Atherton, pp. 57-58)  Atherton also questions whether the $693.28 that she had received as a Wellness Incentive payment for 2003 was calculated using the stipend, but she does not know one way or another.  (Ex. 1, Atherton, pp. 59-60)  With regards to sick leave buy back, Atherton acknowledged that her employment was terminated by something other than retirement.  (Ex. 1, Atherton, p. 61)  Atherton did not respond to Dunn's letter.  (Ex. 1, Atherton, p. 63)

60.    On or about November 24, 2004, Atherton filed a Non-Payment of Wage Complaint with the Office of the Attorney General, indicating that the City discharged her on January 5, 2004, and that the City owed her $24,022.35.  Atherton broke down this figure to include $19,412 for 100 days of sick leave buy back, $2,911.80 for three weeks of vacation pay, $582.36 for three unused personal days, and $1,116.19 for 45 hours of compensatory time that Atherton says she earned from September 30, 2002 through January 23, 2003.  Atherton indicated that her rate of pay was $194.12 per day.  (Ex. 1, Atherton, pp. 63-64; Exhibit 28, Non-Payment of Wage Complaint, dated November 24, 2004, hereinafter "Ex. 28, Wage Complaint")

61.    While Atherton worked for the City, including during the time she served as Confidential Secretary to the Mayor, she never contested the fact that her stipends were not used to calculate her per diem rate and/or her benefits, including vacation or personal time.  Atherton first claimed that her stipends should be included in her per diem rate when she filed her wage complaint with the Attorney General's Office in November 2004.  (Ex. 6, Dunn Aff., ¶7)

62.    When Atherton started working for Crean in September 2002, she did not take lunch breaks or other breaks, and Crean told her that he would give her compensatory time so she recorded compensatory time in a weekly log.  (Ex. 1, Atherton, pp. 65-68; Exhibit 29, Atherton Hours Log, hereinafter "Ex. 29, Hours Log")  After January 23, 2003, recorded no additional compensatory time.  Atherton used 14 hours of compensatory time and asserts the City owes her the cash equivalent for an additional 45 hours.  (Ex. 1, Atherton, p. 68; Ex. 29, Hours Log)

63.    The City does not have a policy, rule, regulation or Ordinance that provides compensatory time to non-union employees.  No City documents, including Atherton's personnel file, reflect any agreement between the City and Atherton to pay her compensatory time.  (Ex. 6, Dunn Aff., ¶8)

64.    On or about January 14, 2005, after reviewing Atherton's wage complaint, the Attorney General declined to take further enforcement action.  (Exhibit 30, Letter from Attorney General to Atherton, dated January 14, 2005, hereinafter "Ex. 30, AGO Letter")

65.    Atherton stated that she received a check from the City, dated August 5, 2005, in the gross amount of $2,599.77, which she claims included an incorrect amount for vacation and personal days.  Atherton did not cash this check.  Atherton also received a check from the City, which she claims was issued in error and is not part of her lawsuit, dated July 8, 2005, in the

gross amount of $866.59, which was sent to her bank by direct deposit. (Ex. 1, Atherton, pp. 62-63; Ex. 13, Atherton Interrogatories, No. 11)

66.    As the result of a payroll processing error, the City issued Atherton a payroll check on July 8, 2005, in the gross amount of $866.59. After withholding deductions, the net amount of this payment was sent to Atherton's banks via direct deposit. The City issued a second check to Atherton on August 5, 2005, for payment of three weeks of vacation and three personal days in the gross amount of $3,199.77. After adjustment for the July 8, 2005 payment that was issued in error and withholding deductions, the net amount of the second check was $1,721.93. This second check remains uncashed as of February 28, 2008. (Ex. 6, Dunn Aff., ¶9)

67.    As Clerk to the Licensing Board, Atherton received an annual stipend of $5,000, which was paid on the first of the month. Atherton's salary for the Executive Secretary position was paid weekly. (Ex. 1, Atherton, pp. 37-38) When Atherton left the City, she states that her salary for the Executive Secretary position was $877 per week. (Ex. 1, Atherton, pp. 43-44) Atherton received an annual stipend of $3,000, also paid on the first of the month, for serving on the City's Retirement Board, which stipend she continues to receive today because she still serves on the Retirement Board. (Ex. 1, Atherton, pp. 47-50)

68.    Atherton's pension includes the stipends she received as the Clerk for the Licensing Board and as a member of the City's Retirement Board. (Ex. 1, Atherton, pp. 78-79)

69.    Atherton's contentions that her political support of Crean was a factor in her termination and that the City and Scanlon discriminated against her based on her political beliefs, registration and/or affiliation are based on the following:

　　　　a.    Atherton was working for Crean at the time Scanlon was re-elected; (Ex. 1, Atherton p. 70)

b.    Atherton supported Crean publicly during the election by telling friends and neighbors and people that she knew that they should give him consideration in the election, and she perhaps gave money to his campaign; (Ex. 1, Atherton, pp. 71-72)

c.    Scanlon's telephone call to her home sometime in December 2003, during which he asked her to retire;  (Ex. 13, Atherton Interrogatories, Nos. 12, 22)

d.    Scanlon's subsequent letter to her in late December 2003, again asking Atherton to retire; (Ex. 13, Atherton Interrogatories, Nos. 12, 22)

e.    The City's denial of a hearing and denial of the position of Secretary to the Mayor, which Atherton claims she was entitled to retain; (Ex. 13, Atherton Interrogatories, Nos. 12, 22)

f.    The words of Scanlon and Nelson at their depositions; and (Ex. 1, Atherton p. 70; Ex. 13, Atherton Interrogatories, Nos. 12, 22)

g.    The inference that can be drawn from the behavior and responses to Atherton's requests to be given an open job that went unfilled. (Ex. 13, Atherton Interrogatories, Nos. 12, 22)

70.    Atherton's allegation that the defendant implemented employment policies and practices which are arbitrary, capricious and discriminatory is based on her belief that Scanlon did not have the power under the Charter to terminate her employment with the City and that by terminating her Scanlon was arbitrary and capricious.  (Ex. 1, Atherton, pp. 73-74)

71.    Atherton's understanding that she would continue to be employed by the City as long as her job performance was satisfactory is based upon language in the Charter.  Atherton relies upon the fact that the Charter stated that the Mayor could terminate department heads and city

officers, and she was neither. Atherton understood that she was protected by the Charter under Section 8-15, which said she could only be removed for cause, and she did not believe the City had cause. (Ex. A., Atherton, p. 75-76) Atherton also stated that as a member of the Charter Commission, a "great deal of time was spent discussing what positions in the city were to be appointed by the Mayor. It was decided that the Mayor would appoint all department heads and city officers and have the authority to remove or suspend these employees under Section 3-4 of the City's Home Rule Charter. All other employees of the City could only be removed for 'cause.' Since I was neither a city officer or a department head, I could only be removed for 'cause,' and since my employment record was exemplary with service of almost seventeen years, I did not believe that "for cause" termination was an issue. Moreover, even if the City of Beverly had cause for termination, I was still entitled to a hearing in accordance with the provisions of the City Charter . . . Finally, in my experience, it is very rare that a seventeen year employee is terminated from municipal employment." (Ex. 13, Atherton Interrogatories, No. 23) Atherton stated these are the only facts that support her contention that Section 8-15 of the Charter applied to her position as Executive/Confidential Secretary to the Mayor. (Ex. 13, Atherton Interrogatories, No. 24)

72.    Atherton's emotional distress claim is based on the following:

    a.    When Scanlon told Atherton that he was not going to keep her as his Confidential Executive Secretary, "it was like someone punched her in the stomach and there was a pain in my stomach that would not go away;" (Ex. 1, Atherton, p. 79)

    b.    Atherton suffered from sleeplessness, diarrhea, nausea, and no appetite, and she thinks she was depressed; (Ex. 1, Atherton, pp. 79, 83)

    c.    Atherton changed her whole life; she does not shop in the same stores because she does not want to run into people she knows and discuss the situation or what she thought of the Mayor; (Ex. 1, Atherton, p. 79)

    d.    Atherton resigned as the historian for her church and from a City group that was part of that historian group, and she is no longer involved with City politics; (Ex. 1, Atherton, p. 80)

    e.    Atherton remains close to home and to her family and does not do anything or go anywhere that would cause her additional anxiety. (Ex. 1, Atherton, p. 80)

73.    Atherton has a history of anxiety dating back twenty years. (Ex. 1, Atherton, pp. 82-83) In 2005, Atherton had a concern about breast cancer due to a lump in one of her breasts, and her doctor prescribed her Celexa for depression, which she continues to take today. (Ex. 1, Atherton, pp. 83-84) Atherton denies that the depression was triggered by the breast cancer scare. (Ex. 1, Atherton, p. 84) Atherton has never treated with a psychologist or a mental health professional. (Ex. 1, Atherton, p. 85) Atherton also has a generic prescription of Xanax that she uses at her discretion, which she has had for ten years. (Ex. 1, Atherton, p. 85)

74.    Atherton's contention that Scanlon acted intentionally, willfully, maliciously, recklessly, and with gross disregard of her rights is based on Scanlon's deposition testimony and the fact that he intentionally fired her after she had worked for the City for almost 17 years when he did not have the power to terminate her employment. (Ex. 1, Atherton, pp. 90-91; Ex. 13, Atherton Interrogatories, No. 21)

75.    In January 2004, Scanlon replaced Atherton with Linda Giallongo ("Giallongo"), who had held the Executive Secretary's job for more than 20 years prior to Atherton. (Ex. 3, Scanlon, pp. 36, 81; Ex. 19, Giallongo, pp. 7-8; Ex. 4, Scanlon Aff., ¶2; Ex. 10, Giallongo Aff., ¶¶1-2) In

January 2004, Giallongo was 55 years old.  (Ex. 19, Giallongo, p. 6)  Giallongo first began

working as Executive Secretary to Mayor Peter Fortunato in 1980.  Giallongo worked for John

Monahan from 1984 until 1993; for Scanlon from 1994 until 2001; and for Crean from January

2002 until October 2002.  (Ex. 19, Giallongo, pp. 7-8; Ex. 4, Scanlon Aff., ¶2; Ex. 10, Giallongo

Aff., ¶2)  Scanlon could not recall when he first contacted Giallongo about her returning as his

Executive Secretary, but thinks it may have been after he was re-elected.  (Ex. 3, Scanlon, pp.

85-86)

76.     In or about October 2002, Crean told Giallongo that if she did not take early retirement

then she would be fired.  Crean told Giallongo he did not want her in the Mayor's office

anymore, and she could retire or be fired.  Giallongo asked if she could be transferred to another

department.  Crean never responded to that request so she was forced to retire.  (Ex. 19,

Giallongo, p. 37; Ex. 10, Giallongo Aff., ¶2)

77.     As Secretary to the Mayor, Giallongo has not attended meetings in place of the Mayor or

represented the Mayor at functions; however, she is available to do so.  (Ex. 19, Giallongo, p. 22;

Ex. 4, Scanlon Aff., ¶3)  Giallongo attends confidential meetings and hearings with Scanlon to

take notes.  (Ex. 10, Giallongo Aff., ¶4)  Scanlon values Giallongo's experience and opinion, and

she advises the Mayor on issues affecting the City or on policy when he discusses them with her

and asks for her opinion.  Scanlon has not necessarily taken her advice.  (Ex. 19, Giallongo, pp.

22-24; Ex. 4, Scanlon Aff., ¶8; Ex. 10, Giallongo Aff., ¶7)  Giallongo answers the telephone and

takes messages, interacts with Department Heads and City employees and communicates

messages to these individuals on behalf of Scanlon, processes payroll, pays bills, files forms

when she receives money, handles checks for copies and for licenses, drafts and types

communications for Scanlon, determines content of things that go to City Council, types

information for constituents and telephones constituents with requested information, speaks to Department Heads and other individuals, including members of the public, when they come into or telephone the Mayor's office, and signs things for Scanlon with his permission.  (Ex. 19, Giallongo, pp. 25-29, 30; Ex. 4, Scanlon Aff., ¶¶3-5; Ex. 10, Giallongo Aff., ¶¶4-6)  As Secretary, Giallongo organizes and summarizes information and prepares it for the Mayor's review and action, discusses business with department heads and interacts with them on behalf of the Mayor, answers general questions for the media, is familiar with aspects of City government and functions of City government, is familiar with services rendered by the City to its residents, reviews correspondence when it comes into the Mayor's office or when it leaves the office, files correspondence, answers the telephone, types documents for the Mayor, handles accounts receivable and payable, and takes minutes to meetings or hearings held by the Mayor.  (Ex. 19, Giallongo, pp. 30-33, 42-44, 47-48; Ex. 4, Scanlon Aff., ¶¶3-5; Ex. 10, Giallongo Aff., ¶¶4-6) All of the Mayor's emails come to Giallongo's computer.  (Ex. 19, Giallongo, p. 48; Ex. 4, Scanlon Aff., ¶2; Ex. 10, Giallongo Aff., ¶4)  Giallongo types all of Scanlon's speeches, press releases, correspondence, and letters to state agencies.  (Ex. 19, Giallongo, p. 49; Ex. 4, Scanlon Aff., ¶3; Ex. 10, Giallongo Aff., ¶4)  Giallongo keeps Scanlon's calendar, schedules all of his appointments, and makes sure he gets to where he is supposed to be when he is supposed to be there.  (Ex. 19, Giallongo, p. 49; Ex. 4, Scanlon Aff., ¶4; Ex. 10, Giallongo Aff., ¶4)  Giallongo also communicates the Mayor's position on certain issues to Department Heads.  (Ex. 19, Giallongo, pp. 49-50; Ex. 4, Scanlon Aff., ¶3; Ex. 10, Giallongo Aff., ¶4)  Giallongo has access and exposure to correspondence and materials that are confidential and not public records, including litigation materials.  (Ex. 19, Giallongo, p. 50; Ex. 4, Scanlon Aff., ¶3; Ex. 10, Giallongo Aff., ¶¶4-5)  Giallongo and Scanlon have a close, confidential relationship, and

Giallongo believes that Scanlon trusts her implicitly.  It would be impossible for Giallongo to do her job to the fullest without the full faith and trust of Scanlon.  (Ex. 10, Giallongo Aff., ¶8)

78.     The job duties of the Confidential Secretary listed in Section 3-313 are not all inclusive. There are a great many things where confidentiality is relevant in the job, although some of the tasks have nothing to do with confidentiality.  (Ex. 3, Scanlon, pp. 69-70)  The position of Confidential Secretary requires the trust and confidence of the Mayor for many reasons. Giallongo is privy to many of the confidential workings of the City, including ongoing litigation. Giallongo processes all of Scanlon's mail and electronic mail that he receives, and she composes responses on his behalf.  Giallongo is available to attend confidential meetings to take notes or dictation.  Giallongo communicates with the public on Scanlon's behalf, dealing with constituent concerns and other issues that arise.  Giallongo serves as Scanlon's liaison with Department Heads and communicates messages between Scanlon and his Department Heads.  Giallongo knows much of the City business prior to it ever reaching the public.  Giallongo types all of Scanlon's press releases and public speeches.  (Ex. 4, Scanlon Aff., ¶3)  Besides Scanlon, Giallongo is the only other person in the Mayor's Office.  Giallongo  serves as the gateway to the Mayor's Office and greets all visitors.  (Ex. 4, Scanlon Aff., ¶5; Ex. 10, Giallongo Aff., ¶¶3, 6) Scanlon and Giallongo have a confidential relationship, and Scanlon is confident that none of the inner workings of the Mayor's Office will be shared with third parties.  (Ex. 4, Scanlon Aff., ¶6) Scanlon would not be able to function with a Confidential Secretary in whom he did not completely trust.  (Ex. 4, Scanlon Aff., ¶7)

79.     Giallongo serves as Clerk to the Licensing Board, but her salary does not include the $5,000 stipend that she receives as Clerk.  (Ex. 19, Giallongo, p. 25)  The stipend that Giallongo

receives is not included in her per diem rate, nor is it used in calculating any of her benefits, such as vacation time, personal time, etc.  (Ex. 6, Dunn Aff., ¶6)

80.     Nelson was first employed by the City in 1994 as a local building inspector, serving in that capacity for 13 years.  He was subsequently appointed Building Commissioner and served in that role for 4 years.  (Exhibit 31, Deposition of Robert G. Nelson, pp. 7-8, hereinafter "Ex. 31, Nelson, p. __")  Nelson stopped working as Building Commissioner in approximately July 2007. (Ex. 31, Nelson, p. 15)

81.     When Nelson worked as Building Commissioner, 7 people worked for him, including a building inspector, an electrical inspector, a plumbing inspector and 4 secretaries.  Diane Rogers ("Rogers") was the executive secretary, and the others included Linda Cook ("Cook"), Jack Ryan ("Ryan"), and Beth McInney ("McInney").  (Ex. 31, Nelson, pp. 14-15, 30)  McInney was hired about a year ago and left a month before Nelson; Ryan was hired about 4 years ago; Cook has been there about 8 years; and Rogers has been there 20 years.  (Ex. 31, Nelson, pp. 18-19)  Ryan was the City Electrician's secretary.  (Ex. 31, Nelson, p. 19)  A woman named Theresa worked in the department as the secretary for the plumbing inspector for a short time, but Nelson did not hire her and could not recall when she was terminated.  (Ex. 31, Nelson, pp. 21-22, 32)  Nelson thinks after Theresa left there was a long period of time when nobody held that position, but he did not speak to the Mayor or Dunn about filling the position.  (Ex. 31, Nelson, p. 24, 26)

82.     Nelson first met Atherton when he was first hired and she worked in City Hall.  (Ex. 31, Nelson, p. 13)  Nelson thinks Atherton stopped working for the City around the transition in Mayors.  (Ex. 31, Nelson, p. 13)

83.     There were no openings in the Building Department in late 2003 or early 2004.  Nelson received a call from Marsella asking if the department had an opening for Atherton, but Nelson

was not posting any openings and did not have an opening.  The department had no funding for a

position for Atherton.  Nobody had left the department in the prior six months, and no opening

was expected in the next six months.  Nelson did not know why Marsella called him and has no

memory of telling Marsella that he did not want to get involved.  (Ex. 31, Nelson, pp. 15-17, 20-

21, 28, 80)  Vacant positions are posted at the City Clerk's office.  After Marsella called him,

Nelson spoke to Rogers, who was in charge of financials, about whether there was room for

another secretary.  (Ex. 31, Nelson, p. 20)  Nobody instructed Nelson not to hire Atherton.  (Ex.

31, Nelson, p. 21)  Nelson never saw an application from Atherton; she never gave him a

resume; and she never personally contacted him about a position in the Building Department.

(Ex. 31, Nelson, pp. 32-33)

84.     Teresa Guertin ("Guertin") was hired as a Part-time Senior Clerk in the Electrical

Department on December 22, 2003.  (Exhibit 32, New Hire Information Sheet, dated December

22, 2003, hereinafter "Ex. 32, New Hire Sheet")  The City terminated Guertin on February 24,

2004.  (Exhibit 33, Payroll Change Forms, dated February 24, 2004, hereinafter "Ex. 33, Payroll

Forms")

85.     On or about July 26, 2004, a vacancy was posted for a Part-Time (9 hours/week), Senior

Clerk in the Municipal Inspections Department – Electrical, which reported to the Inspector of

Wires.  The deadline for applicants was August 4, 2004.  (Exhibit 34, City of Beverly Job

Posting, dated July 26, 2004, hereinafter "Ex. 34, 7/26/04 Job Posting ")

86.     On July 29, 2005, a vacancy was posted for a Part-Time (19 1/2 hours/week), Senior

Clerk in Municipal Inspections - Electrical, which reported to the Inspector of Wires.  The

deadline for applicants was August 8, 2005.  (Exhibit 35, City of Beverly Job Posting, dated July

29, 2005, hereinafter "Ex. 35, 7/29/05 Job Posting")

87.    On September 22, 2005, a vacancy was posted for a Part-Time (19 1/2 hours/week),

Local Building Inspector in the Municipal Inspections Department, which reported to the

Director of Municipal Inspections.  The deadline for applicants was October 3, 2005.  (Exhibit

36, City of Beverly Job Posting, dated September 22, 2005, hereinafter "Ex. 36, 9/22/05 Job

Posting")

                DEFENDANTS,

                CITY OF BEVERLY,
                WILLIAM F. SCANLON, and
                JOHN DUNN
                By their attorneys,


                _/s/    Elizabeth R. Corbo_____
                David C. Jenkins (BBO# 251000)
                Elizabeth R. Corbo (BBO# 640131)
                Kopelman and Paige, P.C.
                101 Arch Street, 12th Floor
                Boston, MA 02110
                (617) 556-0007

Dated:  March 13, 2008

337406/60700/0580