UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05CV11323-MLW

| | |
|---|---|
| CRYSTAL A. ATHERTON, and<br>ROBERT W. ATHERTON,<br><br>      Plaintiff,<br><br>v.<br><br>CITY OF BEVERLY, WILLIAM F.<br>SCANLON JR., in his official and<br>individual capacity, and JOHN DUNN, in<br>his official and individual capacity,<br><br>      Defendants | MEMORANDUM OF LAW IN<br>SUPPORT OF DEFENDANTS'<br>MOTION FOR<br><u>SUMMARY JUDGMENT</u> |

## I.    INTRODUCTION

Plaintiff, Crystal A. Atherton ("Atherton"), filed a thirteen-count complaint against defendants, City of Beverly ("City"), William F. Scanlon, Jr. ("Scanlon"), and John Dunn ("Dunn") (collectively "the Defendants"), stemming from the termination of Atherton's at-will employment as the Confidential Secretary to the former Mayor. Of the original thirteen counts, the remaining claims include: a procedural due process violation (Count I); violations of Atherton's First Amendment and state free speech rights (Counts III, IV and VI); violations of Atherton's federal and state civil rights (Count V); a violation of the Wage Act (Count X); and a claim for intentional infliction of emotional distress (Count XII). The Defendants argue that, on the record, no genuine issue of material fact exists to support these claims, and the Defendants are entitled to judgment as a matter of law.

## II.    FACTS & PROCEDURAL HISTORY

The Defendants rely upon and incorporate herein the Defendants' Local Rule 56.1 Statement of Facts, which will be referred to below as "SOF, ¶___."

III.   ARGUMENT

    A.   Summary Judgment Standard.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter law." Fed.R.Civ.P. 56(c). In order to prevail on summary judgment, "the non-moving party must demonstrate the existence of a genuine issue of material fact pertaining to those issues on which it would bear the burden of proof at trial." Kauffman v. Puerto Rico Telephone Co., 841 F.2d 1169, 1171 (1st Cir. 1988). Under Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1987), summary judgment is appropriate if the non-moving party has the burden of proof and "fails to make a showing sufficient to establish the existence of an element essential to that party's case."

    B.   Insufficient Evidence Exists To Support Atherton's Due Process Claim.

In Count I, Atherton asserts a constitutional due process claim against the City and Scanlon, averring she had a property interest in continued employment as Confidential Secretary that entitled her to a pre-termination hearing based upon "good cause" language in Section 8-15 in the City's Home Rule Charter ("Charter").

"In a due process claim stemming from the termination of employment, a public employee must first demonstrate that [she] has a reasonable expectation, arising out of a statute, policy, rule, or contract, that [she] will continue to be employed." Acevedo-Feliciano v. Ruiz-Hernandez, 447 F.3d 115, 121 (1st Cir. 2006) (internal citation omitted). When no "independent source" exists, the federal constitution offers no procedural protections. Kelley v. Action for Boston Community Development, Inc., 419 F. Supp. 511, 518 (D. Mass. 1976). State law is used to determine whether such a property interest exists. Acevedo-Feliciano, 447 F.3d at 121.

Massachusetts case law establishes that the powers to appoint and remove are executive. Bailen v. Bd. of Assessors of City of Chelsea, 241 Mass. 411, 414 (1922) (internal citation omitted). Accord City Council of Boston v. Mayor of Boston, 383 Mass. 716, 722 (1981) (noting the appointment of single officers or employees is reserved to the executive branch); "Where the power is given to remove 'for cause,' a removal is not authorized without notice and hearing." Bailen, 241 Mass. at 414 (internal citations omitted). "Where, however, a public officer is appointed during pleasure, or where the power of removal is discretionary, the power may be exercised without notice or hearing." Id. Accord Ventetuolo v. Burke, 596 F.2d 476, 481 (1st Cir. 1979), citing Bishop v. Wood, 426 U.S. 341, 343-347 (1976) ("A constitutionally protected property interest has not been recognized where the employee serves at the will and pleasure of the public employer.") Additionally, removal language such as "when in the judgment of the [appointing authority] the best interests of the town so requires" means "for such cause as they may deem sufficient" and requires no notice or hearing. Ray v. Mayor of Everett, 328 Mass. 305, 309-310 (1952). Furthermore, where the "language [of the Ordinance/Charter] is plain, and seems clearly to authorize the removal of the [employee] in the mode in which it has been attempted," the Court is not justified in "engrafting upon it any provisions to defeat the power that it appears to confer." Bailen, 241 Mass. at 415. "The Legislature, in creating the office, had the right to provide for its vacation in such manner as they saw fit, and in ascertaining what the manner is, we must take their language in its ordinary import." Id.

Additionally, principles of statutory construction stipulate that generally if conflicts exist between a city's ordinances and its charter, the charter controls. Chief of Police of Chelsea v. Mayor of Chelsea, 21 Mass. App. Ct. 530 (1986) (internal citation omitted). Courts, however, must construe a city's "charter and ordinances together so that they constitute a harmonious

whole consistent with the purpose of their enactment," and "a literal construction will not be adopted 'when that construction would be inconsistent with other material provisions of the statute and would defeat the aim and object of the legislation.'" Id. at 532, *quoting* Lexington v. Bedford, 378 Mass. 562, 570 (1979).

In this case, Atherton is unable to establish that the Defendants denied her due process rights, and her reliance on Section 8-15 of the Charter is misplaced. First, as Confidential Secretary, Atherton was not a union member, who was subject to the terms of a collective bargaining agreement. SOF, ¶¶21, 45. Second, the powers of the Mayor, relevant to this controversy, are set forth in §§1-3 and 3-2 through 3-4 of the Charter and in §§2-405, 2-406, 3-101 and 3-313 of the Ordinances. SOF, ¶¶5-8, 18-20. The Mayor is the head of the executive/administrative branch of the City's government and is solely vested with the City's executive powers. SOF, ¶¶5-6. The Mayor also supervises, directs and is responsible for the efficient administration of all City functions placed under his control by law, by Charter, by Ordinance or otherwise. SOF, ¶6. Section 3-3 of the Charter provides the Mayor with the powers of appointment and removal. SOF, ¶7. Third, City ordinances are voted upon and approved by the City Council. SOF, ¶14. Sections 2-405, 2-406 and 3-313 of the City's Revised Ordinances ("Ordinances") expressly allow the Mayor to "employ" a Confidential Secretary or other positions "as the Mayor deems to be in the best interest of the City." SOF, ¶18, 20 (emphasis added). Section 3-313 details the terms of employment and expressly provides that "[t]here shall be a Confidential Secretary/Administrative Assistant to the Mayor," who "shall be appointed by and responsible only to the Mayor" and who "shall serve at the pleasure of the Mayor." SOF, ¶20. (emphasis added). As such, the evidence establishes that the terms of Atherton's employment as Confidential Secretary to Scanlon were governed by §3-3 of the

4

Charter and §§2-405, 2-406, and 3-313 of the Ordinances. The evidence also shows that when Scanlon removed Atherton, he was acting within the express executive powers vested in him through the Charter and Ordinances. Atherton was merely an employee at-will, and Scanlon lawfully removed her by exercising his power, authority and discretion to do so. See Ray, 328 Mass. at 309-310; Bailen, 241 Mass. at 414. The fact that Scanlon could terminate Atherton at any time, for any reason, and solely at his discretion precludes any fact finder from finding that Atherton retained a property interest in employment.

In spite of the express authority vested in Scanlon to hire and fire a Confidential Secretary, Atherton asserts §8-15 of the Charter trumps the Ordinances and mandates the Defendants could only terminate her for "good cause." Atherton bases her argument on language in §8-15, which provides, in part, "[a]ny employee of the city, not a city officer or a department head . . . and not subject to the provisions of the civil service law, or covered by the terms of a collective bargaining agreement which provides a different method, and whether appointed for a fixed or an indefinite term, may be suspended or removed from office by the appointing authority for good cause." SOF, ¶¶12, 34, 38, 71 (emphasis added). When, however, §8-15 is construed with §§ 1-3, 3-2, 3-3, 3-4, and 8-3 of the Charter and with §§ 1-101, 1-102, 2-405, 2-406, 3-101, and 3-313 of the Ordinances, as it must be so "that they constitute a harmonious whole consistent with the purpose of their enactment," Chief of Police of Chelsea, 21 Mass. App. Ct. at 532, it is clear that §8-15 only applies to City employees who are not covered by the removal procedures outlined in Section 3-4 of the Charter, civil services law or collective bargaining agreements. SOF, ¶¶5-8, 10, 12, 15, 16, 18-20. Section 3-3 of the Charter expressly mandates that "[t]he mayor may . . . remove any person appointed by the mayor in accordance with the procedure established in section 3-4." SOF, ¶7 (emphasis added). There is

no dispute that the position of Confidential Secretary is appointed by the Mayor, and thus, included under §3-3. This Section also explicitly provides that "[a]ll persons categorized as <u>department heads</u> . . . may . . . remove any assistant, subordinate or other employee of the agency . . . in accordance with the procedures established in <u>section 8-15</u>." SOF, ¶7 (emphasis added). Thus, the plain language of the Charter explicitly mandates §3-4 applies to mayoral appointees, and §8-15 applies to department head appointees. As such, §8-15 is inapplicable to Atherton because she was appointed by the mayor and not by a department head.

Furthermore, Atherton's argument that §3-4 is limited to "any city officer, member of a multiple member body, or the head of any city department appointed by the mayor" and because she does not qualify in any such categories, she is entitled to the default protections in §8-15 must also fail. The clear language in §3-3 contains no such limitation and refers to "any" Mayoral appointee, such as Atherton. SOF, ¶7. As noted above, however, the Charter must be read as a harmonious whole, and Courts may not employ "a literal construction…'when that construction would be inconsistent with other material provisions of the statute and would defeat the aim and object of the legislation.'" <u>Mayor of Chelsea</u>, 21 Mass. App. Ct. at 532.

Moreover, if any doubt still remains as to which Charter provision controls Atherton's removal, §8-3 of the Charter stipulates that specific provisions "shall" prevail over general provisions if a conflict exists between Charter provisions. SOF, ¶10. This provision follows a basic canon of statutory interpretation, i.e., that "general statutory language must yield to that which is more specific." <u>TBI, Inc.</u> v. <u>Bd. of Health of North Andover</u>, 431 Mass. 9, 18 (2000) (internal citation omitted). Consequently, the specific language in §§3-3 and 3-4, referring to the removal of Mayoral appointees, trumps the general language of §8-15, pertaining to removal procedures for all other City employees. Notably, Atherton herself assisted in crafting the

6

language in §3-313 of the Ordinances, which specifically provides that the Confidential Secretary serves "at the pleasure of the Mayor," and at her request, the Revised Ordinances were reviewed by an "expert attorney."  SOF, ¶¶24-25.  As such, Atherton had full knowledge that this language established the position of Confidential Secretary as an at-will position, further negating any finding that Atherton had a legitimate expectation of continued employment or a property interest in employment.

Additionally, the Court should note that §3-313 of the Ordinances includes the word "shall," which imposes "a mandatory duty on the subject of the command," whereas §§3-3, 3-4 and 8-15 of the Charter include the word "may," which is permissive.  United States v. Mass. Water Resources Authority, 256 F.3d 36, 51, n.17 (2001) (internal citation omitted) ("it is eminently reasonable to presume that the choice of verbiage is a deliberate one").  Accordingly, Atherton's argument that the Defendants could only remove her for "good cause" fails.

Finally, Atherton's due process claim also fails because she received all of the process to which she was entitled.  As discussed above, Atherton had no property interest in her employment.  Nevertheless, prior to her termination, the Defendants provided Atherton with the grounds for her termination and afforded her an opportunity to respond.  SOF, ¶¶34-36, 38.  The Defendants' actions met the minimum requirements established by law.  See Loundermill v. Cleveland Bd. of Educ., 470 U.S. 532, 546 (1985) (minimum requirements include notice and opportunity to respond).  Accordingly, Atherton received all the due process to which she was entitled under the United States Constitution and the Charter, and this claim should be dismissed.

      C.      <u>No Facts Exist To Support A Violation Of Atherton's First Amendment Rights.</u>

In her Third, Fourth, and Sixth Counts, Atherton alleges the Defendants terminated her employment in violation of the First Amendment to the United States Constitution, 42 USCA

§ 1983, and Article 16 of the Massachusetts Declaration of Rights, and that they retaliated against her by terminating her without a hearing for exercising her constitutional rights.

In political discrimination cases, the plaintiff must first show party affiliation was a substantial or motivating factor for the contested action.  See Ortiz-Piñero v. Rivera-Arroyo, 84 F.3d 7, 11-12 (1st Cir. 1996) (internal citations omitted).  "The burden then shifts to defendants to establish *either* a nondiscriminatory reason for the dismissal, see Ferrer v. Zayas, 914 F.2d 309, 311 (1st Cir. 1990), *or* that plaintiff held a "political" position for which party affiliation constituted an appropriate qualification for continued employment, see Branti v. Finkel, 445 U.S. 507, 518 (1980)."  Ortiz-Piñero, 84 F.3d at 12 (emphasis in original).

A two-part test is used by the courts to identify "political" positions.  See Cordero v. DeJesus-Mendez, 867 F.2d 1, 9 (1st Cir. 1989).  Step one is to decide whether the position at issue relates to partisan political interests or concerns.  See Cordero, 867 F.2d at 9.  "The second step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, privy to confidential information, a communicator, or some office holder whose function is such that party affiliation is an equally appropriate requirement."  Id. (internal citations omitted).  In the second inquiry, the focus should be on "the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office."  Id.  In Flynn v. City of Boston, 140 F.3d 42, 46 (1st Cir. 1998), the Court explained that an employee is not immune from political firing if the employee is not the ultimate decisionmaker in the department; "[r]ather, it is enough that the employee is involved in policy, even if only as an adviser, implementer, or spokesperson."  Some deference is also given to municipal ordinances that designate positions as "confidential," "especially where other evidence clearly points in the same direction," Ortiz-Piñero, 84 F.3d at 16; however, the official job description is the best

8

objective evidence of the powers inherent in a given office, see Galloza v. Foy, 389 F.3d 26, 31 (1st Cir. 2004); Mendez-Palou v. Rohena-Betancourt, 813 F.2d 1255, 1260 (1st Cir. 1987). Moreover, even if a plaintiff successfully introduces evidence to purportedly show that he had not personally wielded many of the policy-making powers listed in a particular job description, and the court considers such evidence, summary judgment will still be granted to the defendant where the court determines that political affiliation is a permissible requirement for the contested position. See, e.g., Otero-Varcalcel v. Cantero-Frau, 124 Fed.Appx. 662 (2005). Whether a government position is "political" is a question of law for the court. Ortiz-Piñero, 84 F.3d 12.

In this case, the Mayor's Office is charged with the executive and administrative powers of the City, including the general supervision and direction over all City agencies, activities and functions placed under its control by law. SOF, ¶¶5-7. See Cordero, 867 F.2d at 11 (recognizing "inherent political nature" of mayor's office); see also Faughender v. City of North Olmsted, Ohio, 927 F.2d 909, 913 (6th Cir. 1991) ("The mayor of a city is the supreme administrative agent of the government, clearly a policymaker of the highest order"). Thus, the Mayor's Office is unmistakably a municipal department whose functions involve "decision making on issues where there is room for political disagreement on goals or their implementation," and the Office's "inherent responsibilities inevitably entail the kinds of discretionary decisions traditionally associated with municipal politics." Ortiz-Piñero, 84 F.3d at 12-13. As such, the first prong of the two-part test is met.

Turning to the second prong, the evidence reveals that the job duties for Confidential Secretary to the Mayor are set forth in the Ordinances, as well as in a formal job description. SOF, ¶¶20-21, 28. The position includes seven essential duties and responsibilities. SOF, ¶¶20-21. The job description notes that "other duties may be assigned," and Giallongo performs many

9

duties that are not outlined in the Ordinances or the job description, such as: attending confidential meetings and hearings; keeping the Mayor's calendar, scheduling his appointments and making sure he gets to where he needs to be when he needs to be; typing all speeches, press releases, and correspondence; communicating the Mayor's position on issues to Department Heads; receiving and responding to the Mayor's email; advising on City issues; processing payroll; handling accounts receivable and payable; signing documents on behalf of the Mayor; SOF, ¶¶21, 77-78. Other than the Mayor, Giallongo is the only other person in the Mayor's Office. SOF, ¶¶43, 78. As such, Giallongo serves as the gateway to the Mayor's Office and greets all visitors. SOF, ¶78. Giallongo and Scanlon have a confidential relationship, and she is exposed to confidential correspondence and materials on a daily basis. SOF, ¶¶77-78. As such, the duties of the Confidential Secretary listed in the Ordinance and job description, "together with the inherent political nature" of the Mayor's Office and Giallongo's many other duties, reveal that political affiliation is "a dynamic and essential requirement" for the discharge of the Mayor's Office. Cordero, 867 F.2d at 11. Accordingly, because Atherton held a "political" position for which party affiliation constituted an appropriate qualification for continued employment, the Defendants are entitled to judgment as a matter of law on Atherton's political discrimination claims. See Branti, 445 U.S. at 518.

Additionally, with regards to Atherton's contentions that her discharge was based on her political beliefs and/or speech in support of Crean, if the Defendants can demonstrate "an overriding interest of vital importance," requiring that Atherton's private beliefs conform to those of Mayor Scanlon, Atherton's beliefs can be the sole basis for depriving her of continued public employment. Branti, 445 U.S. at 515-516. Additionally, "if an employee's private political beliefs would interfere with the discharge of [her] public duties, [her] First Amendment

10

rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." Id. at 517.  The Court further noted that it is "clear that party affiliation is not necessarily relevant to every policymaking or confidential position," and that "it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." Id. at 518.  Here, the evidence demonstrates that for two years, from 2001 through 2003, Atherton complained to members of the City Council, the Ordinance Review Committee, the League of Women Voters, the City Solicitor, and others that it was her opinion that Scanlon was an obstacle to implementing the Charter provisions.  SOF, ¶30.  Atherton also claimed Scanlon failed to uphold his oath of office by failing to uphold the Charter, the Ordinances and the law of the Commonwealth.  SOF, ¶30.  Additionally, Atherton actively campaigned for Crean and contributed to his re-election campaign against Scanlon.  SOF, ¶¶24, 69.  Furthermore, based on Scanlon's prior observations of Atherton's work habits, performance, and demeanor, he had concerns about her ability to handle the job.  SOF, ¶¶29, 36, 41.  Scanlon also did not have trust or confidence in Atherton and felt that she was not a good fit for him based on her strong advocacy for Crean during the mayoral election.  SOF, ¶¶29, 36, 41.  As such, based on Atherton's political beliefs and her feelings towards Scanlon, Scanlon was warranted in believing that Atherton's political beliefs would have interfered in the discharge of her public duties, and his act of terminating her was necessary to maintain the "governmental effectiveness and efficiency" of the Mayor's Office.  Branti, 445 U.S. at 517.

Finally, any argument by Atherton that the Defendants retaliated against her by not giving her another job in the City or not giving her an open job that went unfilled also fails.  The

Defendants had no legal duty or obligation to find Atherton another job when she was terminated.  Furthermore, no evidence exists on the record that an open job went unfilled or that a vacant position existed within the City that matched Atherton's skills.  SOF, ¶¶50-54, 83. 85-87.  Moreover, Atherton only made three attempts to find another job in the City and admits that since January 1, 2004, she made neither written inquiries nor written applications for full-time, part-time or temporary employment.  SOF, ¶¶50, 51, 83.  Atherton could have applied for one of the part-time positions in the Municipal Inspections Department or other vacancies in the City; however, she did not do so.  SOF, ¶51.  Accordingly, no evidence exists that Defendants retaliated against her for exercising any free speech rights, and these Counts should be dismissed.

       D.      <u>The Record Fails To Support A Massachusetts Civil Rights Act Claim.</u>

In Count V, Atherton alleges the Defendants violated her rights under the Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12, § 11I, and the Defendants threatened, intimidated and coerced her by requesting her resignation and terminating her after she requested a hearing.

In order to prove an MCRA claim, the plaintiff must allege facts sufficient to show that her exercise of rights was interfered with by "threats, intimidation, or coercion."  G.L. c.12, §§11H-11I; <u>see also</u> <u>Lopes</u> v. <u>Comm.</u>, 442 Mass. 170, 184 (2004).  Also, as noted in <u>Bally</u> v. <u>Northeastern Univ.</u>, 403 Mass. 713 (1989), relief under the MCRA may only be granted if the "threat, intimidation or coercion" involves either an actual or potential physical confrontation accompanied by a threat of harm, or the loss of a contractual right.  <u>Id.</u> At 719-720 (internal citations omitted).  A "threat" is "an intentional exertion of pressure to make another fearful or apprehensive of injury or harm;" "intimidation" is the "putting [of someone] in fear for the purpose of compelling or deterring conduct;" and "coercion" is an "application to another of such force, either physical or moral, as to constrain him to do against his will something he

12

would not otherwise have done." Planned Parenthood League, Inc. v. Blake, 417 Mass. 467, 474 (1994).

In this case, no evidence exists that the Defendants engaged in any improper threatening, intimidating or coercive conduct that involved either an actual or potential physical confrontation accompanied by a threat of harm or the loss of a contractual right. Atherton relies upon two acts: 1) a telephone call that Scanlon allegedly made to her home in mid-December 2003, after his re-election, during which he asked Atherton to retire and threatened her with discharge if she refused to resign; and 2) a letter she received from Scanlon, dated December 17, 2003, which asked her to resign from her position or be terminated. SOF, ¶¶34, 36. Scanlon has no memory of any such telephone call. SOF, ¶35. Even if Atherton's characterizations of Scanlon's statements were accurate, his statements fail to constitute actionable threats because, *supra* Section III.B., Scanlon had the power and authority vested in him by the Charter and Ordinances, and thus the legal right, to appoint and remove his Confidential Secretary. More importantly, however, neither the telephone conversation nor the letter involved an actual or potential physical confrontation, as required by law. See Bally, 403 Mass. at 719-720.

Additionally, Atherton's claim fails because, *supra* Section III.B., Atherton had no reasonable right to continued employment, whether by contract or otherwise. Absent such a contract, no viable MCRA claim arising out of an allegedly wrongful termination exists. See, e.g., Willits v. Roman Catholic Archbishop of Boston, 411 Mass. 202, 210-11 (1991) (teacher employed under series of one-year contracts had no MCRA claim when school failed to renew her contract when she sought to organize teachers' union because she had no secured right to job); Korb v. Raytheon Corp., 410 Mass. 581, 585 (1991) ("there is no improper interference with secured rights when an employer fires an at-will employee who has become ineffective");

Flesner v. Technical Communications Corp., 410 Mass. 805, 818-19 (1991) (at-will employee's claim under MCRA failed because he had no constitutional right to maintain at-will employment contract). Consequently, Atherton's MCRA claim must be dismissed.

      E.      <u>No Evidence Exists To Support A Wage Act Violation.</u>

The Tenth Count alleged is based on a violation of the Wage Act, G.L. c. 149, § 148; however, the Defendants paid Atherton all of the wages and benefits that she was due.

Section 148 of the Wage Act provides that employers, including cities, shall pay employees their wages or salary. G.L. c. 149, § 148. "Wages" includes "any holiday or vacation payments due an employee under an oral or written agreement." Id. Federal case law in the First Circuit has interpreted these provisions to mean that the "Wage Act only ensures the payment of ordinary wages and wage equivalents, like specifically accrued vacation pay and sick leave that constitute a significant part of weekly income." Scalli v. Citizens Financial Group, Inc., 2006 WL 1581625, *14 (D.Mass. 2006) (internal quotations omitted). Section 148 also provides for the liability of a public officer "whose duty it is to pay money, approve, audit or verify pay rolls, or perform any other official act relative to payment of any public employees . . . ." if the officer failed to "perform his official duty relative to the payment of their wages or salaries, unless he is prevented from performing the same through no fault on his part." G.L. c. 149, § 148.

In this case, Atherton contends that the Defendants owe her a total of $24,022.35 for unpaid wages and benefits, including three weeks of accrued vacation time, three personal days, sick leave buy back of 100 days, and 45 hours of compensatory time. SOF, ¶60. Atherton bases her total on a per diem rate of $194.12. SOF, ¶60. Atherton's weekly salary at the time that she was terminated was $866.59 gross, and her per diem rate was $173.32, or $20.80 less than Atherton claims. SOF, ¶¶40, 57, 58. Atherton further claims that her per diem rate should

14

include the stipend of $5,000 that she earned as the Clerk to the Licensing Board. SOF, ¶¶57, 59, 60. The stipend, however, was paid monthly and was not included in Atherton's regular weekly paycheck. SOF, ¶¶58, 59, 67. Furthermore, the City never included monthly stipends in employees' per diem rates for purposes of calculating employee benefits, nor is Atherton able to identify any such policy or any employees that were paid in such a manner. SOF, ¶58. More importantly, however, the Defendants issued Atherton a check for all of the benefits that she was owed, including the three weeks of accrued vacation and the three personal days. SOF, ¶¶65-66. Notably, in all the years that Atherton worked for the City and collected stipends, she never once complained that stipends should have been included in her vacation payments, personal time payments or other benefits. SOF, ¶61.

Atherton's claim to Sick Leave Buyback is also without merit. Section 17-47 of the Ordinances allows for sick leave buyback in only two instances, upon retirement or upon demise. SOF, ¶23. Because Atherton was terminated on January 5, 2004, a fact that she does not dispute, Atherton's termination was not due to retirement or demise. SOF, ¶¶41,58, 60. As such, Atherton did not qualify for Sick Leave Buyback, and the City does not owe her $19,412.

Finally, the City has no policy, rule, regulation or Ordinance that provides compensatory time to non-union employees. SOF, ¶63. Furthermore, no documents in the City's possession, including Atherton's personnel file, reflect any agreement between the City and Atherton to pay her for compensatory time. SOF, ¶63. Even assuming, in plaintiff's favor, that Crean told Atherton she would earn compensatory time for not taking lunch or other breaks during the Fall of 2002, no evidence exists that Crean told Atherton that she could carry compensatory time forward to the next fiscal year, that future administrations would be bound by their personal agreement or that if she chose not to use the compensatory time that the City would pay her the

cash equivalent for any unused hours. If Atherton and Crean in fact had an agreement whereby she earned compensatory time, Atherton should have used that time while she had the chance, i.e., during Crean's administration, because neither the City's policies or Ordinances, nor the Wage Act requires the Defendants to pay Atherton for compensatory time. Accordingly, the Defendants did not violate the Wage Act because they paid Atherton all of the wages and benefits that she was due, and this claim should be dismissed.

      F.      No Facts Support Intentional Infliction Of Emotional Distress Claim.

The final Count, intentional infliction of emotional distress against Scanlon in his individual capacity, also lacks merit because no facts exist to establish Scanlon's intent or to show that his conduct was "extreme or outrageous."

In order to state a claim for intentional infliction of emotional distress, the plaintiff must demonstrate: (1) intent to inflict emotional distress or that the defendant knew or should have known that emotional distress was the likely result of his conduct; (2) the defendant's conduct was "extreme and outrageous," "beyond all bounds of decency," and "utterly intolerable in a civilized community"; (3) the defendant's conduct was the cause of the plaintiff's emotional distress; and (4) the plaintiff suffered emotional distress that was "severe" and "of a nature that no reasonable man could be expected to endure it." Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976) (quotations and citations omitted). Massachusetts courts have emphasized the appalling nature of the conduct required to trigger this tort. See, e.g., Foley v. Polaroid Corp., 400 Mass 82, 99 (1987) ("outrageous" means more than workaday insults, annoyances, or even threats and petty oppressions); Conway v. Smerling, 37 Mass. App. Ct. 1, 8 (1994) ("outrageous" means "a high order of reckless ruthlessness or deliberate malevolence" that is simply intolerable). It is also insufficient "'that the defendant has acted with an intent which is

tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort'; rather, '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' Restatement (Second) of Torts § 46, comment d (1965)." Foley, 400 Mass. at 99-100. A court can assess the "extreme and outrageous" element of this tort on a summary judgment motion. See Caputo v. Boston Edison Co., 924 F.2d 11, 14 (1st Cir.1991).

    In this case, Atherton claims Scanlon's termination of her employment without a hearing was done to cause her mental distress, embarrassment and aggravation. In support of her contention that Scanlon acted intentionally, willfully, maliciously, recklessly, and with gross disregard of her rights, Atherton relies on Scanlon's deposition testimony and his termination of her after she had worked for the City for almost 17 years, when he did not have the power to terminate her employment. SOF, ¶74. Termination of an at-will employee without more, however, is insufficient to establish a claim for intentional infliction of emotional distress. See, e.g., Richey v. American Auto Ass'n, Inc., 380 Mass. 835, 839 (1980) (finding no "plausible case of outrage"). The Richey Court found that the case did not approach the abuse of ordinary decencies required by Massachusetts case law, even though a trier of fact could infer that the employer made a "bad, unjust and unkind decision" in terminating the plaintiff, who believed his continued employment to be assured if he provided doctors' notes declaring him fit to work full time, and that plaintiff's supervisors were conscious of the likelihood that plaintiff would be disturbed by a disappointment because he was tightly strung at the time. Id. Similarly, termination following an employer's pressure to take early retirement, combined with a poor

performance review and substantially increased sales goals fails to constitute extreme and outrageous conduct.  See Mathias v. Beatrice Foods Co., 23 Mass. App. Ct. 915, 915-917 (1986); accord Walton v. Nalco Chemical Co., 272 F.3d 13, 19 (1st Cir. 2001) (evidence failed to establish requisite "extreme and outrageous" conduct where, among other things, employer threatened employee's livelihood and professional reputation by attempting to pressure him to accept a buy-out package); Krennerich v. Town of Bristol, 943 F.Supp. 1345, 1356-57 (D. Me. 1996) (claim relying solely on wrongful termination in violation of municipal employee's due process rights failed to meet "extreme and outrageous" standard).  From the facts, it could be inferred that Atherton may have suffered some emotional distress when Scanlon terminated her after nearly 17 years of employment with the City without a hearing; however, Scanlon's termination of her employment without more fails to arise to "a high order of reckless ruthlessness or deliberate malevolence that . . . is simply intolerable."  SOF, ¶¶72; Conway, 37 Mass. App. Ct. at 8.

      Furthermore, no evidence exists that Scanlon intended to inflict emotional distress on Atherton or that he knew or should have known that emotional distress was the likely result of his conduct.  A trier of fact cannot infer that because Scanlon stated that he intended to terminate Atherton, and in fact followed through on that intention, that he held the requisite intent to inflict emotional distress, nor does the evidence support an inference that Scanlon knew Atherton suffered from anxiety or that she would be disturbed by a disappointment because of her emotional state.  While a trier of fact might infer that Scanlon made a "bad, unjust and unkind decision" in terminating Atherton after almost 17 years of service to the City, Scanlon's actions do not "approach the abuse of ordinary decencies required by Massachusetts case law," and this Count should be dismissed.  Richey, 380 Mass. at 839.

G.      <u>The Individual Defendants Are Entitled to Qualified Immunity</u>.

Finally, Scanlon and Dunn are entitled to dismissal of all of the claims against them based on qualified immunity. Public officials are shielded from civil rights claims predicated upon those officials' performance of discretionary functions, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow</u> v. <u>Fitzgerald</u>, 457 U.S. 800, 818 (1982). The critical inquiry on a motion for summary judgment is to determine "whether a reasonable public official could have believed that his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." <u>Febus-Rodriguez</u> v. <u>Betancourt-Lebron</u>, 14 F.3d 91, 91 (1st Cir. 1994).

As noted previously, *supra* Sections IIIA-III.F, the evidence fails to support a claim that the Defendants violated any clearly established statutory or constitutional right of Atherton. No reasonable Mayor vested with the removal powers of the Charter and Ordinances would have believed it was inappropriate to remove the Confidential Secretary of the former Mayor and to replace that individual with someone in whom he trusted and who supported his political beliefs and agenda. Likewise, no reasonable Finance Director would have believed that following the City's guidelines and Ordinances would have violated Atherton's clearly established rights. Accordingly, Scanlon and Dunn are entitled to qualified immunity on all claims against them.

IV.     CONCLUSION

WHEREFORE, based on any or all of the foregoing reasons, the Defendants respectfully request that all Counts in this case be dismissed against the Defendants.

> DEFENDANTS,
>
> CITY OF BEVERLY,
> WILLIAM F. SCANLON, JR., and
> JOHN DUNN,
> By their attorneys,
>
> _/s/_ Elizabeth R. Corbo_____
> David C. Jenkins (BBO# 251000)
> Elizabeth R. Corbo (BBO# 640131)
> Kopelman and Paige, P.C.
> 101 Arch Street, 12th Floor
> Boston, MA 02110
> (617) 556-0007

Dated: March 13, 2008

337397v.2/60700/0580