## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**DOCKET NO.: 05-11323 MLW**

|  |  |
|---|---|
| **CRYSTAL A. ATHERTON** | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **CITY OF BEVERLY, WILLIAM F.** | ) |
| **SCANLON, JR., in his official and** | ) |
| **individual capacity and JOHN DUNN,** | ) |
| **in his official and individual capacity** | ) |
| **Defendants.** | ) |
|  | ) |

### PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF FACTS

Plaintiff, Crystal Atherton (hereinafter "Atherton"), hereby submits this Statement of Facts pursuant to Local Rule 56.1 in support of her Motion for Partial Summary Judgment as to Liability:

1.  Crystal A. Atherton ("Atherton") is the plaintiff in this matter. (Complaint, passim) Atherton began her employment with the City as Legal Secretary/Paralegal to the City Solicitor on February 1, 1987. (Exhibit 1, Deposition of Crystal A. Atherton, p. 11, hereinafter "Ex. 1, Atherton, p. __") In or about June 1997, Atherton became Assistant to the City's Purchasing Agent, and on October 28, 2002, she moved to the Mayor's Office as Executive Secretary to Mayor Thomas Crean ("Crean"). Atherton held that position until she was terminated in January 2004, Defendant, William F. Scanlon (hereinafter "Mayor" or "Scanlon"). (Ex. 1, Atherton, pp. 12-13).

2.  The City of Beverly (hereinafter "City") is a municipal corporation, duly organized under the laws of the Commonwealth of Massachusetts.  (Complaint, passim)

3.  Scanlon is the Mayor for the City. Scanlon previously served as Mayor from 1994 until 2001. Scanlon was re-elected as Mayor and took office again in January 2004. (Exhibit 2, Deposition of William F. Scanlon, p. 8, hereinafter "Ex. 2, Scanlon, p. __")

4.  The voters of the City approved a Home Rule Charter ("Charter") in 1995. (Exhibit 3, A

1

copy of the entire City of Beverly's Home Rule Charter is attached hereto)

5.      Section 3-3 of the Charter provides that: "[t]he mayor shall appoint, subject to the review

of such appointments by the city council as provided in section 2-10, all city officers,

department heads and the members of multiple-member bodies for whom no other

method of appointment or selection is provided by the charter, excepting only persons

serving under the school committee, and persons serving under the city council.  Except

as may otherwise be required by the civil service law, appointments made by the mayor

shall be for periods not to exceed three (3) years, provided, however, the mayor may

appoint the head of department related to the public safety for a term of not less than three

(3) nor more than five (5) years. The mayor may suspend or remove any person appointed

by the mayor in accordance with the procedure established in section 3-4. The decision of

the mayor in suspending or removing a department head shall be final. All persons

categorized as department heads shall, subject to the consent of the mayor, appoint all

assistants, subordinates and other employees of the agency for which such person is

responsible. The department head may suspend or remove any assistant, subordinate or

other employee of the agency for which such person is responsible in accordance with the

procedures established in section 8-15. The decision of the department head to suspend or

remove any assistant, subordinate or other employee shall be subject to review by the

mayor. A person for whom a department head has determined a suspension or removal is

appropriate may seek review of such determination by the mayor by filing a petition for

review, in the office of the mayor, in writing, within ten (10) days following receipt of

notice of such determination.  The review by the mayor shall follow the procedures of

section 8-15.  The decision of the mayor shall be final." (Ex. 3, Charter, Sec. 3-3)

6.      Section 3-4 of the Charter provides, in part, that: "(a) In general: The mayor may, in

writing, remove or suspend any city officer, member of a multiple member body, or the

head of any city department appointed by the mayor by filing a written statement, with the

2

city clerk, setting forth in precise detail the specific reasons for such removal or suspension. A copy of the written statement shall be delivered in hand, or mailed by certified mail, postage prepaid, to the last known address of the said city officer, member of a multiple member body, or head of a department. The said city officer, member of a multiple member body, or head of a department may make a written reply by filing such a reply statement with the city clerk, within ten (10) days following the date the statement of the mayor has been filed; but, such reply shall have no effect upon the removal or suspension unless the mayor shall so determine.  The said city officer, member of a multiple member body, or head of a department may request permission to appear at a public meeting of the city council to read the written reply concerning removal or suspension.  If permission for said city officer, member of a multiple member body, or head of a department to attend a meeting of the city council is granted for such purpose, the mayor may attend the same meeting to read the statement of removal or suspension filed by the mayor in the first instance.  The city council shall have no authority to vote or otherwise express its views concerning such removal or suspension." (Ex. 3, Charter, Sec. 3-4)

7.      Section 5-3 of the Charter provides that "[a]ll appointments and promotions of city officers and employees shall be made on the basis of merit and fitness demonstrated by examination, past performance, or by other evidence of competence and suitability. Each person appointed to fill an office or position shall be a person especially fitted by education, training and previous work experience to perform the duties of the office or position for which chosen." (Ex. 3, Charter, Sec. 5-3)

8.      Section 8-15 of the Charter provides, in relevant part, that "[a]ny employee of the city, not a city officer or a department head (hereafter "such person") and not subject to the provisions of the civil service law, or covered by the terms of a collective bargaining agreement which provides a different method, and whether appointed for a fixed or an

3

indefinite term, may be suspended or removed from office by the appointing authority for good cause. The term "cause" shall include, but not be limited to the following: inefficiency, insubordination, conduct unbecoming the office and incapacity, other than temporary illness . . . The appointing authority when removing any such person shall act in accordance with the following procedure:

    (a)    A written notice of the intent to remove and a statement of the cause or causes therefore shall be delivered in hand or by certified mail to the last known address of the person sought to be removed.

    (b)    Within five (5) days of delivery of such notice, the officer or employee of the city may request a public hearing at which such person may be represented by counsel, shall be entitled to present evidence, call witnesses and to question any witness appearing at the hearing.

    (c)    Between one (1) and ten (10) days after the public hearing is adjourned, or if the officer or employee of the city fails to request a public hearing, between six (6) and fifteen (15) days after delivery of the notice of intent to remove, the appointing authority shall take final action, either removing such person, or, notifying such person that the notice is rescinded. Failure of the appointing authority to take any action within the time period as stated in this section shall be deemed to be a rescission of the original notice and the officer or employee shall, forthwith, be reinstated. Nothing in this section shall be construed as granting a right to such a hearing to a person who has been appointed for a fixed term when that term of office expires and such person is note [sic] reappointed for another term of office." (Ex. 3, Charter, Sec. 8-15)

9.    Section 3-313 of the Ordinances entitled, "Confidential Secretary/Administrative Assistant to the Mayor," provides, in its entirety: "(a) Establishment – There shall be a Confidential Secretary/Administrative Assistant to the Mayor. (b) Mode of Appointment, Term of Office – The Confidential Secretary/Administrative Assistant to the Mayor shall be appointed by and responsible only to the Mayor. The Confidential Secretary/Administrative Assistant shall serve at the pleasure of the Mayor. (c) Authorities and Responsibilities - The Confidential Secretary/Administrative Assistant to the Mayor shall have the following duties: (1) Organize and summarize information and prepare it for the Mayor's review and action; (2) Meet with department heads regarding day-to-day business, expediting administrative interaction between the Mayor's office

4

and City departments; (3) Serve as a officer liaison between the Mayor, the media, public interest groups, businesses and residents; (4) Be familiar with all aspects of the City government and with the functions and activities of the various offices and employees of the City; (5) Be familiar with the various services rendered by the City to its residents, in order that callers can be informed of the extent of these services and of the schedule for their performance; (6) Review all correspondence received in the office of the Mayor, and arrange for its routing and for assembling the materials needed by the Mayor to respond to all such correspondence; (7) Answer all telephone calls placed to the office, respond in an appropriate fashion and direct as appropriate."  (Ex. 4, Ordinance, Sec. 3-313)

10.    In or about mid-December 2003, Scanlon called Atherton at home and informed her that it was his intention not to keep her in the position of Confidential Secretary to the Mayor. Scanlon asked Atherton to retire and threatened to discharge her if she refused to resign. (Ex. 1, Atherton, pp. 29-31, 72). Atherton responded that she did not wish to retire and wanted to continue working and earning money for retirement. Atherton asked Scanlon if he could assign her to the School Department or another job in the City. Atherton also told Scanlon that she did not think he had the power under the Charter to terminate her employment.(Ex. 1, Atherton, pp. 29-31, 55)

11.    On or about December 17, 2003, Scanlon sent Atherton a letter via certified mail, which indicated that as of January 5, 2004, it was his intention to remove her from her position based by the Mayor. The letter offered Atherton the opportunity to resign prior to that date. (Ex. 1, Atherton, pp. 34, 55-56;  Ex. 2, Scanlon, pp. 13-14; Exhibit 5, Scanlon Letter to Atherton, dated December 17, 2003, hereinafter "Ex. 5, Scanlon 12/17/03 Letter") Scanlon wrote this letter to ask Atherton to resign from her position as Executive Secretary to the Mayor and to inform her that if she did not she would be removed. (Ex. 2, Scanlon, pp. 14-15) Scanlon did not send Atherton a copy of the Charter with this letter. (Ex. 2, Scanlon, p. 25) According to the Mayor, the Executive Secretary's position

was appointed by the Mayor and could be removed or changed by the Mayor, and Scanlon believed that he had the right to request Atherton's resignation and to replace her. (Ex. 2, Scanlon, pp. 14, 28, 31) Scanlon did not include a reason for Atherton's removal in this letter.  One of the reasons that Atherton was not hired for the position of secretary was due to her political affiliations with the previous Mayor.  (Ex. 2, Scanlon, p. 22-23, 73).

12.     Atherton failed to resign after Scanlon asked her to do so, which Scanlon considered to be insubordination and that was also one of the reasons that she was removed from her position. (Ex. 2, Scanlon, p. 94)

13.     On or about December 31, 2003, Atherton sent Scanlon a letter, indicating that she had received his letter, dated December 17, 2003, that she did not intend to resign, and that she did not believe that she was subject to removal under the Charter, except possibly for cause. Atherton further indicated that she had decided to take three weeks of vacation and would return to work on January 20, 2004. (Ex. 1, Atherton, p. 35; Exhibit 6, Letter from Atherton to Scanlon, dated December 31, 2003, hereinafter "Ex. 6, Atherton 12/31/03 Letter")

14.     Scanlon remembers receiving Atherton's December 31, 2003 letter, reading it, and filing it, without taking any further action on her request for a hearing pursuant to § 8-15 of the Charter. (Ex. 2, Scanlon, p. 17)

15.     On or about January 5, 2004, after taking office, Scanlon sent a letter to the City Clerk regarding the removal of Atherton from the positions of the Mayor's Confidential Secretary, in accordance with Sections 3-3 and 3-4 of the Charter and Section 3-313 of the Ordinances, and from the position of Clerk to the City's Licensing Board, in accordance with Sections 3-3 and 3-4 of the Charter. Scanlon desired to fill these positions with a person of his own choosing and in whom he had faith and confidence would perform the duties of such positions in an exemplary fashion. The letter further

6

indicated that the removal was effective immediately. Atherton was sent a copy of this letter by certified mail. (Ex. 1, Atherton, p. 35; Ex. 2, Scanlon, pp. 28, 38-39, 92; Exhibit 7, Scanlon letter to City Clerk, dated January 5, 2004, hereinafter "Ex. 7, Scanlon 1/5/04 Letter") This letter made no reference to Section 8-15 of the Charter.

16.    On or about January 12, 2004, Atherton sent Scanlon a letter, which indicated she had received his January 5, 2004 letter. Atherton requested a public hearing pursuant to Section 8-15 of the Charter and a hearing "as otherwise allowed or required by law." (Ex. 1, Atherton, pp. 38-39; Exhibit 8, Atherton letter to Scanlon, dated January 12, 2004, hereinafter "Ex. 8, Atherton 1/12/04 Letter") Atherton looked at the Charter and believed that she complied with the timeframe for requesting a hearing. (Ex. 1, Atherton, p.39)

17.    In January 2004, Scanlon replaced Atherton with Linda Giallongo ("Giallongo"), who had held the Executive Secretary's job for more than 20 years prior to Atherton. (Ex. 3, Scanlon, pp. 36, 81; Ex. 9, Linda Giallongo Deposition, pp. 7-8)

18.    As Secretary to the Mayor Scanlon, Giallongo has not attended meetings in place of the Mayor or represented the Mayor at functions. (Ex. 9, Giallongo, p. 22) Giallongo attends meetings and hearings with Scanlon to take notes. (Id.)  Giallongo does not give advice to the Mayor other than matters involving the licensing board. (Ex. 9, Giallongo, pp. 22-24). Giallongo answers the telephone and takes messages, interacts with Department Heads and City employees and communicates messages to these individuals on behalf of Scanlon, processes payroll, pays bills, files forms when she receives money, files documents, handles checks for copies and for licenses, drafts and types communications for Scanlon, types information for constituents and telephones constituents with requested information, speaks to Department Heads and other individuals, including members of the public, when they come into or telephone the Mayor's office, and sometimes signs documents for Scanlon using her initials, when she has his permission. (Ex. 9 Giallongo Dep., pp. 22-32, 43).  Giallongo keeps Scanlon's calendar and schedules all of his

7

appointments (Ex. 9 Giallongo Dep., p. 49)

19.    The Mayor's secretary does not serve as a liason between the mayor, media, public

interest groups, business and residents although this is listed a job responsibility in §

3-313.  The latter was a function of the administrative assistant and Mayor Scanlon now

takes care of those functions. (Ex. 9 Giallongo Dep., p. 31)



Respectfully Submitted,

CRYSTAL A. ATHERTON

By her Attorney,


/s/ Jordan L. Shapiro
Jordan L. Shapiro
BBO#454240
Shapiro & Hender
640 Main Street
Malden, MA 02148
DATED: March 14, 2008                    (781) 324-5200

8

# Exhibit
# 2

Vol. 1 - 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-11323MLW

CRYSTAL A. ATHERTON and ROBERT W.
ATHERTON,
                    Plaintiffs,

            vs.

CITY OF BEVERLY, WILLIAM F. SCANLON, in
his official and individual capacity,
and JOHN DUNN, in his official and
individual capacity,
                    Defendants.

        DEPOSITION OF WILLIAM F. SCANLON, JR.,
taken pursuant to Notice under the applicable
provisions of the Federal Rules of Civil
Procedure on behalf of the Plaintiffs, before
Simonne J. Elwood, R.P.R. and a Notary Public
in and for the Commonwealth of Massachusetts,
at Beverly City Hall, 191 Cabot Street,
Beverly, Massachusetts, commencing on
Wednesday, September 12, 2007 at 11:01 a.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
781-581-3993 - 978-532-0313 - FAX 978-538-3142

---

Vol. 1 - 2

APPEARANCES:

JORDAN I. SHAPIRO, ESQ.
ERIC SHWARTZ, ESQ
SHAPIRO & HENDER
640 MAIN STREET
MALDEN, MA 02148
    REPRESENTS THE PLAINTIFFS

ELIZABETH CORBO, ESQ.
KOPELMAN & PAIGE
101 ARCH STREET - 12TH FLOOR
BOSTON, MA 02110
    REPRESENTS THE DEFENDANTS

ROBERT A. MUNROE, ESQ.
ASSISTANT CITY SOLICITOR
CITY OF BEVERLY
191 CABOT STREET
BEVERLY, MA 01935
    REPRESENTS THE DEFENDANTS

ALSO PRESENT:  CRYSTAL A. ATHERTON
               ROY GELINEAU

---

Vol. 1 - 3

I N D E X

DEPONENT          DIRECT  REDIRECT  CROSS  R

WILLIAM F. SCANLON, JR.

  By Mr. Shapiro       6       --

  By Ms. Corbo                 92       --

E X H I B I T S

EXHIBIT NO.        DESCRIPTION.        PAGE N

  1     Proposed City Organization      11
        Chart

  2     Letter - 12/11/03 to Ms.        13
        Crystal Atherton from William
        F. Scanlon. Jr.

  3     Letter  12/31/03 to Mayor       17
        Elect Scanlon from Crystal A.
        Atherton

  4     The Charter and Related Laws     18

  5     Letter - 1/5/04 to Mrs. Frances  29
        Macdonald from William F
        Scanlon, Jr.

  6     Letter - 1/12/04 to William F.   32
        Scanlon, Jr., Mayor from
        Crystal A. Atherton

  7     The Charter and Related Laws     34

  8     Beverly Revised Ordinances       36

  9     Page 56 - Section 3-313          38

---

Vol. 1 - 4

CONTINUED
EXHIBIT NO.        DESCRIPTION.        PAGE NO

  10    Charter and Related Laws         51

  11    Defendant, City of Beverly's     55/56
        Answers to Plaintiff's First
        Set of Interrogatories

  12    Complaint and Demand for         70
        Trial by Jury

  13    Answer of Defendants, City       70
        of Beverly and William F.
        Scanlon, Jr.

  14    Friday - The Salem News          82
        September 27, 2002

  15    Letter - 1/5/04 to Honorable     84
        City Council from William F.
        Scanlon, Jr.

  16    Letter - 9/27/02 to Ms.          86
        Linda Giallongo from Thomas
        M. Crean

Vol. 1 - 5

W. SCANLON, JR.

1   **S T I P U L A T I O N S**

2   It is hereby stipulated and agreed by

3   and between counsel for the respective

4   parties that all objections, except as to

5   form, are reserved until the time of trial,

6   including motions to strike.

7   It is further stipulated and agreed

8   that the reading and signing of the

9   deposition are not waived and to be read and

10   signed under the pains and penalties of

11   perjury.

12   It is further stipulated and agreed

13   that the filing and sealing of the deposition

14   are waived.

15

16   WILLIAM F. SCANLON, JR.

17   A witness called on behalf of the

18   Plaintiffs, having been satisfactorily

19   identified by the production of his

20   Massachusetts driver's license (S73074231)

21   and duly sworn, under oath, by the Court

22   Reporter and Notary Public, was examined and

23   testified as follows:

---

Vol. 1 - 6

W. SCANLON, JR.

1   MR. SHAPIRO:  Usual stipulations?

2   MS. CORBO:  Yes.

3   MR. SHAPIRO:  The same as the last

4   deposition.

5   MS. CORBO:  Yes.

6

7   DIRECT EXAMINATION

8   Q   (By Mr. Shapiro)  Could you tell me what your

9   full name is, please, sir?

10   A   William Francis Scanlon, Junior.

11   Q   And what is your home address?

12   A   5 Whitman Place, Beverly.

13   Q   And what is your occupation?

14   A   Mayor of the City of Beverly.

15   Q   And I know you've been deposed before because

16   I deposed you one time before; but just so

17   that you'll refresh your memory about some of

18   the rules is that I ask you a question, and

19   you give me an answer, I'll assume that you

20   understood what the question was.

21   If I ask you a question you don't

22   understand or you want me to repeat or do

23   something about it that you're not clear on,

---

Vol. 1 - 7

W. SCANLON, JR.

1   please ask me to rephrase my question, and

2   I'll be glad to do that.

3   It would be helpful if you wait until

4   I finish my question before you start your

5   answer because the stenographer can't record

6   two people talking at the same time. And you

7   do have to answer verbally; yes' and no's

8   rather than uh-huh's and shaking your head

9   and things like that. Do you understand all

10   that?

11   A   I believe so.

12   Q   Okay.  Have you taken any drugs or medicine,

13   or are you -- have you had any alcohol this

14   morning that will affect your ability to

15   answer my questions this morning?

16   A   No.

17   Q   Could you tell me -- Again, I know you've

18   been through this before, but for this

19   deposition, I have to ask you again.

20   Can you trace for me what your

21   education has been since you got out of high

22   school just in a general sort of way?

23   A   Bachelor of Science in Civil Engineering from

---

Vol. 1 - 8

W. SCANLON, JR.

1   the Massachusetts Institute of Technology,

2   Master's in Business Administration from

3   Harvard University.

4   Q   And when did you get the degree from MIT?

5   A   1961.

6   Q   And from Harvard?

7   A   1957.

8   Q   And could you trace for me what your work

9   experience has been in a general kind of way

10   since you got out of high school?  Well,

11   not -- just give me the last 20 years if you

12   can.

13   A   In the last 20 years, I ran a consulting

14   company from 1987 to 1993; Mayor of the City

15   of Beverly from 1994 through 2001; Professor

16   of Business Administration at Endicott

17   College, 2002 and 2003; Mayor of the City of

18   Beverly, 2004 to today.

19   Q   Can you tell me what you did to prepare for

20   today's deposition?

21   A   I took a look at the interrogatories.  I

22   marked on my calendar that we would have this

23   today.  That's about it.

Vol. 1 - 9

W. SCANLON, JR.

1  Q   Okay. Could you tell me when the first time
2      was that you met Crystal Atherton or came to
3      know her, approximately?
4  A   It would have to have been early 1994.
5  Q   And what was she doing when -- What was her
6      job when you first met her?
7  A   I believe she was working with the city
8      solicitor.
9  Q   Who was the city solicitor around that time,
10     do you know?
11 A   Marshall Handly.
12 Q   Have you had an opportunity to look at
13     Crystal Atherton's personnel records, her
14     files at all?
15 A   No, no.
16 Q   Do you know whether she has ever been
17     disciplined for anything?
18 A   In terms of formal discipline, I do not.
19 Q   Do you know whether she's ever had anything
20     in her record that was in any way derogatory
21     or negative?
22 A   As I said, I have not looked at her record.
23 Q   Nothing that you're aware of that people

Vol. 1 - 11

W. SCANLON, JR.

1      changing --
2  A   I believe he had.
3  Q   All right. And do you know what she did as a
4      result of those discussions?
5  A   No.
6  Q   She never worked for you in your office, is
7      that right?
8  A   That's right.
9  Q   Now, prior to terminating her in January of
10     '04, had you looked at her personnel file to
11     see if there was anything derogatory in it,
12     sir?
13 A   As I've said, I think twice now, I did not
14     look at her personnel file.
15 Q   Okay. Now, your counsel has provided to me a
16     document which I'll mark as Exhibit 1.
17         (Whereupon the Court Reporter marked
18     as Exhibit No. 1 - Proposed City Organization
19     Chart.)
20 Q   What I've shown to you is something called
21     the, "Proposed City Organization Chart." Is
22     that a fair depiction of the city
23     organization chart in your opinion?

Vol. 1 - 10

W. SCANLON, JR.

1      complained about her attendance or promptness
2      in getting to or from work, is that a fair
3      statement?
4  A   I'll go with a yes on that.
5  Q   And insofar as your discussions with Marshall
6      Handly about her ability to do her job in a
7      reasonable manner, did you ever have any
8      discussions with him about that?
9  A   Certainly, there were some discussions about
10     that, yes.
11 Q   And can you tell me approximately when was
12     the first time that you and Marshall ever
13     talked about Ms. Atherton?
14 A   No, I can't be specific on that. I can
15     recall that she had very unusual filing
16     systems that were the subject of discussion.
17 Q   And is that something that you had ever
18     talked with her about?
19 A   That I had talked to her about?
20 Q   Yes.
21 A   No.
22 Q   Do you know whether Marshall Handly ever
23     talked with her about correcting or

Vol. 1 - 12

W. SCANLON, JR.

1      (Indicating)
2  A   At a point in time, yes.
3  Q   Is that a fair depiction of what existed in
4      the 2003/2004 period to the best of your
5      memory?
6  A   2003/2004. That's a little confusing. I was
7      not here in 2003.
8  Q   Okay. How about in 2004?
9  A   It's not totally correct, sir.
10 Q   Okay. The only reason I'm showing that to
11     you, are there and were there -- Let me
12     strike that question.
13         Beginning in 2004 when you came back
14     as the Mayor, were there around ten
15     department heads as is shown here underneath
16     the Mayor box?
17 A   The number, I believe, would have been one
18     larger than what shows here, so that's around
19     ten.
20 Q   Okay. Very good. And are those ten
21     department heads, to the best of your
22     knowledge, persons that you appoint from the
23     Mayor's office, do you know?

Vol. 1 - 13

W. SCANLON, JR.

1  A  Are those positions ones that I appoint?
2  Q  Yes.
3  A  I believe so.
4  Q  Okay.
5        MR. SHAPIRO: Mark this next one as
6        Exhibit 2.
7        (Whereupon the Court Reporter marked
8        as Exhibit No. 2 - Letter - 12/17/03 to Ms.
9        Crystal Atherton from William F. Scanlon,
10       Jr.)
11 Q  Okay. All right. Now, I've put in front of
12    you a letter dated December 17, 2003 and ask
13    you: Is that your signature on the bottom,
14    sir? (Indicating)
15 A  It is.
16 Q  And when was the last time you looked at this
17    letter?
18 A  I honestly don't know. I haven't seen it in
19    a long time. That's all I can tell you.
20 Q  You haven't looked at it today or yesterday
21    or in the last few days?
22 A  No, no.
23 Q  Okay. And do you remember preparing this

Vol. 1 - 15

W SCANLON, JR.

1     that, she would be removed.
2  Q  Okay. And could you tell me: In the month
3     of January of '04 whether there were any
4     other people that you sent similar letters to
5     that worked for the City of Beverly?
6  A  I believe I did send some other letters, yes.
7  Q  And to who were those sent, please?
8  A  I'm not certain I can articulate all of
9     the to whoms to you right now. I believe one
10    of them would be Tom L'Italien, and there may
11    be two or three others.
12 Q  Were there any other secretarial positions
13    that you sent similar letters to, sir?
14 A  I don't believe so.
15 Q  Approximately how many others were sent
16    similar letters, sir?
17 A  It's an estimate. I'm going to say in
18    addition to this letter, perhaps three
19    others.
20 Q  Do you have any memory whether of the four
21    letters that were sent out how many were
22    women?
23 A  Possibly two, but I'm not certain at this

Vol. 1 - 14

W. SCANLON, JR.

1     letter at all?
2  A  Yes.
3  Q  And could you tell me if the position -- What
4     was the position that she held as of January
5     5th, '04, do you know?
6  A  It was the executive secretary to the Mayor,
7     I believe.
8  Q  And was that a position that the Mayor's
9     office appointed?
10 A  I believe so.
11 Q  And is that a position that the Mayor's
12    office also removed?
13 A  Well, or changed, perhaps would be -- I'm not
14    sure.
15 Q  Okay. Or changed?
16 A  Yeah.
17 Q  Yes?
18 A  Yes.
19 Q  Okay. And this letter was to remove her from
20    the position as a secretary in the Mayor's
21    office, isn't that right?
22 A  Well, it was written to ask her to resign the
23    position and indicated that should she not do

Vol. 1 - 16

W. SCANLON, JR.

1     moment.
2  Q  Now, prior to your sending out this letter,
3     can you tell me what your memory is of what
4     her various positions were that she held
5     while employed by the City of Beverly?
6  A  "Her" being?
7  Q  Ms. Atherton.
8  A  She worked in the Purchasing Department as
9     assistant to the purchasing agent, I believe,
10    after having worked in the legal department.
11 Q  Okay. And then she moved from there into the
12    Mayor's office, is that what your memory and
13    understanding is?
14 A  Well, again, that didn't happen while I was
15    here, but that is my understanding.
16 Q  So she was hired into the Mayor's office by
17    Mr. Crean, is that your memory?
18 A  Yes.
19 Q  And that's where she was when you arrived as
20    the Mayor, isn't that right?
21 A  Yes.
22       MR. SHAPIRO: Mark that as Exhibit 3,
23    please.

Vol. 1 - 17
W. SCANLON, JR.

1        (Whereupon the Court Reporter marked
2    as Exhibit No. 3 - Letter - 12/31/03 to Mayor
3    Elect Scanlon from Crystal A. Atherton.)
4    Q    Okay.  Now, I put in front of you Exhibit 3,
5         a letter dated December 31st, 2003 from
6         Crystal Atherton to William F. Scanlon,
7         Junior and ask you if you remember receiving
8         that letter?  (Indicating)
9    A    I do.
10   Q    And when you received that letter, what did
11        you do?
12   A    I read it, and I filed it.
13   Q    Okay.  Now, she, in that letter, indicates in
14        the second line, "As I told you in our
15        telephone conversation, --," that line
16        begins.  Do you remember the conversation
17        that you had with her that she's referring
18        to?
19   A    I remember a few words of a conversation with
20        her in person, not by telephone.
21   Q    Okay.
22   A    And I thought at the time that the letter
23        said a lot more than the bit of conversation

Vol. 1 - 18
W. SCANLON, JR.

1         we had.
2    Q    Can you tell me about the conversation that
3         you had?
4    A    Little except that it was very cryptic, and
5         she pointed out that she wouldn't resign.
6    Q    Do you remember anything you said or she
7         said?  What did you say when she said that?
8    A    I don't think I said anything.  I just
9         listened.
10   Q    Did you take a look at the City Charter,
11        Section 8-15, when you received this letter
12        also?
13   A    I did not.
14   Q    Have you looked at this section of the City
15        Charter between December '03 and today, sir?
16   A    I honestly don't know.  I read the Charter
17        from time to time.
18        MR. SHAPIRO:  Okay.  Mark that as
19        Exhibit 4.
20        (Whereupon the Court Reporter marked
21        Exhibit No. 4 - The Charter and Related
22        Laws.)
23   Q    I'm showing to you Exhibit 4 and ask you if

Vol. 1 - 19
W. SCANLON, JR.

1         you recognize that as a copy of the City
2         Charter page that has in it Section 8-15?
3    A    Uh-huh.  It appears to be the Charter.
4    Q    Okay.  And I'm going to read that first
5         sentence.  If you don't mind, actually, I'm
6         going to read the first sentence.  "Any
7         employee of the city, not a city officer or a
8         department head (hereafter 'such person') and
9         not subject to the provisions of the civil
10        service law, or covered by the terms of a
11        collective bargaining agreement which
12        provides a different method; and whether
13        appointed for a fixed or an indefinite term,
14        may be suspended or removed from office by
15        the appointing authority for good cause.  The
16        term 'cause' shall include, but not be
17        limited to the following:  inefficiency,
18        insubordination, conduct unbecoming the
19        office and incapacity, other than temporary
20        illness."
21            She was an employee of the city,
22        correct?
23   A    Yes.

Vol 1 - 20
W. SCANLON, JR.

1    Q    And that sentence at the -- The first
2         sentence says she may be suspended or removed
3         from office by the appointing authority for
4         good cause.
5             MS. CORBO:  Objection.
6             MR. SHAPIRO:  I haven't asked the
7         question yet.
8             MS. CORBO:  It doesn't say that.  It
9         doesn't say that "she" may be removed; it
10        says, "an employee."
11            MR. SHAPIRO:  Okay.  I stand
12        corrected.  Sorry about that.  I didn't mean
13        to confuse anybody by that.
14   Q    Let me read it.  Let me say it again.  "Any
15        employee of the city," and then skipping
16        down, say, "may be suspended or removed from
17        office by the appointing authority for good
18        cause."
19            Now, do you have any reason to believe
20        that Ms. Atherton was inefficient in her job?
21   A    Well, I certainly do, yes.
22   Q    Okay.  And do you have any reason to believe
23        that she was insubordinate in her job?

Atherton, et al v. City of Beverly, et al    Case 1:05-cv-11323-MLW    Document 41-3    Filed 03/15/2008    Page 7 of 26    September 12, 20

William F. Scanlon, Jr.

Vol. 1 - 21

W. SCANLON, JR.

1    A    Not quite.

2    Q    Do you feel that she was -- What do you mean

3         by "not quite"?

4    A    I said, "not quite." I got a chance to

5         observe Ms. Atherton in her work for a number

6         of years since her desk was about, oh, maybe

7         30 feet from mine, and it was an open doorway

8         between the two. So I had many opportunities

9         to observe her demeanor, conduct of her work,

10        etcetera.

11   Q    Okay. Was there anything that she did that

12        you believed was conduct unbecoming the

13        office?

14   A    Well, I have observed her, for example, sit

15        at the desk while the phone in front of her

16        rang 15 or 18 times, and she didn't answer

17        it. I have observed her when the phone rang

18        a dozen or more times, and she got up and

19        said, "I'm going to lunch," and didn't answer

20        it. Those are two that stick out in my mind.

21   Q    Anything that indicated any of her activities

22        that indicated to you that she was -- did not

23        have the capacity, that there was some

Vol. 1 - 23

W. SCANLON, JR.

1         advocate for him during the election, and

2         it's an executive secretary position, a

3         confidential secretary position; and with me,

4         that simply wasn't a fit.

5    Q    Okay. Well, in fact, the last statement that

6         you just made was the real reason you didn't

7         rehire her, isn't it?

8              MS. CORBO: Objection.

9    Q    Can you answer that question?

10   A    Certainly a reason.

11   Q    Okay. And was it the primary reason that you

12        didn't rehire her?

13             MS. CORBO: Could you just clarify?

14        I'm sorry. What statement are you referring

15        to because he listed a number of them?

16             MR. SHAPIRO: The last statement that

17        he said was that she was strongly aligned

18        with Mayor Crean.

19             MS. CORBO: Okay. Thank you.

20   A    I said I didn't have either trust or

21        confidence in her, and that's probably the

22        primary reason.

23   Q    Okay. And so insofar as all of this, what we

Vol. 1 - 22

W. SCANLON, JR.

1         incapacity of her?

2    A    I have no comment regarding that.

3    Q    Okay. So in regard to inefficiency and

4         insubordination, conduct unbecoming the

5         office, you felt that there were some

6         concerns that you had about those three

7         issues, is that right?

8    A    Well, certainly on inefficiency; and if I

9         might, in your reading of this, "The term,

10        'cause' shall include, but not be limited to

11        the following." So, apparently, it could be

12        a much longer list than what is actually

13        written.

14   Q    Okay. And so when you sent her the letter

15        that we've marked as Exhibit No. 2, is there

16        any reason stated in that letter as to the

17        reason for her removal, sir?

18   A    No. I simply asked her to resign. I thought

19        it would be simpler. I didn't have trust or

20        confidence in this lady, and I felt for this

21        position -- Certainly, my strong perception

22        was that she was closely aligned with

23        Mr. Crean. I believe she had been a strong

Vol. 1 - 24

W. SCANLON, JR.

1         just went through with regard to her not

2         being capable and qualified in her duties,

3         that had nothing to do with your not rehiring

4         her at all, did it?

5    A    I answered your question before, and I

6         indicated that I had an unusual opportunity

7         to observe this woman's work performance

8         because of where she sat for the year she was

9         in the legal department; and so I did have,

10        do have an opinion about that, and it's not a

11        good opinion.

12   Q    Okay. We'll come back to that. The next

13        part of the 8-15 refers to, in the second

14        section, kind of pointing to you here, where

15        it says, "The appointing authority when

16        removing any such person shall act in

17        accordance with the following procedure," and

18        it has a written notice of the intent to

19        remove and hearing opportunities and things

20        like that.

21             We agree that she did not have an

22        opportunity for any hearing after she was

23        terminated, is that right?

Vol. 1 - 25

W. SCANLON, JR.

1    MS. CORBO: Objection. To the extent
2  that you are reading from this document and
3  asking a question under the premise that this
4  section applies to her employment, that's a
5  subject of litigation and a subject in
6  dispute.
7        And so to the extent that your
8  question is premised on this section
9  applying, I don't think it's a fair question.
10       MR. SHAPIRO: Okay. Well, I don't
11  think that I had the premise based upon that
12  it applied, in any event, with the question I
13  just asked, and I'd appreciate it if you'd
14  just give objections and not give speaking
15  objections in the future to give him any
16  suggestion about where your position is on my
17  question.
18  Q  So let me just ask you the question again.
19       Was there any opportunity for her to
20  have a public hearing, that you gave her
21  notice of her opportunity to do that in the
22  letter at least of December 17th, 2003?
23  A  I believe if she wanted to pursue B here, she

Vol. 1 - 26

W. SCANLON, JR.

1  could have attempted to do that with the city
2  council. I don't believe it's a matter with
3  the Mayor. I didn't send her a copy of the
4  Charter if you're asking me that.
5  Q  Well, she responded to you by indicating that
6  it has to be -- the removal must be for
7  cause, and then she said in her letter, "As I
8  also told you in our conversation, I do not
9  have a position to resign from because I am
10  not a city officer or department head but
11  rather a rank and file secretary -- a career
12  public servant who has served a number of
13  administrations, including your earlier
14  administration. As a dedicated public
15  servant with more than 18 years of service
16  and an exemplary employment record, I do not
17  think that 'for cause' termination is an
18  issue."
19       You certainly weren't intending to
20  give her a notice that you were terminating
21  her for inefficiency, insubordination or
22  anything like that as you wrote that letter
23  of December 17th, were you, sir?

Vol. 1 - 27

W. SCANLON, JR.

1  A  Well, there are lot of presumptions in her
2  letter, and I think in what you have just
3  said, I believe I've already answered it. It
4  may be interesting, and I don't know if you
5  know this or not, but this lady was quoted at
6  length in the newspaper when she took that
7  job that she had no protection while she had
8  that job, and she did run the risk of not --
9  you know, she had been a union member, as I
10  recall, prior to that; and when she took that
11  job, she freely admitted to the newspaper she
12  was no longer in that situation.
13       So I'm really not quite sure what your
14  question is.
15  Q  Just listen to my question and see if you can
16  answer it. In the -- At the time that you
17  were writing this letter of December 17th of
18  '03, were you thinking that she was a person
19  who was inefficient or insubordinate or had
20  done something, the kind of conduct that was
21  unbecoming of her?
22  A  I certainly thought about her as being
23  inefficient, absolutely; not productive,

Vol. 1 - 28

W. SCANLON, JR.

1  things like that, yes.
2  Q  Okay. Okay. But as you were writing the
3  letter, had you -- was it your intent that
4  your letter complied with the requirements of
5  Section 8-15?
6        MS. CORBO: Objection to the extent
7  that your intent in writing the letter is
8  based upon any conversations or instructions
9  you may have received from your counsel at
10  the time, I'm ordering you not to answer that
11  question.
12  Q  Okay. When you wrote this letter, was it
13  your intent to comply with Section 8-15? And
14  I'm not asking you about conversations with
15  your attorney. I'm asking: Was it your
16  intent to comply with Section 8-15?
17  A  I believe I had the right to request her
18  resignation; and failing that, to replace
19  her.
20  Q  Okay. So after you received the letter from
21  her of December 31, 2003, I think you've
22  already answered that you did not look at
23  Section 8-15 before you wrote your

Atherton, et al vs. City of Beverly, et al    Case 1:05-cv-11323-MLW    Document 41-3    Filed 03/15/2008    Page 9 of 26    September 12, 20

William F. Scanlon, Jr.

Vol. 1 - 29
W. SCANLON, JR.

1    January 5th, 2004 letter, is that right?
2  A  I'm not sure what the January 5th letter is.
3  Q  That's the letter removing her.
4        Let me have that marked so you'll have
5     everything in front of you.
6        (Whereupon the Court Reporter marked
7     as Exhibit No. 5 - Letter - 1/5/04 to Mrs.
8     Frances Macdonald from William F. Scanlon,
9     Jr.)
10 Q  There's the three letters, actually.
11        MS. CORBO:  Do you have a copy of the
12    January 5th letter for me?
13        MR. SHAPIRO:  Absolutely.
14        MS. CORBO:  Thank you.
15 Q  Okay.  I've put in front of you your letter
16    of January 5th, 2004, and you can read that
17    to yourself and tell me whether that has any
18    reference at all in that letter to Section
19    8-15 that I've just had marked as Exhibit 4
20    [sic].
21 A  No, I don't believe it does.
22 Q  Okay.  And I will ask you one more time.  Did
23    you intend to comply with Section 8-15 when

---

Vol. 1   30
W. SCANLON, JR.

1    you wrote the letter of December 17th which
2    we have marked as Exhibit 2?
3        MS. CORBO:  I have a question for
4    clarification.
5        MR. SHAPIRO:  Sure.
6        MS. CORBO:  Exhibit 4, was that the
7    Charter provision or was Exhibit 5 -- I think
8    you referred to this as Exhibit 4, the letter
9    marked January 5th, and I think the letter
10   marked January 5th is actually Exhibit 5.
11        MR. SHAPIRO:  Okay.  We want to stand
12   corrected that the letter of January 5th is
13   Exhibit No. 5.
14 Q  And what I'm asking you, and I want to make
15   sure that I do ask it correctly is:  When you
16   wrote the letter that is dated January 5th,
17   that we've marked as Exhibit 5, we agree it
18   does not refer at all to Section 8-15 in
19   order -- after your counsel's objection is
20   clarified, correct?
21        MS. CORBO:  Yes.  Okay.
22 Q  The letter of January 5th, 2004, Mr. Scanlon,
23   does not refer to 8-15, is that right?

---

Vol. 1 - 31
W. SCANLON, JR.

1  A  No, it does not.
2  Q  Okay.  And now, let me ask you as I wanted to
3     before:  December 31st, 2003 letter, Exhibit
4     No. 3, before you had looked at that -- No,
5     let me strike that.
6        When you sent out the letter of
7     December 31st, 2003, did you intend to comply
8     with Section 8-15?
9  A  I didn't send out any letter on
10    December 31st.  That's the letter that she
11    sent.
12 Q  I'm sorry.  Regarding the letter of
13    December 17th that you sent out as Exhibit 2,
14    when you sent out that letter, did you intend
15    to comply with Section 8-15?
16 A  When I sent out the letter of December 17th,
17    I thought I had the right to request her
18    resignation; and failing that, I thought I
19    had the right to replace her, and I still do;
20    and when I sent out the letter of
21    January 5th, I was complying with what I said
22    I would do in the letter of December 17th.
23        MR. SHAPIRO:  Mark this as the next

---

Vol. 1 - 32
W. SCANLON, JR.

1    exhibit.
2        (Whereupon the Court Reporter marked
3    as Exhibit No. 6 - Letter - 1/12/04 to
4    William F. Scanlon, Jr., Mayor from Crystal
5    A. Atherton.)
6  Q  Now, I'm showing you Exhibit 6, and that is a
7     letter from Crystal Atherton addressed to
8     Mayor Scanlon, you; and in that letter, the
9     bottom line says, "Pursuant to Section 8-15
10    of the Beverly Home Rule Charter, I hereby
11    request a public hearing and a hearing as
12    otherwise allowed or required by law."  And I
13    ask you if you received that letter?
14    (Indicating)
15 A  I believe I did.
16 Q  And what did you do when you received that
17    letter?
18 A  I read the letter, and I also filed that
19    letter.  The earlier letter indicated that
20    she was going to take the first three weeks
21    in January off.  I guess she made that
22    decision summarily.  And the Charter calls
23    for, I believe, any such hearing to be

Vol 1 - 33

W SCANLON, JR.

1  coordinated with the city council. It's not
2  a hearing with the Mayor as I recall.
3  Q  Okay. Well, let's take a look at that.
4  Paragraph B of Section 8-15 says, "Within
5  five (5) days of delivery of such notice, the
6  officer or employee of the city may request a
7  public hearing at which such person may be
8  represented by counsel, shall be entitled to
9  present evidence, call witnesses and to
10  question any witness appearing at the
11  hearing."
12      Section C says, "Between one (1) and
13  ten (10) days after the public hearing is
14  adjourned, or if the officer or employee of
15  the city fails to request a public hearing,
16  between six (6) and fifteen (15) days after
17  delivery of the notice of intent to remove,
18  the appointing authority shall take final
19  action, either removing such person, or,
20  noticing such person that the notice is
21  rescinded."
22      Having looked at that, does that
23  change your view that it's the appointing

Vol 1 - 35

W. SCANLON, JR.

1  shall be made on the basis of merit and
2  fitness demonstrated by examination, past
3  performance, or by other evidence of
4  competence and suitability. Each person
5  appointed to fill an office or position shall
6  be a person especially fitted by education,
7  training and previous work experience to
8  perform the duties of the office or position
9  for which chosen."
10      Now, again, let me take a look at your
11  Exhibit 5 and ask you: In looking at
12  Exhibit 5, is there anything in Exhibit 5
13  that indicates that your reason, the specific
14  reason for this action has anything to do
15  with merit?
16  A  Well, certainly, the replacement of
17  Ms. Atherton fits this section rather neatly
18  in my opinion.
19  Q  Does it say that in your letter of
20  January 5th, 2004?
21  A  Well, in talking about that, I'm talking
22  about the replacements, so I don't think
23  there would be any need for that to be in

Vol 1 - 34

W. SCANLON, JR.

1  authority that holds the hearing, sir?
2  A  My comment was made on my recollection from
3  the City Charter that any such hearings occur
4  with the city council. I can't swear to
5  that, but that's my recollection.
6  Q  Okay. That's fine. That's all I'm asking
7  you today. Okay. Okay. Good.
8      MR. SHAPIRO: Mark that as the next
9  exhibit, please.
10      (Whereupon the Court Reporter marked
11  as Exhibit No. 7 - The Charter and Related
12  Laws.)
13  Q  All right. Now, we have had marked as
14  Exhibit 7 another page of the City Charter.
15  Does that appear to be a page of the City
16  Charter? (Indicating)
17  A  It does.
18  Q  And I'm calling your attention to Section
19  5-3, "Merit principle." Have you looked at
20  that section at all in the last year or so?
21  A  No.
22  Q  And what it indicates is, "All appointments
23  and promotions of city officers and employees

Vol 1 - 36

W. SCANLON, JR.

1  this letter.
2      As you probably know, I replaced Ms.
3  Atherton with the person that she had
4  replaced and who had held the job for perhaps
5  20 years prior to Ms. Atherton taking it
6  over.
7  Q  Okay. Let's take a look at the next section.
8      MR. SHAPIRO: Mark this as the next
9  exhibit.
10      (Whereupon the Court Reporter marked
11  as Exhibit No. 8 - Beverly Revised
12  Ordinances.)
13  Q  I'm showing to you an exhibit that I've
14  marked as 8, Section 9-4. Does this also
15  appear to be a page from the Beverly Revised
16  Ordinances? (Indicating)
17  A  It does.
18  Q  And this section    I'm sorry. That section
19  says, "Any person holding a city office, or a
20  position in the administrative service of the
21  city, or any person holding full time
22  employment under the city, shall retain such
23  office, or position, or employment, and shall

Vol. 1 - 37
W. SCANLON, JR.

1  continue to perform the duties of such
2  office, position or employment until
3  provision shall have been made for the
4  performance of those duties by another person
5  or agency; provided, however, no person in
6  the permanent full time service of the city
7  shall forfeit his or her pay grade, or time
8  in service of the city. All such persons
9  shall be retained in a capacity as similar to
10 the capacity in which they were serving at
11 the time this charter is adopted as is
12 practical and any reduction in the personnel
13 needs of the city shall be accomplished
14 through a policy of attrition, unless
15 specific provision is otherwise made in this
16 article."
17       Do you believe you can find with that
18 provision when you removed Ms. Atherton from
19 office?
20 A  I believe I had the right to have an
21    executive secretary in whom I had confidence
22    and trust; and as I did advise Ms. Atherton,
23    the specific reason for her removal is that I

Vol. 1 - 38
W. SCANLON, JR.

1  desired to fill the position with a person of
2  my own choosing and in whom I have faith and
3  confidence to perform the duties in an
4  exemplary fashion which I would not have had
5  with her.
6       MR. SHAPIRO: Well, let's see if we
7  can just mark the next section.
8       (Whereupon the Court Reporter marked
9  as Exhibit No. 9 - Page 56 - Section 3-313.)
10 Q  Now, we have marked as Exhibit 9, Section
11    3-313 that deals with the position of
12    confidential secretary, administrative
13    assistant to the Mayor. Is that the position
14    that she held with Mayor Crean? (Indicating)
15 A  I believe so.
16 Q  And what it indicates here at Section B is,
17    "The Confidential Secretary/Administrative
18    Assistant to the Mayor shall be appointed by
19    and responsible only to the Mayor. The
20    Confidential Secretary/Administrative
21    Assistant shall serve at the pleasure of the
22    Mayor."
23       And so your -- You indicated that you

Vol. 1 - 39
W. SCANLON, JR.

1  did not want her to continue in the position
2  because you believed you had the right to
3  remove her at the pleasure of the Mayor under
4  this section, isn't that what you relied upon
5  in your prior letter?
6 A  Well, I believe this is a true statement,
7    sir.
8 Q  Okay. And, in fact, that's what you cited in
9    your Exhibit 5, in your letter of
10   January 5th, '04, is pursuant to Section 3 --
11   I'm sorry. Section 3-313 of the
12   administrative code in removing her, is that
13   right?
14 A  Uh-huh.
15 Q  So you were relying upon this section in
16   removing her. And you also refer -- Okay.
17       So can you tell me: What is the
18   distinction between -- at least in your
19   opinion, what is the distinction between the
20   administrative code and the city ordinances
21   of the Charter, can you give me your views on
22   that for a moment while I digress?
23 A  The distinction between -- I think, in

Vol. 1 - 40
W. SCANLON, JR.

1  general, the administrative code further
2  amplifies the Charter.
3 Q  Do you think it has equal weight and strength
4  as the -- in enforceability as the ordinances
5  of the Charter?
6 A  I think it generally gives further
7    definition, further detail beyond the
8    Charter.
9       We looked at something before that you
10   brought out which said, "shall include but
11   not be limited to the following," for
12   example. So that's the way I view this. I
13   do view it as relevant if that's part of your
14   question.
15 Q  Okay. If there were conflicts between the
16   administrative code and an ordinance of the
17   Charter, which one do you believe would take
18   precedence?
19 A  Well, I'd have to go back to the city
20   solicitor to take a look at that.
21 Q  So you don't have an opinion on that then?
22 A  I have opinions but, you know, a conflict
23   could exist for a variety of reasons. A

Vol. 1 - 41

W. SCANLON, JR.

1    Charter could be in conflict with state law,
2    and then administrative codes might be in
3    accordance with state law. So it's just a
4    complex question.
5 Q  Okay. Well, what I'm asking you is what your
6    knowledge and opinion is as to the --
7 A  I don't see here any conflict, personally. I
8    think the Charter is the primary document if
9    that's what you're —
10 Q  Okay. And then do you think the ordinance
11    would take second place in the administrative
12    code?
13 A  I think the ordinance is generally amplify
14    and define the detail, that it can't possibly
15    be in the Charter.
16 Q  Okay. And then what I'm asking you about:
17    What does the administrative code do in that
18    case?
19        MS. CORBO: I'm sorry. What did --
20 Q  What does the administrative code do insofar
21    as the relationship between the ordinances
22    and the Charter?
23 A  As I say, it amplifies and defines it.

Vol. 1 - 42

W. SCANLON, JR.

1 Q  Okay. All right.
2        MS. CORBO: Could I ask you about how
3    much time do we have left?
4        MR. SHAPIRO: Sure. Off the record.
5        (Whereupon an off-the-record
6    discussion took place.)
7        (Lunch break takes place at 11:47
8    a.m.)
9        (Back on the record at 1:02 p.m.)
10        (Eric Shwartz, Esq. is now present.)
11 Q  (By Mr. Shapiro) I want to go over a couple
12    of things that we touched on this morning.
13    Do you have any memory of you initiating a
14    call to Ms. Atherton in the December '03
15    period to ask her to submit her retirement
16    papers? Do you remember a conversation like
17    that at all?
18 A  I don't. I don't.
19 Q  See if this will trigger anything in your
20    memory. Do you have any memory of having a
21    conversation with her around that time where
22    she asked you to help her get another job
23    somewhere else in the city; does that --

Vol. 1 - 43

W. SCANLON, JR.

1 A  I do remember a brief conversation with her
2    in the office across --
3 Q  Okay.
4 A  Not in the Mayor's office but in the outside
5    office, and I don't recall the specific
6    content.
7 Q  Okay. Do you remember calling -- Do you have
8    any memory of calling anybody else who was
9    terminated in January of '04 by telephone?
10 A  I don't have any memory of calling any of
11    those persons that way.
12 Q  Okay. All right. Now, with regard to your
13    memory as to who was terminated, do you
14    remember Tom L'Italien was terminated?
15 A  I mentioned that, I believe.
16 Q  Yes. Peter Gilmore, the City Solicitor, do
17    you remember him being terminated?
18 A  Uh-huh. Uh-huh.
19 Q  How about a Deborah Hurlburt?
20 A  Yes.
21 Q  And do you remember what her position was?
22 A  The planning director.
23 Q  And do you remember what the reason was for

Vol. 1 - 44

W. SCANLON, JR.

1    terminating her?
2 A  Do I remember what the reason was for
3    terminating her? Well, I certainly wasn't,
4    you know, of the view that she was a good
5    person for that job.
6 Q  She supported Tom Crean, too, isn't that
7    right?
8 A  I don't know that, but I would assume so. I
9    don't think she was a Beverly person.
10 Q  Okay.
11 A  So that makes my earlier answer correct
12    that there were two women. You asked me
13    about that.
14 Q  How about Robert Vallier (phonetic), was he a
15    person who was terminated also in January of
16    '04?
17 A  Yes, and that job was eliminated.
18 Q  Was there a finance director also that was
19    terminated?
20 A  Certainly, he left and would have been — I
21    don't know whether -- or how it worked but,
22    yes.
23 Q  Do you know if those five people that I just

Vol. 1 - 45
W. SCANLON, JR.

1     mentioned were all terminated by you in
2     January '04?
3  A  I believe that's correct.
4  Q  Okay. Good. Now, I want to go back for a
5     little bit. The flaws in Ms. Atherton's
6     work, for lack of a better word, the problems
7     that you had with her work -- Strike that.
8     You had mentioned, prior to this
9     morning, that you had certain issues, that
10    you had concerns about her work, is that a
11    fair statement?
12  A  Yes.
13  Q  Okay. And some of the issues that you
14    mentioned were that Mr. Handly and you
15    were -- had discussions that he -- or you had
16    observed some problems with her filing
17    system, was that one of them?
18  A  She had filed things in such a way that
19    others couldn't find them later.
20  Q  Exactly. Okay. And then you mentioned also
21    that you, personally, had seen her doing some
22    bad things on the telephone, is that --
23  A  Yeah. I mentioned two things this morning.

Vol. 1 - 46
W. SCANLON, JR.

1     I could repeat what I said if you would like.
2  Q  Okay. No, you don't have to. Okay. And
3     other than those instances of her 17 years of
4     employment, is there anything else that you
5     can remember?
6  A  She was often spoken to about giving legal
7     advice to people who would call the
8     solicitor's office. The attorney would tell
9     her that that's not her purpose in that role.
10    I certainly remember that.
11    And I just had a general collection of
12    observations over, -- well, I don't know how
13    many years but certainly four, maybe longer,
14    where, at times, she'd walk away from a
15    ringing phone or just walk out of the office,
16    this kind of a thing.
17  Q  Okay. And that was in no way insubordination
18    to anyone what you --
19  A  I didn't suggest she was insubordinate.
20  Q  Okay. And you feel that those were signs of
21    some inefficiency, is that --
22  A  Yeah. Over the course of time, I observed
23    what I thought was unproductive, inefficient

Vol. 1 - 47
W. SCANLON, JR.

1     and unhelpful behavior.
2  Q  And as a result of those factors, you
3     considered that in removing her, is that what
4     you're saying today?
5  A  Well, all those things -- all those things
6     were in my mind, but I think the most
7     succinct statement of the reasons -- You've
8     given me that letter this morning, "The
9     specific reason for this action --," the
10    action being the removal, "-- is that I
11    desire to fill these positions with a person
12    of my own choosing and in whom I have faith
13    and confidence will perform the duties of
14    such positions in an exemplary fashion."
15  Q  Okay. So that it really wasn't a removal
16    because you didn't think she couldn't do a
17    decent job in your office?
18  A  I don't think she could have done a decent
19    job working with me, certainly.
20  Q  Do you know what her education is?
21  A  Not specifically.
22  Q  Do you know what her licenses are?
23  A  But, as I say, I've observed her for a number

Vol. 1 - 48
W. SCANLON, JR.

1     of years, so I do not know what her licenses
2     are, no.
3  Q  Do you know she has a degree in office
4     management, sir?
5  A  I did not know.
6  Q  Do you know she has a certificate for
7     paralegal, do you know that? Did you know
8     that before I just told you that?
9  A  No.
10  Q  Did you know that she is also certified to be
11    a purchasing agent for a municipality?
12  A  I knew that she had passed certain
13    qualifications regarding purchasing.
14  Q  Did you know that she served as a license
15    board clerk while she was here?
16  A  During the time she was secretary to
17    Mr. Crean?
18  Q  Yes.
19  A  I had heard that, yes.
20  Q  Do you know that she was elected by the other
21    city employees to serve on the retirement
22    board?
23  A  I'm aware of that.

Vol. 1 - 49

W. SCANLON, JR.

1    Q    And did you appoint her to the Charter
2         Commission or to the ordinance review --
3    A    I know she served on that Commission. I
4         couldn't swear to the appointment at this
5         point.
6    Q    You don't remember that you appointed her
7         yourself?
8    A    Well, there are something in the order of 250
9         people on boards and commissions, so I just
10        don't know that.
11   Q    Okay. Do you know that she became the
12        chairman for three years working on that job,
13        do you know that?
14   A    I don't know that, but I don't doubt it.
15   Q    Okay. I believe when you said you received
16        the letter from her requesting a public
17        hearing, you just filed it, is that    I'm
18        showing you Exhibit 6. (Indicating)
19   A    I said I read it, and I filed it, yes.
20   Q    Okay. And so I thought you testified this
21        morning that you believe that hearings would
22        be granted by the council, not by the Mayor?
23   A    That's my understanding, yes.

Vol. 1 - 50

W. SCANLON, JR.

1    Q    So you didn't forward this letter to the
2         council is your best memory, is that right?
3    A    I don't think so.
4    Q    Okay. Now, I believe you -- Do you have any
5         memory of her asking to be reassigned to
6         another job?
7    A    I know she had interest in another position.
8    Q    And do you notice on the bottom line
9         paragraph of -- Excuse me. Strike that.
10            Do you know on the bottom line of
11        Exhibit 3, it's dated December 31st, 2003,
12        she says, "If you wish to re-assign me to a
13        different department or location, please let
14        me know."; do you remember that?
15   A    I believe so.
16   Q    Okay. And did you do anything to try to get
17        her reassigned to another job?
18   A    I did not.
19   Q    Do you remember her asking you when you spoke
20        to her that she said she would even move to
21        the School Department? Do you have any
22        memory of that conversation?
23   A    I do not.

Vol. 1 - 51

W. SCANLON, JR.

1    Q    You don't. Okay. That's fine.
2            Okay. Did you make any efforts to try
3         and find her another job in the City of
4         Beverly?
5    A    No.
6    Q    Do you know whether there were any vacancies
7         in the secretarial or clerical or paralegal
8         or anything else that she had qualifications
9         for?
10   A    To the best of my knowledge, there were not
11        any openings.
12            MR. SHAPIRO: Mark this as the next
13        exhibit.
14            (Whereupon the Court Reporter marked
15        as Exhibit No. 10 - Charter and Related
16        Laws.)
17   Q    I've had the stenographer mark Exhibit 10
18        Article 3 of "The Charter and Related Laws."
19        Does this look like a copy of Article 3 of
20        the Charter for Beverly? (Indicating)
21   A    Uh-huh.
22   Q    You have to say yes.
23   A    Yes. Excuse me.

Vol. 1 - 52

W. SCANLON, JR.

1    Q    And pointing your attention to -- Pointing
2         your attention to Section 3-3, do you recall
3         that you referred to those sections in your
4         notice to her, Exhibit 5, that, in accordance
5         with 3-3 and 3-4 and 3-313, you were removing
6         her from office; do you recall that?
7    A    Yes.
8    Q    Okay. So let's take a look at 3-3 for a
9         moment, and 3-3 says, "The Mayor shall
10        appoint, subject to the review of such
11        appointments by the city council as provided
12        in section 2-10, all city officers,
13        department heads and the members of
14        multiple-member bodies for whom no other
15        method of appointment or selection is
16        provided by the charter excepting only
17        persons serving under the school committee,
18        and persons serving under the city council."
19            Is Ms. Atherton a city officer,
20        department head or member of a
21        multiple-member body, do you know, sir; was
22        she?
23   A    I don't believe so.

Vol. 1 - 53

W. SCANLON, JR.

1  Q  Okay. And reading down a little bit further,
2  it talks about, "The mayor may suspend or
3  remove --," on the first column down about
4  eight lines, do you see where I'm looking at?
5  "The mayor may suspend or remove any person
6  appointed by the mayor in accordance with the
7  procedure established in section 3-4."
8  Again, --
9  A  Yes.
10 Q  -- it doesn't look like she's a party, that
11  she is one of those named individuals, is
12  that right?
13  MS. CORBO: Objection. I'm sorry. To
14  the form of the question.
15  MR. SHAPIRO: Sure. Let me try again.
16 Q  It doesn't look like she's one of those
17  people who -- Let me strike that.
18  She is not a city officer, department
19  head or member of a multiple-member body, is
20  that right?
21 A  In my opinion, she is not.
22 Q  Okay. So can you tell me if you can -- Well,
23  let me ask you something: Did you meet with

Vol. 1 - 54

W. SCANLON, JR.

1  counsel before this letter was sent out on
2  January 5th, '04?
3  A  I did.
4  Q  Did you prepare this? Well, it's signed by
5  you. You read it before it went out,
6  correct?
7  A  More than that, yes.
8  Q  Okay. And so can you tell me why this
9  Section 3-3 and 3-4 are referred to in this
10  letter if it doesn't appear to apply to her?
11  MS. CORBO: Objection to the extent
12  that your understanding is based upon any
13  conversations you had with your counsel at
14  the time. I would instruct you not to answer
15  under the grounds of privilege.
16 Q  Okay. Can you tell me your knowledge or
17  understanding about why those two sections
18  are referred to?
19 A  I'm going to accept the advice of counsel.
20 Q  Okay. It was based upon advice of counsel?
21 A  Certainly in consultation with counsel.
22 Q  Okay. All right. Did somebody in your
23  office or did you, personally, go looking to

Vol. 1 - 55

W. SCANLON, JR.

1  see these Section 3-3 or Section 3-4 before
2  this letter went out?
3  A  The matter was reviewed with counsel. That's
4  as far as I'm going to go.
5  Q  All right. That's fine. Okay.
6  MR. SHAPIRO: If you could mark this,
7  please.
8  (Whereupon the Court Reporter marked
9  as Exhibit No. 11 - Defendant, City of
10  Beverly's Answers to Plaintiff's First Set of
11  Interrogatories.)
12 Q  We've now marked as Exhibit 11, "Defendant,
13  City of Beverly's Answers to Plaintiff's
14  First Set of Interrogatories," and -- Wait a
15  minute. I did it wrong again. My yellow
16  highlighter.
17  I'm sorry. Could -- Let's see. I did
18  that wrong.
19  MR. SHAPIRO: Could I have you re-mark
20  this, and I'll give this to you as Exhibit
21  No. 11 if you would? That's going to be your
22  copy. (Indicating)
23  MS. CORBO: Thank you.

Vol. 1 - 56

W. SCANLON, JR.

1  (Whereupon the Court Reporter marked
2  as Exhibit No. 11 - Defendant, City of
3  Beverly's Answers to Plaintiff's First Set of
4  Interrogatories.)
5  Q  Okay. And I ask you to take a look at the
6  last page of what we have just marked as,
7  "Defendant, City of Beverly's Answers to
8  Plaintiff's First Set of Interrogatories,"
9  and see if that's your -- looks like an
10  original signature on that document; is that
11  your signature?
12 A  I believe so.
13 Q  Okay. I see it indicates also that you
14  had counsel with you to also sign that
15  document, is that correct?
16 A  Yes.
17 Q  Okay. Now, let's take a look at No. 3, and
18  the Question No. 3 is, "To the best of your
19  knowledge --." I'm sorry. The interrogatory
20  is, "Please state the reason that the
21  Plaintiff was not transferred to another
22  position for the City of Beverly at the time
23  she was terminated in her position as

Vol. 1 - 57
W. SCANLON, JR.

1     Executive Secretary to the Mayor."
2     And the answer is, "To the best of my
3     knowledge, there were no job openings
4     available that matched Ms. Atherton's
5     skills."
6     And, again, you attempted to find —
7     You did not attempt to find any jobs for
8     Ms. Atherton?
9  **A**  **I do not — As this indicates, I do not**
10     **believe there were any job openings that**
11     **matched her skills.**
12  **Q**  And did you talk to Mr. Nelson about that who
13     was the Building Commissioner at the time in
14     January '04; do you have any memory of that,
15     sir?
16  **A**  **I don't. I don't have any recollection of**
17     **talking to him about that.**
18  **Q**  Do you know if there was a lady who left the
19     City of Beverly around that period of time
20     whose name was Theresa who left because of
21     allegations that she had stolen some money
22     from the City of Beverly?
23  **A**  **I have no recollection of that.**

Vol. 1 - 58
W. SCANLON, JR.

1  **Q**  Did you ever talk with Gerry Marsella about
2     trying to find a job for Crystal Atherton?
3  **A**  **I did not.**
4  **Q**  Now, Interrogatory No. 4 asked, "Please
5     identify position requirements for the
6     position assignment that plaintiff requested
7     and was denied at the time she was terminated
8     in her position as Executive Secretary to the
9     Mayor."
10     And your answer is, "I am not aware
11     that Ms. Atherton requested to be assigned to
12     any particular position."
13     So you are unaware of any request by
14     Ms. Atherton to be assigned to a particular
15     position?
16  **A**  **To a particular position, I am unaware, yes.**
17  **Q**  I see. And the letter here that she asked to
18     be reassigned we just referred to as Exhibit
19     No. 3, that doesn't -- that doesn't change
20     your view of whether she asked to be assigned
21     to a different department?
22  **A**  **It certainly doesn't refer to any particular**
23     **position; so, no, it doesn't change my**

Vol. 1 - 59
W. SCANLON, JR.

1     **opinion.**
2  **Q**  Now, moving on to Answer No. 6, and I'm not
3     sure if this is a typo or not; but in any
4     event, --
5     MR. SHAPIRO: Was there -- Yes, the
6     1997?
7     MS. CORBO: Actually, the Mayor --
8     MR. SHAPIRO: Can we just go off the
9     record for a moment?
10     MS. CORBO: I'm sorry. Yes.
11     (Whereupon an off-the-record
12     discussion took place.)
13     MR. SHAPIRO: Back on the record,
14     What we have just talked about was
15     making a correction to Answer No. 6 to be the
16     date that she was appointed to work for the
17     purchasing agent began on or about June 1997
18     is what I'm marking on my copy, and I don't
19     know whether you do want to make that change,
20     and I don't have a problem with doing that  -
21     MS. CORBO: Okay.
22     MR. SHAPIRO:  -- with just initialing
23     and making the change to say "to June 1997,"

Vol. 1 - 60
W. SCANLON, JR.

1     so that we will have that accurate, and then
2     that makes sense to me. Okay. Good.
3     MS. CORBO: And you agree that that's
4     accurate?
5     THE WITNESS: I can't swear to the
6     date, but it seems reasonable.
7     MR. SHAPIRO: Let me just see if I can
8     be sure, too.
9     (Mr. Shapiro and Ms. Atherton confer
10     off the record.)
11  **Q**  Okay. Interrogatory No. 14. Let me go back
12     to another question arising out of No. 4.
13     Who is the person who would normally
14     be checking the various ten different
15     department -- ten different department heads
16     to see if there's a job opening? Is there a
17     person who does that?
18  **A**  **The Human Resources Director would be the**
19     **most --**
20  **Q**  Was there any conversations with the Human
21     Resources Director by your office to find out
22     if there was any position open in the
23     entire city?

Vol. 1 - 61
W. SCANLON, JR.

1  A  I'm generally aware if there are openings
2     because turnover is not that great.
3  Q  Okay. How many employees are there at the --
4     Excuse me. After about 2004, approximately
5     how many employees were there in the City of
6     Beverly; just ball park round number?
7  A  On the city side?
8  Q  Yes.
9  A  About 280.
10 Q  I see. Is the School Department separate?
11 A  Separate.
12 Q  How many employees are there, about?
13 A  About 700.
14 Q  In Interrogatory No. 15, it refers to the
15    people identified in No. 14, but we don't --
16    they're listed also in No. 15. It says, "--
17    please state and describe what contact
18    Defendant through its representative,
19    employee, agent, independent contractor,
20    insurer and/or attorney has had with him or
21    her pertaining to this lawsuit."
22       Marshall Handly, you've never spoken
23    to him about this Crystal Atherton's claim,

Vol. 1 - 62
W. SCANLON, JR.

1     is that what you say today?
2  A  I don't believe I've spoken to Marshall
3     Handly about Crystal Atherton since the time
4     he ceased to be an employee of the city.
5  Q  Okay. And how about -- Have you had any
6     conversations with Mayor Crean about Crystal
7     Atherton?
8  A  I have not.
9  Q  And Christopher Bradley, who is he?
10 A  He was the former purchasing agent.
11 Q  And did you talk with him about Crystal
12    Atherton's performance while she worked for
13    him?
14 A  While she worked for him? It's likely that
15    we had discussion.
16 Q  Do you have any memory of any conversation
17    that you had with him that you can relate to
18    me today?
19 A  Not specifically, no.
20 Q  Well, do you have any vague recollections at
21    all without being specific about talking
22    about her to him?
23 A  Well, I believe she worked with him for

Vol. 1 - 63
W. SCANLON, JR.

1     several years, and I'm sure there was
2     discussion, but I cannot remember any of it.
3  Q  Okay. Linda Giallongo.
4  A  Giallongo.
5  Q  Giallongo. What conversations did you have
6     with her about this case?
7  A  I don't know of any conversations I've had
8     with her about this case.
9        MS. CORBO: Just as a point of
10    clarification, --
11       MR. SHAPIRO: Yes.
12       MS. CORBO: -- the interrogatory also
13    says "representative, employee, agent,
14    independent contractor." So some of the
15    answers may reflect contact that an agent may
16    have had with Linda that the Mayor didn't
17    directly himself have.
18       MR. SHAPIRO: Well, as I'm reading
19    this answer, it looks like it was just
20    scheduling meetings and different things like
21    that was what he said that he spoke with her
22    about. It looks like he was talking about
23    his own conversations. But fine, I'll ask.

Vol. 1 - 64
W. SCANLON, JR.

1  Q  Were there other people who may have been
2     acting on your behalf that spoke with her in
3     more detail about what this case was about?
4  A  With Linda Giallongo?
5  Q  Yes.
6  A  I don't believe so.
7  Q  When you received this lawsuit, did you
8     contact the city council?
9  A  Did I contact the city council?
10 Q  Yes. Any of the members of the city council?
11 A  No. I wasn't sure whether you were talking
12    about the CIL or the SEL earlier.
13 Q  Yes.
14 A  No, I do not believe I discussed this with
15    the city councilors.
16 Q  So when this case hit the newspapers or --
17    Let me strike that.
18       When this case came to your desk and
19    you were aware that a lawsuit had been filed,
20    you didn't contact any of the city councilors
21    to say anything about this case?
22 A  I don't believe so. I believe I spoke with
23    the city solicitor which is the typical way I

Vol. 1 - 65
W. SCANLON, JR.

1      would respond.
2  Q   And who is Pauline Teixteria?
3  A   She's the Human Resources Director.
4  Q   And did you or somebody in your office
5      gathered documents for this response to this
6      lawsuit, is that all that you talked with her
7      about?
8  A   I don't believe I've discussed this matter
9      with her. I think the city solicitor
10     developed the criteria —
11 Q   About this —
12 A   — and outside counsel.
13 Q   And in regard to John Dunn, you say all
14     conversations that occurred in -- with him
15     were in the presence of the city solicitor,
16     is that right?
17 A   I believe so.
18 Q   So that other than talking to John Dunn about
19     this case, you didn't talk with anybody --
20     and your attorney, you didn't talk with any
21     other city officials or city employees or
22     department heads about this case?
23 A   I think that's — I think that's right. I

Vol. 1 - 66
W. SCANLON, JR.

1      notice here that her name is misspelled, but
2      perhaps it's not too important.
3  Q   So other than talking with John Dunn and your
4      counsel, the lawyers, you say today that you
5      talked with nobody about her job performance
6      or her discharge or -- or her discharge?
7  A   Not that I can recall.
8  Q   Not that you can recall. Okay. Now, No. 17,
9      "Please state and describe each and every
10     ground relied upon, know, and/or heard by
11     defendant to indicate or demonstrate that
12     Plaintiff did not merit retention in another
13     position as an employee for the City of
14     Beverly."
15         And your answer, when we get to the
16     next page after the lawyer's objection says,
17     "I had the opportunity to observe
18     Ms. Atherton in her position as paralegal for
19     the City Solicitor's office. I was not
20     impressed with Ms. Atherton's performance in
21     that position and did not have confidence in
22     Ms. Atherton's ability to perform as the
23     Confidential Secretary to the Mayor."

Vol. 1 - 67
W. SCANLON, JR.

1      Is there anything you want to add to
2      that today?
3  A   No.
4  Q   Okay. That's all I have for that document.
5         As a result of your observations of
6      her work for the city solicitor's office when
7      she was with Mr. Handly, you did not request
8      that she be removed from her office, is that
9      right, to Mr. Handly or --
10 A   I did not request that.
11 Q   Okay. And you did not request that she be
12     disciplined for anything you saw, is that
13     right?
14 A   I left that to Mr. Handly.
15 Q   And you did not ask that she be retrained or
16     given further education on how to properly
17     respond to phone calls and those issues, did
18     you?
19 A   No. I left that between the department head
20     and the employee,
21 Q   Could you tell me -- I'm going back to
22     Exhibit 9, Section 3-313. It refers to the,
23     "Authorities and Responsibilities." Were

Vol. 1 - 68
W. SCANLON, JR.

1      there any other secretarial positions in your
2      office other than confidential secretary,
3      administrative assistant?
4  A   No.
5  Q   And how many positions are there -- Excuse
6      me.
7         How many positions were there in 2004
8      that held those jobs, that job?
9  A   I'm not sure if I understand the question.
10     How many positions throughout the city?
11 Q   No. How many people in your office are
12     confidential secretary, administrative
13     assistant to the Mayor?
14 A   One.
15 Q   Just one?
16 A   Yes.
17 Q   And how many secretaries are there in your
18     office?
19 A   One.
20 Q   Okay. And the -- Have you had an opportunity
21     to read Part C that describes what their
22     duties are?
23 A   I think so.

Vol. 1 - 69
W. SCANLON, JR.

1  Q   And is there anything more or less that are
2      part of the job duties of the confidential
3      secretary to the Mayor?
4  A   I'm certain it's not all inclusive given that
5      there's only the one person.
6          MS. CORBO: Objection. I just want to
7      make a note for the record that there's only
8      one page to this document, and it looks like
9      it may continue onto another page. I'm not
10     sure that Section C is complete. I don't
11     know if it does or not. So when you ask if
12     there's more --
13         MR. SHAPIRO: Okay. I think that's
14     it, but -- Okay. Good note. And we'll find
15     if there are more.
16  Q  And what is there that makes this particular
17     job confidential as compared to just a
18     general secretarial?
19  A  Well, there are a great many things where
20     confidentiality is relevant as I'm sure we
21     can all understand.
22  Q  Well, some of the tasks that are to be done
23     have nothing to do with confidentiality, is

Vol. 1 - 70
W. SCANLON, JR.

1      that correct?
2  A   That's correct.
3  Q   Meeting as liaison officer between the Mayor,
4      the media, public interest groups, businesses
5      and residents don't involve confidentiality,
6      do they?
7  A   I'm certain that there are a number of
8      activities that don't involve
9      confidentiality.
10         MR. SHAPIRO: Please mark these as the
11     next exhibits.
12         (Whereupon the Court Reporter marked
13     as Exhibit No. 12 - Complaint and Demand for
14     Trial by Jury.)
15         (Whereupon the Court Reporter marked
16     as Exhibit No. 13 - Answer of Defendants,
17     City of Beverly and William F. Scanlon, Jr.)
18  Q  The next exhibit that we've marked is -- What
19     I want to do is see if we get - And I'll put
20     these out together and go through some of the
21     admissions or the denials in the Complaint
22     and the Answer.
23         And the first paragraph that I just

Vol. 1 - 71
W. SCANLON, JR.

1      want you to look at was Paragraph 7. Let's
2      first see if you understand that the exhibit
3      we marked as Exhibit 13 is the, "Answer of
4      Defendants, City of Beverly and William F.
5      Scanlon, Jr.," and it's signed by the
6      attorney for the city, and I just want to ask
7      you: Have you ever seen this document
8      before? (Indicating)
9  A   I didn't sign it.
10  Q  No, you did not.
11  A  No. I'm not absolutely certain. I believe
12     that I'm somewhat familiar with questions
13     that seem to be discussed in it, but I'm not
14     absolutely certain, sir.
15  Q  Okay. Well, let's just take a look at
16     Paragraph 7 for the moment and see if you
17     agree with some of the answers that we have
18     here, if that makes sense, and you can
19     explain them to me.
20         No. 7, the Complaint says, "During her
21     seventeen year tenure as a City of Beverly
22     employee, Plaintiff, Crystal Atherton, served
23     in several positions, including the law

Vol. 1 - 72
W. SCANLON, JR.

1      department paralegal and assistant to the
2      Purchasing Director."
3          And your answer was, "Denied as to
4      allegation that the Plaintiff had a
5      'seventeen year tenure.'" Any reason you
6      could think of why that --
7  A   I'm not sure what her tenure was. I do
8      recall when she was getting close to what she
9      considered tenure, she used to talk about
10     taking retirement, and I'd have to see the
11     actual dates. I can't say that she did or
12     didn't have 17 years of service. It's not
13     clear to me that she did. Let me just say
14     that.
15  Q  Okay. Let's look at No. 20, please, the
16     Answer and the Complaint there. And
17     number -- Paragraph 20 of the Complaint,
18     Exhibit 12, says, "During her various
19     capacities on behalf of the City of Beverly,
20     Plaintiff, Crystal Atherton, was never
21     informed that any particular political
22     association, affiliation or patronage would
23     be a requirement for performance of her job."



Vol. 1 - 73
W. SCANLON, JR.

1        And the answer is, "Defendants are
2    without sufficient information to either
3    admit or deny the allegations in Paragraph
4    20."
5        And what I want to ask you is: Did
6    you ever tell her that her political
7    affiliations were an issue for you?
8  A  No.
9  Q  Do you know if anybody else did?
10 A  I do not.
11 Q  But, in fact, her political affiliation was a
12   factor that went into the decision to have
13   her as your confidential secretary, isn't
14   that right? They were a factor?
15 A  It didn't help.
16 Q  Okay. And Paragraphs 25, 26 and 27. Let's
17   see if I can just go through those. Let me
18   take a look at 25, 26 and 27. Okay. 25.
19   Paragraph 25 says, "Plaintiff, Crystal
20   Atherton, was not discharged because of
21   unsatisfactory job performance." And that
22   is, "Denied."
23        Do you mean that should have been

Vol. 1 - 74
W. SCANLON, JR.

1    admitted? And I'm just asking you.
2        MS. CORBO: Objection. Are you asking
3    me about --
4        MR. SHAPIRO: No. I'm asking -- No,
5    I'm asking Mr. -- the Mayor if he has a view
6    as to whether or not did he intended to say
7    "denied."
8        MS. CORBO: Objection to the extent
9    that you have knowledge as to what the
10   drafter of this document meant when they
11   provided an answer, you can answer, but --
12       THE WITNESS: But I don't. I don't
13   believe I can answer.
14 Q  All right. Well, let me ask you then today
15   without looking at the answer that counsel
16   has filed for you, is it true or false that
17   she was not discharged because of
18   unsatisfactory job performance?
19       MS. CORBO: Objection as to form.
20 Q  Well, see if you can answer that. Do you
21   understand the question? Do you want me to
22   try it again?
23 A  Do you have a --

1
2
3 (
4 A
5
6
7 Q
8 A
9
10
11 Q
12
13
14
15
16
17 A  I                      ....uence that going
18   f      ..... sue could do a reasonable job as is
19   written in the documents.
20 Q  But there was no unsatisfactory job
21   performance for you that you were discharging
22   her for, was there?
23 A  She did not work for me.

Vol. 1 - 76
W. SCANLON, JR.

1  Q  Right. So did you --
2  A  Again, it seems like it's a question that's
3     kind outside of the foul line.
4  Q  Sir, --
5        MS. CORBO: Objection. He's already
6     answered about her performance and the
7     concerns he had.
8        Are you referring to her job
9     performance as executive secretary?
10       MR. SHAPIRO: No. I'm trying to get
11    an answer to this Complaint that I filed that
12    I think there is a little bit of confusion as
13    to whether the answer is denied or admitted,
14    and so I just want to be sure that what he's
15    saying today is what he intends the answer to
16    be to this allegation.
17       So please don't give him anymore
18    suggestions as to what the answer should be.
19    It would be helpful --
20       MS. CORBO: Well, I'll object as much
21    as I want.
22       MR. SHAPIRO: You can object as much
23    as you want, but you're subject to sanctions

Vol. 1 - 77
W. SCANLON, JR.

1    if you keep giving him lengthy answers other
2    than objection or not objection.
3        MS. CORBO: So please file for them.
4    The form of the question. It's asked and
5    answered and asked and answered. He's
6    already discussed his opinions about her job
7    performance. I don't think your question is
8    clear. I think that the man has indicated
9    that.
10       MR. SHAPIRO: The question is -- All
11   right. Well, let me try one last time, and
12   please don't say anything other than
13   objection when I ask him a question.
14       MS. CORBO: I'll object and clarify as
15   I feel appropriate.
16       MR. SHAPIRO: Okay. You can do that
17   but --
18       MS. CORBO: I will.
19       MR. SHAPIRO: Okay. You are at great
20   risk before the Judge. Okay. And --
21       MS. CORBO: And I disagree.
22       MR. SHAPIRO: Okay.
23   Q  (By Mr. Shapiro) I'm asking you to take a

Vol. 1 - 79
W. SCANLON, JR.

1    Q  I thought so, too. Paragraph 26. You didn't
2       discharge her because of any specific
3       job-related action that she had taken either,
4       did you?
5    A  I believe that's true.
6    Q  And you did not discharge her because of any
7       job-related omission that she had failed to
8       take; that's also true, isn't it, sir?
9    A  I'm not aware of what omissions she might
10      have had or not. I go back to believing that
11      all three questions are really moot
12      because --
13   Q  Okay.
14   A  -- my actions were taken looking forward, not
15      at her interactions with then Mayor Crean.
16   Q  Okay. Exactly. Okay. Let's take a look at
17      Paragraph 28 for a moment. Paragraph 28 asks
18      you prior to her being -- Paragraph 28 of the
19      Complaint, Exhibit 12, says, "Prior to being
20      discharged, and after her discharge,
21      Plaintiff, Crystal Atherton was: (a) not
22      afforded an opportunity to be heard to
23      contest her discharge." Is that true?

Vol. 1 - 78
W. SCANLON, JR.

1    look at Paragraph 25 of the Complaint. It
2    says, "Plaintiff, Crystal Atherton, was not
3    discharged because of unsatisfactory job
4    performance." Is that true or false? And
5    just one second. Take a -- Just read
6    Paragraphs 26 and 27 and see if that helps
7    you to answer 25.
8    A  (Reviewing document)
9    Q  And when you're ready, let me know.
10   A  I can't speak to the specific performance of
11      her during those years. She did not, in
12      fact, work for me. I removed her from office
13      when she was unwilling to resign for the
14      reasons cited in the material you've put into
15      the exhibits earlier in the day. I think
16      that's clear with regard to this request.
17   Q  Okay. And I'm asking to you now: Just
18      forget about what you've already told me.
19      I'm asking you to answer my question which
20      I'm asking you, as to Paragraph 25, whether
21      you admit or deny what is said in Paragraph
22      25?
23   A  I think what you say there is true.

Vol. 1 - 80
W. SCANLON, JR.

1    A  She did not pursue the opportunity. She --
2       As her own letter states, she took three
3       weeks of vacation, and then she never pursued
4       it with the city council. So I think that
5       I'd have to deny the statement.
6    Q  Okay. Paragraph --
7    A  This lady is not bashful. She could have
8       gone forward and done that with the city
9       council.
10   Q  Okay.
11   A  As stated in the Charter.
12   Q  And Paragraph B says she was "not afforded a
13      hearing before an impartial tribunal in which
14      to contest or challenge her discharge." Is
15      that also --
16   A  That's the same answer as I have just given
17      you, sir.
18   Q  Okay. But when you received the letter from
19      her asking for a hearing, you just filed it
20      away, right, sir?
21   A  It was not the proper process to obtain a
22      hearing, and the lady is very familiar with
23      the City Charter.

Vol. 1 - 81
W. SCANLON, JR.

1  Q  Okay. By the way, did you consider that
2     after 17 years of her working here, if she
3     had another three years of employment, she
4     would have received 20 years' retirement
5     pension?
6  A  I don't find the logic in that approach
7     because once one is eligible for a pension,
8     there's no magic to the number of years.
9     Every year one works, it increases, so it's
10    not as if there's a big jump at 20 years
11    versus 19. There's no difference, really,
12    between 19 and 20 and 18 and 19 in percentage
13    terms.
14 Q  Okay.
15 A  So it's just -- I see that as a red herring.
16 Q  Okay. Now, Linda Giallongo --
17 A  Giallongo.
18 Q  Giallongo. Is the person who replaced
19    Crystal Atherton as the Mayor's executive
20    secretary, is that correct?
21 A  Yes.
22 Q  Okay. Now, did you know that she had filed a
23    lawsuit against the city when Tom Crean had

Vol. 1 - 82
W. SCANLON, JR.

1     removed her?
2  A  I am aware there was a lawsuit.
3  Q  Okay. And, in fact, her lawsuit was making
4     the same claim against Mayor Crean that
5     Ms. Atherton is making against you, isn't
6     that a general fair statement?
7        MS. CORBO: Objection.
8  A  I don't know the details of her lawsuit. I
9     was away from the city at that time.
10 Q  Okay. We'll soon find out.
11       MR. SHAPIRO: Mark that as an exhibit.
12       (Whereupon the Court Reporter marked
13    as Exhibit No. 14 - Friday - The Salem News
14    September 27, 2002.)
15       MS. CORBO: Can we go off the record?
16       MR. SHAPIRO: Sure.
17       (Whereupon an off-the-record
18    discussion took place.)
19       MR. SHAPIRO: Back on the record.
20 Q  Have you had a chance to look at that
21    document? (Indicating)
22 A  Some of it.
23 Q  Okay. Let me bring to your -- Let me call

Vol. 1 - 83
W. SCANLON, JR.

1     your attention to the third column.
2     "Giallongo called the move 'political,' and
3     said she suspects that her friendship with
4     former Mayor William Scanlon bothered her new
5     boss."
6        Is that something that she talked with
7     you about if she was having trouble with
8     Mayor Crean; do you recall?
9  A  When I left the office for the years 2002,
10    2003, I did not keep in contact with her.
11 Q  Okay. And are you aware that Tom Crean kept
12    her in the job for about nine months to see
13    how she'd work out before he terminated her?
14 A  That's what it says.
15 Q  Okay. And do you see in this article that's
16    under the writer, Mark Fortier,
17    F-O-R-T-I-E-R, is quoting you and says,
18    "Scanlon, reached at home yesterday, called
19    Giallongo 'one of the most competent people
20    I've ever come across.' He said it is a
21    shame that Crean decided to replace her. 'I
22    find it exceedingly unfortunate for the
23    community to lose her talents, and I expect

Vol. 1 - 84
W. SCANLON, JR.

1     that there are people who don't have any clue
2     what to do with certain problems who will now
3     be making the decisions,' Scanlon said."
4        Does that refresh your memory about
5     your involvement with this situation back in
6     September of '02?
7  A  I think it's a fair -- I think it's a fair
8     quote. But I don't believe there was any
9     involvement with her. I think I'd probably
10    make the same statement today.
11 Q  Okay. Well, you certainly have a fondness
12    for her ability, at least, is that true?
13 A  Yes.
14       MR. SHAPIRO: Mark that as the next
15    exhibit.
16       (Whereupon the Court Reporter marked
17    Exhibit No. 15 - Letter - 1/5/04 to Honorable
18    City Council from William F. Scanlon, Jr.)
19 Q  I'm showing you a letter dated January 5th,
20    2004 that we have marked as Exhibit 15, and
21    ask you if you remember signing that letter?
22    (Indicating)
23 A  I believe so, yes.

Vol. 1 - 85

W. SCANLON, JR.

1  Q    Yes. And can you tell me approximately when,
2       prior to January 5th, 2004, you had contacted
3       Ms. Giallongo to bring her back to work for
4       you?
5  A    I don't know when.
6  Q    A week, a month, three months, four months?
7  A    I don't know when.
8  Q    No estimate, possibly? A wild estimate, a
9       guess?
10          MS. CORBO: Objection.
11  A   I simply don't know when. Certainly, prior
12      to that date, but I don't know when.
13  Q   Do you know if it was prior to
14      December 15th of --
15  A   I don't -- Sir, I do not know the date.
16  Q   I'm just trying to see if I can help you to
17      remember what the date is.
18          Does it help you that you were talking
19      to Crystal about removing her in the middle
20      of December, that you may have called Ms.
21      Giallongo to come in?
22  A   It's possible. It's possible.
23  Q   Would it be your normal procedure that you

Vol. 1 - 86

W. SCANLON, JR.

1       would want to have a vacancy filled before
2       you let Ms. Atherton go?
3  A    I don't think there's a normal procedure
4       there. No, I don't think that I have a
5       normal procedure. It may be that more often
6       than not, I'd do it the other way.
7  Q    Okay. Can you tell me: When did you start
8       thinking about contacting Ms. Giallongo to
9       bring her back as your secretary?
10  A   Probably after I was elected or re-elected.
11  Q   Well, that makes sense. Okay. Good.
12          MR. SHAPIRO: Can you mark that one,
13      please?
14          (Whereupon the Court Reporter marked
15      as Exhibit No. 16 - Letter - 9/27/02 to Ms.
16      Linda Giallongo from Thomas M. Crean.)
17  Q   I'm showing you a letter by Thomas Crean that
18      your counsel produced for me in the
19      production of documents, and it's dated
20      September 27th, 2002. I as you to -- And
21      we've had that marked as Exhibit 16, and I'd
22      ask if you've ever seen that letter before?
23      (Indicating)

Vol. 1 - 87

W. SCANLON, JR.

1  A    I don't believe so.
2  Q    So when you decided to terminate
3       Ms. Atherton, you didn't review Mr. Crean's
4       letter that says to Ms. Giallongo the reason
5       he is terminating her was "-- your attitude
6       toward my staff and hires has been at times
7       uncooperative and unhelpful." There are
8       deficiencies in your job performance. I
9       cannot guarantee that you would be able to
10      stay here for the next four years and be
11      eligible for the higher pension you seek.
12      All of those kinds of things; these are ideas
13      you got from Tom Crean?
14  A   I don't believe, as I've stated, that I have
15      ever seen this letter before this moment,
16      sir.
17  Q   I see. Have you -- Or from anybody that this
18      was the kind of a letter that Mr. Crean had
19      sent to Ms. Giallongo before you sent similar
20      documents to my client?
21          MS. CORBO: Objection.
22  A   That's a ridiculous question given that I
23      just told you that I've never seen this

Vol. 1 - 88

W. SCANLON, JR.

1       letter.
2  Q    I didn't ask you if you saw the letter. The
3       only question I just asked you -- I just
4       asked you: Had you heard from anybody that
5       that was what Mr. Crean did when he
6       terminated Ms. Giallongo?
7  A    You made reference to the letter which I said
8       I had not seen and then asked me if I got
9       ideas from it.
10          Now, please, remember what you're
11      saying when you ask the question because it
12      gets rather ridiculous at moments.
13  Q   I just wanted to keep track.
14          MR. SHAPIRO: Could you read back the
15      question that I had in that area when I
16      started asking about this letter, please?
17          (Whereupon the Court Reporter read
18      back the requested information.)
19  A   Well, it started off as a direct reference to
20      that letter. So she's already answered the
21      question.
22          MR. SHAPIRO: No, the second -- the
23      next question that I asked you to read.

Vol. 1   89
W. SCANLON, JR.

1    (Whereupon the Court Reporter read
2    back the requested information.)
3 Q  Okay. Well, then I'll ask the question
4    again.
5        Had you spoken to anybody about -- Let
6    me ask it this way: Had you talked to Ms.
7    Giallongo about the way that Mr. Crean had
8    terminated her, alleged all of the defects in
9    her work as an excuse to terminate her?
10 A **I did not get involved in that matter. I was**
11   **away from the city when that happened.**
12 Q  So the answer is, no, you never spoke to her
13   about that case?
14 A **We may have talked a little bit at some point**
15   **of, you know, that life wasn't easy, and she**
16   **left but not beyond that kind of thing.**
17 Q  So you didn't get the idea to say that
18   Ms. Atherton's work performance is lousy from
19   Ms. Giallongo?
20 A **Absolutely, I did not.**
21 Q  Okay. Good. Were you aware that there was
22   a -- I think I had asked you before about the
23   lady in the Building Department who had been

Vol. 1 - 90
W. SCANLON, JR.

1    terminated, and I think you said you weren't
2    aware of that at all, is that right?
3 A  **That's what I said, yes.**
4 Q  Was there a position as the assistant to the
5    plumbing inspector that was not filled for a
6    long time in 2004 that you recall?
7 A  **I honestly can't tell you.**
8 Q  Do you know whether there was a position in
9    the Building Department of secretary that
10   went unfilled for a long time in 2004?
11 A  **I have answered you, and I'll do it again,**
12   **that I'm not aware of any open positions that**
13   **are relevant or even open positions that**
14   **weren't relevant.**
15 Q  Okay.
16 A  **I'm not aware of any openings that existed at**
17   **that time.**
18 Q  Okay. And just so that I'm specific, not
19   general, like your answer just was, so then
20   you were unaware that there was a secretarial
21   position open in 2004 for a long period of
22   time in the Building Commissioner's
23   Department, is that --

Vol. 1 - 91
W. SCANLON, JR.

1 A  **I am unaware of that, yes.**
2        MR. SHAPIRO: Okay. Just one moment
3    and let me just see if I have anything
4    further if I could. Let me talk to my client
5    for a moment if I could, and we'll come right
6    back very quickly.
7        (Break takes place at 2:04 p.m.)
8        (Back on the record at 2:06 p.m.)
9 Q  Just one more try at seeing if you have any
10   memory of anybody talking to you about a job
11   opening in the Building Department.
12       Do you have any memory of Roy Gelineau
13   talking with you about filling a vacancy in
14   the Building Department for Ms. Atherton?
15       MS. CORBO: Objection to the extent
16   that you're requesting conversation with
17   counsel.
18       MR. SHAPIRO: It's all legal advice.
19   Why would that be privileged?
20       MS. CORBO: Huh?
21       MR. SHAPIRO: It's all legal advice.
22   Why would that be privileged?
23       MS. CORBO: Well, it has to do with a

Vol. 1 - 92
W. SCANLON, JR.

1    potential lawsuit from Ms. Atherton, wouldn't
2    it?
3        MR. SHAPIRO: I don't think so.
4 Q  Anyway, --
5 A  **I have no such recollection.**
6        MR. SHAPIRO: Okay. Okay. That's all
7    I have.
8        THE WITNESS: Okay.
9        MS. CORBO: I just have a few more.
10
11   CROSS EXAMINATION
12 Q  (By Ms. Corbo) I'm going to redirect your
13   attention to what's been marked as -- I
14   believe as Exhibit 5. Is it an accurate
15   statement to state that the reasons you state
16   in your letter of January 5th that you are
17   removing Ms. Atherton from her position is
18   that because you wanted to appoint someone in
19   whom you had faith and confidence who would
20   perform the duties of the position in an
21   exemplary fashion?
22 A  **That is the reason, yes.**
23 Q  Okay. And you previously testified that you

Vol. 1 - 93
W. SCANLON, JR.

1  had some concerns regarding Ms. Atherton's
2  performance that you had observed while you
3  were Mayor, is that correct?
4  A  That is correct, yes.
5  Q  Did those concerns regarding Ms. Atherton's
6  performance that you had previously observed
7  have anything to do with the fact that you
8  did not -- that you sought to remove her from
9  the position of confidential executive
10  secretary?
11  A  They were a part of an overall opinion I
12  developed that she was not appropriate for
13  that position under my --
14  Q  So if I refer your attention to what's been
15  marked as Exhibit 12, and we look back at, I
16  believe it was Paragraph 24. I'm sorry. It
17  was Paragraph 25. The statement in
18  Paragraph 25 in the Complaint reads,
19  "Plaintiff, Crystal Atherton, was not
20  discharged because of unsatisfactory job
21  performance."
22  My question to you is: Was her
23  performance at all a consideration in your

Vol. 1 - 95
W. SCANLON, JR.

1  MS. CORBO: I have no further
2  questions.
3  MR. SHAPIRO: Nothing further.
4  (Whereupon the deposition of William
5  F. Scanlon, Jr., concluded at 2:10 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Vol. 1 - 94
W. SCANLON, JR.

1  decision to remove her from the position of
2  executive confidential secretary?
3  A  Her expected performance going forward based
4  on things I had learned and observed after
5  years of watching her work.
6  Q  Okay. In Paragraph 26, it says, "Plaintiff,
7  Crystal Atherton, was not discharged because
8  of any specific job-related action that she
9  had taken."
10  Did Ms. Atherton fail to resign when
11  you asked her to resign?
12  A  Yes.
13  Q  And then in Paragraph 27 it says, "Plaintiff,
14  Crystal Atherton, was not discharged because
15  of any specific job-related omission that she
16  had failed to take."
17  Did Ms. Atherton resign when you
18  requested her resignation?
19  A  No.
20  Q  Was one of the reasons that she was removed
21  from her position because she failed to
22  resign?
23  A  Absolutely.

Vol. 1 - 96
W. SCANLON, JR.

C E R T I F I C A T E

I, WILLIAM F. SCANLON, JR., do hereby
certify that I have read the foregoing transcript
of my testimony and further certify that said
transcript is a true and accurate record of said
testimony and signed under the pains and
penalties of perjury.

Dated this _____ day of_____
2007.

_____
WILLIAM F. SCANLON, JR.

Atherton, et al vs. City of Beverly, et al                    William F. Scanlon, Jr

Case 1:05-cv-11323-MLW    Document 41-3    Filed 03/15/2008    Page 26 of 26

September 12, 2007

Vol. 1 - 97
W. SCANLON, JR.

## CERTIFICATE

I, Simonne J. Elwood, R.P.R. and a
Notary Public within and for the Commonwealth of
Massachusetts, duly commissioned, qualified and
authorized to administer oaths and to take and
certify depositions, do hereby certify that
heretofore, to wit, on the 12th day of September
2007, personally appeared before me William F.
Scanlon, Jr., at the Beverly City Hall, 191 Cabot
Street, Beverly, Massachusetts, in the
aforecaptioned cause pending in the United States
District Court, for the District of Massachusetts;
that the witness was by me duly sworn to testify
to the truth, the whole truth and nothing but the
truth; that thereupon and while said witness was
under oath, the within deposition was taken down
by me in shorthand at the time and place herein
named and was thereafter reduced to computer
transcription under my supervision. I further
certify that I am not interested in the event of
the action.

IN WITNESS WHEREOF, I have hereunto
subscribed my hand and affixed my seal of office
this ____ day of _____, 2007.

_____
Simonne J. Elwood
REGISTERED PROFESSIONAL REPORTER

My Commission Expires: February 14, 2008

---

Vol. 1 - 98
W. SCANLON, JR.
### ERRATA SHEET

Date of Deposition: September 12, 2007

Case Name: Crystal A. Atherton, et al vs. City
of Beverly, et al
C.A. No. 05-11323MLW

Deponent's Name: William F. Scanlon, Jr.

I, the undersigned, do hereby certify
that I have read the foregoing deposition
transcript and that to the best of my knowledge,
said deposition transcript is true and accurate
(with the exceptions of the following changes
listed below):

_____
WILLIAM F. SCANLON, JR.

Dated _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction__

Page No. __ Line No.__ Correction   _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.   Correction _____

Page No. __ Line No.  . Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.   Correction _____

Page No. __ Line No.__ Correction _____ .

Page No. __ Line No.__ Correction_____

---

Vol. 1 - 99
W. SCANLON, JR.

Page No. __ Line No.___ Correction _____

Page No. __ Line No.___ Correction _____

Page No. __ Line No.___ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction

Page No. __ Line No.   Correction _____

Page No. __ Line No.__ Correction___   _____

Page No. __ Line No.   Correction   _____

Page No.   Line No.   Correction_____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction _____

Page No. __ Line No.__ Correction

Page No. __ Line No.__ Correction

# Exhibit
# 3

EXHIBIT A

## SUBPART A.
## BEVERLY HOME RULE CHARTER*

Art. 1.     Incorporation; Short title; Definitions, §§ 1-1—1-7
Art. 2.     Legislative Branch, §§ 2-1—2-11
Art. 3.     Executive Branch, §§ 3-1—3-8
Art. 4.     School Committee, §§ 4-1—4-3
Art. 5.     Administrative Organization, §§ 5-1—5-8
Art. 6.     Finance and Fiscal Procedures, §§ 6-1—6-9
Art. 7.     Elections; Election Related Matters, §§ 7-1—7-13
Art. 8.     General Provisions, §§ 8-1—8-16
Art. 9.     Transitional Provisions, §§ 9-1—9-7

A TRUE COPY

ATTEST: *James A. McDonald*

City Clerk

*Editor's note—Set out herein is the Home Rule charter of Beverly, Massachusetts, as proposed by the Beverly Charter Commission and approve by the voters on Nov. 7, 1985. The former Charter derived from the Acts of 1910, chapter 542; Acts of 1913, chapter 396; Acts of 1920, chapter 26; Acts of 1922, chapter 140; Acts of 1936, chapter 29; Acts of 1943, chapter 196; Acts of 1953, chapter 95; Acts of 1954, chapter 602.

Sections lacking a history note contained in parentheses at the end of the section derive unamended from the Charter of 1985, and sections amended by subsequent legislation are followed by a parenthetical history note. Material in brackets [ ] has been added by the editor for purposes of clarification.

3

## ARTICLE 1. INCORPORATION; SHORT TITLE; DEFINITIONS

### Sec. 1-1. Incorporation.

The inhabitants of the City of Beverly, within the territorial limits established by law, shall continue to be a municipal corporation, a body corporate and politic, under the name "City of Beverly."

### Sec. 1-2. Short title.

This instrument shall be known, and may be cited, as the Beverly Home Rule Charter.

### Sec. 1-3. Distribution of powers.

The administration of the fiscal, prudential and municipal affairs of Beverly, with the government thereof, shall be vested in an executive/administrative branch headed by a mayor, and a legislative branch to consist of a city council. The legislative branch shall never exercise any executive/administrative power and the executive/administrative branch shall never exercise any legislative power.

### Sec. 1-4. Powers of the city.

Subject only to express limitations on the exercise of any power or function by a municipal government in the constitution or general laws of the Commonwealth, it is the intention and the purpose of the voters of Beverly through the adoption of this charter to secure for themselves and their government all of the powers it is possible to secure as fully and as completely as though each such power were specifically and individually enumerated herein.

### Sec. 1-5. Construction.

The powers of the City of Beverly under this charter are to be construed liberally in favor of the city, and the specific mention of any particular power is not intended to limit the general powers of the city as stated in section 1-4.

### Sec. 1-6. Intergovernmental relations.

Subject only to express limitations in the constitution or general laws of the Commonwealth, Beverly may exercise any of its powers or perform any of its functions and may participate in the financing thereof, jointly or in cooperation, by contract or otherwise, with the Commonwealth or any agency or political subdivision thereof, or with the United States government or any agency thereof.

### Sec. 1-7. Definitions.

Unless another meaning is clearly apparent from the manner in which the word or phrase is used, the following words and phrases as used in this charter shall have the following meanings:

(a) *Charter:* The word "charter" shall mean this charter and any amendment to it hereafter adopted.

(b) *City:* The word "city" shall mean the City of Beverly.

(c) City bulletin board: The words "city bulletin board" shall mean the bulletin board in the city hall on which the city clerk posts official notices of meetings and upon which other official city notices are posted, and the bulletin boards at any other locations as may be designated city bulletin boards by the city council.

(d) *City agency:* The words "city agency" shall mean any multiple member body, any department, division, or office of the City of Beverly.

(e) *City officer:* The words "city officer" when used without further qualification or description, shall mean a person having charge of an office or department of the city who in the exercise of the powers or duties of such position exercises some portion of the sovereign power of the city.

(f) *Emergency:* The word "emergency" shall mean a sudden, unexpected, unforeseen happening, occurrence or condition which necessitates immediate action or response.

(g) *Full council, full multiple member body.* The words "full council" or "full multiple member body" shall mean the entire authorized complement of the city council, school committee or other multiple member body, notwithstanding any vacancy, which might exist.

(h) *general laws:* The words "general laws" (all lower case letters) shall mean laws enacted by the

state legislature which apply alike to all cities and towns, to all cities, or to a class of two or more cities and or cities and towns of which Beverly is a member.

(i) *General Laws:* The words "General Laws" (initial letter of each word in upper case letters) shall mean the General Laws of the Commonwealth of Massachusetts, a codification and revision of statutes enacted on December 22, 1920, and including all amendments thereto subsequently adopted.

(j) *Initiative measure:* The words "initiative measure" shall mean a measure proposed by the voters through the initiative process provided under this charter.

(k) *Local newspaper:* The words "local newspaper" shall mean a newspaper of general circulation within Beverly, with either a weekly or daily circulation.

(l) *Majority vote:* The words "majority vote", when used in connection with a meeting of a multiple member body, shall mean a majority of those present and voting, unless another provision is made by ordinance, by law, or by its own rules.

(m) *Measure:* The word "measure" shall mean any ordinance, order, resolution, or other vote or proceeding adopted, or which might be adopted by the city council or the school committee.

(n) *Multiple member body:* The words "multiple member body" shall mean any board, commission, committee, sub-committee or other body consisting of two (2) or more persons whether elected, appointed or otherwise constituted, but not including the city council or the school committee.

(o) *Referendum measure:* The words "referendum measure" shall mean a measure adopted by the city council or the school committee which is protested under the referendum procedures of this charter.

(p) *Voters:* The word "voters" shall mean registered voters of the City of Beverly.

## ARTICLE 2. LEGISLATIVE BRANCH

### Sec. 2-1: Composition; term of office.

(a) *Composition:* There shall be a city council of nine (9) members which shall exercise the legislative powers of the city. Three (3) of these members, to be known as councillors-at-large, shall be nominated and elected by and from the voters at large. Six (6) of these members, to be known as ward councillors, shall be nominated and elected by and from the voters of each ward, one (1) such ward councillor to be elected from each of the six (6) wards into which the city is divided, in accordance with section 7-5.

(b) *Term of office:* The term of office for all city councillors shall be for two (2) years each, beginning on the first Monday of January in the year following their election, and until their successors have been qualified.

(c) *Eligibility:* Any voter shall be eligible to hold the office of councillor-at-large. A ward councillor shall at the time of election be a voter of the ward from which elected, provided, however, if any ward councillor shall during the first eighteen (18) months of the term of office remove to another ward in the city, such office shall be deemed vacant and the balance of the unexpired term shall be filled in the manner provided in section 2-11. If such removal occurs after the first eighteen months of the term of office, such councillor may continue to serve for the balance of the term for which elected. If a councillor-at-large or a ward councillor removes from the city during the term for which elected such office shall immediately be deemed vacant and filled in the manner provided in section 2-11.

### Sec. 2-2. Council president.

(a) *Election and term:* The candidate for councillor-at-large receiving at the biennial city election the largest number of votes for the office shall serve as council president during the ensuing term of office.

(b) *Powers and duties:* The council president shall preside at all meetings of the city council, regulate its proceedings and shall decide all questions of order. The council president shall appoint

6

all members of all committees of the city council, whether special or standing. The council president shall have the same powers to vote upon all measures coming before the city council as any other member of the city council. The council president shall perform such other duties consistent with the office as may be provided by charter, by ordinance or by other vote of the city council.

(c) *Council vice-president:* As soon as practicable after the councillors-elect have been qualified following each biennial election, the members of the city council shall elect from among its members a vice-president who shall act as president during the absence or disability of the council president. The powers of an acting council president shall be limited to only those powers which are indispensably essential to perform the duties of acting council president during the absence or disability of the council president.

### Sec. 2-3. Prohibitions.

No member of the city council shall hold any other city office or city employment for which a salary or other emolument is payable from the city treasury. No former member of the city council shall hold any compensated appointed city office or city employment until one (1) year following the date on which such former member's service on the city council has terminated.

### Sec. 2-4. Compensation; expenses.

(a) *Salary:* The city council may, by ordinance, provide an annual salary for its members. No ordinance increasing such salary shall be effective, however, unless it shall have been adopted during the first twelve months of a term of office and it provides that such salary is to take effect with the organization of the city government following the next biennial election.

(b) *Expenses:* Subject to appropriation, the council members shall be entitled to reimbursement of their actual and necessary expenses in the performance of their duties.

### Sec. 2-5. General powers.

Except as otherwise provided by general law or by this charter, all powers of the city shall be vested in the city council which shall provide for their exercise and for the performance of all duties and obligations imposed upon the city by law.

### Sec. 2-6. Exercise of powers; quorum; rules.

(a) *Exercise of powers:* Except as otherwise provided by general law or by this charter, the legislative powers of the city council may be exercised in a manner determined by it.

(b) *Quorum:* The presence of five (5) members shall constitute a quorum for the transaction of business, but a smaller number may meet and adjourn from time to time. Except as otherwise provided by general law or by this charter, the affirmative vote of five (5) members shall be required to adopt any ordinance or appropriation order.

(c) *Rules of procedure:* The city council shall from time to time adopt rules regulating its procedures, which shall be in addition to the following:

(i) Regular meetings of the city council shall be held at a time and place fixed by ordinance.

(ii) Special meetings of the city council shall be held at the call of the council president, or, on the call of any three or more members, by written notice delivered in hand or to the place of residence of each member and which contains a listing of the items to be acted upon. Except in case of an emergency, of which the council president shall be judge, such notice shall be delivered at least forty-eight (48) hours in advance of the time set for such meeting. A copy of the notice to members shall, forthwith, be posted upon the city bulletin board.

(iii) All sessions of the city council and of every committee or subcommittee thereof, shall at all times be open to the public and to the press, unless another provision is made by law.

(iv) A full, accurate, up-to-date account of the proceedings of the city council and of every committee and sub-committee thereof shall be kept, which account shall include a

7

BEVERLY REVISED ORDINANCES

§ 2-8

record of each vote taken, and which shall be made available with reasonable promptness following each meeting.

## Sec. 2-7. Access to information.

(a) *In general:* The city council may make investigations into the affairs of the city and into the conduct and performance of any city agency and for this purpose may subpoena witnesses, administer oaths and require the production of evidence.

(b) *City officers, members of city agencies, employees:* The city council or any committee or sub-committee thereof may require any city officer, member of a city agency or city employee to appear before it to give such information as the city council may require in relation to the municipal services, functions, powers, or duties which are within the scope of responsibility of such person and within the jurisdiction of the city council.

(c) *Mayor:* The city council may require the mayor to provide specific information to it on any matter within the jurisdiction of the city council. The city council may require the mayor to appear before it, in person, to respond to written questions made available to the mayor at the time the request to attend is made to the mayor to provide specific information on the conduct of any aspect of the business of the city. The mayor may bring to such meeting any assistant, department head or other city officer or employee the mayor may deem necessary to assist in responding to the questions posed by the city council.

(d) *Notice:* The city council shall give not less than five (5) days notice to any person it may require to appear before it under the provisions of this section. The notice shall include specific questions on which the city council seeks information and no person called to appear before the city council under this section shall be required to respond to any question not relevant or related to those presented in advance and in writing. Notice shall be by delivery in hand, or by registered or certified mail to the last known place of residence of any such person.

## Sec. 2-8. Officers elected by city council.

(a) *Budget/management analyst:* The city council shall elect a budget/management analyst to serve for a term of three (3) years and until a successor is chosen and qualified. The budget/management analyst shall perform a legislative oversight and a post audit function and shall not be involved in the day-to-day administrative detail of the financial operations of the city. The budget/management analyst shall have free access to all books, accounts, bills and vouchers of the city and shall continuously review and examine the same. The budget/management analyst shall make periodic reports thereon to the city council, with such frequency as the city council by ordinance, by rule or by other vote may direct, but not less frequently than quarterly. All officials of the city shall cooperate with the budget/management analyst in the performance of this oversight function. The budget/management analyst shall have such other powers and duties as may be provided by charter, by ordinance or by other vote of the city council.

(b) *City clerk:* The city council shall elect a city clerk to serve for a term of two (2) years and until a successor is chosen and qualified. The city clerk shall have the powers and duties relating to the keeping of records and vital statistics, the regulation and conduct of elections and the issuance of licenses as are provided to city clerks by general laws and such additional powers and duties as may be provided by general laws, by charter, by ordinance or by other vote of the city council.

(c) *Clerk of the council:* The city council shall elect a clerk of the council, who may be the city clerk, to serve for a term of two (2) years and until a successor is chosen and qualified. The clerk of the council shall give notice of its meetings to its members and to the public, keep the journal of its proceedings and perform such other duties as may be provided by ordinance or by other vote of the city council.

(d) *Salaries/compensation:* The officers appointed or elected by the city council shall receive such salaries or other compensation as may from time to time be provided for such office, by ordinance.

(e) *Removal/suspension:* Any person appointed or elected by the city council may be removed or suspended by the city council by the use of procedures substantially the same as those contained in section 8-15.

Sec. 2-9. Ordinances and other measures.

(a) *Emergency ordinances:* No ordinance shall be passed finally on the date it is introduced, except in case of emergency involving the health or safety of the people or their property.

No ordinance shall be regarded as an emergency ordinance unless the emergency is defined and declared in a preamble to such ordinance, separately voted upon and receiving the affirmative vote of six (6) or more members of the city council.

Emergency ordinances shall stand repealed on the sixty-first day following their adoption, unless an earlier date is specified in the measure, or unless a second emergency measure adopted in conformity with this section is passed extending it, or unless a measure passed in conformity with the procedures for measures generally has been passed extending it.

(b) *Measures, in general:* The city council may pass a measure through all of its stages at any one (1) meeting, except proposed ordinances, appropriation orders and loan authorizations, provided that no member of the city council shall object; but, if any single member objects, a vote on the measure shall be postponed to the next meeting of the city council.

On the first occasion that the question of adopting any measure is put to the city council, except an emergency measure as defined in section 2-9(a), if a single member objects to the taking of a vote, the vote shall be postponed until the next meeting of the city council regular or special. If when the matter is next taken up for a vote, three or more members object to the taking of the vote, the matter shall be further postponed for not less than an additional five (5) days. This procedure shall not be used more than once for any measure notwithstanding any amendments made to the original measure.

(c) *Publication:* Every proposed ordinance, appropriation order or loan authorization (except

emergency ordinances as provided in section 2-9(a)) shall be published once in full in a local newspaper, and in any additional manner as may be provided by ordinance, at least ten (10) days before final passage. After final passage, it shall be posted on the city bulletin board and otherwise published as may be required by ordinance. Provided, however, that whenever a proposed ordinance or codification of ordinances or other measure would exceed in length more than ten column inches of ordinary newspaper notice print, then, in lieu of publication in a local newspaper, the same may be published and made available at the office of the city clerk in booklet or pamphlet form, and, if so published and available at least ten (10) days before its final passage, shall be deemed sufficient notice. Whenever the city council provides for publication in a booklet or pamphlet in lieu of the newspaper publication, it shall, at least ten (10) days before final passage, publish in a local newspaper a general summary of the proposed ordinance, or ordinances, and a notice stating the times and places at which copies of the booklet or pamphlet may be obtained by the public.

(d) *Council reconsideration:* The clerk of the city council shall hold every measure adopted by the city council for a period of twenty-four hours, Sundays and legal holidays excepted, and if during said time notice of an intent to file a motion to reconsider the matter is filed with the clerk of the council by a member entitled to make such a motion, the measure shall be returned to the city council for further action. If no such statement of intent is filed with the clerk of the council during such period the clerk shall, at the expiration of the said twenty-four hour period, forthwith present the matter to the mayor.

Sec. 2-10. Council review of certain appointments.

The mayor shall submit to the city council the name of each person the mayor desires to appoint to any city office, as a department head or as a member of a multiple-member body, but not including any position which is subject to the civil service law. The city council shall refer each such name as is submitted to it to a standing committee of the city council which shall investigate each

such candidate for appointment and may make a report, with recommendations, to the full city council not less than seven (7) nor more than twenty-one (21) days following such referral. The committee may require any person whose name has been referred to it to appear before the committee, or before the city council, to give such information relevant to such appointment as the committee, or the city council, may require.

Appointments made by the mayor shall become effective on the thirtieth day following the date on which notice of the proposed appointment was filed with the clerk of the council, unless the city council shall within the said thirty (30) days vote to reject such appointment, or unless the city council has sooner voted to affirm the appointment. Rejection by the city council shall require a two-thirds (⅔) vote of the full council, except that an appointment to a multiple member body may be rejected by a majority vote of the full council. The question on rejection of any appointment made by the mayor shall not be subject to the procedure of charter objection provided in section 2-9 (b) of this Charter.

Sec. 2-11. Filling of vacancies.

(a) *Councillor-at-large:* If a vacancy shall occur in the office of councillor-at-large during the first eighteen (18) months of the term for which councillors are elected, the vacancy shall be filled in descending order of votes received by the candidate for the office of councillor-at-large at the preceding city election who received the largest number of votes without being elected, provided such person remains eligible and willing to serve and provided such person received votes at least equal to thirty (30) percent of the vote total received by the person receiving the largest number of votes for the office of councillor-at-large at the said election. The city clerk shall certify such candidate to the office of councillor-at-large to serve for the balance of the then unexpired term.

If a vacancy shall occur in the office of councillor-at-large during the last six (6) months of the term for which councillors-at-large are elected, such vacancy shall be filled by the person at the biennial city election who receives the highest number of votes for the office of councillor-at-

large and who is not then serving as a councillor-at-large. Such person shall forthwith be certified and shall serve for the last two (2) months of the concluding term in addition to the term for which such person was elected.

(b) *Ward councillor:* If a vacancy shall occur in the office of ward councillor, it shall be filled in the same manner as provided in section 2-11(a) for the office of councillor-at-large except that the list shall be of the candidates for the office of ward councillor in the ward in which the vacancy occurs, provided, however, if there be no candidate on such list who remains eligible and willing to serve, the next highest ranking candidate from among the candidates for election to the council at large who is a resident of the ward in which the vacancy exists shall be certified and shall serve until the next regular election provided such candidate remains a resident of the ward, is willing to serve as a ward councillor and received votes in the ward at least equal to thirty (30) percent of the vote total received by the person receiving the largest number of votes for the office of ward councillor at the said election. If the vacancy shall occur by reason of an incumbent ward councillor filling a vacancy in the office of councillor-at-large, as provided in the penultimate sentence of (a) above, such vacancy shall be filled by the person at the biennial city election who receives the highest number of votes for the office of ward councillor from that ward. Such person shall forthwith be certified and shall serve for the last two (2) months of the concluding term in addition to the term for which such person was elected. The city clerk shall certify such candidate to the office of ward councillor to serve for the balance of the then unexpired term.

(c) *Filling of vacancies by city council:* Whenever a vacancy shall occur in the office of councillor-at-large or in that of ward councillor and there is no available candidate to fill such vacancy in the manner provided in section 2-11(a) or (b), the vacancy shall be filled by the remaining members of the city council. Persons elected to fill a vacancy by the city council shall serve only until the next regular election at which time the vacancy shall be filled by the voters and the person chosen to fill such vacancy shall forthwith be sworn and shall serve for the remainder of the unexpired term in

addition to the term for which elected. Persons serving as city councillors under this section shall not be entitled to have the words "candidate for re-election" printed against their names on the election ballot.

## ARTICLE 3. EXECUTIVE BRANCH

### Sec. 3-1. Mayor; qualifications; term of office; compensation.

(a) *Mayor, qualifications:* The chief executive officer of the city shall be a mayor, elected by and from the voters of the city at large. Any voter shall be eligible to hold the office of mayor. The mayor shall devote full time to the office and shall not hold any other elective public office, nor shall the mayor be actively engaged in any other business, occupation or profession during the period of service as mayor.

(b) *Term of office:* The term of office of the mayor shall be two (2) years beginning on the first Monday of January following the biennial city election at which chosen and until a successor is qualified.

(c) *Compensation:* The city council shall, by ordinance, establish an annual salary for the mayor. No ordinance increasing the salary of the mayor shall be effective unless it shall have been adopted in the first twelve (12) months of the term for which councillors are elected and it provides that such salary is to become effective in January of the year following the next biennial city election.

### Sec. 3-2. Executive powers; enforcement of ordinances.

The executive powers of the city shall be vested solely in the mayor, and may be exercised by the mayor either personally or through the several city agencies under the general supervision and control of the office of the mayor. The mayor shall cause the charter, the laws, the ordinances and other orders for the government of the city to be enforced, and shall cause a record of all official acts of the executive branch of the city to be kept.

The mayor shall exercise a general supervision and direction over all city agencies, unless other-

wise provided by law, by the charter or by ordinance. Each city agency shall furnish to the mayor, forthwith upon request, any information, materials or otherwise as the mayor may request and as the needs of the office and the interest of the city may require.

The mayor shall be the chief procurement officer for the city responsible for buying, purchasing, renting, leasing, or otherwise acquiring all supplies and all services for all departments and all activities of the city and including all functions that pertain to the obtaining of a supply or a service, including description of requirements, selection and solicitation of sources, preparation and award of all contracts and all phases of contract administration. The mayor may delegate all or any portion of such powers and duties to a subordinate officer, but, no such delegation shall in any way absolve the mayor from the ultimate responsibility for all procurement activities.

The mayor shall supervise, direct and be responsible for the efficient administration of all city activities and functions placed under the control of the mayor by law, by this charter, by ordinance or otherwise. The mayor shall be responsible for the efficient and effective coordination of the activities of all agencies of the City of Beverly and for this purpose shall have authority consistent with law to call together for consultation, conference and discussion at all reasonable times, all persons serving the city, whether elected directly by the voters, chosen by persons elected directly by the voters, or otherwise.

The mayor shall hold no other city office or city employment for which a salary or other emolument is payable from the city treasury. No former mayor shall hold any compensated appointed city office or city employment until one (1) year following the date on which such former mayor's city service has terminated.

### Sec. 3-3. Appointments by the mayor.

The mayor shall appoint, subject to the review of such appointments by the city council as provided in section 2-10, all city officers, department heads and the members of multiple-member bodies for whom no other method of appointment or selection is provided by the charter, excepting

only persons serving under the school committee, and persons serving under the city council. Except as may otherwise be required by the civil service law, appointments made by the mayor shall be for periods not to exceed three (3) years, provided, however, the mayor may appoint the head of a department related to the public safety for a term of not less than three (3) nor more than five (5) years. The mayor may suspend or remove any person appointed by the mayor in accordance with the procedure established in section 8-4. The decision of the mayor in suspending or removing a department head shall be final. All persons categorized as department heads shall, subject to the consent of the mayor, appoint all assistants, subordinates and other employees of the agency for which such person is responsible. The department head may suspend or remove any assistant, subordinate or other employee of the agency for which such person is responsible in accordance with the procedures established in section 8-15. The decision of the department head to suspend or remove any assistant, subordinate or other employee shall be subject to review by the mayor. A person for whom a department head has determined a suspension or removal is appropriate may seek review of such determination by the mayor by filing a petition for review, in the office of the mayor, in writing, within ten (10) days following receipt of notice of such determination. The review by the mayor shall follow the procedures of section 8-15. The decision of the mayor shall be final.

### Sec. 8-4. Removal or suspension of certain officials.

(a) *In general:* The mayor may, in writing, remove or suspend any city officer, member of a multiple member body, or the head of any city department appointed by the mayor by filing a written statement, with the city clerk, setting forth in precise detail the specific reasons for such removal or suspension. A copy of the written statement shall be delivered in hand, or mailed by certified mail, postage prepaid, to the last known address of the said city officer, member of a multiple member body, or head of a department. The said city officer, member of a multiple member body, or head of a department may make a

written reply by filing such a reply statement, with the city clerk, within ten (10) days following the date the statement of the mayor has been filed; but, such reply shall have no effect upon the removal or suspension unless the mayor shall so determine. The said city officer, member of a multiple member body, or head of a department may request permission to appear at a public meeting of the city council to read the written reply concerning removal or suspension. If permission for said city officer, member of a multiple member body, or head of a department to attend a meeting of the city council is granted for such purpose, the mayor may attend the same meeting to read the statement of removal or suspension filed by the mayor in the first instance. The city council shall have no authority to vote or otherwise express its views concerning such removal or suspension.

(b) *Public safety:* The mayor may, in writing, remove or suspend the head of any city department relating to the public safety appointed by the mayor by filing a written statement, with the city clerk, setting forth in precise detail the specific reasons for such removal or suspension. A copy of the written statement shall be delivered in hand, or, mailed by certified mail, postage prepaid, to the last known address of the said head of a department. The said city officer or head of a department may make a written reply by filing such a reply statement, with the city clerk, within ten (10) days following the date the statement of the mayor has been filed; but, such reply shall have no effect upon the removal or suspension unless the mayor shall so determine. The said city officer or head of a department may request permission to appear at a public meeting of the city council to contest the decision of the mayor concerning a removal from office and to read the written reply filed with the city clerk concerning such removal. If permission for said head of a department to attend a meeting of the city council is granted for such purpose the mayor may attend the same meeting to read the statement of removal filed by the mayor in the first instance. The city council shall have the authority to vote to approve or disapprove of the action of the mayor, but, it shall have no other power to otherwise express its views concerning such removal or

suspension. The removal shall not take effect unless at least five (5) members of the city council shall vote to confirm the action of the mayor.

## Sec. 3-5. Temporary appointments to city offices.

Whenever a vacancy, either temporary or permanent, occurs in a city office and the needs of the city require that such office be filled, the mayor may designate the head of another city agency or a city officer or city employee, or some other person to perform the duties of the office on a temporary basis until such time as the position can be filled as otherwise provided by law, by the charter or by ordinance. The mayor shall file a certificate in substantially the following form, with the city clerk, whenever a person is designated under this section:

I designate (name of person) to perform the duties of the office of (designate office in which vacancy exists) on a temporary basis until the office can be filled by (here set out the regular procedure for filling the vacancy, or when the regular officer shall return). I certify that said person is qualified to perform the duties which will be required and that I make this designation solely in the interests of the City of Beverly.

(signed)
Mayor

Persons serving as temporary officers under the authority of this section shall have only those powers of the office indispensably essential to the performance of the duties of the office during the period of such temporary appointment and no others. No temporary appointment shall be for more than thirty (30) days and not more than one (1) renewal of a temporary appointment may be made when a permanent vacancy exists in the office.

## Sec. 3-6. Communications; special meetings.

(a) *Communications to the city council:* Within six (6) weeks following the start of each fiscal year, the mayor shall submit to the city council, and make available for public distribution, a complete report on the financial and administrative activities of the city for the preceding fiscal year. The mayor shall, from time to time, through-out the year, by written communications, recommend to the city council for its consideration such measures as, in the judgment of the mayor, the needs of the city require. The mayor shall, from time to time throughout the year, but at least quarterly, by written communications, keep the city council fully informed of the financial and administrative condition of the city and shall specifically indicate in any such reports any fiscal, financial or administrative problems of the city.

(b) *Special meetings of the city council:* The mayor may at any time call a special meeting of the city council, for any purpose, by causing a notice of such meeting to be delivered in hand or to the place of business or residence of each member of the city council. Such notice shall, except in an emergency of which the mayor shall be the sole judge, be delivered at least forty-eight (48) weekday hours in advance of the time set and shall specify the purpose or purposes for which the meeting is to be held. A copy of each such notice shall, forthwith, be posted on the city bulletin board.

## Sec. 3-7. Approval of mayor, exception (veto).

Every order, ordinance, resolution or vote adopted or passed by the city council relative to the affairs of the city, except memorial resolutions, the selection of city officers by the city council and any matters relating to the internal affairs of the city council, shall be presented to the mayor for approval. If the mayor approves of the measure, the mayor shall sign it; if the mayor disapproves of the measure, the mayor shall return the measure, with the specific reason or reasons for such disapproval attached thereto, in writing, to the city council. The city council shall enter the objections of the mayor on its records, and not sooner than ten (10) days, nor after thirty (30) days from the date of its return to the city council, shall again consider the same measure. If the city council, notwithstanding such disapproval by the mayor, shall again pass the order, ordinance, resolution or vote by a two-thirds (⅔) vote of the full council, it shall then be deemed in force, notwithstanding the failure of the mayor to approve the same. If the mayor has neither signed a measure nor returned it to the city council within ten (10) days

following the date it was presented to the mayor, the measure shall be deemed approved and in force.

### Sec. 3-8. Temporary absence of the mayor.

(a) *Acting mayor:* Whenever, by reason of sickness, absence from the city or other cause, the mayor shall be unable to perform the duties of the office for a period of five (5) successive working days or more, the president of the city council shall be the acting mayor. In the event of the absence or disability of the president of the city council, the vice-president of the city council shall serve as acting mayor.

The mayor shall, by a letter filed with the city council and a copy filed with the city clerk, designate a qualified city officer or city employee to exercise the powers and perform the duties of the office during the temporary absence of the mayor for periods of less than five (5) days and to serve only when the needs of the city require and only to the extent necessary under the then circumstances.

(b) *Powers of acting mayor:* The acting mayor shall have only those powers of the mayor as may be necessary to the conduct of the business of the city in an orderly and efficient manner and which may not be delayed. The acting mayor shall have no authority to make any permanent appointment or removal from city service unless the disability of the mayor shall extend beyond sixty (60) days nor shall an acting mayor approve or disapprove of any measure adopted by the city council unless the time within which the mayor must act would expire before the return of the mayor. During any period in which any member of the city council is serving as acting mayor, such councillor shall not vote as a member of the city council.

### Sec. 3-9. Vacancy in office of mayor.

(a) *Special election:* If a vacancy in the office of mayor occurs in the first fifteen (15) months of the term for which the mayor is elected, whether by reason of death, resignation, removal from office, incapacity or otherwise the city council shall forthwith order a special election, to be held

within ninety (90) days following the date the vacancy is created, to fill such vacancy for the balance of the then expired term.

(b) *Council election:* If a vacancy in the office of mayor occurs in the last nine (9) months of the term for which the mayor is elected, whether by reason of death, resignation, removal from office, or otherwise, the president of the city council shall become the mayor. Upon the qualification of the president of the city council as the mayor, under this section, a vacancy shall exist in that council seat on the city council which shall be filled in the manner provided in section 2-10.

(c) *Powers, term of office:* The mayor elected under Section 3-9 (a) or (b) shall have all the powers of the mayor. A person elected pursuant to subsection (a), above, shall serve for the balance of the term unexpired at the time of election to the office. A person chosen pursuant to subsection (b), above, shall serve until the time of the next regular election at which time the person elected to fill the office for the ensuing term of office shall serve, in addition for the balance of the then unexpired term.

### ARTICLE 4. SCHOOL COMMITTEE

### Sec. 4-1. School committee.

(a) *Composition, term of office:* There shall be a school committee which shall consist of seven (7) members. Six (6) of these members, to be known as ward school committee members, shall be nominated and elected by and from the voters of each ward, one such ward school committee member to be elected from each of the six (6) wards into which the city is divided, in accordance with section 7-5. The mayor shall serve as the seventh member of the school committee. The term of office for all school committee members shall be for two (2) years each, beginning on the first Monday of January in the year following their election, and until their successors have been qualified.

(b) *Eligibility:* A ward school committee member shall at the time of election be a voter of the ward from which elected, provided, however, if any ward school committee member shall, during

the first eighteen (18) months of the term of office, remove to another ward in the city, such office shall be deemed vacant and the balance of the unexpired term shall be filled in the manner provided in section 4-1(f). If such removal occurs after the first eighteen (18) months of the term of office, such school committee member may continue to serve for the balance of the term for which elected. If a ward school committee member removes from the city during the term for which elected such office shall immediately be deemed vacant and filled in the manner provided in section 4-1(f).

(c) *Powers and duties:* The school committee shall have all powers which are conferred on school committees by general laws and such additional powers and duties as may be provided by the charter, by ordinance, or otherwise and not inconsistent with said grant of powers conferred by general laws. The powers and duties of the school committee shall include the following:

(1) To elect a superintendent of the schools who shall be charged with the day-to-day administration of the school system, subject only to policy guidelines and directives adopted by the school committee;

(2) To make all reasonable rules and regulations for the management of the public school system and for conducting the business of the school committee as may be deemed necessary or desirable;

(3) To adopt and administer an annual operating budget for the school department, subject to appropriation by the city council.

The school committee shall have general charge and superintendence of all school buildings and grounds, shall furnish all school buildings with proper fixtures, furniture and equipment and shall provide ordinary maintenance of all school buildings and grounds; provided, however, the city council may, by ordinance, provide for the establishment of a central municipal maintenance department which may include maintenance of school buildings and grounds. Whenever the school committee shall determine that additional classrooms are necessary to meet the educational needs of the community, at least one (1) member of the school committee, or designee of

the school committee, shall serve on the agency, board or committee to which the planning or construction of such new, remodeled or renovated school building is delegated.

(d) *Prohibitions:* No member of the school committee shall hold any other city office or city employment for which a salary or other emolument is payable from the city treasury. No former member of the school committee shall hold any compensated appointed city office or city employment until one (1) year following the date on which such member's service on the school committee has terminated.

(e) *Salary:* The city council may, by ordinance, provide an annual salary for the members of the school committee. No ordinance increasing such salary shall be effective, however, unless it shall have been adopted during the first twelve (12) months of a term of office and it provides that such salary is to take effect with the organization of the city government following the next biennial election.

(f) *Filling of vacancies:* If a vacancy shall occur in the office of ward school committee member during the first twenty (20) months of the term for which school committee members are elected, the vacancy shall be filled in descending order of votes received by the candidate for the office of ward school committee member from that ward at the preceding city election who received the largest number of votes without being elected, provided such person remains eligible and willing to serve and provided such person received votes at least equal to thirty (30) percent of the vote total received by the person receiving the largest number of votes for the office of ward school committee member in that ward. If there be no such candidate eligible and willing to serve, the vacancy shall be filled by a majority vote of the remaining members of the school committee and the city council sitting in joint convention, from among the voters of the ward. If the vacancy shall occur during the last four (4) months of the term of office such vacancy shall be filled by the person at the biennial city election who receives the highest number of votes for the office of ward school committee member from that ward. Such person shall forthwith be certified and shall serve for the

last two (2) months of the concluding term in addition to the term for which such person was elected. The city clerk shall certify such candidate to the office of ward school committee member to serve for the balance of the then unexpired term.

## Sec. 4-2. School committee president.

(a) *Election and term:* The school committee shall organize by electing one of the ward school committee members to serve as school committee president during the ensuing term of office.

(b) *Powers and duties:* The school committee president shall preside at all meetings of the school committee, regulate its proceedings and shall decide all questions of order. The school committee president shall appoint all members of all committees of the school committee, whether special or standing. The school committee president shall have the same powers to vote upon all measures coming before the school committee as any other member of the school committee. The school committee president shall perform such other duties consistent with the office as may be provided by charter, by ordinance or by other vote of the school committee.

## Sec. 4-3. School committee budget.

The mayor and city council shall annually provide an amount of money sufficient for the support of the public schools as required by the General Laws. In acting on appropriations for educational costs, the city council shall vote on the total amount of appropriations requested, and shall not allocate appropriations among accounts or place any restrictions on such appropriations. The city council may make nonbinding monetary recommendations to increase or decrease certain items allocating such appropriations. The vote of the city council shall establish the total appropriation for the support of the schools, but may not limit the authority of the school committee to determine expenditures within the total appropriations.

## ARTICLE 5. ADMINISTRATIVE ORGANIZATION.

## Sec. 5-1. Organization of city agencies.

The organization of the city into operating agencies for the provision of services and the administration of the government may be accomplished through either of the methods provided in this article.

(a) *Ordinances:* Subject only to express prohibitions in a general law or the provisions of this charter, the city council may, by ordinance, reorganize, consolidate, create, merge, divide or abolish any city agency, in whole or in part; establish such new city agencies as it deems necessary or advisable; determine the manner of selection, the term of office and prescribe the functions of all such entities; provided, however, that no function assigned by this charter to a particular city agency may be discontinued, or assigned to any other city agency, unless this charter specifically so provides.

(b) *Administrative code:* The mayor may from time to time prepare and submit to the city council plans of organization or reorganization which establish operating divisions for the orderly, efficient or convenient conduct of the business of the city.

Whenever the mayor proposes such a plan, the city council shall hold one (1) or more public hearings on the proposal giving notice by publication in a local newspaper, which notice shall describe the scope of the proposal and the time and place at which the hearing will be held, not less than seven (7) nor more than fourteen (14) days following said publication.

An organization or reorganization plan shall become effective at the expiration of sixty (60) days following the date the proposal is submitted to the city council unless the city council shall, by a majority vote, within such period vote to disapprove the plan. The city council may vote only to approve or to disapprove the plan and may not vote to amend or to alter it.

The mayor may, through the administrative code, and subject only to express prohibitions in a general law or this charter, reorganize, consolidate or abolish any city agency, in whole or in part; establish such new city agencies as is deemed necessary to the same extent as is provided in section 5-1(a), above, for ordinances; and for such

purpose may transfer the duties and powers and, so far as is consistent with the use for which the funds were voted by the city, transfer the appropriation of one city agency to another; provided, however, that no function assigned by this charter to a particular city agency may be discontinued or assigned to any other city agency unless this charter specifically so provides.

## Sec. 5-2. Publication of administrative code.

For the convenience of the public, the administrative code and any amendments to it shall be printed as an integral part of the ordinances of the City of Beverly.

## Sec. 5-3. Merit principle.

All appointments and promotions of city officers and employees shall be made on the basis of merit and fitness demonstrated by examination, past performance, or by other evidence of competence and suitability. Each person appointed to fill an office or position shall be a person especially fitted by education, training and previous work experience to perform the duties of the office or position for which chosen.

## Sec. 5-4. Department of municipal finance.

(1)*Establishment, scope:* There shall be a department of municipal finance responsible for the performance of all of the fiscal and financial activities of the city. The department of municipal finance shall assume all of the duties and responsibilities related to municipal finance activities which prior to the adoption of the home rule charter were performed by or under the authority of the city auditor, the city treasurer, the city collector, the chief procurement officer and the board of assessors; and it may have such additional powers, duties and responsibilities with respect to municipal finance related functions and activities as the city may from time to time provide, by ordinance.

(2) *Director of municipal finance.* The department of municipal finance shall be under the direct control and supervision of a director of municipal finance who shall be appointed by and who shall be responsible to the mayor. The mayor shall also appoint the person, or persons, perform-

ing the duties of city collector and city treasurer. The director of municipal finance shall be a person especially fitted by education, experience and training to perform the duties of the office. The director of municipal finance shall be responsible for the supervision and coordination of all activities of the department of municipal finance in accordance with state statutes, city ordinances, administrative code and rules and regulations. The director of municipal finance shall serve, ex officio, as the mayor may from time to time specify, as the city treasurer, collector, or treasurer-collector.

## Sec. 5-5. Department of planning and development.

(1) *Establishment, scope:* There shall be a department of planning and development responsible for the coordination of all the planning and development related activities of the city. The department of planning and development shall be responsible for the coordination of all of the duties and responsibilities related to planning and development activities which prior to the adoption of the home rule charter were performed by or under the authority of the planning board, board of appeals, and the conservation commission; and it may have such additional powers, duties and responsibilities with respect to the coordination of planning and development related functions and activities as the city may from time to time provide, by ordinance and which may include the coordination of all land acquisition and land management proposals, economic development planning, the preparation of a comprehensive or master plan and maintenance of a centralized source of records, reports, statistical data and other planning and development related materials.

(2) *Director of planning and development:* The department of planning and development shall be under the direct control and supervision of a director of planning and development who shall be appointed by and who shall be responsible to the mayor. The director of planning and development shall be a person especially fitted by education, experience and training to perform the duties of the office. The director of planning and development shall be responsible for the supervision and coordination of all activities of the de-

partment of planning and development in accordance with state statutes, city ordinances, administrative code and rules and regulations.

## Sec. 5-6. Planning and construction of buildings and other facilities.

(a) *Composition, mode of appointment and term of office:* There shall be a permanent building and other facilities planning and construction committee (which may be referred to as the planning and construction committee) consisting of seven members. Six (6) of the committee members shall be appointed by the mayor for terms of three (3) years each so arranged that the term of two (2) members shall expire each year. In making appointments to the committee, the mayor shall seek persons having experience in the fields of architecture, engineering, construction, real estate or law. The seventh member of the committee shall be designated by the school committee and may, but need not, be a member of the school committee.

(b) *Powers and duties:* The buildings and other facilities planning and construction committee shall be responsible for monitoring the physical condition of all municipal buildings and other facilities. The committee shall meet from time to time with representatives of municipal agencies to evaluate the need for additions, renovations or remodeling of any existing building or facility or for the construction of new buildings or other facilities. The committee shall file written reports, at least annually with the mayor in which it shall make recommendations as to the need for any project or projects.

Whenever any construction work on any municipal building or other facility is authorized, the buildings and other facilities planning and construction committee shall be responsible for all work in connection with the project including site planning, surveying, engineering studies, architectural plans and specifications and the supervision of construction.

## Sec. 5-7. Department of human resources.

(1) *Establishment, scope:* There shall be a department of human resources which shall be responsible for all personnel and employee-related functions and activities of the city government and its administration. The department of human resources shall assume all of the duties and responsibilities related to human resources activities which, prior to the adoption of the home rule charter, were performed by or under the authority of the city auditor, the city treasurer, and the heads of city agencies; and it may have such additional powers, duties and responsibilities with respect to human resources related functions and activities as the city may from time to time provide, by ordinance. The functions of the department shall include the following:

1. Plan, administer and direct all phases of all municipal personnel plans and collective bargaining agreements, including job description, position classification, sick and vacation day administration, accident prevention programs, employee grievance procedures, physical examination processing, testing, review and evaluation of work records and all other record keeping related to city employees.

2. Develop new and revised personnel policies and practices to maintain and keep current the existing high standards for municipal personnel.

3. Review and evaluate all requests for new or additional personnel made by city agencies and make recommendations to the mayor.

4. Advise and assist all agency heads and employees in all aspects of municipal personnel matters including recruitment, promotion, transfer, training, wages, insurance and other benefits of employment.

(2) *Director of human resources.* The department shall be headed by a director of human resources appointed by the mayor and who shall be responsible to the mayor. The director of human resources shall be a person especially fitted by education, experience and training to perform the duties of the office. The director of human resources shall be responsible for the supervision and coordination of all activities of the department of human resources and development in accordance with state statutes, city ordinances, administrative code and rules and regulations.

## Sec. 5-8. Department of municipal inspections.

(1) *Establishment, scope:* There shall be a department of municipal inspections which shall be responsible for the coordination of all inspection functions performed by any city officer, employee or agent. The department of municipal inspections shall be responsible for the coordination of all of the inspection functions conducted by the city, including, but not limited to, those required under the zoning or any other city ordinance, the provisions of the Code of Massachusetts Regulations relating to buildings, electrical wiring, plumbing, gas fitting, sanitation, wetlands, fire protection and fire safety, hazardous materials, local regulations adopted by the board of health, conservation commission, historical commission, planning board and every other local inspection as may be otherwise authorized or conducted. The department of municipal inspections shall have such additional powers, duties and responsibilities with respect to the coordination of municipal inspection functions as the city may from time to time provide by ordinance and which may include the maintenance of all records relating to inspections in a central place through a common index, a single application process which would indicate all inspections which might be necessary for a particular project and provide for a consolidated, coordinated review and processing of each such application.

(2) *Director of municipal inspections:* The department of municipal inspections shall be under the direct control and supervision of a director of municipal inspections who shall be appointed by the mayor and who shall be responsible to the mayor. The director of municipal inspections shall be a person especially fitted by education, experience and training to perform the duties of the office. The director of municipal inspections shall be responsible for the supervision and coordination of all activities of the department of municipal inspections in accordance with state statutes, city ordinances, administrative code and rules and regulations. The director of municipal inspections shall in addition to the coordination responsibilities assigned by this provision also perform the duties of building inspector or any other position within the department as the mayor may from time to time specify.

## ARTICLE 6. FINANCE AND FISCAL PROCEDURES

### Sec. 6-1. Fiscal year.

The fiscal year of the city shall begin on the first day of July and shall end on the last day of June, unless another period is required by general law.

### Sec. 6-2. School committee budget.

(a) *Public hearing:* At least seven (7) days before the meeting at which the school committee is scheduled to vote on its final budget request, the school committee shall cause to be published in a local newspaper a general summary of its proposed budget. The summary shall specifically indicate any major variations from the current budget, and the reasons for such changes. It shall further indicate the times and places at which complete copies of its proposed budget are available for examination by the public, and the date, time and place when and where a public hearing will be held by the school committee on the proposed budget. The school committee shall not take its final vote on its proposed budget until all persons who desire to be heard concerning the budget proposal have had an opportunity to be heard.

(b) *Submission to mayor:* The budget as adopted by the school committee shall be submitted to the mayor at least twenty-one (21) days before the date the mayor is required to submit a proposed city budget to the city council to allow the mayor sufficient time within which to consider the effect the school department's requested appropriation will have upon the total city operating budget the mayor is required to submit under this article.

### Sec. 6-3. Submission of budget and budget message.

Within the time fixed by law, before the start of the fiscal year of the city, the mayor shall submit to the city council a proposed operating budget for the ensuing fiscal year with an accompanying budget message and supporting documents. The mayor shall simultaneously provide for the publication in a local newspaper of a notice and a general summary of the proposed budget. The summary shall specifically indicate any major

1-63    BEVERLY REVISED ORDINANCES

variations from the current operating budget and the reason for such changes. The notice shall further indicate the times and places at which complete copies of the proposed operating budget for the city are available for examination by the public.

### Sec. 6-4. Budget message.

The budget message of the mayor shall explain the budget for all city agencies both in fiscal terms and in terms of work programs. It shall outline proposed financial policies of the city for the ensuing fiscal year, describe important features of the budget, indicate any major variations from the current fiscal year in financial policies, expenditures and revenues together with the reasons for such changes, summarize the city's debt position and include other material as the mayor deems desirable, or as may be required by the provisions of a city ordinance.

### Sec. 6-5. The budget.

The proposed operating budget shall provide a complete financial plan for all city funds and city activities for the ensuing fiscal year. Except as may otherwise be required by general law, or this charter, it shall be in the form which the mayor deems desirable or as a city ordinance may require. In the presentation of the budget, the mayor shall utilize modern concepts of fiscal presentation so as to furnish an optimum level of information and the best financial control. The budget shall show in detail all estimated income from the proposed property tax levy and from all other sources and all proposed expenditures, including debt service, for the following year. The budget shall be arranged to show the actual and estimated income and expenditures for the previous, current and ensuing fiscal years and shall indicate in separate sections:

(a) Proposed expenditures for current operations during the ensuing fiscal year, detailed by city agency and position in terms of work programs, and the method of financing such expenditures;

(b) Proposed capital expenditures during the ensuing fiscal year, detailed by city agency, and the proposed method of financing each such capital expenditure;

(c) The relationship of each proposed capital expenditure to the capital improvement program required to be submitted under section 6-8; and

(d) Estimated surplus revenue and free cash at the end of the current fiscal year, including estimated balances in any special accounts established for specific purposes.

### Sec. 6-6. Action on the budget.

(a) *Public hearing:* Forthwith upon its receipt of the proposed operating budget, the city council shall provide for the publication in a local newspaper of a notice stating the time and place, not less than seven (7) nor more than fourteen (14) days following such publication, at which it will hold a public hearing on the proposed operating budget as submitted.

(b) *Review:* The city council shall consider, in open public meetings, the detailed expenditures proposed for each city agency and may confer with representatives of each such agency in connection with its review and consideration. The city council may require the mayor, or any other city agency, to furnish it with such additional information as it may deem necessary to assist it in its review and consideration of the proposed operating budget.

(c) *Action by city council:* The city council shall adopt the budget, with or without amendments, within sixty (60) days following the day the proposed budget is received by it, or such other period as may be provided by general law. In amending the budget, the city council may delete or decrease any programs or amounts except expenditures required by law, or for debt service. If the city council fails to take any action with respect to any item in the proposed budget within sixty (60) days following the date of its receipt of the proposed budget, or such other period as may be provided by general law, such amount shall, without any action by the city council, become a part of the appropriations for the ensuing fiscal year and shall be available for the purposes specified.

### Sec. 6-7. Supplementary budgets, other appropriations.

(a) *Intradepartmental transfers:* With the approval of the mayor, funds appropriated for one

line item within the appropriation made for a particular municipal agency may be transferred to another line item within the same municipal agency. Whenever such a transfer is authorized by the mayor, notice of the transfer, and the circumstances under which such transfer was deemed advisable, shall be filed with the clerk of the city council.

(b) *Interdepartmental transfers:* With the approval of the city council, funds appropriated to the use of one (1) municipal agency may be transferred to the use of another municipal agency. Requests to the city council for the transfer of funds from one municipal agency to another shall be made by the mayor, in writing, and shall include a statement setting forth the reason the additional funds are needed by the agency to which it is proposed they be transferred and shall be accompanied by a certificate signed by the agency from which the appropriation is proposed to be taken that such transfer will not prevent that agency from performing its vital functions. A copy of this request shall, forthwith, be posted on the city bulletin board. The city council shall, by its rules, provide a procedure governing interdepartmental transfer requests which shall include at least two readings and a public hearing by the city council. Such rule shall specify the circumstances under which notice by publication in a newspaper shall be required and circumstances under which simple posting on the city bulletin board shall be sufficient.

(c) *Supplementary appropriations:* Whenever the mayor shall submit to the city council a request for a new appropriation of any sum of money, either as a supplement to some item in the annual operating budget or for an item, or items, not included in the annual operating budget as adopted, the city council shall not act upon such request until it has (1) given notice by publication in a local newspaper of the request, and (2) held a public hearing concerning such request. The publication of the notice and the public hearing shall be generally in conformity with the provisions of section 6-6(a) concerning the proposed annual operating budget.

## Sec. 6-8. Capital improvement program.

The mayor shall submit a capital improvement program to the city council at least one hundred fifty (150) days before the start of each fiscal year. It shall include:

(a) A clear and concise general summary of its contents;

(b) A list of all capital improvements proposed to be undertaken during the next ensuing five (5) years, with supporting information as to the need for each capital improvement;

(c) Cost estimates, methods of financing and recommended time schedules for each improvement; and

(d) The estimated annual cost of operating and maintaining each facility and piece of major equipment involved.

This information is to be annually revised by the mayor with regard to the capital improvements still pending or in the process of being acquired, improved or constructed.

## Sec. 6-9. Independent audit.

The city council shall annually provide for an outside audit of the books and accounts of the city to be made by a certified public accountant, or firm of such accountants.

## ARTICLE 7. ELECTION RELATED MATTERS

### Sec. 7-1. City elections: general, preliminary.

The regular general city election shall be held on the first Tuesday following the first Monday in November in each odd numbered year.

On the sixth Tuesday preceding every regular general city election there shall be a preliminary election for the purpose of nominating candidates.

### Sec. 7-2. Non-partisan elections.

All elections for city offices shall be non-partisan and election ballots shall be printed without any party mark, emblem, or other designation whatsoever.

## Sec. 7-3. Preliminary election

(a) *Signature requirements:* The number of signatures of voters required to place the name of a candidate on the official ballot to be used at a preliminary election shall be as follows: for the office of mayor not less than one hundred (100) such signatures, provided, however, that not more than twenty-five (25) signatures from any one (1) ward shall be counted in the minimum number of required signatures; for the office of councillor-at-large not less than one hundred (100) such signatures, provided, however, that not more than twenty-five (25) signatures from any one (1) ward shall be counted in the minimum number of required signatures; for the office of ward councillor not less than fifty (50) such signatures, all of which shall be from the ward from which the nomination is sought.

(b) *Ballot position:* The order in which names of candidates appear on the ballot for each office shall be determined by a drawing, by lot, conducted by the city clerk which shall be open to the public.

(c) *Determination of candidates:* The two (2) persons receiving at a preliminary election the highest number of votes for nomination for any office shall be the sole candidates for that office whose names shall be printed on the official ballots to be used at the regular general city election at which such office is to be voted upon, and no acceptance of a nomination shall be necessary to its validity. If two (2) or more persons are to be elected to the same office at such regular election, the several persons, in number equal to twice the number so to be elected, receiving at such preliminary election the highest number of votes for nomination for that office shall be the sole candidates for that office whose names shall be printed on the official ballots.

If the preliminary election results in a tie vote among candidates for nomination receiving the lowest number of votes which, but for said tie vote, would entitle a person receiving the same to have his name printed on the official ballots for the election, all candidates participating in said tie vote shall have their names printed on the official ballots, although in consequence thereof

there be printed on such ballots the names of candidates exceeding twice the number to be elected.

(d) *Condition making preliminary unnecessary:* If at the expiration of time for filing statements of candidates to be voted upon at any preliminary election not more than twice as many such statements have been filed with the city clerk for an office as candidates are to be elected to such office, the candidates whose statements have been filed with the city clerk shall be deemed to have been nominated to such office, and their names shall be voted upon for such office at the succeeding general election and the city clerk shall not print their names on the ballots to be used at said preliminary election and no other nomination to such office shall be made. If in consequence it shall appear that no names are to be printed upon the official ballots to be used in any particular ward or wards of the city, no preliminary election shall be held in such ward or wards.

## Sec. 7-4. Ballot position, regular city election.

The order in which names of candidates appear on the ballot for each office shall be determined by a drawing, by lot, conducted by the city clerk which shall be open to the public.

## Sec. 7-5. Wards.

The territory of the city shall be divided into six (6) wards so established as to consist of compact and contiguous territory, bounded insofar as possible by the center line of known streets or ways or by other well-defined limits. Each such ward shall be composed of voting precincts otherwise established in accordance with general laws. The city council shall from time to time, but at least once in each ten (10) years, review such wards to insure their uniformity in number of inhabitants.

## Sec. 7-6. Application of state general laws.

Except as expressly provided in this charter and authorized by law, all city elections shall be governed by the laws of the commonwealth relating to the right to vote, the registration of voters, the nomination of candidates, the conduct of pre-

liminary, general and special elections, the submission of charters, charter amendments and other propositions to the voters, the counting of votes, the recounting of votes, and the determination of results.

### Sec. 7-7. Petitions to council or school committee.

The city council or the school committee shall hold a public hearing and act with respect to every petition which is addressed to it, which is signed by one hundred (100) voters, or more, and which seeks the passage of a measure. The hearing shall be held by the city council or the school committee, or, in either case, by a committee or sub-committee thereof, and the action by the city council or the school committee shall be taken not later than three (8) months after the petition is filed with the clerk of the council or the secretary of the school committee as may be appropriate. Hearings on two (2) or more petitions filed under this section may be held at the same time and place. The clerk of the council or the secretary of the school committee shall mail notice of the hearing to the ten (10) persons whose names appear first on the petition at least forty-eight (48) hours before the hearing. Notice, by publication, of all such hearings shall be at public expense.

### Sec. 7-8. Citizen initiative measures.

(a) *Commencement:* Initiative procedures shall be started by the filing of an initiative petition with the clerk of the council or the secretary of the school committee, as the case may be. The petition shall be addressed to the city council or to the school committee, shall contain a request for the passage of a particular measure which shall be set forth in full in the petition, and shall be signed by at least ten (10) percent of the total number of voters as of the date of the most recent city election. Signatures to an initiative petition need not all be on one (1) paper, but all such papers pertaining to any one measure shall be fastened together and shall be filed as a single instrument, with the endorsement thereon of the name and residence address of the person designated as

filing the same. With each signature on the petition there shall also appear the street and number of the residence of each signer.

Within ten (10) days following the filing of the petition, the board of registrars of voters shall ascertain by what number of voters the petition has been signed, and what percentage that number is of the total number of voters as of the date of the most recent city election. The city clerk shall attach to the petition a certificate showing the results of their examination and shall return the petition to the clerk of the council or the secretary of the school committee according to how the petition is addressed. A copy of the board of registrars of voters certificate shall also be mailed to the person designated upon such petition as having filed the same.

(b) *Referral to city solicitor:* If the board of registrars of voters determine that a petition has been signed by a sufficient number of voters, the clerk of the council or the secretary of the school committee, as the case may be, shall forthwith following receipt of such certificate deliver a copy of the petition to the city solicitor. The city solicitor shall, within fifteen days following receipt of a copy of the petition, in writing, advise the city council or the school committee, as may be appropriate, whether the measure as proposed may lawfully be proposed by the initiative process and whether, in its present form it may be lawfully adopted by the city council or the school committee. If the opinion of the city solicitor is that the measure is not in proper form, the reply shall state the reasons for such opinion, in full. A copy of the opinion of the city solicitor shall also be mailed to the person designated on the petition as having filed the same.

(c) *Action on petitions:* Within thirty days following the date a petition has been returned to the clerk of the council or the secretary of the school committee by the city solicitor and after publication in accordance with the provisions of section 2-9(c), the city council or the school committee shall act with respect to each initiative petition by passing it without change, by passing a measure which is stated to be in lieu of the initiative measure, or by rejecting it. The passage of a measure which is in lieu of an initiative

measure shall be deemed to be a rejection of the initiative measure. If the city council or the school committee fails to act with respect to any initiative measure which is presented to it within thirty (30) days following the date it is returned to it by the city solicitor, the measure shall be deemed to have been rejected on such thirtieth day. If an initiative measure is rejected, the clerk of the council or the secretary of the school committee shall promptly give notice of that fact to the person designated on the petition as having filed the same, by certified mail.

(d) *Supplementary petitions:* Within forty-five (45) days following the date an initiative petition has been rejected, a supplemental initiative petition may be filed with the clerk of the council or the secretary of the school committee. The supplemental initiative petition shall be signed by a number of additional voters which is equal to five (5) percent of the total number of voters as of the date of the most recent city election. If the number of signatures to such supplemental petition is found to be sufficient by the city clerk, the city council shall call a special election to be held on a date fixed by it not less than forty-five (45) nor more than ninety (90) days following the date of the certificate of the city clerk that a sufficient number of voters have signed the supplemental initiative petition and shall submit the proposed measure, without alteration, to the voters for determination; provided, however, if any other city election is to be held within one hundred and twenty (120) days following the date of the said certificate, the city council may omit the calling of such special election and cause said question to appear on the election ballot at such approaching election for determination by the voters.

(e) *Publication:* The full text of any initiative measure which is submitted to the voters shall be published in a local newspaper not less than seven (7) nor more than fourteen (14) days preceding the date of the election at which such question is to be voted upon. Additional copies of the full text shall be available for distribution to the public in the office of the city clerk.

(f) *Form of question:* The ballots used when voting on a measure proposed by the voters under this section shall contain a question in substantially the following form:

Shall the following measure which was proposed by voters in an initiative petition take effect? (Here insert the full text of the proposed measure, or a fair, concise summary, prepared by the petitioners, and approved by the city solicitor)

—— YES
—— NO

(g) *Time of taking effect:* If a majority of the votes cast on the question is in the affirmative, the measure shall be deemed to be effective forthwith, unless a later date is specified in such measure; provided, however, that no such measure shall be deemed to be adopted if fewer than twenty (20) percent of the total number of voters have voted to adopt the measure proposed under the initiative or to rescind the measure protested by the referendum.

Sec. 7-9. Citizen referendum procedures.

(a) *Petition, effect on final vote:* If within twenty (20) days following the date on which the city council or the school committee has voted finally to approve of any measure a petition signed by a number of voters equal to twelve (12) percent of the total number of voters as of the date of the most recent general city election and addressed to the city council, or to the school committee as may be, protesting against the measure or any part thereof is filed with the secretary of the school committee or clerk of the council, the effective date of such measure shall be temporarily suspended. The school committee or the city council shall forthwith reconsider its vote on such measure or part thereof, and if such measure is not rescinded, the city council shall provide for the submission of the question for a determination by the voters either at a special election, which it may call at its convenience, or within such time as may be requested by the school committee, or at the next regular city election, but pending such submission and determination, the effect of such measure shall continue to be suspended.

(b) *Certain initiative provisions to apply.* The petition described in this section shall be termed a referendum petition and insofar as applicable section 7-8 (a), (b), (e) and (f) shall apply to such referendum petitions, except that the words "measure or part thereof protested against" shall be deemed to replace the word "measure" in said sections wherever it may occur and the word "referendum" shall be deemed to replace the word "initiative" wherever it may occur in said sections.

## Sec. 7-10.  Ineligible measures.

None of the following shall be subject to the initiative or the referendum procedures: (1) proceedings relating to the internal organization or operation of the city council or of the school committee, (2) an emergency measure adopted in conformity with the charter, (3) the city budget or the school committee budget as a whole, (4) revenue loan orders, (5) any appropriation for the payment of the city's debt or debt service, (6) an appropriation of funds to implement a collective bargaining agreement, (7) proceedings relating to the election, appointment, removal, discharge, employment, promotion, transfer, demotion, or other personnel action, (8) any proceedings repealing or rescinding a measure or part thereof which is protested by referendum procedures, and (9) any proceedings providing for the submission or referral to the voters at an election.

## Sec. 7-11.  Submission of other matters to voters.

The city council may of its own motion, and shall at the request of the school committee if a measure originates with that body and pertains to affairs under its jurisdiction, submit to the voters at any regular city election for adoption or rejection any measure in the same manner and with the same force and effect as are hereby provided for submission by petitions of voters.

## Sec. 7-12.  Conflicting provisions.

If two (2) or more measures passed at the same election contain conflicting provisions, only the one receiving the greatest number of affirmative votes shall take effect.

## Sec. 7-13.  Recall elections.

(a) *Application:* Any person holding an elected city office may be recalled from such office by the voters in accordance with the procedures made available in this section.

(b) *Recall petition*

(1) *Office elected by voters at large:* Four hundred (400) or more voters may file with the board of registrars of voters an affidavit containing the name of the officer sought to be recalled and a statement of the grounds for recall. The signatures on such affidavit shall contain the names of at least sixty (60) voters in each of the wards into which the city is divided for the purpose of elections.

(2) *Office elected by voters by ward.* One hundred (100) or more voters may file with the board of registrars of voters an affidavit containing the name of the officer sought to be recalled and a statement of the grounds for recall. The signatures on such affidavit shall contain the names only of voters in the ward from which the officer was elected.

(3) *At large, or by ward:* If the affidavit is found to be valid, the city clerk shall thereupon deliver to the first ten (10) persons named on said affidavit, petition blanks demanding said recall, printed forms of which shall be kept available. The blanks may be completed by printing or by typewriting; they shall be addressed to the city council; they shall contain the names and residence addresses of the ten (10) persons to whom they are issued and they shall contain the grounds for recall as stated in the affidavit; they shall demand the election of a successor to the office; and they shall be dated and signed by the city clerk.

The recall petitions shall be returned to the office of the board of registrars of voters within twenty-one (21) days following the date they are issued, signed by not less than twenty (20) percent of the total number of voters (of the ward or of the city as is appropriate) as of the date of the most recent city election.

The sheets constituting a petition need not all be filed at the same time. For the purposes of this section such a petition shall be deemed filed whenever the persons responsible for its filing notify the board of registrars of voters, in writing, that the filing is complete. Before receiving such notice, the board of registrars of voters may, but shall not be required to, certify signatures on the sheets already filed.

The board of registrars of voters shall, within ten (10) days following the date the petition forms are filed, certify the number of signatures thereon which are the names of voters and the percentage that number represents of the total number of voters as of the date of the most recent city election.

(c) *Recall election:* If the petitions are certified by the board of registrars of voters to contain a sufficient number of signatures, they shall forthwith submit the same, with their certificate, to the city council. Upon receipt of the certified petition forms, the city council shall forthwith give written notice to the officer whose recall is sought of the validity of such petitions. If the officer whose recall is sought does not resign the office within five (5) days following delivery of the said notice, or by leaving at the last known place of residence, the city council shall order a special election to be held on a date fixed by it not less than thirty-five (35) days nor more than ninety (90) days after the date of its notice to the officer whose recall is sought.

(d) *Ballot question:* Ballots used at the recall election shall state, the proposition in substantially the following form: "Shall (insert name of officer) be recalled from the office of (insert name of office held)?"

_____ YES
_____ NO

(e) *Officeholder:* The person whose recall is sought shall continue to hold the office and to perform the duties until the recall election. If a majority of the votes cast on the question as stated above is in the affirmative, the officer shall be deemed to be recalled and the office shall be deemed to be vacant upon the certification of the election results. If a majority of the votes cast on the said question is in the negative, the person whose recall was sought shall continue in the office until the expiration of the term for which elected, but subject to recall as provided in section (f), below.

(f) *Restriction on recall petition:* No recall petition shall be filed against any officer until at least six (6) months following the commencement of a term of office, nor, in the case of an officer subjected to a recall election and not recalled thereby, during the remainder of the current term of office. A recall election shall not be held if less than six (6) months of the term of office of the person whose recall is sought remains at the time of the certification of the petition forms.

(g) *Filling of vacancy:* If the office of mayor is declared vacant as the result of a recall election, the city council shall forthwith call a special election to be held on a date fixed by it not less than sixty (60) nor more than ninety (90) days following the date of the recall election. The person elected at such special election shall serve for the balance of the unexpired term remaining at the time of election.

Vacancies in any other office shall be filled in accordance with the procedures for filling the same as provided in section 2-11 and section 4-1(f).

No person recalled from an office under the terms of this section shall be eligible to be a candidate to fill any vacancy created by such recall.

## ARTICLE 8. GENERAL PROVISIONS

### Sec. 8-1. Charter changes.

(a) *In general:* This charter may be replaced, revised or amended in accordance with any procedure made available under the state constitution, or by statutes enacted in accordance with the state constitution.

(b) *Periodic review:* The city council shall provide, in every year ending in a zero, for a review of the charter by a special or standing committee of the council and four additional persons to be appointed by the council president. The said com-

mittee shall file a report within the said year recommending any changes in the charter which it may deem to be necessary or desirable.

### Sec. 8-2. Severability.

The provisions of this charter are severable. If any provision of this charter is held invalid, the other provisions shall not be affected thereby. If the application of this charter, or any of its provisions, to any person or circumstance is held invalid, the application of this charter and its provisions to other persons and circumstances shall not be affected thereby.

### Sec. 8-3. Specific provision to prevail.

To the extent that any specific provision of this charter may conflict with any other provision expressed in general terms, the specific provision shall prevail.

### Sec. 8-4. Rules and regulations.

A copy of all rules and regulations adopted by city agencies shall be placed on file in the office of the city clerk and shall be available for review by any person who requests such information at any reasonable time. No rule or regulation adopted by any city agency shall become effective until seven (7) days following the date it is so filed.

### Sec. 8-5. Review of ordinances.

The city council shall provide, in each year ending in a two or in a seven, for a review of all ordinances of the city for the purpose of determining if any amendments or revisions may be necessary or desirable. Such review shall be conducted under the supervision of the city counsel, or, if the city council so directs, by special counsel appointed for that purpose. A report, with recommendations, shall be submitted within the said year.

### Sec. 8-6. Uniform procedures applicable to multiple member bodies.

(a) *Meetings:* All multiple member bodies of the city shall meet regularly at such times and places as they may, by their own rules, prescribe, unless some other provision is made by ordinance or by law. Special meetings of any multiple member body shall be held on the call of the chairman or by one third ($\frac{1}{3}$) of the members thereof, by written notice delivered in hand or to the place of residence of each member and which contains a list of the item or items to be acted upon. Except in case of an emergency, such notice shall be delivered at least forty-eight (48) hours in advance of the time set for such meeting. A copy of such notice to members shall, forthwith, be posted upon the city bulletin board.

(b) *Rules and journals:* Each multiple member body shall determine its own rules and order of business, unless otherwise provided by this charter, by law, or by ordinance, and shall provide for keeping minutes of its proceedings. These rules and the minutes of meetings shall be public records, and certified copies of them shall be kept available in the office of the city clerk. For the convenience of the public, copies of these records shall also be kept at the Beverly Public Library, provided, however, such copies kept at the public library are not to be construed in any way as being the official records.

(c) *Voting:* If requested by any member, any vote of any multiple member body shall be taken by a call of the roll and the vote of each member shall be recorded in the journal; provided, however, that if the vote is unanimous only that fact need be recorded.

(d) *Quorum:* A majority of the members of a multiple member body shall constitute a quorum, but a smaller number may meet and adjourn from time to time.

### Sec. 8-7. Number and gender.

Words importing the singular number may extend and be applied to several persons or things; words importing the plural number may include the singular; and words importing the masculine gender shall include the feminine gender.

### Sec. 8-8. Computation of time.

In computing time under the charter, if seven (7) days or less, "days" shall refer to secular days

not including Saturdays, Sundays or legal holidays. If more than seven (7) days, every day shall be counted.

### Sec. 8-9. References to general laws.

All references to General Laws contained in the charter refer to the General Laws of the Commonwealth of Massachusetts and are intended to refer to and to include any amendments or revisions to such chapters or sections, or to the corresponding chapters and sections of any rearrangement, recodification, or revision of such statutes enacted or adopted subsequent to the adoption of this charter.

### Sec. 8-10. Certificate of election or appointment.

Every person who is elected, including those elected by the city council, or appointed to an office of the city shall receive a certificate of such election or appointment from the city clerk.

Except as otherwise provided by law, before performing any act under an appointment or election, all such persons shall take and subscribe to an oath of office and be sworn to the faithful performance of their duties.

### Sec. 8-11. Oath of office of mayor, councillors, and school committee members.

The mayor-elect, councillors-elect, and school committee members-elect shall, on the first Monday in January of each even-numbered year at twelve o'clock noon, meet and be sworn to the faithful discharge of their duties. The oath may be administered to the mayor by the city clerk, or by a judge of a court of record, or by a justice of the peace. The oath may be administered to the members of the city council and the school committee by the mayor, after the mayor has been duly sworn, or by any of the above named officials. A certificate that said oath or oaths have been taken shall be entered in the journal of the city council.

In case of the absence of the mayor-elect, or any member-elect of the city council or school committee on said day, the oath of office may at any time

thereafter be administered to such person who for any reasons shall not have taken the oath on the day named. A certificate of each oath subsequently taken shall be entered in the journal of the city council.

After the oath has been administered to the councillors present, they shall organize, with the member elected at large receiving the highest number of votes at the preceding biennial city election, as president, as provided in section 2-2. The president shall be sworn by the city clerk, or, in the case of the absence of the city clerk, by any person qualified to take oaths or affirmations.

After the oath has been administered to the school committee members present, the committee shall organize by choosing a school committee president, as provided in section 4-2. The president shall be sworn by the city clerk, or, in the case of the absence of the city clerk, by any person qualified to take oaths or affirmations.

### Sec. 8-12. Notice of vacancies.

Whenever a vacancy shall occur in any city office or in the employment of the city, or, when by reason of a retirement, or resignation, or the expiration of a fixed term, or otherwise a vacancy can be anticipated, the mayor or other appointing authority shall forthwith cause public notice of such vacancy or impending vacancy to be publicly posted on the city bulletin board for not less than ten (10) days. Each such notice shall contain a brief description of the duties of the office or position and shall indicate a list of necessary or desirable qualifications for the office or position. Any person who desires to be considered for an appointment to fill such vacancy may, within ten (10) days following the date the notice is posted, or such longer period as may be indicated in such announcement, file with the appointing authority a statement setting forth with reasonable clarity and specificity, the qualifications of such person for such appointment. No permanent appointment to fill any position shall be effective until at least fourteen (14) days shave elapsed following such posting to permit the reasonable consideration of all such applicants. This section shall not

apply to positions covered under the civil service law and rules or if in conflict with the provisions of a collective bargaining agreement.

### Sec. 8-13. Loss of office, excessive absence.

If any person appointed to serve as a member of a multiple member body shall fail to attend three (3) or more consecutive meetings, or all of the meetings held during four (4) calendar months, or one-half (½) or more of all of the meetings of such body held in one (1) calendar year, the remaining members of the multiple member body may, by a majority vote of their number, declare the office to be vacant, provided, however, that not less than ten (10) days prior to the date said vote is scheduled to be taken, the body has given in hand, or mailed, postage prepaid, by registered or certified mail, return receipt requested, notice of such proposed or pending vote to the last known address of the person whose removal is sought.

### Sec. 8-14. Filling of vacancies.

Whenever a vacancy shall occur in the membership of an appointed multiple member body, the remaining members shall, forthwith, give written notice of such vacancy to the appointing authority. If, at the expiration of thirty (30) days following the delivery of such notice to the appointing authority, said appointing authority has not appointed some person to fill the vacancy, the remaining members of the multiple member body shall fill such vacancy for the remainder of any unexpired term by majority vote of its remaining members.

### Sec. 8-15. Removals and suspensions.

Any employee of the city, not a city officer or a department head (hereafter "such person") and not subject to the provisions of the civil service law, or covered by the terms of a collective bargaining agreement which provides a different method; and whether appointed for a fixed or an indefinite term, may be suspended or removed from office by the appointing authority for good cause. The term "cause" shall include, but not be limited to the following: inefficiency, insubordination, conduct unbecoming the office and incapacity, other than temporary illness.

Any such person may be suspended from office by the appointing authority if such action is deemed by the appointing authority to be necessary to protect the interests of the city. However, no suspension shall be for more than fifteen (15) days. Suspension may be coterminous with removal and shall not interfere with the rights of the officer or employee under the removal procedure given below.

The appointing authority when removing any such person shall act in accordance with the following procedure:

(a) A written notice of the intent to remove and a statement of the cause or causes therefore shall be delivered in hand or by certified mail to the last known address of the person sought to be removed.

(b) Within five (5) days of delivery of such notice, the officer or employee of the city may request a public hearing at which such person may be represented by counsel, shall be entitled to present evidence, call witnesses and to question any witness appearing at the hearing.

(c) Between one (1) and ten (10) days after the public hearing is adjourned, or if the officer or employee of the city fails to request a public hearing, between six (6) and fifteen (15) days after delivery of the notice of intent to remove, the appointing authority shall take final action, either removing such person, or, noticing such person that the notice is rescinded. Failure of the appointing authority to take any action within the time periods as stated in this section shall be deemed to be a rescission of the original notice and the officer or employee shall, forthwith, be reinstated.

Nothing in this section shall be construed as granting a right to such a hearing to a person who has been appointed for a fixed term when that term of office expires and such person is not reappointed for another term of office.

## ARTICLE 9. TRANSITIONAL PROVISIONS.

### Sec. 9-1. Continuation of existing laws.

All general laws, special laws, city ordinances, city council votes, and rules and regulations of or

pertaining to city that are in force when this charter takes effect, and not specifically or by implication repealed hereby, shall continue in full force and effect until amended or repealed, or rescinded by due course of law, or until they expire by their own limitation.

### Sec. 9-2. Continuation of government and administration.

All city agencies shall continue to perform their duties until re-elected, re-appointed, or until successors to their respective positions are duly appointed or elected, or until their duties have been transferred and assumed by another city agency.

### Sec. 9-3. Transfer of records and property.

All records, property and equipment whatsoever of any city agency, or part thereof, the powers and duties of which are assigned in whole or in part to another city agency, shall be transferred forthwith to such agency.

### Sec. 9-4. Continuation of personnel.

Any person holding a city office, or a position in the administrative service of the city, or any person holding full time employment under the city, shall retain such office, or position, or employment, and shall continue to perform the duties of such office, position or employment until provision shall have been made for the performance of those duties by another person or agency; provided, however, no person in the permanent full time service of the city shall forfeit his or her pay grade, or time in service of the city. All such persons shall be retained in a capacity as similar to the capacity in which they were serving at the time this charter is adopted as is practicable and any reduction in the personnel needs of the city shall be accomplished through a policy of attrition, unless specific provision is otherwise made in this article.

### Sec. 9-5. Effect on obligations, taxes, etc.

All official bonds, recognizances, obligations, contracts, and other instruments entered into or executed by or to the city before the adoption of this charter, and all taxes, assessments, fines, penalties, forfeitures, incurred or imposed, due or owing to the city, shall be enforced and collected; and all writs, prosecutions, actions and causes of action, except as herein otherwise provided, shall continue without abatement and remain unaffected by the charter; and no legal act done by or in favor of the city shall be rendered invalid by reason of the adoption of this charter.

### Sec. 9-6. Time of taking effect.

The provisions of this charter shall take full effect following the inauguration of the mayor and the organization of the city government on the first Monday in January in the year following the year in which the charter is adopted, except as is hereinafter provided:

(a) The provisions of section 2-6(a) establishing the position of budget/management analyst under the city council, the provisions of sections 5-4, 5-5, 5-6, 5-7 and 6-8 providing for the establishment, consolidation and coordination of certain administrative functions, the provisions of section 6-6 providing for a five year capital improvement program to be submitted by the mayor, the provisions of section 8-4 providing for copies of administrative rules and regulations to be filed in the office of the city clerk and the provisions of section 8-10 providing for a certificate of election, or appointment, to be issued to certain city officers shall not become fully effective until the first day of July in the year following the year in which the charter is adopted.

(b) It is the intention of the charter that the procedures for budget preparation and budget review of the annual operating budget for the city, established in article 6, shall insofar as possible be followed in the year following the year in which the charter is adopted, recognizing however that full conformity might not be possible until the second year following such adoption.

(c) The members of the school committee who have been chosen for terms of four (4) years each shall serve for the balance of the terms for which they were elected, but, their successors shall be chosen for terms of two (2) years each. If a vacancy shall

occur in any such office for a period longer than two (2) years, it shall be filled as though the term to be filled had been for two (2) years. When the terms of office of the two school committee members at large expire, or otherwise become vacant, such offices shall be deemed abolished and the committee structure shall thereafter be as established in section 4-1.

(d) While the mayor elected at the election at which this charter is adopted is not expected to file a capital improvement plan with the city council in the first year of the term for which elected, the said mayor shall be responsible, forthwith, to set into motion a procedure and a process for the development of a five year capital improvement program which can be submitted in the second year of said term and thereafter updated from year to year. In order to assist the mayor in this process a special commission shall be established to consist of four (4) persons chosen by the mayor and three (3) persons chosen by the city council to assist in the development of the initial capital improvement plan. Persons appointed to such commission by the mayor, or council, may be incumbent city officers or employees or may be other voters, as may be deemed appropriate.

(e) All persons currently serving in a city office or position by election of the city council, which office under the charter is to be filled by some other method, shall continue to serve in such office until the term for which they were chosen expires and until a successor to such office is chosen in accordance with the charter and the powers, duties and responsibilities transferred or assigned to such other person.

(f) The authority of the mayor to make all appointments as provided in the first paragraph of section 3-3 shall take effect as the terms of office of incumbent officials expire or vacancies in city positions otherwise occur.

(g) The authority of the mayor to remove officers or department heads appointed by the mayor

contained in section 3-4, shall not become effective until the first Monday in January in the second year following the year in which the charter is adopted and shall only apply to offices which have been appointed by the mayor pursuant to the provisions of the first paragraph of section 3-3.

(h) The appointment making authority in the second paragraph of section 3-5 shall take effect for each department head appointed by the mayor pursuant to the authority of the first paragraph of section 3-3 upon such appointment.

(i) The incumbent city auditor shall serve in such office until the last day of June in the year following the year in which the charter is adopted, notwithstanding the date on which the term of the incumbent would otherwise expire. The position of city auditor as it has heretofore existed and functioned shall be abolished as of the first day of July in said year. The powers of the office of auditor associated with auditing, including those described in sections fifty, fifty-one, fifty-three and fifty-four A of chapter forty-one of the General Laws, shall be retained for the position of budget/management analyst appointed by the city council. It is the intention of the charter that the day-to-day responsibilities presently performed by the auditor, such as those described in section fifty-two of said chapter forty-one, are to be transferred and assigned to a person in the department of municipal finance established by section 5-4, who shall be known as the city accountant, and who shall have the powers of a town accountant as described in sections fifty-six, fifty-seven, and fifty-eight of said chapter forty-one.

(j) Until such time as the following may be changed by an ordinance adopted by the city council which amends, revises or repeals the same, the following shall have the force of a city ordinance.

(1) Salary of budget/management analyst. The annual salary of the budget/management analyst appointed by the city council pur-

§ 9-6

suant to charter section 2-8(a) shall initially be established at twenty-five thousand dollars ($25,000.00) with a proviso that the amount provided for such office shall never be less than one-half (½) the amount provided for the office of finance director. The city council may, in lieu of expending such sum as salary, expend the said sum as a consultant account paying the certified public accountant, or firm of such accountants retained to provide the annual audit pursuant to section 6-9 from such account to provide periodic oversight services to it throughout the fiscal year.

(2) Information to be given to newly appointed members of multiple member bodies. In order that newly appointed members of multiple member bodies might have the opportunity to become acquainted with the type and variety of matters which are likely to come before the multiple member body during the term of appointment, the chair of each multiple member body shall, forthwith upon receipt of notice of the appointment of a new member, provide such member with copies of the minutes of meetings of the body for the two (2) prior years and copies of all laws, ordinances, rules or regulations governing or otherwise applicable to the office. The chair shall, within thirty (30) days following receipt of notice of the appointment, meet with the new member and provide such orientation to the duties of the office as may be deemed necessary or desirable.

(k) Chapter 142 of the acts of 1936 and chapter 203 of the acts of 1938 placing, respectively, the office of police chief and the office of fire chief under the civil service law and rules are hereby repealed, each repeal to be effective upon the expiration of the period of service of the incumbents of the respective offices. Nothing in this revocation of acceptance of the civil service law and rules shall in any way affect any of the rights, privileges and obligations of either of said chiefs under the said civil service law and rules. The successors to said officers shall however be appointed and shall hold their office without regard to the civil service law and rules. It is the inten-

tion of the charter commission in making this provision that every mayor shall make appointments to these offices on the basis of merit and fitness alone and that the guiding principle shall always be to do that which is best for our city.

(l) Forthwith following the organization of the city government in January of the year following the year in which the charter is adopted, the mayor shall appoint seven (7) persons as a committee to review the ordinances of the city for the purpose of preparing suggested revisions to bring the ordinances into conformity with, and to fully implement the provisions of the charter. At least two (2) such persons shall have been members of the Beverly Charter Commission. The committee shall submit a report and recommendations within one year following its appointment and may submit interim reports at any time throughout the year. The committee shall give special early attention to revisions necessary to implement the organizational structure contained in article 5 of the charter.

**Sec. 9-7. Disposition of certain special laws.**

(a) *Certain special laws; recognized and retained.* The following special acts are hereby especially recognized and retained:

An act passed by the legislature of the Colony of Massachusetts Bay on November 7, 1668 (old style calendar), providing, in part, That Basse River be, henceforth a touneship of themselves . . . and that it be called Beverly. And an act passed on May 28, 1675 (old style calendar) in which the Boundaries between Beverly, Salem and Wenham are established and clarified. And an act passed by the legislature of the Province of the Massachusetts Bay on September 13, 1753, entitled, An Act for Setting off the Inhabitants, as Also Estates of the Proprietors, of That Part of the Precinct of Salem and Beverly, So-Called, Which Is Part of Salem, to the Town of Beverly. And an act passed by the legislature of the Commonwealth of Massachusetts in 1857, Chapter 90, entitled, an Act to Set Off A Part of the Town of Beverly, and Annex the Same to the Town of Danvers.

(b) *Certain special laws; recognized and retained, in part:* The following special acts which

were enacted for the purpose of enabling and authorizing the city to exercise certain powers or functions, which prior to the enactment of article eighty-nine of the state constitution may not otherwise have been available to the city, are hereby recognized, so much of these acts which might grant a power to the city which it otherwise might not have are hereby retained, but all such powers shall be exercised in a manner consistent with the charter:

1865, Chapter 294—an Act to Furnish the Town of Beverly with Water and to Increase the Supply Thereof. 1927, Chapter 8—an Act to Authorize the City of Beverly to Establish a Trust Fund to Provide Medical Treatment for the Public School Children of Said City. 1953, Chapter 652—an Act Providing That the City of Beverly May Improve Certain Water Courses for the Protection of Public Health. 1960, Chapter 113—an Act Authorizing the Establishment of a Separate Account in the Treasury of the City of Beverly Consisting of Receipts of its Recreation Commission and Providing for Expenditures Therefrom Without Further Appropriation. 1968, Chapter 313—an Act Authorizing the City of Beverly to Revoke its Acceptance of the Law Applicable to Tenement Houses in Cities. 1969, Chapter 308—an Act Authorizing the Establishment of a Separate Account in the Treasury of the City of Beverly Consisting of Receipts of its Youth Activities Commission and Providing for Expenditures Therefrom Without Further Appropriation. 1974, Chapter 735—an Act Authorizing the City of Beverly to Enter into a Certain Contract with Gordon College for Sewage Disposal. 1983 Chapter 250—an Act Relative to the Licensing and Keeping of Dogs in the City of Beverly. 1986, Chapter 366—an Act Further Authorizing the City of Beverly to Enter into a Certain Contract with Gordon College for Sewage Disposal. 1994, Chapter 30—an Act Authorizing the City of Beverly to Amortize the Revenue Deficit over a Period of Three Years. 1994, Chapter 228—an Act Authorizing the City of Beverly to enter into a contract for the disposal of sewage.

(c) *Certain obsolete borrowing authorizations, repealed;* The following special acts which autho-

rized the city to borrow certain sums of money, for certain purposes, are hereby recognized as obsolete and are to stand repealed:

1874, Chapter 168—an Act to Authorize the Town of Beverly to Issue Bonds for the Purpose of Funding its Debt. 1881, Chapter 231—an Act to Authorize the Town of Beverly to Refund its Indebtedness. 1893, Chapter 250—an Act to Authorize the Town of Beverly to Incur Indebtedness Beyond the Limit Fixed by Law, for the Purpose of Constructing a System of Sewerage. 1893, Chapter 259—an Act to Authorize the Town of Beverly to Cancel Certain of its Bonds Now Held in its Sinking Fund. 1894, Chapter 29—an Act to Authorize the Town of Beverly to Issue Bonds for the Purpose of Funding its Water Loan. 1896, Chapter 271—an Act to Authorize the City of Beverly to Incur Indebtedness Beyond the Limit Fixed by Law, for Park Purposes. 1898, Chapter 398—an Act to Authorize the City of Beverly to Incur Indebtedness Beyond its Debt Limit, for School Purposes. 1900, Chapter 288—an Act to Authorize the City of Beverly to Incur Indebtedness Beyond the Limit Fixed by Law, for the Purpose of Constructing a System of Sewerage. 1901, Chapter 475—an Act to Authorize the City of Beverly to Incur Indebtedness for School Purposes. 1902, Chapter 431—an Act to Authorize the City of Beverly to Incur Indebtedness for School Purposes. 1903, Chapter 182—an Act to Authorize the City of Beverly to Incur Indebtedness Beyond the Limit Fixed by Law, for the Purpose of Extending its System of Sewerage. 1903, Chapter 183—an Act to Authorize the City of Beverly to Incur Indebtedness Beyond the Limit Fixed by Law, for the Purpose of Extending its Water Supply System. 1903, Chapter 263—an Act to Authorize the City of Beverly to Incur Indebtedness for School and Street Purposes. 1905, Chapter 132—an Act to Authorize the City of Beverly to Incur Indebtedness Beyond its Debt Limit, for Water Supply Purposes. 1905, Chapter 143—an Act to Authorize the City of Beverly to Incur Indebtedness Beyond its Debt Limit, for School Purposes. 1906, Chapter 110—an Act to Authorize the City of Beverly to Incur Indebtedness for Sewerage Purposes, Beyond the Statutory Limit. 1906, Chapter 388—an Act to Determine the Indebtedness of the City of

Beverly Incurred for Water Supply Purpose. 1913, Chapter 298—an Act Relative to Sewer Loans of the City of Beverly. 1914, Chapter 321—an Act to Authorize the City of Beverly to Incur Indebtedness for the Improvement of its Harbor and Shores. 1914, Chapter 768—an Act to Authorize the City of Beverly To Incur Indebtedness for the Purpose of Relaying Certain Water Mains. 1915, Chapter 266—an Act to Authorize the City of Beverly to Incur Indebtedness for the Purpose of Relaying Certain Water Mains. 1921., Chapter 453—an Act Authorizing the City of Beverly to Incur Indebtedness for a High School Building. 1949, Chapter 500—an Act Authorizing the City of Beverly to Borrow Money for Fire Station and Signal Station Building Purposes. 1949, Chapter 120—an act authorizing the City of Beverly to borrow money for school purposes. 1950, Chapter 642—an Act Authorizing the City of Beverly to Borrow Money for School Purposes.

(d) *Certain other obsolete special laws repealed:* The following special laws which were enacted for special purposes and were limited in time by their own provisions are hereby recognized as obsolete and are to stand repealed, but all acts taken under the authority of the said special laws are hereby preserved:

1910, Chapter 505—an Act to Confirm Certain Proceedings of the City Council of the City of Beverly. 1912, Chapter 544—an Act to Authorize the City of Beverly to Discontinue the Use for Playground Purposes of a Certain Parcel of Land near the Poor Farm in That City. 1914, Chapter 650—an Act to Authorize the City of Beverly to Pension George O. Obear. 1920, Chapter 275—an Act to Authorize the City of Beverly to Contribute a Sum of Money to the Federal Government to Be Used in the Improvement of Beverly Harbor. 1922, Chapter 87—an Act Authorizing the City of Beverly to Pay a Sum of Money to the Estate of Patrick Gallagher for Taxes Erroneously Assessed and Collected. 1922, Chapter 155—an Act Authorizing the City of Beverly to Pay a Sum of Money to the Widow of James J. Fagan. 1923, Chapter 356—an Act Authorizing the City of Beverly to Pension Walter Farnham. 1924, Chapter 125—an Act Authorizing the City of Beverly to Pension

Nathaniel W. Corliss. 1924, Chapter 333—an Act Authorizing the City of Beverly to Pay a Sum of Money to the Widow of James J. Fagan. 1925, Chapter 276—an Act Authorizing the City of Beverly to Appropriate Money to Provide Facilities for Holding in Said City During the Current Year the State Convention of the Veterans of Foreign Wars of the United States. 1938, Chapter 375—an Act to Authorize the City of Beverly to Refund Certain Taxes Erroneously Assessed upon and Collected from Alonzo B. Morse. 1941, Chapter 469—an Act Authorizing the City of Beverly to Take by Eminent Domain for Public Airport Purposes Certain Property in the Town of Danvers. 1943, Chapter 429—an Act Relating to the Acquisition of Certain Property by the City of Beverly for a Public Park. 1946, Chapter 118—an Act Relative to the Number of Members of the Reserve Police Force in the City of Beverly. 1951, Chapter 187—an Act Authorizing the City of Beverly to Pay a Certain Claim Legally Unenforceable by Reason of Failure to Comply with Certain Provisions of its City Charter. 1959, Chapter 162—an Act Authorizing the Granting of a License For the Sale of Alcoholic Beverages to Vittori Rocci Post # 56 of the Italian-American War Veterans. 1959, Chapter 204—an Act Authorizing the City of Beverly to Pay Sums of Money to William Devitt, Alice F. Huson, Bayard D. Huson, Lawrence Lapointe, Marie and Anthony Vaccaro and Clifford M. And Henrietta C. Caverly. 1959, Chapter 434—an Act Authorizing the City of Beverly to Pay a Certain Unpaid Bill to Merrimack Essex Electric Company. 1962, Chapter 118—an Act Providing Life Tenure for Gordon T. Richardson, Incumbent of the Office of Commissioner of Public Works of the City of Beverly. 1963, Chapter 139—an Act Authorizing the City of Beverly to Acquire Land and to Construct—an Off-Street Parking Area and to Borrow Money for the Construction Thereof. 1965, Chapter 588—an Act Providing for Life Tenure for Walter T. Barnes, Incumbent of the Office of City Collector of the City of Beverly. 1966, Chapter 568—an Act Authorizing the City of Beverly to Appropriate Money for the Payment of, and to Pay, Certain Unpaid Bills. 1967, Chapter 146—an Act Authorizing the City of Beverly to Pay a Certain Unpaid Bill to Sid's

Donuts, Inc. 1968, Chapter 571—an Act Validating a Certain Building Permit Issued by the City of Beverly. 1970, Chapter 624—an Act Authorizing the City of Beverly to Appropriate Money for the Payment of, and to Pay, a Certain Unpaid Bill. 1970, Chapter 661—an Act Authorizing the City of Beverly to Appropriate Money for the Payment of and to Pay a Certain Unpaid Bill. 1973, Chapter 196—an Act Authorizing the City of Beverly to Appropriate and Pay a Sum of Money to Michael J. Frasca. 1973, Chapter 1139—an Act Authorizing the City of Beverly to Convey Certain Land in the City of Beverly. 1974, Chapter 64—an Act Authorizing the City of Beverly to Convey Certain Land in the City of Beverly. 1975, Chapter 423—an Act Authorizing the City of Beverly to Redraw its Ward Lines. 1983, Chapter 493—an Act Authorizing the City of Beverly to Acquire Easements for the Construction of Certain Sewerage Facilities. 1986, Chapter 533—an Act Authorizing the Acquisition of Land in the Town of Wenham by the City of Beverly. 1989, Chapter 136—an Act Authorizing the City of Beverly to Pay Certain Retroactive Compensation.

(e) *Certain Other Obsolete Special Laws Repealed:* The following special laws which established and amended the charter for the city of Beverly are hereby recognized as obsolete and are to stand repealed, but all acts taken under the authority of the said special laws are hereby preserved:

1894, Chapter 161—an Act to Incorporate the City of Beverly. 1898, Chapter 319—an Act Relative to Streets and Highways in the City of Beverly. 1910, Chapter 542—an Act to Revise the Charter of the City of Beverly. 1911, Chapter 267—an Act Relative to Wires and Electric Appliances in the City of Beverly. 1913, Chapter 398—an Act Relative to Printing Proposals for Contracts with the City of Beverly. 1913, Chapter 208—an Act to Authorize the School Committee of the City of Beverly to Appoint the School Physicians for That City. 1915, Chapter 72—an Act to Authorize the City of Beverly to Pay Permanent Men in the Fire Department Three Dollars a Day. 1915, Chapter 141—an Act to Authorize the City of Beverly to Pay Salaries to the Members of its Board of Alder-

men. 1919, Chapter 75—an Act Relative to the Payment of Salaries In the Police and Fire Departments of the City of Beverly. 1920, Chapter 20—an Act Relative to the Salaries of the Mayor and Other Public Officers of the City of Beverly. 1921, Chapter 9—an Act Authorizing the City of Beverly to Compensate the Members of its Board of Aldermen. 1922, Chapter 140—an Act Providing for a Preliminary Election for the Choice of Municipal Officers in the City of Beverly. 1927, Chapter 279—an Act Authorizing the City of Beverly to Compensate the Members of its Board of Aldermen. 1934, Chapter 169—an Act Authorizing the City of Beverly to Compensate the Members of its Board of Aldermen. 1936, Chapter 29—an Act Establishing Biennial Municipal Elections in the City of Beverly and Making Certain Other Charter Changes. 1936, Chapter 46—an Act Authorizing the City of Beverly to Compensate the Members of its Board of Aldermen. 1939, Chapter 135—an Act Authorizing the City of Beverly to Compensate the Members of its Board of Aldermen. 1941, Chapter 228—an Act Authorizing the City of Beverly to Compensate the Members of its Board of Aldermen. 1943, Chapter 112—an Act Providing for the Holding of Biennial Municipal Elections in the City of Beverly in Odd-Numbered Years and Establishing the Date of Said Elections. 1943, Chapter 198—an Act Authorizing the City of Beverly to Compensate the Members of its Board of Aldermen. 1945, Chapter 144—An Act Relative to the Polling Hours at Elections in the City of Beverly. 1947, Chapter 162—an Act Authorizing the City of Beverly to Increase the Compensation of the Members of its Board of Aldermen. 1951, Chapter 238—an Act Providing for the Holding of Biennial Municipal Elections in the City of Beverly in Odd-Numbered Years and Establishing the Date of Said Elections. 1952, Chapter 236—An Act Creating a Development and Industrial Commission in the City of Beverly. 1952, Chapter 336—an Act Authorizing the City of Beverly to Increase the Compensation of the Members of its Board of Aldermen. 1953, Chapter 95—an Act Relative to Additions to or Alterations of Certain Buildings in the City of Beverly. 1954, Chapter 602—an Act Relative to the Election of Certain Officials in the City of

# Exhibit
# 4

# PART II
# THE REVISED ORDINANCES

ARTICLE 1: GENERAL PROVISIONS* ........................................................................ 2
Article 2: Elective Offices* ........................................................................................ 9
ARTICLE 3 ADMINISTRATIVE ORGANIZATION* ................................................ 19
ARTICLE 4: ORGANIZATION INTO DEPARTMENTS* ........................................ 76
Chapter 4A  AIRPORT* ............................................................................................ 112
Chapter 4B* ANIMALS** ......................................................................................... 114
Chapter 5  BUILDINGS AND BUILDING REGULATIONS* ................................ 122
Chapter 6  CIVIL DEFENSE AND EMERGENCY PLANNING* .......................... 126
Chapter 7 ELECTRICITY* ....................................................................................... 128
Chapter 8  FIRE PREVENTION AND PROTECTION* .......................................... 140
Chapter 9  HEALTH* ................................................................................................ 151
Chapter 10  HISTORIC DISTRICTS* ..................................................................... 157
Chapter 11  LIBRARY ............................................................................................... 166
Chapter 12  LICENSES AND BUSINESS REGULATIONS* ................................. 169
Chapter 13  MOTOR BUSSES AND HACKNEY CARRIAGES ............................ 197
Chapter 14  MOTOR VEHICLES AND TRAFFIC* ............................................... 206
Chapter 15  OFFENSES AND MISCELLANEOUS PROVISIONS ......................... 268
Chapter 16  PARKS AND RECREATION* .............................................................. 285
Chapter 17  PERSONNEL* ....................................................................................... 290
Chapter 18  PLANNING* .......................................................................................... 304
Chapter 19  POLICE DEPARTMENT* .................................................................... 311
Chapter 20  PUBLIC SERVICES ............................................................................. 317
Chapter 21  SEWERS* .............................................................................................. 362
Chapter 22  SHELLFISH* ......................................................................................... 375
Chapter 23  TREES* .................................................................................................. 377
Chapter 24  WETLANDS PROTECTION* .............................................................. 385
Chapter 25  WEIGHTS AND MEASURES DEPARTMENT ................................... 394
Chapter 26 BOARD OF ASSESSORS OF TAXES ................................................. 396

The Director of Community Services shall have the following specific powers and duties:

a)    Provide coordination and direction to the agencies within the department to insure consistent administration and the efficient delivery of services to citizens and taxpayers.

b)    Meet regularly with the Mayor to develop goals and objectives for each of the agencies within the department and to measure and evaluate the performance of functions by the agencies.

c)    Meet with the multiple member bodies which are responsible for the oversight of the agencies' programs to explain the goals and objectives set by the Mayor for each such agency.

d)    Examine the level of services provided in other communities to ensure the City of Beverly provides nothing less than an equivalent service for its citizens.

e)    Assist constituent agencies in the development of annual operating budgets and capital outlay requests.

f)    Provide assistance to the constituent multiple member bodies in personnel-related matters including appointment, discharge, evaluation and supervision.

g)    Serve as liaison between the multiple member bodies, the divisions, the City Council and the Mayor.

h)    Be responsible for the coordination and supervision of the data processing and management information systems for the city and any of its governmental offices and agencies.


**SECTION 3-313. Confidential Secretary/Administrative Assistant to the Mayor**
    **(a). Establishment.** – There shall be a Confidential Secretary/Administrative Assistant to the Mayor.

    **(b) Mode of Appointment, Term of Office** - The Confidential Secretary/Administrative Assistant to the Mayor shall be appointed by and responsible only to the Mayor. The Confidential Secretary/Administrative Assistant shall serve at the pleasure of the Mayor.

    **(c) Authorities and Responsibilities** - The Confidential Secretary/Administrative Assistant to the Mayor shall have the following duties:

    (1) Organize and summarize information and prepare it for the Mayor's review and action;

    (2) Meet with department heads regarding day-to-day business, expediting administrative interaction between the Mayor's office and City departments;

(3) Serve as a liaison officer between the Mayor, the media, public interest groups, businesses and residents;

(4) Be familiar with all aspects of the City government and with the functions and activities of the various offices and employees of the City;

(5) Be familiar with the various services rendered by the City to its residents, in order that callers can be informed of the extent of these services and of the schedule for their performance;

(6) Review all correspondence received in the office of the Mayor, and arrange for its routing and for assembling the materials needed by the Mayor to respond to all such correspondence;

(7) Answer all telephone calls placed to the office, respond in an appropriate fashion and direct as appropriate;

## SECTION 3-314. Constables

*(a) Establishment* - There shall be one or more constables as provided in MGL Chapter 41, Sections 91 through 95.

*(b) Mode of Appointment, Term of Office* - The Mayor shall appoint, subject to the review of the City Council as provided in Section 2-10 of the Beverly Home Rule Charter, one or more constables for a term not to exceed three years each.

*(c) Authorities and Responsibilities* - Constables may serve certain civil writs and processes. They have the powers of sheriffs to require aid in the execution of their duties. Constables take due notice of and prosecute all violations of law, respecting the observance of the Lord's Day, profane swearing and gaming. Constables also serve all processes directed to them by the City, for notification of City meetings, or for other purposes.

## SECTION 3-315. Dog Officer (Animal Control Officer)

*(a) Establishment* -- There shall be a Dog Officer as provided in MGL Chapter 140, Section 151 *et seq.*

*(b) Mode of Appointment, Term of Office* - The Mayor shall annually, subject to the review of the City Council as provided in Section 2-10 of the Beverly Home Rule Charter, appoint a Dog Officer and one or more assistants, for a term not to exceed three years. The person appointed to such office shall be known as the Animal Control Officer. (Ord. No. 428, § 1, 10-19-87)

*(c) Authorities and Responsibilities* - The Dog Officer/Animal Control Officer shall be responsible for the enforcement of all laws relating to the care, custody and control of dogs in the

# Exhibit
# 5

**William F. Scanlon, Jr.**
5 Whitman Place
Beverly, MA 01915

978-922-9699

December 17, 2003

<u>VIA CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Ms. Crystal Atherton
61 Conant Street
Beverly, MA 01915

Dear Crystal:

As you most probably are aware, the City Charter of the City of Beverly grants to the Mayor the power to remove from office all persons appointed by the Mayor. On January 5, 2004 it is my intention to remove you from your present position. Before that should become necessary, I offer you this opportunity to resign your position, with such resignation to be effective no later than 12:00 Noon, Monday, January 5, 2004. If you wish to take advantage of this opportunity I request that you file your resignation with the City Clerk by the close of business Wednesday, December 31, 2003.

Should you choose to resign, please know that in so acting you are serving the citizens of Beverly by facilitating and contributing to a smooth transition of government from the present administration to the next and for that you have my thanks.

Very truly yours,

# Exhibit
# 6

December 31, 2003

William F. Scanlon, Jr.
Mayor Elect
5 Whitman Place
Beverly, MA 01915

Dear Mayor Elect Scanlon:

I have received your letter dated December 17, 2003 seeking my resignation. As I told you in our telephone conversation, I do not intend to resign and do not believe I am subject to removal under the City Charter (see Section 8-15), except possibly for cause. As I also told you in our conversation, I do not have a position to resign from because I am not a city officer or a department head but rather a rank and file staff secretary—a career public servant who has served a number of administrations, including your earlier administration.

As a dedicated public servant with more than 18 years of service and an exemplary employment record, I do not think that "for cause" termination is an issue.

I have decided to take three weeks of vacation and will return to work on January 20, 2004. Having dedicated more than 18 years to the City as a loyal employee and public servant, I look forward to continuing my work for the City of Beverly and its residents.

If you wish to re-assign me to a different department or location, please let me know.

Sincerely,

Crystal A. Atherton
61 Conant Street
Beverly, MA 01915
(978) 927-2943

# Exhibit
# 7

*Office of the Mayor*
*City of Beverly*
*Massachusetts 01915*

Mayor
William F. Scanlon, Jr.

Executive Secretary
Linda Paluzzi Giallongo

Telephone
(978) 921-6000

Facsimile
(978) 922-0285

January 5, 2004

Mrs. Frances Macdonald
Beverly City Clerk
City Hall
191 Cabot Street
Beverly, MA 01915

Re: Removal of Crystal Atherton from the position as the Mayor's Confidential
Secretary and Clerk to the Beverly License Board

Dear Mrs. Macdonald:

In accordance with Section 3-3 and Section 3-4 of the Beverly Home Rule Charter and
Section 3-313 of the Administrative Code, I do hereby remove Crystal Atherton from the
position of Mayor's Confidential Secretary. Further in accordance with Section 3-3 and
Section 3-4 of the Beverly Home Rule Charter, I do hereby remove Crystal Atherton
from the position of Clerk to the Beverly License Board.

The specific reason for this action is that I desire to fill these positions with a person of
my own choosing and in whom I have faith and confidence will perform the duties of
such positions in an exemplary fashion.

This removal is effective immediately.

Very truly yours,

William F. Scanlon, Jr.
Mayor of Beverly

WFS/lpg

Cc: Crystal Atherton by Certified Mail, Postage Prepaid

# Exhibit
# 8

January 12, 2004

William F. Scanlon, Jr., Mayor
City of Beverly
191 Cabot Street
Beverly, MA 01915

Dear Mayor Scanlon:

I am in receipt of a copy of your letter dated January 5, 2004, in which you advised the City Clerk that you have removed me in accordance with Section 3-3 and 3-4 of the Beverly Home Rule Charter from the positions I have recently held in the City of Beverly.

Pursuant to Section 8-15 of the Beverly Home Rule Charter, I hereby request a public hearing and a hearing as otherwise allowed or required by law.

Very truly yours,


Crystal A. Atherton
61 Conant Street
Beverly, MA 01915

# Exhibit
# 9

## Page 1 (left)

```
1    VOLUME:  1
2    PAGES:  1-59
     EXHIBITS:  1-8
3    UNITED STATES DISTRICT COURT
4    DISTRICT OF MASSACHUSETTS
5
6    CASE NO. 05 11323MLW
     ................................
7    CRYSTAL ATHERTON,
              Plaintiff
8
              vs.
9
     CITY OF BEVERLY, et al.,
10            Defendant
     ................................
11
12
13   DEPOSITION OF LINDA P. GIALLONGO, a
14   witness called on behalf of the Plaintiff,
15   pursuant to the Massachusetts Rules of Civil
16   Procedure, before Kelly G. Patterson, a
17   Notary Public in and for the Commonwealth of
18   Massachusetts, at the Law Offices of
19   Shapiro & Hender, 640 Main Street, Malden,
20   Massachusetts, on Tuesday, November 6, 2007,
21   commencing at 1:58 p.m.
22
23
24

                DORIS O. RAY COURT REPORTING
```

## Page 2 (right)

**APPEARANCES:**

**SHAPIRO & HENDER**

(by Eric L. Shwartz, Esquire)

(by Jordan Shapiro, Esquire)

640 Main Street

Malden, Massachusetts 02148

Tel. (781) 324-5200

for the Plaintiff;


**KOPELMAN & PAIGE**

(by Elizabeth Corbo, Esquire)

101 Arch Street

Boston, Massachusetts 02110

for the Defendant.

## Page 3 (lower left)

# INDEX

**DEPONENT:**                          **PAGE**

**LINDA P. GIALLONGO**

Examination by Mr. Shwartz        5, 51

Examination by Ms. Corbo          48, 55


# EXHIBITS

NO.                                  PAGE
1   Document entitled "Employee's
    Complaint of Unlawful
    Practices."                       11

2   Newspaper article entitled
    "Mayor hires Atherton as
    new executive secretary."         18

3   Newspaper article entitled
    "Ex-secretary sues for
    discrimination."                  19

4   Proposed City Organization
    Chart.                            20

5   Section 3-313.                    29

6   Letter dated January 5, 2004.     33

7   Letter dated January 12,
    2004.                             34

8   Complete Section 3-313.           40

## Page 4 (lower right)

# STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by
and between counsel for the respective
parties that the Witness will read and sign
the deposition transcript under the pains
and penalties of perjury; and that the
reading and signing is deemed waived if not
accomplished within 30 days of transcript
delivery.

It is further stipulated and agreed
that all objections, except as to the form
of the questions, and motions to strike will
be reserved until the time of trial or
pretrial hearing.

                *  *  *  *

LINDA P. GIALLONGO, a witness
called for examination by counsel for the
Plaintiff, having been satisfactorily
identified by the production of her/his
driver's license, being first sworn by the
Notary Public, was examined and testified as
follows:

                **DIRECT EXAMINATION**

(By Mr. Shwartz)

| | | | | | |
|---|---|---|---|---|---|
| 1 | Q. | Hi, Ms. Giallongo. Am I pronouncing your | 1 | Q. | Your full name, please? |
| 2 | | name correctly? | 2 | A. | **Linda Giallongo.** |
| 3 | A. | **That's correct.** | 3 | Q. | Your age? |
| 4 | Q. | My name is Eric Shwartz. I'm going to ask | 4 | A. | **Fifty-eight.** |
| 5 | | you a number of questions, and I'm going to | 5 | Q. | Your address? |
| 6 | | ask you for your verbal response, so if you | 6 | A. | **18 Somerset Avenue in Beverly,** |
| 7 | | could please not give "Uh-huh" and "Huh-uh" | 7 | | **Massachusetts, 01915.** |
| 8 | | type responses, that would be easier for the | 8 | Q. | Your occupation? |
| 9 | | stenographer. Another thing that will make | 9 | A. | **Executive secretary for the mayor for the** |
| 10 | | it easier for the stenographer will be for | 10 | | **City of Beverly.** |
| 11 | | me to ask the question, finish the question, | 11 | Q. | What is your education? |
| 12 | | give you an opportunity to answer, and I'll | 12 | A. | **I have an associate's degree from North** |
| 13 | | try not to interrupt you, and hopefully we | 13 | | **Shore Community College, in legal** |
| 14 | | won't talk over each other, because then it | 14 | | **secretarial, I guess is what it was, and I** |
| 15 | | makes it very difficult for the | 15 | | **have some business courses at Salem State** |
| 16 | | stenographer. | 16 | | **College.** |
| 17 | A. | **Okay.** | 17 | Q. | What year did you get your associate's |
| 18 | Q. | If for any reason you don't understand a | 18 | | degree? |
| 19 | | question, please tell me and I'll repeat it | 19 | A. | **1970, I believe.** |
| 20 | | or rephrase it. If you do not ask me to | 20 | Q. | Have you taken any other courses, other than |
| 21 | | repeat or rephrase the question, I will | 21 | | the things you just mentioned? |
| 22 | | assume that you understood the question. | 22 | A. | **Similar type things, but no courses, no.** |
| 23 | | Are we in agreement? | 23 | Q. | You don't have any certificates, otherwise? |
| 24 | A. | **Yes.** | 24 | A. | **No.** |

| | | | | | |
|---|---|---|---|---|---|
| | | 7 | | | 8 |
| 1 | Q. | Where did you work after you received your | 1 | Q. | Would it be 1986? |
| 2 | | associate's degree? | 2 | A. | **No, it was two-year terms, so it would have** |
| 3 | A. | **I worked for the City of Beverly since 1967** | 3 | | **been '82 to '83, and then '84, it would have** |
| 4 | | **until 2002.** | 4 | | **been John Monahan, and I worked for him** |
| 5 | Q. | In what capacity did you work in '67? | 5 | | **until 1993, at which time Mayor Scanlon came** |
| 6 | A. | **I worked as the secretary to the principal** | 6 | | **in office in '94, and I worked for him until** |
| 7 | | **at the Memorial Junior High School at 502** | 7 | | **2001, and then I worked for Thomas Crean** |
| 8 | | **Cabot Street in Beverly. I worked there** | 8 | | **from January 2002 until about October 2002,** |
| 9 | | **until, I think it was, 1978 that I became a** | 9 | | **and then I went back to work for William** |
| 10 | | **senior bookkeeper at the administration** | 10 | | **Scanlon in 2004. I think that's about** |
| 11 | | **office at the superintendent where I did** | 11 | | **right. I'm not exactly sure about the** |
| 12 | | **payroll until I went to work at City Hall in** | 12 | | **dates, but I think that's what it was.** |
| 13 | | **1980.** | 13 | Q. | When you left during the term of Mayor |
| 14 | Q. | What did you do in 1980 for the City? | 14 | | Crean? |
| 15 | A. | **I became the mayor's secretary.** | 15 | A. | **Yes.** |
| 16 | Q. | How many mayor's have you worked under? | 16 | Q. | Did you formally retire from the City? |
| 17 | A. | **Four.** | 17 | A. | **I did.** |
| 18 | Q. | Their names are, and can you give me their | 18 | Q. | You submitted formal retirement papers to |
| 19 | | terms, as well, to the best of your | 19 | | the retirement board? |
| 20 | | knowledge? | 20 | A. | **I did.** |
| 21 | A. | **I came in the middle of a term when I first** | 21 | Q. | What did you do for work during that time |
| 22 | | **began. It was Peter Fortunato, and that was** | 22 | | after you retired from the City? Did you |
| 23 | | **in June of 1980, and I worked for him** | 23 | | work any other positions? |
| 24 | | **through that term and another term.** | 24 | A. | **I worked as the secretary to the director** |

1    for the Amesbury Alliance.
2  Q.  What is the Amesbury Alliance?
3  A.  It's similar to a Chamber of Commerce,
4    little bit of differences.  They were funded
5    partially by the City of Amesbury.
6  Q.  What did you do to come back with the City
7    in terms of your retirement?
8  A.  When I came back to work under Mayor Scanlon
9    in 2004, I repaid the money that I had
10    received in retirement.
11  Q.  Have you ever been deposed before?
12  A.  Yes.
13  Q.  When?
14  A.  It was three or four years ago.  It was a
15    case that my son was involved with an
16    automobile accident.  He was hit by a car.
17  Q.  Have you ever been deposed in any other
18    situations?
19  A.  No.
20  Q.  Just to go back a question or two.  What did
21    you do to prepare for today's deposition?
22  A.  I gave a thought about what I thought you
23    might ask me.  I prepared a general list of
24    duties.  That was it.

1  Q.  Duties of?
2  A.  What my current duties are.
3  Q.  Did you review any documents?
4  A.  No.
5  Q.  Did you speak to Mayor Scanlon about this
6    deposition?
7  A.  I did not.
8  Q.  He didn't speak to you about it either?  I
9    just want to clarify that.
10  A.  No, he did not, except that I told him I was
11    coming today, but I didn't discuss it at
12    all.
13  Q.  Just to tell him you weren't going to be in
14    so someone could fill in for you, fair to
15    say?
16  A.  Uh-huh.
17  Q.  Have you ever been involved as a party in
18    another lawsuit?
19  A.  Well, when I left the City of Beverly, I did
20    file a lawsuit, but shortly thereafter, I
21    dropped it.  I didn't want to go forward
22    with it, so I never really went to court or
23    anything like that.
24  Q.  When was that filed?

---

11

1  A.  It probably was the early part of November
2    of 2002.  The latter part of October.  I'm
3    not exactly sure.
4    (Document entitled "Employee's Complaint
5    of Unlawful Practices" marked Exhibit No. 1
6    for Identification.)
7  A.  And the other would have been when my son
8    was hit by the car was the other.
9    MS. CORBO:  Off the record.
10    (Discussion off the record.)
11  Q.  Just to go back to what you just said, how
12    old was your son when he was involved in the
13    accident?
14  A.  I think he was in the seventh grade.
15  Q.  So he was a minor?
16  A.  That's correct.
17  Q.  Just wanted to clarify that.  Have you seen
18    this document before, Ms. Giallongo?
19  A.  Yes, I have.
20  Q.  How did you?
21  A.  I think my attorney showed it.  I think I
22    did.
23  Q.  Who represented you in this matter?
24  A.  Marshall Handly.

1  Q.  Was he former city solicitor for Beverly?
2  A.  He was.
3  Q.  Have you read this document before?
4  A.  To be honest with you, I can't remember.
5    Yes, I did read this.
6  Q.  Fair to say on the next to last page that is
7    your signature?
8  A.  Yes, that is my signature.
9  Q.  Now, you said previously that you filed the
10    suit and dropped it soon thereafter?
11  A.  Yeah.
12  Q.  Do you know when, approximately, it was
13    dropped?
14  A.  I don't.
15  Q.  Can you tell me why it was dismissed?
16  A.  I just decided that -- well, I didn't think
17    at the time that I should have filed with
18    the Commission Against Discrimination,
19    because I didn't feel discrimination, and I
20    got a job shortly after I left the city, so
21    I felt it was better for myself and my
22    family just to move on.
23  Q.  On the first page, you claim that there were
24    "Statements in connection with employment,

**14**

1  which expresses, directly or indirectly,
2  limitation, specification or discrimination
3  as to the age of municipal employees
4  unrelated to any bona fide occupational
5  qualification." It's on the bottom of the
6  first page. Can you tell me what is meant
7  by that, if you know?
8  A.  **I guess it means that I was being**
9  **discriminated against because of my age.**
10 Q.  On the second page, there's a section titled
11 "Factual Allegations". Just to be clear,
12 above your signature, let me go back a
13 question, you verified and attested that the
14 statements in this document were true on
15 October 18, 2002, correct?
16 A.  **Yes.**
17 Q.  In the "Factual Allegations," you claim that
18 Section 815 of the city Charter provides
19 you, in Paragraph 4, provide you a specific
20 process for employee discipline. Is that
21 correct, that you invoked that section?
22 A.  **Yes.**
23 Q.  It was your belief at the time that Section
24 815 applied to you as secretary to the

1  mayor?
2  A.  **That's correct.**
3  Q.  And then in Paragraph 5, you claim that,
4  Section 5-3, "that employment by the city is
5  governed by a 'merit principle'." That's a
6  fair statement that this document reflects
7  that?
8  A.  **Yes.**
9  Q.  This merit principle applies to you as
10 secretary to the mayor?
11 A.  **Yes.**
12 Q.  And then in Paragraph 6, at the end, that
13 there's a general, without going through the
14 full, there's a general policy of attrition,
15 is that a fair statement, in terms of hiring
16 or letting people go, it should be done
17 naturally through a normal attrition, as
18 opposed to layoffs, that that's the stated
19 policy of the City?
20 A.  **Yes.**
21 Q.  And then in Paragraph 8 you state that it
22 was your belief that your employment is
23 protected except through attrition, correct?
24 A.  **That's correct.**

**15**

1  Q.  Do you still believe, as we sit here today,
2  that that is the case?
3  A.  **No.**
4  Q.  Why has your view changed?
5  A.  **Because my attorney and I had a discussion,**
6  **and he said --**
7  Q.  Well, I don't want you to waive your
8  attorney/client privilege.
9      MS. CORBO: Go off the record for a
10 second.
11     (Discussion off the record.)
12     (Recess.)
13 Q.  Let me try to rephrase the question, maybe
14 that will assist in moving this along to
15 some degree. Previously, I asked you if
16 your opinion had changed as to some of the
17 things that I read you from this document,
18 correct?
19 A.  **Correct.**
20 Q.  And you said that it had. Without knowing
21 the basis as to why your opinion had
22 changed, can you tell me what your opinion
23 is today?
24     MS. CORBO: Go ahead and answer the

**16**

1  question. Do not get into any conversations
2  that you had. He's just asking you what
3  your opinion is today as to.
4      MR. SHWARTZ: As to whether or not the
5  employment as secretary is protected by the
6  Charter, I guess, generally.
7  A.  **I do not believe that the position is**
8  **protected by the Charter, after I had**
9  **conversation with my attorney.**
10 Q.  Do you have any specific reason as to why
11 your opinion changed?
12     MS. CORBO: Objection to the extent that
13 your reason is based upon conversations with
14 your attorney that would be privileged.
15 Q.  How has your belief changed, other than the
16 fact that you believe that it's not
17 protected? What is your basis for those
18 beliefs, I guess is my question?
19     MS. CORBO: Same objection. Sometimes
20 I'm going to object, and you can answer. If
21 you have any basis for belief that is not as
22 a result of your discussions with your
23 counsel, you can state that. Anything
24 independent of your discussions with your

**17**

1  counsel.

2  A.  **Well, when I first started working for the**
3  **City in 1980, I knew at that time that my**
4  **position was at the discretion of the mayor.**
5  **When I left the school department, I took a**
6  **leave of absence from my position and I went**
7  **to work for the mayor.  I guess probably**
8  **into my second term, I decided that it**
9  **wasn't fair to the person that was taking my**
10  **position at the school department, and so I**
11  **resigned my position at the school**
12  **department, knowing, going forward, that my**
13  **job hinged upon whether or not the mayor**
14  **wanted to keep me.  Somewhere in between**
15  **there, when the Charter changed, I thought**
16  **that there were things written — there was**
17  **a portion of the Charter that protected us,**
18  **but after my discussion with my attorney, I**
19  **realized that that wasn't the case.**

20  Q.  You said that your case against the city you
21  filed at the Mass. Commission Against
22  Discrimination was dismissed?

23  A.  **We withdrew it, I believe.**

24  Q.  There was no settlement with the city?

**18**

1  A.  **No.**

2  Q.  You stated earlier that you had worked for
3  Mayor Crean for a period of time?

4  A.  **Yes.**

5  Q.  How long did you work for him before you
6  left the City?

7  A.  **From the first Monday in January, and I**
8  **think my retirement date was October 4.**

9  MS. CORBO:  If you can let Attorney
10  Shwartz finish his question, even if you
11  think you know what he's going to ask.

12  Q.  Did you ever have a hearing at the MCAD, in
13  terms of going there?

14  A.  **No.**

15  Q.  I'm going to have some newspaper articles
16  marked.

17  (Newspaper article entitled "Mayor hires
18  Atherton as new executive secretary" marked
19  Exhibit No. 2 for Identification.)

20  Q.  Have you seen this newspaper article before?

21  A.  **Yes.**

22  Q.  In the third paragraph, there's a statement
23  attributed to you that claims that your
24  termination was political?

**19**

1  A.  **Yes.**

2  Q.  Is that a fair representation of what you
3  told the reporter?

4  A.  **Yes.**

5  Q.  I presume that you believed that to be the
6  case at the time?

7  A.  **That's true.**

8  Q.  As we sit here today, you still believe that
9  your termination was due to political
10  reasons?

11  A.  **I do.**

12  (Newspaper article entitled
13  "Ex-secretary sues for discrimination marked
14  Exhibit No. 3 for Identification.)

15  Q.  Ms. Giallongo, have you seen this article
16  before?

17  A.  **I've seen it, but I don't believe I read it**
18  **at the time.**

19  Q.  This article, there's an assertion that you
20  were fired for political reasons.  Do you
21  remember speaking to the reporter at or
22  around that time, May 4, 2005, Chas Sisk?

23  A.  **I don't remember.**

24  Q.  In the paragraph above where it says

**20**

1  "trading places", the preceding paragraph,
2  there's one sentence there, it says,
3  "Giallongo eventually dropped her complaint
4  when Scanlon again took the mayor's office
5  and she resumed her post as mayor's
6  secretary."  That's not a fair
7  characterization, because you didn't drop
8  the suit as soon as when -- previously,
9  right?

10  A.  **No. Uh-huh.**

11  Q.  Yes?

12  A.  **I believe that I dropped it before that.**

13  Q.  Okay.  I'd like to have this marked.

14  (Proposed City Organization Chart marked
15  Exhibit No. 4 for Identification.)

16  (Discussion off the record.)

17  Q.  Ms. Giallongo, I'm showing you a document
18  entitled "Proposed City Organizational
19  Chart."  Have you seen this before?

20  A.  **I have.**

21  Q.  Connected to the mayor there are two jobs,
22  or two positions, is that a fair statement?
23  One is executive secretary to mayor, and
24  then the other is chief administrative aide?

22

```
1   A.  There are two listed here, yes.
2   Q.  Are there -- Is there a chief administrative
3       aide in the City of Beverly for the mayor?
4   A.  Not at this time.
5   Q.  Has previously, mayors that you've worked
6       for, have they had administrative aides, the
7       previous mayors?
8   A.  Yes, not always, but at certain times, yes,
9       and when Mr. Crean was in office, his person
10      was called the chief of staff.
11  Q.  The present office today, as we speak?
12  A.  There is no administrative aide or chief of
13      staff.  It's only Mayor Scanlon and myself.
14  Q.  Are there any other employees that work out
15      of the office?
16  A.  No.
17  Q.  What role did the chief of staff or previous
18      chief administrative aides perform?
19  A.  Well, in each situation I guess they were a
20      little different.  Sometimes they went to
21      meetings for the mayor, sometimes they
22      represented the mayor at functions.  It's
23      hard for me to know because I wasn't doing
24      that job, but they had different duties than
```

```
1       what I did.
2   Q.  Have you ever gone to meetings on behalf of
3       the mayor, other than to take notes?
4   A.  No.
5   Q.  For Mayor Scanlon?
6   A.  No.
7   Q.  Have you ever represented the mayor at
8       functions outside of City Hall?
9   A.  No.
10  Q.  Earlier you had said that you made a list of
11      job qualifications to prepare for this
12      deposition.  Is that what you stated
13      earlier?
14  A.  I wrote something out for my own benefit,
15      yes.
16  Q.  Did you prepare it with someone else or did
17      you do it on your own?
18  A.  I did it on my own.
19  Q.  Why did you prepare that list in order to
20      prepare for this deposition?
21  A.  Because I thought it might be one of the
22      questions that you would ask me.
23  Q.  In your capacity as executive secretary to
24      the mayor, do you advise the mayor as to
```

23

```
1       what policies should be with respect to day
2       to day operation of the city?
3   A.  I don't understand what you mean by
4       "policies".
5   Q.  In terms of anything that occurs outside of
6       the office that you work in physically, do
7       you advise the mayor to take a particular
8       stance on issues affecting the city?
9   A.  No.
10  Q.  Do you participate in meetings with respect
11      to the mayor and the formulation of policy,
12      outside of the office?  I'm not talking
13      about filing internally within the office.
14      I'm talking about in his capacity as mayor.
15  A.  When you say "outside of the office," I
16      don't understand.
17  Q.  I mean physically, you're not making a
18      determination as to how something should be
19      physically filed in the office.  I'm talking
20      about in his position, in the mayor's
21      position as chief executive of the city.  Do
22      you advise him as to how to formulate policy
23      or give him any input in terms of
24      formulating policy on behalf of the city?
```

24

```
1   A.  Only if he asks me my opinion of something.
2   Q.  Has he ever asked you?
3   A.  Yes.
4   Q.  What types of things has he asked you about?
5   A.  I'm not sure that I can give you a specific
6       example.  I mean, he may have a question,
7       say, about -- well, I also do things for the
8       License Board, and there's been some issues
9       with that with the city, so he may ask me
10      how things are done or what my opinion is,
11      but that doesn't necessarily mean that he
12      takes my advise or, you know, there are
13      times that he just asks me what I think
14      about things and I give him my answer and he
15      goes from there, but I don't think that I
16      feel that I am setting policy, as such.
17  Q.  Do you have a list of the duties that you
18      prepared?
19  A.  I did not bring one with me, no.
20  Q.  Okay.  Have you been asked by the mayor to
21      influence other elected officials regarding
22      their policies?
23  A.  Absolutely not.
24  Q.  In terms of your salary as secretary, and
```

1  benefits, do you make more than the typical
2  secretary in City Hall?
3  A.  Yes, I do.
4  Q.  Do you know the difference in salary,
5  approximately?
6  A.  I do not.
7  Q.  When you say that, do you include the five
8  thousand dollars that you receive as clerk
9  to the License Board?
10  A.  No.  My salary as secretary is separate.
11  There are different levels of secretaries in
12  the building, but I don't know what the
13  amounts are, union negotiations.
14  Q.  Do you know if the secretary for the law
15  department or the city solicitor's office is
16  a union position?
17  A.  I believe that it is not.
18  Q.  Do you know the relative pay of that
19  position as compared to your position?
20  A.  I don't.
21  Q.  Generally, what is your typical day as a
22  secretary?  How would you describe it?
23  A.  Well, answering the telephone, typing
24  communications, dealing with constituents,

1  directing with city employees, department
2  heads.  Every day is different.  Doing
3  payroll, paying bills, filing forms, when we
4  take money in.  That's probably a typical
5  day.
6  Q.  You take cash in the mayor's office?
7  A.  Not cash, checks, because people are paying
8  for certain things.
9  Q.  What type of things?
10  A.  Well, in the mayor's office, if people want
11  copies made, we charge them for that.  In my
12  duties as the clerk of the License Board,
13  people are paying for licenses and things
14  like that.
15  Q.  These communications that you referred to
16  previously, is the content of those
17  communications, is that something that's
18  given to you by the mayor, or is that
19  something that you make up?
20  A.  Both.
21  Q.  What type of communications would you be
22  determining the content of?
23  A.  Sometimes with things that are going to the
24  city counsel, if it's kind of just general

1  re-appointments of people to boards and
2  commissions, I would just type up the
3  letter.  It's kind of a template.  People
4  looking for tag days, sometimes a
5  constituent looks for information, I would
6  maybe compose something and have the mayor
7  look at it and approve it before I send it
8  out, type of thing.
9  Q.  So is it fair to say unless something is in
10  a template, the mayor would review it and
11  approve it?
12  A.  Could you repeat that.
13  Q.  Is it fair to say that if something is not
14  in template form or a form letter, then the
15  mayor will review and approve that letter
16  before it goes out?
17  A.  What I compose?
18  Q.  Yes.
19  A.  Yes.
20  Q.  When you say you have, you meet with
21  department heads or department heads
22  probably come in to meet with you?
23  A.  Not necessarily come in to meet with me, but
24  they do come in or call and ask either for

1  some information or for me to give
2  information to the mayor, and sometimes
3  he'll ask me to call them and get
4  information or to give them a directive of
5  such, maybe ask them for something that he
6  needs or explain something.  If we have a
7  constituent call wanting to know when their
8  street is going to be paved, I would call
9  the department and say when do you think
10  that is.
11  Q.  And then call the constituent back?
12  A.  Yes.
13  Q  And that's not something that you would
14  typically have to discuss with the mayor
15  because it happens frequently?
16  A.  Sometimes I do, sometimes I don't.
17  Q.  If the answer is the street is not going to
18  be paved, you might tell the mayor that
19  someone called and complained about that
20  their --
21  A.  Perhaps, or sometimes he will make the call
22  himself after he's asked me to get the
23  information.
24  Q.  Do you ever sign any documents in your own

29

```
 1   name that leave the office, or are they
 2   typically signed by the mayor or you sign it
 3   on behalf of the mayor and initial it?
 4   Documents that leave City Hall -- let me
 5   rephrase.  Documents that are being sent out
 6   in the U.S. mail, for example, being sent to
 7   constituents, are those letters typically --
 8 A. Typically, not.  Typically, the mayor signs
 9   them.  Most often, he signs them, unless,
10   for some reason, he's not going to be there,
11   he'll say to me "Sign my name and initial
12   it."
13 Q. But even in that case, he's authorized you
14   to send out a letter with his name and then
15   you initial it?
16 A. That's correct.
17        MR. SHWARTZ:  I'd like to have this
18   marked.  I believe this is Exhibit 5.
19        (Section 3-313 marked Exhibit
20   No. 5 for Identification.)
21 Q. Ms. Giallongo, have you seen this
22   Section 313 before today?
23 A. What is this from?
24 Q. I'm not sure.  I was going to ask you that.
```

30

```
 1 A. I'm not sure.  I think that I have read it
 2   before but I'm not positive.  I don't know
 3   what this is from.  It might be from the
 4   Ordinance.
 5 Q. Can you recall the first time that you saw
 6   this document?  You believe that you've seen
 7   it, correct?  I just want to clarify that.
 8 A. I honestly don't know if I've seen it
 9   before.
10 Q. Okay.  Taking a look at the content, you're
11   not sure if you've seen it before, C-1, 313,
12   it states that the secretary shall, quote,
13   organize and summarize information and
14   prepare it for the mayor's review and
15   action, is that a fair statement as to one
16   of the aspects of your job as secretary to
17   the mayor?
18 A. Yes.
19 Q. No. 2 states that you "meet with department
20   heads regarding day-to-day business," and
21   that you expedite interaction between the
22   mayor's office and city departments, is that
23   a fair statement?
24 A. I wouldn't say that I would meet with them.
```

31

```
 1   I mean, I talk to them and I discuss things
 2   with them, but I don't sit down and have
 3   meetings with them, and yes, I do interact
 4   with them for the mayor.
 5 Q. The third subsection says that you "serve as
 6   a liaison officer between the mayor, the
 7   media, public interest groups, businesses
 8   and residents.
 9 A. I believe that that was a function of the
10   administrative assistant to the mayor.  I
11   don't deal with the press.  I don't meet
12   with public interest groups.  Sometimes I
13   deal with businessmen and residents, but
14   that, I believe, was a function of the
15   administrative assistant position.
16 Q. Who is performing that function now, as we
17   speak?
18 A. We don't have an administrative assistant to
19   the mayor, so the mayor takes care of that.
20 Q. So if you have the press calls, for example,
21   on the phone to the mayor's office and you
22   know it's a member of the press that's
23   calling, you just forward that message to
24   the mayor, correct?
```

32

```
 1 A. That's correct.
 2 Q. You don't speak on behalf of the mayor,
 3   correct?
 4 A. If they have a general question for
 5   information, like what time the fireworks
 6   are going to be on Sunday, I might tell them
 7   that, but I don't discuss issues with the
 8   media.
 9 Q. Fair to say that you don't discuss the
10   mayor's opinion as to certain policies with
11   the press?
12 A. That's correct.
13 Q. As we've discussed this document, does that
14   refresh your recollection as to whether or
15   not you've seen it before?
16 A. I believe I have seen it, but I don't know
17   what it's from.  I don't know if it's the
18   Ordinance, and I don't believe it's the
19   Charter.
20 Q. Do you know if there's another page to this
21   document?
22 A. I would have to think there is, but I don't
23   know that for sure.
24 Q. It's fair to say you don't know what the
```

33

```
1    content is off the top of your head?
2  A.  No, I don't.
3        (Letter dated January 5, 2004 marked
4    Exhibit No. 6 for Identification.)
5  Q.  Have you seen this document before, Ms.
6    Giallongo?
7  A.  Yes.
8  Q.  Did you type up this document on behalf of
9    the mayor?
10 A.  I did.
11 Q.  Did you have any discussion with the mayor
12   regarding this content, other than the
13   content itself?
14 A.  No.
15 Q.  Does he dictate to you?
16 A.  Sometimes.
17 Q.  Do you recall as to whether or not he
18   dictated this letter to you?
19 A.  I don't recall.
20 Q.  Do you recall if this letter was mailed on
21   the date in question --
22       MR. SHWARTZ:  Strike that.
23 Q.  Do you have any reason to believe that this
24   letter wasn't sent on January 5?
```

34

```
1  A.  No.
2  Q.  So you believe that it was sent on the fifth
3    of January 2004?
4  A.  Yes.
5        (Letter dated January 12, 2004 marked
6    Exhibit No. 7 for Identification.)
7  Q.  Have you seen this letter dated January 12,
8    2004?
9  A.  Yes, I have.
10 Q.  How did you have knowledge of this letter?
11 A.  It came in the mail, I believe, and I opened
12   the mail.
13 Q.  Did you bring it to the attention of the
14   mayor?
15 A.  I did.
16 Q.  Do you know, as a result of this letter, did
17   the mayor do anything?
18 A.  I don't believe he did.
19 Q.  So when Ms. Atherton, in her last sentence,
20   requested a hearing pursuant to Section 815
21   of the Beverly Home Rule Charter, Mayor
22   Scanlon took no action as a result of that
23   request?
24 A.  Not that I'm aware of.
```

35

```
1  Q.  Do you know what happened to the letter
2    after you received it, other than -- did he
3    file the letter?
4  A.  I honestly don't know.
5  Q.  Did you talk with the mayor about the
6    letter?
7  A.  Did I discuss it?
8  Q.  Yeah.
9  A.  No.
10 Q.  So you've never discussed the contents of
11   this letter in terms of Ms. Atherton's
12   request for a hearing with Mayor Scanlon?
13 A.  No.
14 Q.  Have you spoken with anyone else at City
15   Hall regarding this letter, or the letter
16   that precipitated this response, other than
17   your counsel?
18 A.  I was just going to say I might have spoken
19   with the city solicitor about it, but no.
20 Q.  Did you receive a letter when you were --
21   when you left the city the time that you
22   left Mayor Crean's office, did you receive a
23   similar letter to the letter of January 5, I
24   believe?
```

36

```
1  A.  I did not.
2  Q.  Do you believe that Ms. Atherton's
3    termination was political?
4  A.  I don't have an opinion.
5  Q.  It's fair to say -- you stated earlier that
6    your termination was political, correct?
7  A.  I believed that it is, yes, or was.
8  Q.  Do you know if the mayor spoke with anyone
9    else at City Hall regarding the contents of
10   either the letter that he sent out on
11   January 5, 2004 or the response of
12   January 12, 2004, to anyone other than
13   counsel at City Hall?
14 A.  I don't know that.
15       MR. SHWARTZ:  I'm going to take a brief
16   recess.
17       (Recess.)
18       MR. SHWARTZ:  Back on the record.
19 Q.  You've stated that you believe that your
20   termination by Mayor Crean -- let me
21   rephrase that.  You weren't formally
22   terminated, correct, by Mayor Crean, is that
23   a fair statement?
24 A.  I took retirement.
```

37

1 Q.  Why did you believe, at the time, that your
2     leaving the office of Mayor Crean's was
3     political?
4 A.  Because I had initially thought about taking
5     early retirement, and I had been told one
6     thing by the retirement board as to what my
7     pension would be.  When I checked into it
8     when it got closer to the time, the figures
9     had changed considerably from what they said
10    initially, and I had told Mr. Crean that I
11    was not going to take the early retirement,
12    and he told me if I did not take the early
13    retirement that I would be fired, and I
14    asked him why, and he said because he didn't
15    want me in the office anymore, so it was
16    either retire or get fired, and I believe
17    that he felt as though I was not loyal to
18    him, although that wasn't true, that's what
19    I think what prompted him to tell me that,
20    because I also asked could I be transferred
21    to another department so I could finish out
22    my retirement time, and he said he would
23    have to think about it and never got back to
24    me, so I just decided to move on.

38

1 Q.  Why do you believe that he felt that you
2     were not being faithful to him?  What
3     was --
4 A.  Loyal to him.
5 Q.  Loyal to him.
6 A.  Because I had maintained a friendship with
7     Mayor Scanlon, but never in the time that I
8     worked for Mr. Crean did I ever discuss
9     anything that went on in the office with
10    Mayor Scanlon.
11 Q. Is it fair to say that you were loyal to all
12    the mayors that you worked for?
13 A.  I believe I was, yes.
14 Q.  Do you have any reason to believe that Ms.
15    Atherton, during her employment as secretary
16    to the mayor, was anything but loyal?
17 A.  I have no way to know that.
18       MR. SHWARTZ:  I have no further
19    questions.
20       MS. CORBO:  Can we have a minute?
21    (Recess.)
22       MS. CORBO:  Attorney Shwartz had asked a
23    question about whether or not she had
24    received a similar letter from Mayor Crean,

39

1  it was similar to the January 5, I believe
2  that was your question, and Ms. Giallongo
3  just wanted to clarify something on the
4  record.
5        THE WITNESS:  You asked if I had
6  received a letter similar to the one Ms.
7  Atherton received, I did not, but the day
8  that I was leaving, when my retirement date,
9  the last day, as I was going down the hall,
10 Mr. Crean tried to hand me a letter, and I
11 refused to take it and he mailed it to my
12 house.  It wasn't a letter terminating me or
13 anything like that.  He was answering some
14 of the things that I had said to the
15 newspaper, so I just wanted to say -- when
16 you asked me if I had received a similar
17 letter, I hadn't.
18       MR. SHWARTZ:  It wasn't a letter of
19 termination?
20       THE WITNESS:  No, it was not.
21       MS. CORBO:  Okay.  That was it.
22       MR. SHWARTZ:  We'll go off the record
23 and wait for that document.
24       (Recess.)

40

1        MR. SHWARTZ:  Back on the record.  Ms.
2  Giallongo, we're going back on the record,
3  and I'm going to continue my direct
4  questions of you.  We have -- can we
5  stipulate on the record that this is the
6  complete 313 that was in effect at the time
7  that Ms. Atherton was terminated?
8        MS. CORBO:  I would probably just want
9  to double check that with Noreen.  I don't
10 know if there's another page that didn't
11 come through.  I assume it is because this
12 is what's been provided by fax.
13       MR. SHWARTZ:  Can we go off the record.
14       (Discussion off the record.)
15       (Complete Section 3-313 marked Exhibit
16 No. 8 for Identification.)
17       MR. SHWARTZ:  Exhibit 8 is Section 3-313
18 and we -- it's fair to say that we've
19 stipulated to the fact that that is a true
20 and accurate copy of the "Confidential
21 Secretary/Administrative Assistant to the
22 Mayor" job description as it existed on
23 December 1, 2003 as it was approved.
24       MS. CORBO:  I think we can stipulate

1   that this is the job duties as specified in
2   the Ordinance. I think there might be a
3   separate job description, so I wouldn't
4   stipulate that this is the only job
5   description for the position, but I would
6   stipulate that this is, what's been marked
7   as Exhibit 8, is Section 3-313. It is
8   entitled "Confidential
9   Secretary/Administrative Assistant to the
10  Mayor", and it is the official version that
11  we believe is contained within the Ordinance
12  of the city, which were in effect and
13  approved prior to Ms. Atherton's
14  termination.
15  Q.   Okay. Ms. Giallongo, I'm going to have a
16       few more questions about this document,
17       because it has just been brought to our
18       attention. Have you seen this before, this
19       document?
20  A.   **I probably have seen it in the Ordinance**
21       **book, but it was after I left City Hall, so**
22       **it's not something that I was aware of.**
23  Q.   Have you seen it since you returned back to
24       the City?

1   A.   **Like I say, I may have seen it in the**
2        **Ordinance book, but I don't remember having**
3        **read it, I honestly and truly don't.**
4   Q.   Have you seen other job descriptions
5        regarding the position of executive
6        secretary?
7   A.   **I believe when the human resources**
8        **department was established that there was a**
9        **job description written up, but that was**
10       **long after I had started working for the**
11       **City and the mayor. It was when the Charter**
12       **changed and they established the human**
13       **resource department, but yes, I have seen**
14       **one.**
15  Q.   Looking at the document, we had already
16       discussed Subsection C-1, 2 and 3?
17  A.   **Yes.**
18  Q.   I'd like to discuss 4, familiarity with
19       aspects of the city government and functions
20       of the city government. That's one of the
21       functions that you --
22  A.   **Yes, I am familiar with them.**
23  Q.   And that you're familiar with various
24       services rendered by the City to its

---

43

1   residents?
2   A.   **Yes.**
3   Q.   You review the correspondence when it comes
4        in to the mayor's office or when it leaves
5        the mayor's office?
6   A.   **Yes, I do.**
7   Q.   You file the same, you file those documents?
8   A.   **Yes.**
9   Q.   In appropriate areas within the office?
10  A.   **Well, typically when the correspondence**
11       **comes in, some things I automatically**
12       **handle. Say somebody writes in looking for**
13       **a tag day, rather than give that to the**
14       **mayor, I just prepare the letter saying that**
15       **they can have a tag day and then I put it**
16       **there for his signature, and I put it in the**
17       **file. Other things that require his**
18       **attention, I put in his office on his desk**
19       **for his review, and sometimes I might make**
20       **him a note or a suggestion or whatever or a**
21       **reminder of something that may have happened**
22       **relative to that correspondence.**
23  Q.   Finally, in Subsection 7 says that you would
24       answer the calls placed into the office.

---

44

1   Fair to say the mayor doesn't typically
2   answer the phones when calls are incoming?
3   A.   **Typically, I answer the phone, but yes, he**
4        **does answer the phone sometimes.**
5   Q.   You said earlier that Mayor Crean had
6        someone called the administrative assistant?
7   A.   **Actually, he was called the chief of staff.**
8   Q.   Chief of staff, I'm sorry. Who was that?
9   A.   **His name was Robert Belliere.**
10  Q.   What were his functions, at least for the 11
11       months that you were there?
12  A.   **I honestly don't know. He worked very**
13       **closely with the mayor. He wrote most of**
14       **the mayor's correspondence, but other than**
15       **that, I'm not sure, because most of the time**
16       **when the two of them met they closed the**
17       **doors.**
18  Q.   You never sat in on any of the meetings,
19       took dictation?
20  A.   **No.**
21  Q.   With respect to this 3-313, this document
22       we've marked as 8, this is a -- refers to a
23       job description that includes both the
24       administrative assistant and the

45

1 confidential secretary, correct?

2 A. When I was looking at the one that you gave
3 us before, do we know what this is, because
4 I have a feeling that this is part of what
5 the administrative assistant position.

6 Q. I'm not sure. I presume that's 3-312, but I
7 do not know what that is.

8    MR. SHWARTZ: Can we go off the record
9 for a second.

10 A. What I'm saying is, this says "Confidential
11 Secretary/Administrative Assistant to the
12 Mayor". I'm not sure how that was, but when
13 the first administrative assistant came into
14 the office, it was under Mayor Monahan.
15 Some of the things that were on here are the
16 things that she did. Like multiple member
17 bodies and divisions of the city council and
18 the mayor, she would go to those meetings, I
19 didn't, so I don't know if this is part of
20 what the chief of staff position was or not
21 because the administrative assistant, as I
22 knew her, didn't do these duties. These
23 were my duties, the confidential secretary
24 to the mayor.

46

1 Q. Just to follow-up one thing. In terms of
2 Subsection 3, which we had discussed
3 earlier, there are aspects of that that you
4 do not do?

5 A. That's true, so it's sort of like one's
6 overlapping the other, but I don't know.

7    MS. CORBO: I'm not sure that there's
8 that much of a conflict. I mean, here it's
9 called chief administrative aide, not
10 administrative assistant to the mayor, so I
11 would assume that there is another position
12 and it might be this one is actually chief
13 administrative aide.

14    THE WITNESS: That's what I was trying
15 to say.

16    MS. CORBO: Okay, but you were referring
17 to it as the administrative assistant.

18    THE WITNESS: Well, when the woman first
19 came in, that's what her title was,
20 administrative assistant. That's why it's
21 confusing, the titles have changed over the
22 years.

23 Q. Just my final question. I think this will
24 be it. Other than the responsibilities --

47

1    MS. CORBO: Are we on the record?

2    MR. SHWARTZ: Yeah, I think we still
3 are. We never went off the record.

4 Q. Can you think of any other duties and
5 responsibilities that aren't listed here
6 that you do or that are inherent in your
7 position as secretary to the mayor that
8 aren't listed here?

9 A. Well, things like doing his correspondence,
10 typing documents that he wants done, like
11 the annual report, all of those things,
12 that's not in here, but doing the payroll,
13 doing accounts receivable, accounts payable,
14 so I'm not sure what you're asking me.

15 Q. Are there other duties or responsibilities
16 as you know it, as you understand as
17 executive secretary to the mayor, that
18 aren't listed there that are crucial to the
19 position of being executive secretary to the
20 mayor, other than the ones you just listed a
21 second ago?

22 A. Sometimes I would sit in, I haven't done it
23 really recently, but in other occasions I
24 have taken minutes to meetings that he's

48

1 had, hearings he might have had relative to
2 grievances from departments or from
3 employees or whatever. We don't do that as
4 much now as before because of the human
5 resource department, but I guess that pretty
6 much sums it up.

7 Q. In that capacity it was just keeping records
8 of what was taking place during that
9 meeting?

10 A. That's correct.

11    MR. SHWARTZ: Okay. No further
12 questions.

13    MS. CORBO: I actually just have a
14 couple.

15         CROSS-EXAMINATION

16 (By Ms. Corbo)

17 Q. Ms. Giallongo, do you have any access to the
18 mayor's e-mail?

19 A. Yes.

20 Q. What type of access do you have? Do you
21 review it when it comes in?

22 A. All of his e-mails come in on my computer.

23 Q. What about in terms of the mayor's speeches
24 or communications with the public, do you

48

| | |
|---|---|
| 1 | have any responsibility for typing those? |
| 2 A. | **I type everything that he does.** |
| 3 Q. | So if he has a speech that's he's going to |
| 4 | make -- |
| 5 A. | **Speeches, press releases, correspondence,** |
| 6 | **annual report, whatever needs to be typed,** |
| 7 | **letters to state agencies, whatever. I type** |
| 8 | **all of those. Occasionally, the city** |
| 9 | **planner may do one if it's technical, but** |
| 10 | **typically, I type just about everything that** |
| 11 | **goes out of the office.** |
| 12 Q. | What about the mayor's whereabouts, do you |
| 13 | have any responsibility for keeping track of |
| 14 | where he's going or his meetings? |
| 15 A. | **Yes, I keep his calendar. I set his** |
| 16 | **appointments, make sure that he gets where** |
| 17 | **he's supposed to be when he's supposed to be** |
| 18 | **there.** |
| 19 Q. | Do you have any responsibility for |
| 20 | communicating his position on any certain |
| 21 | issues to department heads? |
| 22 | MR. SHWARTZ: Objection. You can |
| 23 | answer. |
| 24 A. | **Yes, sometimes I do.** |

50

| | |
|---|---|
| 1 Q. | Can you give me an example? |
| 2 A. | **Well, recently, Chief Pierce, the fire** |
| 3 | **chief, had sent an e-mail to the mayor** |
| 4 | **asking him how he wanted to handle a** |
| 5 | **particular grant receipt. Well, the City** |
| 6 | **was going to receive a grant and the fire** |
| 7 | **chief wanted to know how the mayor wanted to** |
| 8 | **handle it, if he wanted to do it himself or** |
| 9 | **with the city council, so the mayor asked me** |
| 10 | **to call the chief and tell him that he would** |
| 11 | **prefer to have it done as part of the city** |
| 12 | **council and asked when it would happen.** |
| 13 Q. | Your responsibility for e-mails and |
| 14 | correspondence that comes into the office, |
| 15 | does that include materials that may be |
| 16 | considered confidential and not public |
| 17 | records? |
| 18 | MR. SHWARTZ: Objection. |
| 19 A. | **Yeah.** |
| 20 Q. | Do you have any exposure or access to |
| 21 | confidential matters such as litigation that |
| 22 | the City is involved in? |
| 23 A. | **Yes.** |
| 24 | MS. CORBO: That's all the questions |

51

| | |
|---|---|
| 1 | that I have. |
| 2 | MR. SHWARTZ: I have a few questions |
| 3 | based on what you just said. |
| 4 | **REDIRECT EXAMINATION** |
| 5 | (By Mr. Shwartz) |
| 6 Q. | Ms. Corbo just mentioned that you have come |
| 7 | across documents or create documents that |
| 8 | are not considered public records? Let me |
| 9 | go back a step. What is your understanding |
| 10 | of what a public record is? |
| 11 A. | **My understanding is that anything that has** |
| 12 | **to do with City communications are open to** |
| 13 | **the public. I would not consider, I don't** |
| 14 | **know that this is true, but I would not** |
| 15 | **consider anything that comes in about** |
| 16 | **litigation to be a public record at the** |
| 17 | **time that it comes into my office.** |
| 18 Q. | Any other documents, based upon your |
| 19 | understanding, other than litigation |
| 20 | documents? |
| 21 A. | **No.** |
| 22 Q. | What about litigation documents where the |
| 23 | litigation has already ended, what is your |
| 24 | understanding of that? |

52

| | |
|---|---|
| 1 A. | **I believe then it would become a public** |
| 2 | **record.** |
| 3 Q. | So when Ms. Corbo was asking you about |
| 4 | public records, she was just referring to |
| 5 | litigation records, in your mind, that are |
| 6 | records that are not public records? Let me |
| 7 | clarify that. |
| 8 A. | **I'm not —** |
| 9 Q. | She asked you if you had come across |
| 10 | litigation records in one of her questions, |
| 11 | correct? |
| 12 A. | **Yes.** |
| 13 Q. | And you said you do, and then I believe that |
| 14 | she asked whether or not you come across |
| 15 | documents or create documents that are not |
| 16 | public records. Are there any other |
| 17 | documents, in your mind, that are not public |
| 18 | records that do not involve litigation, |
| 19 | based upon your understanding of what a |
| 20 | public record is? |
| 21 A. | **No, I don't believe so. I was thinking in** |
| 22 | **terms of litigation as a non-public record.** |
| 23 | **I'm not sure that I understand the question.** |
| 24 Q. | If it's your belief that the only type of |

53

1   records that are not public are litigation,
2   correct, is that a fair statement?
3   A.  Well, things that I'm aware of in my office.
4       I mean, some of the things that I do with
5       the License Board are not public record, and
6       I know that. I believe some of the things,
7       CORI's are not public records, those kinds
8       of things, but I thought you were talking in
9       terms of my office. I'm sorry.
10  Q.  No, I'm talking, for the most part, your
11      office. In terms of your position as
12      secretary to the mayor and in terms of
13      documents that you come across in that
14      capacity --
15  A.  I'm not sure what would be not considered a
16      public record.
17  Q.  How can you answer the question if you don't
18      know what you consider to be a public
19      record? You can't.
20      MS. CORBO:  Are you answering for her or
21  are you asking her?
22      MR. SHWARTZ:  No, I'm asking her a
23  question.
24      MS. CORBO:  If you don't understand his

54

1   question, just say you don't understand it.
2   Q.  I'm just trying to get an idea as to what
3       you subjectively believe to be a public
4       record in order to answer Ms. Corbo's
5       question, so I'm trying to get
6       clarification, but if you do not --
7       MS. CORBO:  I'll be happy to re-ask my
8   question in a different manner that's less
9   confusing.
10      MR. SHWARTZ:  I have no further
11  questions. If you want to answer my
12  question, it's still open to you.
13  Q.  Ms. Corbo previously asked you whether or
14      not you came across any public records.
15      Then I had asked you a line of questions as
16      to what --
17      MS. CORBO:  Any public records?
18      MR. SHWARTZ:  No, any records,
19  documents, that were not public records.
20  I'm sorry.
21  Q.  Then I asked you a line of questions to
22      determine what, in your mind, constituted
23      public records, and you told me litigation
24      files that you've come across in your

55

1   capacity as executive secretary, and I asked
2   you if you've come across any other records
3   in your capacity as executive secretary.
4       MS. CORBO:  Objection.
5   Q.  Have you come across any other documents,
6       other than litigation records, that are not
7       public records in your capacity as executive
8       secretary to the mayor?
9       MS. CORBO:  Objection. Go ahead, you
10  can answer it.
11  A.  I don't believe that I have.
12      MR. SHWARTZ:  Okay. I have no further
13  questions.
14      MS. CORBO:  Just one further question.
15          RECROSS EXAMINATION
16  (By Ms. Corbo)
17  Q.  Ms. Giallongo, do you have a complete and
18      full understanding of the public records
19      law?
20      MR. SHWARTZ:  Objection.
21  A.  I guess I don't, because I assume that most
22      everything that comes across my desk is
23      public record, except litigation, and I
24      guess that's not correct.

56

1       MS. CORBO:  Thank you, Linda.
2       MR. SHWARTZ:  Nothing further.
3       (Whereupon the Deposition was concluded
4   at 3:29 p.m.)

57

1 DEPONENT'S ERRATA SHEET
2 AND SIGNATURE INSTRUCTIONS
3
4 The original of the Errata Sheet
5 has been delivered to Atty. Elizabeth Corbo.
6     When the Errata Sheet has been
7 completed by the deponent and signed, a copy
8 thereof should be delivered to each party of
9 record and the ORIGINAL delivered to Atty.
10 Eric Shwartz to whom the original deposition
11 transcript was delivered.
12
13         INSTRUCTIONS TO DEPONENT
14
15     After reading this volume of your
   deposition, indicate any corrections or
16 changes to your testimony and the reasons
   therefor on the Errata Sheet supplied to you
17 and sign it. DO NOT make marks or notations
   on the transcript volume itself.
18
19 REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20 COMPLETED AND SIGNED ERRATA SHEET WHEN
21 RECEIVED.
22
23
24

58

1 ATTACH TO THE DEPOSITION OF **LINDA P. GIALLONGO**
2 CASE:  ATHERTON vs. CITY OF BEVERLY
3         ERRATA SHEET
4 INSTRUCTIONS:  After reading the transcript
  of your deposition, note any change or
5 correction to your testimony and the reason
  therefor on this sheet. DO NOT make any
6 marks or notations on the transcript volume
  itself. Sign and date this errata sheet
7 (before a Notary Public, if required).
  Refer to Page 57 of the transcript for
8 errata sheet distribution instructions.
9 PAGE  LINE
10 ____  ____  CHANGE: _____
              REASON: _____
11 ____  ____  CHANGE: _____
              REASON: _____
12 ____  ____  CHANGE: _____
              REASON: _____
13 ____  ____  CHANGE: _____
              REASON: _____
14 ____  ____  CHANGE: _____
              REASON: _____
15 ____  ____  CHANGE: _____
              REASON: _____
16 ____  ____  CHANGE: _____
              REASON: _____
17 ____  ____  CHANGE: _____
              REASON: _____
18 ____  ____  CHANGE: _____
              REASON: _____
19 ____  ____  CHANGE: _____
              REASON: _____
20     I have read the foregoing transcript
21 of my deposition and except for any
   corrections or changes noted above, I hereby
22 subscribe to the transcript as an accurate
   record of the statements made by me.
23
24         _____    _____
           (WITNESS)            (DATE)

59

1 COMMONWEALTH OF MASSACHUSETTS
  MIDDLESEX, ss.
2
3     I, Kelly G. Patterson, a Notary Public
4 duly commissioned and qualified within and
5 for the Commonwealth of Massachusetts, do
6 hereby certify:
7     That **LINDA P. GIALLONGO**, the witness whose
8 deposition is hereinbefore set forth, was
9 duly sworn by me, and that such deposition
10 is a true record of the testimony given by
11 the witness to the best of my skill,
12 knowledge, and ability.
13     IN WITNESS WHEREOF, I have hereunto set my
14 hand and my affixed notarial seal this **14th**
15 **day of November, 2007.**
16
17
18
19         _____
           Kelly G. Patterson
           Notary Public
20
21
22
   My Commission expires:
23 September 12, 2014
24

# Exhibit
# 1

VOLUME:     I
PAGES:      1 - 93
EXHIBITS:   I - 5

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

C.A. # 05-11323 MLW

* * * * * * * * * * * * * * *

CRYSTAL A. ATHERTON
And ROBERT W. ATHERTON,
                    Plaintiffs,

vs.

CITY OF BEVERLY, WILLIAM F. SCANLON, JR.,
in his official and individual capacity
and JOHN DUNN, in his official and individual
capacity,
                    Defendants.

* * * * * * * * * * * * * * *

DEPOSITION OF CRYSTAL A. ATHERTON, a witness
called on behalf of the Defendants, pursuant to
Massachusetts Rules of Civil Procedure, before
Carolyn McGill, a Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
for Kopelman & Paige, P.C., 101 Arch Street, Boston,
Massachusetts, held at Beverly City Hall, 191 Cabot
Street, Beverly, Massachusetts on Tuesday, October
16, 2007 commencing at 10:44 a.m.

---

1    I N D E X
2
3    **DEPONENT**                        PAGE
4
5    Crystal A. Atherton
6    Examination by Ms. Corbo            4
7
8    E X H I B I T S
9
10
11   NO.   DESCRIPTION              PAGE
12   1     Newspaper Article          28
13   2     11/7/04 Letter to Atherton  54
14   3     Atherton Record of          65
15         Compensatory Time
16   4     Complaint and Demand for    69
17         Trial Jury
18   5     Answers to Interrogatories  76
19
20
21
22
23

---

2

1    <u>APPEARANCES</u>
2
3    KOPELMAN & PAIGE, P.C.,
4        (By Elizabeth Corbo, Esq.)
5        101 Arch Street,
6        Boston, MA 02116,
7        On behalf of the Defendants.
8
9
10   SHAPIRO & HENDER,
11       (By Jordan L. Shapiro, Esq.)
12       (By Eric Shwartz, Esq.)
13       640 Main Street,
14       Malden, MA 02148,
15       On behalf of the Plaintiffs.
16
17   Also Present:  Robert A. Munroe, Esq., City of
18   Beverly.
19
20
21
22
23

---

4

1    P-R-O-C-E-E-D-I-N-G-S
2    STIPULATIONS
3        It was stipulated and agreed by
4    and between counsel for the respective parties
5    that the witness will read and sign the
6    deposition transcript and the sealing, filing
7    and certification thereof are waived.
8
9        **Crystal Atherton**, having been
10   satisfactorily identified by the production of
11   her driver's license and duly sworn by the
12   Notary Public, called on behalf of the
13   Defendants, on oath deposes and says as follows:
14   **Examination by Ms. Corbo:**
15       Q.  Good morning, Miss Atherton.  My name
16   is Elizabeth Corbo and I represent the City of
17   Beverly, Mayor Scanlon and John Dunn in the
18   action you've brought against the City of
19   Beverly.
20           Have you ever been deposed before?
21       A.  No.
22       Q.  I'm going to give you a small set of
23   instructions which your attorney can add to if

1  he likes that will help you through this
2  proceeding.
3          First, if you need a break at any
4  time just ask for it. There's no magic to
5  sitting for a certain number of hours. So if
6  you're uncomfortable, you want to consult with
7  your attorney, you need a break, you can take
8  one at any time. The only thing I ask is if
9  there's  a question pending that you answer the
10  question and then you can take the break.
11          If I ask a question and it's not
12  clear, please just ask me to rephrase it. I
13  will be happy to do that. If there's a question
14  that you don't understand please say so. If you
15  don't say so I'm going to assume you've
16  understood the question. Is that okay?
17      A.  Yes.
18      Q.  And when you're going to make a
19  response to a question please make sure that
20  it's a verbal response so that it can recorded
21  by the stenographer. Shakes of heads and nods
22  cannot be recorded for the record. Okay?
23      A.  Yes.
            LEAVITT REPORTING, INC.

1      A.  Yeah, I was sixty-five and a half I
2  believe.
3      Q.  And you were going to turn sixty-six
4  that June?
5      A.  Right.
6      Q.  Do you live in Beverly, Miss Atherton?
7      A.  Yes, I do.
8      Q.  Have you lived in Beverly all your
9  life?
10      A.  Not all my life. All my married life.
11      Q.  How many years have you been a
12  resident of the city?
13      A.  Over forty.
14      Q.  Can you give me a brief background of
15  your employment history from -- let's do your
16  educational background first. Where did you go
17  to high school?
18      A.  I went to high school in Danvers. I
19  was a resident of Danvers, brought up in Danvers
20  and graduated from Houghton High School in 1956.
21      Q.  And you graduated with a diploma?
22      A.  Yes.
23      Q.  Did you go on to any type of finishing
            LEAVITT REPORTING, INC.

6

1      Q.  All right. Also let's endeavor not to
2  talk over each other. Sometimes that happens.
3  You get to be in a flow of a conversation. I
4  won't quite finish asking my question and then
5  we'll talk over each other and that's also hard
6  for the stenographer to record for the record.
7  Okay?
8      A.  I understand.
9      Q.  All right. Miss Atherton, can you
10  tell me how old you are today?
11      A.  Sixty-nine.
12      Q.  What is your date of birth?
13      A.  June 13, 1938.
14      Q.  Could you state your full name for the
15  record?
16      A.  Crystal Anne Atherton.
17      Q.  How old were you when you were
18  terminated with the City of Beverly in January?
19  I think it was January.
20      A.  I must have been about sixty-six.
21      Q.  Sixty-six?
22      A.  I'm sixty-nine. And this is 07.
23          MR. SHAPIRO: Think to yourself.
            LEAVITT REPORTING, INC.

8

1  school or college?
2      A.  From there I went to Burdett College
3  which was a two year legal secretarial course I
4  took there. That was a two year college.
5      Q.  Other than Burdett do you have any
6  advanced degrees or certifications?
7      A.  I went to Salem State College and I
8  have a degree in Office Management. I also took
9  the certification program at Bentley College in
10  Waltham for paralegal so I'm a certified
11  paralegal.
12          Since then I have taken numerous
13  courses mostly for computers at North Shore
14  Community College, Gordon College, the
15  vocational school in Middleton. I have taken a
16  lot of courses relative to computers and new
17  software programs.
18      Q.  When was the most recent computer
19  class that you've taken?
20      A.  It was when I was working for the
21  purchasing agent of the city. I went there in
22  97. Probably 99.
23      Q.  Since 1999 have you taken any classes?
            LEAVITT REPORTING, INC.

9

1    A.   I would say no.

2    Q.   Just to backtrack a little bit, when

3  did you finish at Burdett?

4    A.   1960.

5    Q.   And Salem State?

6    A.   86.

7    Q.   When did you receive your paralegal

8  certification?

9    A.   It was before my college degree from

10  Salem State so it was in between.  I'm not sure

11  of the year.

12    Q.   Would that be reflected on your

13  resume?

14    A.   It might be.

15    Q.   When did you begin your first

16  employment out of high school?

17    A.   My first position after high school?

18    Q.   Yes.

19    A.   Going back to when I did waitress

20  work?

21    Q.   You don't have to name every job.

22  Let's say your first job that you were at for

23  more than three years.

LEAVITT REPORTING, INC.

---

10

1    A.   Okay.  My first job after I got out of

2  Burdett College, I worked for Paul and James

3  Liacos in Peabody.  I worked for them for

4  probably ten years either full-time for

5  part-time.  That was my first full-time job.

6    Q.   What were your job duties there?

7    A.   I was a legal secretary.

8        MR. SHAPIRO:  L I A C O S.

9    Q.   After you left there?

10    A.   I had children.  I had twins.  And

11  even though I wanted to continue to work that

12  wasn't possible with two small babies.  So I

13  probably didn't work for maybe five years except

14  for part-time.

15        The Liacoses would call me now and

16  then and ask me if I could come in for two or

17  three weeks or a month.  I did tax returns for

18  them.  So I would continue to go in if I could.

19  But I didn't do any full-time work until my

20  children went to the first grade.

21    Q.   When was that?

22    A.   I can't remember the dates.  They were

23  born in 1961.  They were seven.  They were six.

LEAVITT REPORTING, INC.

---

11

1  Probably 1967, 68.

2    Q.   Do you recall where you went?

3    A.   Yes.  I went to work for the law firm

4  of Sandry McDonald in Lynn and I worked for them

5  on and off either full-time or part time for

6  over a period of twenty years.

7    Q.   After this law firm in Lynn where did

8  you go?

9    A.   I came to the City of Beverly.

10    Q.   Do you recall when you started with

11  the City?

12    A.   It was in February of 1987.

13    Q.   Where was the first position you held?

14    A.   The first position was in this room as

15  a legal secretary to Adam Ricci.

16        MR. SHAPIRO:  R I C C I.

17    Q.   Was Mr. Ricci the City Solicitor at

18  the time?

19    A.   He was at the time.

20    Q.   How long were you legal secretary for

21  the City Solicitor?

22    A.   Mr. Ricci or all the solicitors I

23  worked for.

LEAVITT REPORTING, INC.

---

12

1    Q.   In a continuous amount of time?

2    A.   Ten years.

3    Q.   Did you do paralegal work at that time

4  as well?

5    A.   Yes.

6    Q.   Where did you go from the City

7  Solicitor's Office?

8    A.   From the City Solicitor's Office I

9  went to the second floor for Christopher Bradley

10  who was the purchasing agent of the City of

11  Beverly as his assistant.

12    Q.   Do you recall what year that was?

13    A.   I believe it was 97.

14    Q.   How long did you stay as a purchasing

15  assistant?

16    A.   I was there from 97 until 2002.

17    Q.   In 2002 where did you go?

18    A.   I went into the Mayor's Office for

19  Mayor Crean as his secretary.

20    Q.   That was the last position you held

21  with the City of Beverly?

22    A.   Yes.

23    Q.   You held that position until --

LEAVITT REPORTING, INC.

13

1    A.    Until I was terminated in January of
2    2003.
3    Q.    When were you notified by Mr. Crean
4    that he would like you to be his executive
5    secretary?
6    A.    I actually wasn't notified by him.
7    The Human Resource Director came into my office
8    on the second floor and asked me if I would be
9    willing to fill in in the Mayor's Office until
10   the job was posted and filled and advertised.
11   Q.    Was the job ever posted to the best of
12   your knowledge?
13   A.    To the best of my knowledge it was
14   advertised.
15   Q.    Did you apply for the position when it
16   was advertised?
17   A.    I was in the office for about three
18   weeks before I applied for the position. I felt
19   comfortable there and it was a substantial
20   increase in salary.
21   Q.    Prior to going into the Mayor's Office
22   did you have any relation with Mr. Crean? Did
23   you know him? Were you familiar with him?

LEAVITT REPORTING, INC.

15

1    provisions of the charter. And it gives I think
2    it's one year to do the work. I was appointed
3    by Mayor Scanlon to that committee. And we
4    finished our work and presented it to the
5    Council.
6    Q.    Could you tell me, do you happen to
7    recall what provision of the charter that's
8    mandated in?
9    A.    I don't.
10   Q.    You said you were appointed by Mayor
11   Scanlon. Do you remember what year that was?
12   A.    It had to be 1996 I believe. The
13   charter was voted in in 1995 and immediately
14   thereafter we formed -- the committee was
15   formed. And there was a requirement in the
16   charter that two of the members of this
17   committee had to have been former charter
18   members.
19   Q.    Were you a former charter member?
20   A.    Yes, I was.
21   Q.    What years did you serve on the
22   Charter Committee?
23   A.    I think I was elected to that position

LEAVITT REPORTING, INC.

14

1    A.    Yes, I did.
2    Q.    How were you familiar with him?
3    A.    The first contact I had with Mayor
4    Crean was when he was running for the office.
5    He called my home and he asked me several
6    questions about the City charter and City
7    ordinances because people had told him that I
8    had been working on all these Ordinance Review
9    Committees without any success in getting any
10   ordinances passed in the city.
11          He wanted to understand what the
12   purposes of these ordinances were, why I was so
13   concerned that they weren't being passed. And
14   he told me if he was elected he would be more
15   than happy to help me accomplish that.
16   Q.    Explain to me if you can your
17   participation or involvement in the Ordinance
18   Review Committee?
19   A.    Which one?
20   Q.    How many were there?
21   A.    The first ordinance review committee
22   was a committee that is mandated in the charter.
23   It requires that the committee implement the

LEAVITT REPORTING, INC.

16

1    in either 91 or 92. And that was a two -- I
2    think it was a two year commitment. I'm not a
3    hundred percent sure. It seemed like it was
4    forever.
5    Q.    What was the process for election to
6    that position on the Charter Committee?
7    A.    That was a city wide election.
8    Q.    What were your responsibilities on the
9    charter committee?
10   A.    Mine personally or just all charter
11   members?
12   Q.    Let's talk about yours personally.
13   A.    Personally I was very much interested
14   in the organizational structure of the City. I
15   had been working in the Law Department
16   approximately five years at the time of my
17   election to the Charter Commission so I was very
18   much aware of some of the deficiencies that
19   existed in city government here.
20          And I was very interested in
21   working on the section of the charter relating
22   to the administrative offices and the
23   organizational structure.

LEAVITT REPORTING, INC.

17

Q. Did you have specific responsibilities or a specific mission that you were supposed to be carrying out as part of this Charter Committee?

Let me rephrase that. What was the purpose of the Charter Committee?

A. To go over the old city charter and try to make a better charter that would be -- that had more checks and balances, that was more open to citizens that they'd be able to understand what department is doing what, where their tax dollars were going. So it was a matter of efficiency to have a more efficient government.

Q. And so basically was the purpose to revise the charter?

A. Yes.

Q. So did you do that?

A. Yes, we did.

Q. The charter as it stands currently enacted, is that the charter that you worked on?

A. Yes.

Q. Did the committee make certain

18

recommendations to the City and the City Council?

A. The way that it was done was there was a preliminary report filed with the City Council and filed with the Attorney General's Office. If there were anything in that charter that was not in compliance with state law or anything that the Attorney General felt wasn't right then we'd get a letter back telling us that we had to revise that part of the charter before it would be accepted.

Q. The revision of the charter was accomplished in two years?

A. Yes.

Q. When was it voted on for acceptance by the City?

A. 1995.

Q. At that time were there also city ordinances?

A. Yes, there were.

Q. You mentioned that you had participated in Ordinance Review Committee?

A. Right.

19

Q. The first one being in, was it 1996?

A. It was right after the charter was enacted so it would have had to have been close. I'm not sure if it was 96 or late 95 or sometime in that area.

Q. What was the purpose of the ordinance review committee in 1996?

A. To write ordinances and revise the ordinances that were already on the books in the City of Beverly because many of the ordinances that were there were no longer valid.

Q. How many ordinance committees did you serve on?

A. Two.

Q. Approximately 1996 and when was the second one?

A. The second one was formed I believe somewhere in 97. But I didn't get appointed to that committee until sometime in maybe 2001.

Q. So the one that was formed in 1997 went until 2001?

A. Yes.

Q. Who appointed you?

20

A. I believe it was the President of the City Council, Paul Guanci. He called and asked me if I'd be willing to work with them as they had been working on the ordinance for over four years and had not gotten anywhere.

Q. So when you joined in 2002 what were some of your primary duties and responsibilities?

A. I think it was 2001.

Q. Sorry. 2001. You're correct.

A. They asked me if I would work on the section that was at that time called the Administrative Code which was the organizational structure of the City of Beverly as it then existed written in words instead of just on an organizational chart with what the duties and responsibilities of each department was, who the appointing authority was, what the powers of the office were, and to put that all in writing for many purposes including the use of the public.

Q. Did you work on that?

A. Yes, I did.

Q. Was it completed?

23

1    A.    Yes, it was.

2    Q.    Once you had a completed document for

3  all -- was it for all the positions in the City?

4    A.    This was the second ordinance review

5  group. The first one we did try to have passed

6  and the second one we tried too.

7    Q.    Did the second one get passed?

8    A.    Not at first. It went before the

9  Council and Mayor Scanlon and who was now the

10  City Solicitor, Roy Gelineau. And several other

11  people came and said that the document was

12  fatally flawed and asked the Council not to pass

13  it.

14    Q.    The Council did not pass it at that

15  time?

16    A.    Right.

17    Q.    Do you recall what year that was?

18    A.    No, I don't. I'm sorry.

19    Q.    It was after 2001 obviously?

20    A.    Yes. It was somewhere right around

21  that time.

22    Q.    After the document did not pass what

23  was the next step that you participated in?

22

1    A.    I think by that time Mayor Crean had

2  been elected and we needed funds to pay -- I

3  told the Ordinance Review Committee that there

4  was no way that we could draft this document

5  without professional assistance. And the

6  Charter Commission and the original ordinance

7  review had hired an attorney, Michael Curran,

8  who I considered an expert in charters and

9  ordinances.

10         And I felt that if the ordinances

11  were ever going to be written and passed that we

12  needed an expert attorney to assist us in

13  drafting the document.

14         So Mayor Crean and the City

15  Solicitor agreed that they would fund that. I

16  think the money came out of the City Solicitor's

17  budget to pay Mr. Curran for his legal services

18  to the City.

19    Q.    Did you personally have any more

20  involvement in the ordinances after the point

21  that Mr. Curran was hired?

22    A.    I continued working on the ordinances

23  until they were finally passed in December of

23

1  2003. Probably a week before I was terminated

2  they were finally passed which I considered a

3  very big accomplishment in my life since I had

4  spent over ten years attempting to have the

5  charter in place with new ordinances.

6    Q.    When you had worked on what was

7  originally referred to as the administrative

8  code regarding the organizational structure of

9  the City did you work on a section that dealt

10  with the confidential executive secretary for

11  the Mayor?

12    A.    This is in what year now are we

13  talking?

14    Q.    It would be after 2001.

15    A.    Okay. Yes. The answer is yes.

16    Q.    Did anyone assist you in drafting the

17  section regarding the confidential executive

18  secretary?

19    A.    I believe that all of the duties and

20  responsibilities that were listed in the charter

21  came from the Human Resource Department from job

22  specs that were in already on file with the

23  City.

24

1    Q.    You had said all the job duties listed

2  in the charter. Was it the charter or the

3  ordinance?

4    A.    The ordinance. In other words, I went

5  to the Human Resource Department and got all of

6  the job specs for the positions that were going

7  to be in the ordinances.

8    Q.    Were there other sections of the

9  ordinances that you didn't participate in

10  drafting?

11    A.    I would say I participated in most of

12  it but I didn't do any like research work. Some

13  of the boiler plate type language that's in all

14  charters, I didn't participate in any research

15  or work to write those.

16    Q.    How many members were on the Ordinance

17  Review Committee when you were elected or

18  assigned in 2001?

19    A.    I don't know if it was seven or nine.

20  I'd have to look at the charter.

21    Q.    Did everyone have a specific section

22  of the ordinance that they were responsible for?

23    A.    Not really in that group. The charter

25

```
1   commission did.  But the ordinance review group,
2   I don't believe that people were responsible for
3   any particular section.
4       Q.  Was most of your work primarily on the
5   administrative code slash organizational makeup
6   of the City?
7       A.  More than fifty percent.
8       Q.  Okay.  Now, when you were working as
9   the executive confidential secretary to the
10  Mayor, Mayor Crean I should be specific about,
11  when did you first learn that your job in that
12  position may be in jeopardy?
13      A.  I'm not sure of the month.  I should
14  know but it was after the primary election.  And
15  Mayor Crean had done very poorly in that
16  primary.  And Mayor Scanlon was running and I
17  believe he made comments to the newspapers that
18  if he did win the final election he would be
19  replacing certain people.  And I was one of
20  those persons.
21      Q.  Did he name you in the newspaper
22  article?
23      A.  No, I don't believe he named me
              LEAVITT REPORTING, INC.
```

27

```
1   highlighted document that might be easier.
2       A.  What's the question?
3       Q.  That is a copy of a newspaper article.
4   And I'm going to ask you whether you
5   recognize -- they quote you in this article.
6   I'm going to ask you whether you recognize the
7   quote.  The first quote states --
8       A.  The first quote I did say.  The second
9   quote I didn't say.
10      Q.  That she's waiting to be terminated?
11      A.  Yes.
12      Q.  And then later in the article it says
13  that "I knew the risk," Atherton said.  "I could
14  have sat tight in Purchasing."
15      A.  I never said that.
16      Q.  Do you recall being interviewed for
17  this article?
18      A.  It was not really an interview.  I was
19  in the copy room across the hall and the
20  newspaper people were doing a newspaper article
21  on how you feel knowing that you're going to
22  lose your job.
23          And I just didn't think it was
              LEAVITT REPORTING, INC.
```

26

```
1   specifically, but he said that he was going to
2   be bringing back his old secretary.  So
3   obviously if I was working as the secretary in
4   the Mayor's Office you could put two and two
5   together pretty easily that he was referring to
6   my position.
7       Q.  Do you know who his prior secretary
8   was?
9       A.  Linda Giallongo.
10      Q.  Do you have any knowledge as to what
11  happened to her when Mayor Crean came into
12  office?
13      A.  Only hearsay what people talked about
14  or what I read in the newspaper.  I didn't have
15  any personal conversation with her or anyone.
16      Q.  Or Mayor Crean?
17      A.  No.
18      Q.  I'm not interested in the hearsay at
19  this point.
20      A.  Okay.
21      Q.  I'm going to show you a document.
22      A.  Where am I looking?
23      Q.  I'm going to give you a copy of a
              LEAVITT REPORTING, INC.
```

28

```
1   appropriate and I kind of just fluffed him off
2   and said, I'm waiting to be terminated.
3           I didn't have any interview.  I
4   didn't sit down with anybody.  It was just off
5   the cuff in the hallway.  I never made the
6   comment I could have sat tight in Purchasing.
7   That's not something I would say.
8       Q.  Do you recall when this article was
9   written?
10      A.  No, I don't.
11      Q.  Did you see this article at the time
12  it was first published, do you recall?
13      A.  I must have because, you know, it
14  involves Changes In Store at City Hall.  It's
15  something I would have looked at.
16          I had a habit of reading newspaper
17  articles and even saving them.  This one I
18  didn't.  I don't know why.  I didn't keep this
19  article.
20      Q.  Did you ever notify the paper after
21  having read it that you were incorrectly quoted?
22      A.  No.
23          (Exhibit No. 1, Newspaper Article;
              LEAVITT REPORTING, INC.
```

29

1  so marked.)
2      Q.  When was your first conversation with
3  Mayor Scanlon about you continuing in your
4  position as confidential executive secretary
5  after he was elected Mayor or as he was elected
6  Mayor?
7      A.  The first conversation I had with him
8  was via telephone somewhere in mid December.  I
9  remember it very well because it was very
10  upsetting.  He called me in the evening, perhaps
11  around seven o'clock.  He asked me to retire.
12          And he told me he wasn't going to
13  keep me in the position, and that it would be
14  best for the City and for me and everyone else
15  if I retired.
16          I told him I didn't want to
17  retire, that I was healthy.  I had energy.  I
18  wanted to continue working for the City.  I
19  wanted to do it for many reasons, for my own
20  personal benefit because I enjoyed it, but also
21  because I wanted to increase my pension benefits
22  in the future.  And I wanted to continue earning
23  the money and savings into my retirement

LEAVITT REPORTING, INC.

30

1  account, the private retirement account that I
2  was paying into in addition to the City's
3  retirement account.
4          So all of these things were
5  important to me and I wanted to stay in
6  employment for two or three years I told him.
7  And I asked him if he could assign me to the
8  School Department or any other job in the City
9  I'd be willing to take.  And his comment was I
10  do not have a job for you.
11      Q.  So you told him during that
12  conversation that you had a personal retirement
13  account and you wanted to continue earning
14  money?
15      A.  Yes.  I also told him that I didn't
16  think he had the power under the charter to
17  terminate my employment.
18      Q.  What was his response?
19      A.  He didn't answer me at all.
20      Q.  You stated that you'd asked to be
21  assigned to the School Department?
22      A.  I asked any job, anywhere, if it was
23  the City or the School Department so I could

LEAVITT REPORTING, INC.

31

1  continue paying into my retirement account and
2  continue working.
3      Q.  Did you specifically mention the
4  school department?
5      A.  Yes, I did.
6      Q.  Was there a particular position at the
7  School Department that you were aware of?
8      A.  I didn't know.  I just said I'd be
9  willing to take any job anywhere.  I would even
10  go into the school department.
11      Q.  At that time during your conversation
12  with the then Mayor Scanlon, he had been elected
13  at that time?
14      A.  Yes.
15      Q.  Were you aware of any openings in the
16  City?
17      A.  Yes.  After my phone call with him and
18  I definitely knew he was going to not keep me in
19  that position, I went to see the President of
20  the Union and asked him if there were any
21  options at all, any place in the City; that I
22  wanted to continue my employment and I would be
23  willing to take any job that was open.

LEAVITT REPORTING, INC.

32

1          He initially told me that he
2  didn't think there were any positions open at
3  the time but about a week later he came up to
4  the Mayor's Office and he said there was an
5  opening in the Building Inspector's Office, that
6  some employee there had recently been terminated
7  for possibly absconding with some funds and that
8  that position was open and would I be interested
9  in it.
10          I didn't tell him that day that I
11  was.  I talked it over with my husband and then
12  I went down and saw Jerry Marsella and I said I
13  would like to take that job.  I've discussed it
14  with my husband and it's something I'd like to
15  do.  And he told me if I wanted to continue
16  working he would support me.
17      Q.  Was Jerry Marsella the President of
18  the Union at the time?
19      A.  Yes.
20      Q.  What happened at that point?  Did you
21  submit an application to the Building
22  Department?
23      A.  No, because from what I understood

LEAVITT REPORTING, INC.

33

1  from the Union contracts, and even though I
2  wasn't a member of the Union, there was a
3  confidential secretary's ordinance that said
4  that we were entitled to the same benefits as a
5  Union member.
6          And there was a section in the
7  Union contract that provided for employees to be
8  transferred from one department to another if
9  there was an opening. And I believe they had
10 three months to show that they were capable of
11 doing the job.
12         So I believed from the Union
13 contract that I was entitled to any opening
14 there was in the City of Beverly.
15     Q.  As a result of that ordinance?
16     A.  As a result of the Union contract.
17     Q.  And the order --
18     A.  And the ordinance that said I was
19 entitled to the same benefits as a Union member.
20     Q.  So what happened with the position in
21 the building department? Did you receive it?
22 Did you not receive it?
23     A.  I did not receive it.

LEAVITT REPORTING, INC.

35

1      Q.  How did you respond to that?
2      A.  I believe I wrote a letter back to him
3  telling him I didn't wish to resign. I wanted
4  to stay employed. I think I asked again that he
5  assign me to another position. I think I
6  pointed out in that letter that I didn't believe
7  he had the authority to terminate my employment
8  with the city.
9      Q.  Do you recall the approximate date of
10 the letter that you wrote back to him?
11     A.  It would have had to be sometime in
12 December I believe, late December.
13     Q.  Did Mayor Scanlon respond to the
14 letter that you wrote?
15     A.  I think I got another letter. The
16 second letter was after January and he had
17 already taken oath of office and was in the
18 Mayor's Office at the time.
19         And I believe he wrote me a second
20 letter, one paragraph that just said you are
21 hereby removed from your position as secretary
22 and your position as clerk to the Licensing
23 Board effective immediately I think it said.

LEAVITT REPORTING, INC.

34

1      Q.  Did you tell anyone in the City that
2  you were interested in that position besides
3  Jerry Marsella who was President of the Union,
4  any city officials or department heads?
5      A.  No.
6      Q.  Do you know who was hired into that
7  position that you were seeking?
8      A.  No.
9      Q.  Do you know if anyone was hired into
10 that position?
11     A.  I don't know.
12     Q.  Do you recall approximately what point
13 in time this was? Was this still December?
14     A.  Yes. It was before I left.
15     Q.  What was your next contact with Mayor
16 Scanlon regarding your position as confidential
17 executive secretary?
18     A.  Via phone or via letter or whatever?
19     Q.  Either.
20     A.  Some time after the phone call I
21 received the first letter sometime in December,
22 I'm not sure of the date, asking me I believe to
23 resign.

LEAVITT REPORTING, INC.

36

1      Q.  So in addition to holding the position
2  of confidential executive secretary you also
3  held a position on the Licensing Board?
4      A.  Clerk.
5      Q.  What were your job duties and
6  responsibilities on the Licensing Board?
7      A.  It was to administrate the program and
8  keep the three members of the licensing board
9  up-to-date on people filing for new licenses,
10 people turning in licenses, people calling and
11 writing that one of the license holders had not
12 complied with the licensing laws.
13         It was mostly paperwork. We met
14 once a month. I provided them all monthly with
15 all the documents that were going to be
16 presented to them at the meeting. I took the
17 minutes. I typed the minutes up. I had them
18 recorded and filed all the documents that were
19 presented to me by -- it would be mostly
20 attorneys who represented people applying for
21 licenses. So they would bring me a packet and I
22 would present that to the members of the
23 licensing board.

LEAVITT REPORTING, INC.

37

Q. How long did you serve as clerk for the licensing board?

A. The entire time I was in the Mayor's Office.

Q. Was that a position that you received by virtue of holding the confidential executive secretary position?

A. Yes.

Q. Did you receive separate pay for that position?

A. Yes.

Q. I'm sorry. The clerk of the licensing board position?

A. Yes. There was a separate line item. The board received a certain amount and the secretary received a certain amount.

Q. Was it a stipend?

A. I think it was referred to as a stipend in the ordinance book.

Q. How much was that?

A. It was $5,000 a year.

Q. Was that paid in a lump sum or was it monthly installments?

38

A. It was monthly. I believe it was the first of the month.

Q. How often were you paid your salary for the executive secretary position?

A. That was paid weekly.

Q. After you received the letter from Mayor Scanlon notifying you that you'd been removed from your position as confidential executive secretary did you have any further communication with the Mayor regarding that?

A. I'm trying to think. I don't believe I did. Everything was by mail. I don't believe we had any conversations at all.

Q. Did you send him another letter? I'm sorry. When I say communication I mean either telephone or written communication.

A. I would have to look through my own file and find those documents to see. I know I got two letters from him. I responded to those in that letter and then I asked for a hearing because I believed I had a right to a hearing under Section 815 of the city charter.

Q. Do you recall approximately when you

39

requested a hearing under 815?

A. I know it would have been within so many days after receiving that termination notice because the charter required that. I know I looked at the charter and I complied with the timeframe.

Q. Did you receive any response from the City regarding your request for a hearing?

A. Yes, I did.

Q. Do you recall what that was?

A. I believe it was from the City Solicitor and it was his opinion that I was not entitled to a hearing.

Q. After receiving that response from the City Solicitor did you take any further action by contacting the city?

A. Yes. I called the City Solicitor some time in January.

Q. Who was the City Solicitor at the time?

A. It was Roy Gelineau.

Q. What was your conversation with Mr. Gelineau?

40

A. My conversation was that I was seeking a position in the city anywhere. That I wanted to continue working. I asked him if -- I still believed at that time that there was an opening in the Building Department. So I asked him if he would intercede with the Mayor on my behalf and him to please give me that position. And he said he would. But I never heard from him again.

Q. Regarding the position in the Building Department, did you ever file any grievances or take any administrative appeal regarding your failure to get the Building Department position?

A. No.

Q. Why not?

A. It was obvious to me that the Mayor didn't want me working for the City of Beverly. And I just said to myself after a while, I'm hitting my head against the wall. That was it. He's not going to give you a job. I really didn't want to involve other people either.

Q. When you say it was obvious what do you base that on?

41

1    A.  I base it on him asking me to retire,
2  to give up my position, to give up my employment
3  with the City of Beverly that meant a lot to me,
4  his refusal to even consider giving me a job,
5  telling me I have no job for you.  Just his
6  whole attitude and demeanor was one that he
7  didn't want me working for the City of Beverly.
8    Q.  So basically his phone conversation
9  with you and letters that he sent to you?
10    A.  Right.
11    Q.  Was there anything else?
12    A.  In that time period I can't think of
13  anything.
14    Q.  After your conversation with the City
15  Solicitor was there any other further
16  communication from the city or from you to the
17  City regarding a job at City Hall?
18    A.  No.
19    Q.  At that point in time did you make
20  efforts to find other employment?
21    A.  Yes.
22    Q.  What efforts were those?
23    A.  I made phone calls to some of the

42

1  local city halls to see if they were hiring.  I
2  stopped into a couple of them and talked to the
3  people at the desk about jobs.
4          And at that particular time most
5  of the cities and towns were lessening their
6  work force.  They were offering early retirement
7  incentives and they were under pressure in their
8  budgets because of health insurance costs and
9  pensions.  And it was just a time when there
10  were not jobs available in cities.
11    Q.  What cities did you stop in or call?
12    A.  I went to the Town of Wenham and the
13  Town of Hamilton.  I believe I went there.
14  Salem I called.  Danvers I think I stopped in
15  one day and asked one of the women if there were
16  any job options.  There was no jobs available in
17  any city government, local, that I was aware of.
18    Q.  So did you ever submit any employment
19  applications or did you just inquire?
20    A.  I just inquired.
21    Q.  Did you seek any private sector
22  employment?
23    A.  I did.  After I gave up on the cities

43

1  I started checking the newspapers every day to
2  see if I could find something in maybe a
3  paralegal job or a legal secretarial or
4  something that I felt was in my line and would
5  pay me a descent salary.  I never was able to
6  find anything.  All the jobs I saw in the paper
7  were low paying positions.
8    Q.  When you say low paying, how much are
9  you referring to as low paying?
10    A.  I would say clerks in stores or --
11  probably I imagine minimum wage.
12    Q.  At the time you were terminated from
13  the city do you recall how much you were making
14  a week?
15    A.  The position -- the City -- are you
16  talking about all my salary or just my salary as
17  the secretary?
18    Q.  Could you break it down for me?  Do
19  your salary as a secretary separately and
20  anything else that you consider wages let me
21  know what those are.
22    A.  I believe when I left the City my
23  salary for the executive secretarial position

44

1  was 877 per week.
2    Q.  Were there any other moneys that you
3  considered salaries or wages?
4    A.  I was earning $5,000 a year as a clerk
5  which was part of my duties in the office of the
6  Mayor and I paid taxes on.
7    Q.  You pay taxes on the 5,000.  Do you
8  also pay other like retirement?  Is retirement
9  taken out of the 5,000?
10    A.  Yes.
11    Q.  Anything other than the 877 and the
12  $5,000 a year that you consider wages or
13  compensation?
14    A.  I think that probably we had a program
15  in effect called the wellness program.  And if
16  you had over so many sick days on account you
17  could request up to five days if you had not
18  been absent for that previous year.  And I think
19  I did that on one occasion and that was included
20  on my W-2 form as federal taxable wages.
21    Q.  So you could get paid out five of your
22  sick days?
23    A.  Yes.

45

1    Q.   If you had perfect attendance?

2    A.   If you had perfect attendance and you

3   had so many days in your account.

4    Q.   Do you recall what year you got paid

5   out those five sick days?

6    A.   I think it was the last year I was

7   there. It would probably be 2002.

8    Q.   At some point in time you stated that

9   you began looking for private employment. Do

10   you recall when approximately that was?

11    A.   Let me see. January and February I

12   was still hoping I could get a job back with the

13   City so I didn't really pursue anything else.

14   March I was checking with local cities and

15   towns. So it would be April, May and June.

16    Q.   Of what year?

17    A.   Of 2003.

18    Q.   After June did you make any decisions

19   regarding continuing employment or continuing to

20   look for employment?

21    A.   No. I had decided at that point that

22   I would probably file for my retirement money

23   because I could have got that money in January

LEAVITT REPORTING, INC.

46

1   of 2002. So I knew I could collect that and

2   there was no reason to have money that was due

3   me that I wasn't taking.

4    Q.   So when did you file for retirement,

5   if you did?

6    A.   I believe it was in August of 2003.

7    Q.   Was your application for retirement

8   immediately approved?

9    A.   Yes.

10    Q.   Was there a dispute about the amount

11   of retirement benefits that you had with the

12   retirement board?

13    A.   Yes.

14    Q.   Can you tell me what the basis of that

15   dispute was?

16    A.   Basically I had worked -- I had filed

17   in August. And I had been earning $3,000 a year

18   and paying into the pension plan on that 3,000.

19   So much per month was taken out of that check

20   for the retirement board.

21        I believed that I was entitled to

22   the nine months as part of my creditable service

23   from January until when I filed for my

LEAVITT REPORTING, INC.

47

1   retirement.

2        Initially the administrator agreed

3   with me and my first two checks were based on

4   that additional nine months of service. After I

5   received about two checks I got an e-mail from

6   her saying that one of the members of the board

7   didn't think that I was entitled to that money.

8    Q.   Can I back you up?

9    A.   Yeah.

10    Q.   I'm not as familiar with this aspect

11   of the retirement proceedings. So you had said

12   you were earning $3,000 a year I believe?

13    A.   Right.

14    Q.   What was that for?

15    A.   That was for my services on the

16   retirement board.

17    Q.   So you served as a member of the

18   retirement board?

19    A.   Right.

20    Q.   How long were you on the retirement

21   board?

22    A.   You're asking me such hard questions.

23    Q.   You're doing very well with dates.

LEAVITT REPORTING, INC.

48

1    A.   I was three years the first term,

2   three years the second term. I would say seven

3   years.

4    Q.   Is that an elected position?

5    A.   Yes.

6    Q.   City wide election?

7    A.   No. It's an elected position of the

8   members of the retirement system. I believe

9   there are approximately twelve hundred members.

10    Q.   Did you receive the $3,000 each year

11   that you served?

12    A.   Yes.

13    Q.   Was that considered wages?

14    A.   Yes.

15    Q.   You paid taxes on the $3,000?

16    A.   Yes.

17    Q.   Who paid you the $3,000? Who issued

18   the money?

19    A.   The check came to me from the City of

20   Beverly.

21    Q.   What were some of your

22   responsibilities on the retirement board?

23    A.   Monthly meetings, managing millions of

LEAVITT REPORTING, INC.

49

1  dollars, meeting with the money managers. At
2  the time we had five or six money managers and
3  had the moneys in different sectors of the
4  market.
5          So there was a lot of time spent
6  meeting with these managers as to how our money
7  was doing, how the market was doing, what they
8  predicted ahead of time.
9          We also voted on refunds for
10 people who had left the system. We had to vote
11 on whether or not a person who was asking for a
12 disability pension would get that disability
13 pension. There was a lot of work on that board.
14     Q.  How many other people were on the
15 board with you?
16     A.  Five. Four. The whole membership is
17 five and I was one of the five. So there were
18 four members.
19     Q.  After your termination from the city
20 in January did you continue to serve on the
21 retirement board?
22     A.  Yes. I believe I had just been
23 re-elected at the time of my termination so I
                  LEAVITT REPORTING, INC.

50

1  had a three year term.
2      Q.  When did you finish your service on
3  the retirement board after your most recent
4  election?
5      A.  I'm on the board now.
6      Q.  You continue to serve to this date?
7      A.  Yes.
8      Q.  Do you continue to receive the $3,000
9  stipend or payment?
10     A.  Yes.
11     Q.  Is that paid in a lump sum or monthly
12 or weekly?
13     A.  It's monthly.
14     Q.  So when you filed for retirement in
15 August they had initially included that $3,000
16 in your retirement benefit calculation?
17     A.  No. That went there anyway. What
18 they had included was the nine months of service
19 to the City which was -- one of the numbers that
20 you need to figure your pension is how many
21 years you worked, how old you were and what your
22 salary was.
23     Q.  I see. So it wasn't the money it was
                  LEAVITT REPORTING, INC.

51

1  the creditable service?
2      A.  It was the creditable service.
3      Q.  You were receiving credit or you
4  initially received credit for the nine months?
5      A.  Right.
6      Q.  And what happened, did something
7  change that?
8      A.  One of the members questioned whether
9  or not I should be receiving that creditable
10 service from the time of my termination.
11     Q.  So the issue became whether or not
12 your service on the retirement board constituted
13 eligible service?
14     A.  Would you repeat that?
15     Q.  Did the issue become whether or not
16 your service on the retirement board constituted
17 creditable service?
18     A.  Yes.
19     Q.  Can you tell me what happened with
20 that dispute?
21     A.  How it ended finally or the whole
22 story?
23     Q.  How long is the whole story?
                  LEAVITT REPORTING, INC.

52

1      A.  It ended finally that on appeal the --
2  the original decision was in my favor.
3      Q.  Was that with CRAB?
4      A.  No, it wasn't. The original decision
5  was from DALA and that was in my favor. Then
6  the board appealed it. It went to CRAB and CRAB
7  overturned the decision of DALA and then I
8  didn't take it any further.
9          MR. SHAPIRO: If you want copies
10 of some of those decisions we have that. But I
11 don't think it was responsive to any of the
12 requests that you had. I don't think you knew
13 about it maybe until today.
14         MS. CORBO: Thank you for that.
15     Q.  So at this point the retirement moneys
16 that you receive now are not including the nine
17 months of service from January to approximately
18 September?
19     A.  I only received two checks that
20 included that time. And then when the question
21 came up of whether or not that service was
22 considered creditable service they stopped it.
23     Q.  Can you tell me, is the $3,000
                  LEAVITT REPORTING, INC.

53

1  included in your retirement benefits that you
2  received while you were on the retirement board
3  all those years?
4    A.  It's used in the calculation of my
5  three years highest pay.
6    Q.  What about the $5,000 that you
7  received as clerk on the licensing board, is
8  that also included in your highest three years?
9    A.  Yes.
10   Q.  At some point in time after your
11  termination there became a dispute about moneys
12  that you felt were owed from the city and you
13  had not received, is that correct?
14   A.  Yes.
15   Q.  Can you tell me what moneys you felt
16  you were owed from the city and had not
17  received?
18   A.  I sent a letter to the Human Resource
19  Department after I filed my request for
20  retirement and I believe I asked for any funds
21  that were due to me under the city ordinance or
22  Union contracts including vacation pay, personal
23  days, longevity if I had it coming to me, sick

LEAVITT REPORTING, INC.

54

1  leave buy back.
2       Those are the only ones I can
3  remember specifically listing.  There may have
4  been other money that I think I may have just
5  added at the end and any other moneys that are
6  due to me relative to my employment with the
7  City of Beverly.
8    Q.  Do you recall the approximate date of
9  when you sent that letter?
10   A.  It was after I filed for -- I filed
11  in August for my retirement so I believe it
12  probably would have been September or October.
13   Q.  Of 04 or 03?
14   A.  Of 03 I believe.
15   Q.  Did you receive a response from the
16  City?
17   A.  Yes, I did.
18   Q.  I'm going to show you a document.
19  Could you please take a look at that for me?
20  Let me know whether or not you recognize it?
21   A.  Yes, I do.
22       (Exhibit No. 2, 11/7/04 Letter to
23  Atherton; so marked.)

LEAVITT REPORTING, INC.

55

1       (Discussion off the record).
2       MR. SHAPIRO:  It appears that
3  there have been some errors in the years that we
4  have been referring to.  We now realize that it
5  was December 2003 when Miss Atherton was
6  terminated and when Crean lost his re-election
7  and when Mayor Scanlon was elected.  So she was
8  terminated in January of 04.
9       I think that there may have been
10  times when we were thinking and saying that she
11  was terminated in January of 2002 or 2003 when
12  in fact the termination date is obviously and
13  clearly January 5, 2004.
14   Q.  Is that correct, Miss Atherton?
15   A.  Yes.
16   Q.  So would it be fair to say that the
17  conversation, the telephone conversation that
18  you had with Mayor Scanlon in December was in
19  December of 2003 not December 2002?
20   A.  Correct.
21   Q.  And the correspondence that you
22  received from the Mayor notifying you that you
23  were no longer employed by the City was in

LEAVITT REPORTING, INC.

56

1  January 2004, is that correct?
2    A.  December of 2003 and January of 2004.
3    Q.  Okay.  The letter that you received
4  from the Mayor stating that he was removing you
5  from your position, do you recall when you
6  received that?
7    A.  January of 2004.
8    Q.  I just wanted to clarify that for the
9  record.
10       All right.  Exhibit Number Two has
11  been marked.  Do you recognize this document
12  that's been marked as Exhibit Two, Miss
13  Atherton?
14   A.  Yes, I do.
15   Q.  Can you tell me in your own words what
16  this document is?
17   A.  It's a letter from the Finance
18  Director of the City of Beverly, John Dunn, in
19  response to my request for moneys I believed due
20  to me at the time of my termination.
21   Q.  If I could go through the letter with
22  you, for vacation days, did you have any dispute
23  with the way John Dunn in this letter calculated

LEAVITT REPORTING, INC.

57

1  what was owed to you for vacation days?
2  A.  I had a dispute as to the salary, not
3  the time.
4  Q.  What was the nature of the dispute
5  regarding the amount of payment for the vacation
6  days?
7  A.  Because I believed that my salary
8  included both the moneys that I received as a
9  clerk to the licensing board and for my job as
10  secretary.  So he was paying me here just for
11  the secretarial salary and I believed that I was
12  entitled to both.
13  Q.  You were entitled to a calculation
14  that included the moneys you received for the
15  secretarial salary and the $5,000 for the
16  licensing board?
17  A.  Yes.
18  Q.  Do you know of anyone else in the city
19  who has received vacation payments including
20  stipends or additional payments outside their
21  main position salary?
22  A.  I don't know of anyone.
23  Q.  Moving down to personal days, he
LEAVITT REPORTING, INC.

59

1  Q.  Sure.
2  A.  Because when I received those, when I
3  left in 2003, those two payments I never
4  actually looked at the calculation.  So I can't
5  say to you now here that I believed that the
6  calculations are correct.
7  Q.  Conversely do you believe that they
8  are incorrect?  Do you have any reason to think
9  that they are?
10  A.  Now that I'm looking at the second
11  one, the wellness incentive payment, that may
12  not have been my true salary at the time.  The
13  500 I don't have a problem with because that was
14  part of the Union contract that you'd receive
15  500 for longevity after so many years of
16  service.  I believe it was ten years.
17  Q.  But the 693.28, you think that may not
18  have been based upon the correct salary?
19  A.  Correct.
20  Q.  Meaning it may not have included the
21  5,000?
22  A.  Right.
23  Q.  Do you know whether it did or didn't?
LEAVITT REPORTING, INC.

58

1  states that you accrued three personal days.
2  Was the number of the personal days to your
3  recollection correct?
4  A.  That part is correct.
5  Q.  What about the calculation of the
6  moneys owed?
7  A.  The calculation would be the same
8  problem I had with the vacation days, that it
9  didn't include the $5,000 I earned per year as
10  the clerk to the licensing board.
11  Q.  What about paragraph three, the
12  longevity and beneficial payments?
13  A.  I did receive those.
14  Q.  I should say in the first paragraph
15  three because there's another paragraph three
16  just below.
17  In the first paragraph three,
18  longevity, were there any problems with the way
19  he had calculated that?
20  A.  No.
21  Q.  Now in what's been marked --
22  A.  I'm sorry.  Wait a minute.  Can I go
23  back on that?
LEAVITT REPORTING, INC.

60

1  A.  No, I don't.  In fact, I never thought
2  of it before until just looking at it now.  I
3  believe that check I received was in one lump
4  sum for my final week's pay including the 500.
5  I never really broke it all down as to what was
6  for what.
7  Q.  The sick leave buy back which is in
8  the second paragraph three on the first page, in
9  that paragraph, correct me if I'm wrong, Mr.
10  Dunn takes the position that because you were
11  terminated from the city and did not immediately
12  retire that you are not entitled to sick leave
13  buy back.  Is that what you understand that
14  paragraph to mean?
15  A.  Let me read it.  Would you repeat the
16  question?
17  Q.  I'll make it easy.  What do you
18  understand Mr. Dunn to be saying in regards to
19  your request for sick leave buy back?  What was
20  his position?
21  MR. SHAPIRO:  Objection.  You can
22  answer.
23  A.  Quite frankly I don't understand it.
LEAVITT REPORTING, INC.

61

1  I don't understand what he's trying to say here.
2  He says the time period between when I was
3  terminated and when I retired is too long to say
4  that employment was terminated by retirement.
5           It's true that employment was
6  terminated by something other than retirement.
7  I was fired. But I don't know what that has to
8  do with the sick leave buy back.
9       Q.  Do you know of anyone else in the city
10 who was fired who was able to buy back sick
11 time?
12      A.  Not anyone -- well, wait a minute.
13 Fired. Not fired. I believe that there was a
14 gentleman in the Collector's Office. And I had
15 read an article in the newspaper that he was
16 attempting to get his sick leave buy back after
17 he had been terminated for over two years.
18           But he didn't realize he was
19 entitled to the money until someone spoke to him
20 about it and then he asked for it. I believe he
21 was negotiating with the city for that amount.
22           Mr. Dunn, in the newspaper, stated
23 that Mr. Acciavatta deserved the money. But the

LEAVITT REPORTING, INC.

62

1  reason the City had not paid it was because
2  there was a problem with the calculation.
3       Q.  Was that Thomas Acciavatta?
4       A.  Yes
5       Q.  You believe he was terminated?
6       A.  I don't think he was terminated. I
7  think he wasn't reappointed. He was the person
8  who had a job that was appointed. So when his
9  time was up, his latest appointment, I think the
10 Mayor just didn't reappoint him.
11      Q.  So his term expired?
12      A.  Right.
13      Q.  Do you know whether he applied for
14 retirement after his term expired?
15      A.  I don't. No, I don't know anything
16 about Mr. Acciavatta, only what I read in the
17 paper about him attempting to get his sick leave
18 buy back.
19      Q.  At some point in time did the city
20 issue you a check for payment of vacation and
21 benefits?
22      A.  Yes, I did get a check from the city
23 which I never cashed because as I said to you I

LEAVITT REPORTING, INC.

63

1  didn't believe that it was the correct amount.
2           MR. SHAPIRO:  When you finish this
3  area I wouldn't mind a break.
4       Q.  What happened with the check?
5       A.  It's in the file.
6       Q.  What file?
7       A.  My file.
8           (Short recess).
9       Q.  So Miss Atherton, it would be correct
10 to say that you never cashed the check that was
11 issued by the City for vacation benefits and
12 personal days?
13      A.  No, I didn't.
14      Q.  Did you make any response to Mr.
15 Dunn's letter that's been marked as Exhibit Two?
16      A.  I don't believe I responded to Mr.
17 Dunn. I don't remember writing any letter back
18 to Mr. Dunn.
19      Q.  Did you take any further action to
20 seek these additional compensation that you felt
21 you were owed? For example, did you file a
22 complaint with the Attorney General's Office?
23      A.  Yes, I think my attorney did. I think

LEAVITT REPORTING, INC.

64

1  at this point this is when I had finally reached
2  a point where I couldn't handle any more myself
3  and decided that I had to hire an attorney. So
4  from this point forward I relied upon Mr.
5  Shapiro.
6       Q.  Okay. Do you recall whether or not a
7  complaint was filed at the Attorney General's
8  Office?
9       A.  I believe he did.
10      Q.  Do you know what the result of that
11 complaint was?
12      A.  No, I don't.
13      Q.  Were there any other proceedings that
14 you recall with the City that followed this
15 November 7, 2004 letter from John Dunn with
16 regards to wages or compensation payments,
17 internal proceedings within the City?
18      A.  I've just drawn a blank. All I know
19 is once I received this letter I just said to
20 myself, I'm just going to hire an attorney to
21 help me out because now in addition to losing my
22 job the City is refusing to pay me money that I
23 believe that I had earned over working twenty

LEAVITT REPORTING, INC.

65

1  years.
2      Q.  I'm going to show you a document.
3  This is something that came to me through your
4  attorney in a response to my Request for
5  Production Of Documents.  Can you tell me
6  whether you recognize that document?
7      A.  Yes, I do.
8          (Exhibit No. 3, Atherton Record of
9  Compensatory Time; so marked.)
10     Q.  Could you tell me what this document
11  is?  Is this a log or record that you kept?
12     A.  This was a little log that I had in my
13  top drawer when I was working in the Mayor's
14  Office.
15     Q.  It dates back to September 30?
16     A.  That was probably the first week I was
17  working in the Mayor's Office.
18     Q.  Do you know if that was September 30,
19  2003?
20     A.  Yes.  I was working in the Mayor's
21  Office in 2003.
22     Q.  Can you tell me what these numbers
23  represent, these five hours on the side of the
               LEAVITT REPORTING, INC.

67

1  contemporaneously?
2      A.  Yes.
3      Q.  What was the final total of
4  compensatory time that you believed you were
5  owed at the time of your termination?
6      A.  Forty-five hours.
7      Q.  At the bottom of your calculation
8  there's also a date.  It looks like it says
9  January 23?
10     A.  Yeah.
11     Q.  Were you employed by the City at that
12  time?
13     A.  Yes.  I see what this is now.  This is
14  not 2003.  This is 2002 to December, the first
15  months of my employment.  This is 2002 that I
16  went upstairs.  Then I worked all of 2003.  So
17  this was the first three or four months that I
18  was in the Mayor's Office that I kept this
19  record.
20     Q.  So it would go September 2002?
21     A.  Yeah, I believe so.
22     Q.  What would January --
23     A.  January would have been 2003.
               LEAVITT REPORTING, INC.

66

1  document?
2      A.  They represent compensatory time that
3  I was recording because during those months I
4  never took any lunch or any breaks or anything.
5  And Mayor Scanlon noticed that I was not leaving
6  the building for lunches or break time.
7          And I told him that there was so
8  much work to be done between the licensing board
9  and his office and trying to get up to speed in
10  a position that I had not had any training for
11  at all, just put in there, that I had to work
12  these extra hours.  And he told me to keep a
13  record and he would give me compensatory time.
14     Q.  Which mayor was that?
15     A.  Mayor Crean.
16     Q.  Was this a log that you kept daily or
17  weekly?
18     A.  Weekly.
19     Q.  This was something that was generated
20  contemporaneously?  It wasn't generated after
21  the fact?
22     A.  No.
23     Q.  Was this a log that was kept
               LEAVITT REPORTING, INC.

68

1      Q.  Okay.  After January 23, 2003 did you
2  stop working your extra hours for compensatory
3  time?  Why is there no further?
4      A.  Because by then I felt that I could
5  take a lunch hour.
6      Q.  After January 23, 2003 it would be
7  fair to say that there were no more hours that
8  were accumulated as compensatory time?
9      A.  That's true.
10     Q.  Over in the left-hand corner it looks
11  like, the bottom left-hand corner, it looks like
12  it says vacation days.  The copy is not that
13  great.  I can't really make it out.  Do you
14  recall what it says there?
15     A.  I don't really to tell you the truth.
16     Q.  Then just below that it states
17  election something.  I can't read that.
18     A.  I think that was election week and
19  probably took off for compensatory time two
20  days, the 4th and the 5th which would have been
21  the difference between the fifty-nine hours and
22  the 45 I still felt I had remaining.
23     Q.  Okay.  Does the City have any policy
               LEAVITT REPORTING, INC.

69

1 on compensatory time that you're aware of?
2    A.   I know that people do receive
3 compensatory time but I'm not sure what the
4 exact written policy is.
5    Q.   Can you think off the top of your head
6 of any other individuals that you know of who
7 have taken compensatory time?
8    A.   That I know of throughout the whole
9 city?
10    Q.   Right.  If you can think of a couple
11 of examples.
12    A.   Fire department.
13    Q.   Any employees within City Hall?
14    A.   I'm not sure.
15    Q.   I'm going to show you another document
16 and ask if you can identify this document for
17 the record?
18    A.   This is the Complaint and the lawsuit.
19         (Exhibit No. 4, Complaint and
20 Demand for Jury Trial; so marked.)
21    Q.   Miss Atherton, I'd like you to review
22 what's been marked as Exhibit Four.  And we have
23 gone through many of the allegations already I

LEAVITT REPORTING, INC.

70

1 believe in your Complaint but there were a few
2 things that I did want to ask you about.
3         If you could direct your attention
4 to page seven, paragraph thirty-nine, the
5 allegation there is that you were discharged
6 because of your political beliefs or
7 affiliation?
8    A.   I believe that to be true.
9    Q.   Could you explain that to me why you
10 believe that?  What's the factual basis for your
11 belief?
12    A.   Well, the Mayor himself in his own
13 deposition stated that my affiliation with Mayor
14 Crean was his, I believe, reason for not keeping
15 me in the position.
16    Q.   At the time this complaint was filed,
17 at the time this compliant was drafted, I
18 believe that Mayor Scanlon had not then been
19 deposed.
20         So other than Mayor Scanlon's
21 deposition, do you have any personal belief that
22 would support your allegation that you were
23 terminated because of your political beliefs or

LEAVITT REPORTING, INC.

71

1 affiliation?
2    A.   I was working for Mayor Crean at the
3 time Mayor Scanlon was re-elected.  And I
4 believe that was why he fired me because of my
5 affiliation with Mayor Crean.
6    Q.   Did you actively support or campaign
7 for Mr. Crean?
8    A.   I supported him.  I supported him
9 publicly.  I perhaps gave money to his campaign.
10 I talked to him several times about the charter
11 and the ordinances and he was willing to help me
12 in my endeavor to get the ordinances in place.
13    Q.   When you say you supported him
14 publicly what do you mean by that?
15    A.   I told my friends and my neighbors and
16 people that I knew that they should give him
17 consideration in the election.
18    Q.   Did you have a sign on your house or a
19 sign on your lawn?
20    A.   No.  I have a small business on my
21 property and I just don't feel it's appropriate
22 to have political signs.
23    Q.   What kind of business do of you have?

LEAVITT REPORTING, INC.

72

1    A.   It's a garden business, a garden shop.
2    Q.   Do you sell flowers?
3    A.   Yes.
4    Q.   How long have you owned that business?
5    A.   It's my husband's business and I never
6 worked in it.  He's probably had it for over --
7 he retired in 1990 and he opened that business
8 in 1990.
9    Q.   What's the name?
10    A.   Rose Hill Farm.
11    Q.   In paragraph thirty-eight there's
12 allegations that you were threatened with
13 discharge if you refused to resign.
14         Could you tell me just so we have
15 it in the record when you feel that you were
16 threatened with discharge?  You've told me about
17 the letters and your conversation with Mayor
18 Crean.
19    A.   That was in the telephone
20 conversation.
21    Q.   With Mayor Scanlon?
22    A.   With Mayor Scanlon.  He told me if I
23 didn't resign that he would not keep me in the

LEAVITT REPORTING, INC.

73

1  position.
2      Q.  Other than your telephone conversation
3  with Mayor Scanlon which I believe you testified
4  occurred in December of 2003 -- would that be
5  the correct year?
6      A.  I've got to get this straight in my
7  head.  I think it was December of 2003.
8      Q.  Is there anything you'd like to look
9  at that could refresh your recollection as to
10  the date?
11      A.  No.  I now believe it was in December
12  of 2003.
13      Q.  Other than that conversation was there
14  anything else that you felt threatened you with
15  discharge if you refused to resign the position?
16      A.  No.
17      Q.  In paragraph forty there's an
18  allegation that the defendant has implemented
19  employment policies and practices which are
20  arbitrary, capricious and discriminatory.
21          Could you explain what you mean by
22  that allegation?
23          MR. SHAPIRO:  Other than from
                LEAVITT REPORTING, INC.

74

1  information from your attorneys of course.
2          MS. CORBO:  I'm not interested in
3  any conversations you have had with your
4  attorney or any advice that your attorney has
5  given you.
6      A.  I believe that Mayor Scanlon did not
7  have the power under our city's charter to
8  terminate my employment with the City of
9  Beverly.  And by doing so I think that he was
10  arbitrary and capricious.
11      Q.  You also allege as part of your
12  complaint gender discrimination.  Could you tell
13  me why you feel you have been discriminated
14  against on the basis of your gender?
15      A.  Where is that?
16      Q.  I'm sorry.
17          MR. SHAPIRO:  Counsel, let me
18  indicate on the record that we're planning to
19  waive that claim of gender and age
20  discrimination.
21          MS. CORBO:  Why don't we in
22  regards to the allegation of gender and age I'll
23  suspend this deposition and not ask any
                LEAVITT REPORTING, INC.

75

1  questions regarding those complaints.
2          MR. SHAPIRO:  We'll file documents
3  that reflect what I just told you.
4          MS. CORBO:  And if for some reason
5  they're not filed I reserve the right to recall.
6  I'll withdraw the last question to Miss
7  Atherton.
8      Q.  Could I direct you to page four,
9  paragraph twenty-one?
10      A.  Paragraph what?
11      Q.  Paragraph twenty-one on page four.
12  That paragraph states that you understood you
13  would continue to be employed by the City of
14  Beverly as long as your actual job performance
15  was satisfactory.  I'm paraphrasing a little bit
16  there.
17          The question I'm going to ask you
18  regarding that paragraph is, what basis in fact
19  did you have for understanding that you would
20  continue to be employed by the City of Beverly
21  as long as your performance was satisfactory?
22      A.  Because the City charter stated that
23  the Mayor could terminate department heads and
                LEAVITT REPORTING, INC.

76

1  city officers.  I was neither a city officer or
2  department head.  And I understood that I was
3  protected by the charter under Section 815 which
4  said I could only be removed for cause.  And I
5  didn't believe that the city had cause.
6      Q.  Was there anything else besides the
7  charter that you relied upon in believing that
8  your employment would continue as long your job
9  performance was satisfactory?
10      A.  I think that was the main reason.
11      Q.  Miss Atherton, I'd like to show you
12  another document if I may.  If you could tell me
13  whether or not you recognize that document?
14      A.  These are the Answers to
15  Interrogatories that I answered.  Yes, I do.
16          (Exhibit No. 5, Answers to
17  Interrogatories; so marked.)
18      A.  I think mine is put together
19  incorrectly.  Page ten is my second.
20          (Discussion off the record.)
21          (Short recess.)
22      Q.  Miss Atherton, I'd like to direct your
23  attention to page five of your Answers to
                LEAVITT REPORTING, INC.

77

1  Interrogatories that have been marked as Exhibit
2  Five. At the top of the page, and you might
3  want to refer to page four which is the actual
4  question, but it's a calculation regarding your
5  pension.
6        At the top of page five could you
7  tell me how you went about calculating -- what
8  those numbers mean? Just break it down for me
9  because I'm not totally clear on how you went
10  about calculating your damages in relation to
11  your pension.
12    A.  The pension I'm receiving right now is
13  based on an average salary of $47,088.88 times
14  my years of service which were 16.9 years times
15  a factor that is used if you're over sixty-five.
16        So if you're over sixty-five years
17  of age it's .025 times your average salary over
18  three years, times your years of service. And
19  that is how I computed the calculation of my
20  pension which is $19, 914.72.
21        It was my intention, if I had had
22  the opportunity, to work at least another three
23  years. I had chosen the figure of the years of

LEAVITT REPORTING, INC.

79

1    A.  No.
2    Q.  In terms of your damages, Miss
3  Atherton, one of the things that you allege is
4  that you've suffered emotional distress as a
5  result of the alleged actions of the City.
6        Can you tell me what type of
7  emotional distress or how you suffered emotional
8  distress? Can you describe that for the record?
9    A.  I have a history of Irritable Bowel
10  Syndrome and in times of emotional stress that
11  condition is always worse. So when the Mayor
12  called and told me that he was not going to keep
13  me in the position it was like somebody punched
14  me in the stomach and there was a pain in my
15  stomach that would not go away.
16        So I have suffered with this
17  condition. I have had sleepless nights. I have
18  actually really changed my whole life because of
19  this. I don't even shop in the same stores I
20  shopped in because I don't want to run into
21  people that I know and constantly have to go
22  over this and what I thought about it, what I
23  thought of the Mayor.

LEAVITT REPORTING, INC.

78

1  twenty years as what I would liked to have
2  worked. And the next figure is the difference
3  by the calculation using twenty years instead of
4  16.9 years which would have been $326
5  approximately every month for the rest of my
6  life.
7        I just used the fifteen years life
8  expectancy because of my family's history of
9  longevity. My mother is ninety-five and she's
10  still alive. Her sister is ninety-one and she's
11  still alive.
12    Q.  The current pension that you're
13  receiving --
14    A.  The pension is 19,914.72.
15    Q.  Thank you. That figure, is that based
16  upon a salary that includes the $5,000 stipend
17  and the $3,000 stipend?
18    A.  Yes.
19    Q.  So currently that's factored into your
20  retirement?
21    A.  Yes.
22    Q.  So that is not an issue that's in
23  dispute in terms of your retirement?

LEAVITT REPORTING, INC.

80

1        So I have given up all of my
2  positions that I worked for throughout the City.
3  I resigned from everything. I've kind of gone
4  into a mode of a cocoon with my family and
5  staying close to home and staying close to my
6  family and not really having much to do outside
7  of my home life whereas before I was very much
8  involved with city politics.
9        I went to all the Alderman's
10  fundraisers. I participated in their campaigns.
11  I gave to their campaigns. I was involved with
12  the City of Beverly historians. I was the
13  historian for my church. I resigned from that.
14  I resigned from the group of the City of Beverly
15  that was part of that historian group. And I
16  kind of just pulled myself in and decided to
17  just stay home, stay close to my family and try
18  not to do anything or go anywhere that would
19  cause me any other additional anxiety.
20        I didn't want to bump into the
21  Mayor. I didn't want to bump into people that
22  were part of his group. I just really had a
23  very bad time.

LEAVITT REPORTING, INC.

81

1    Q.  When you say that you resigned from
2 everything, you're currently still a member of
3 retirement board?
4    A.  Right.
5    Q.  What are you referring to, what
6 exactly did you resign from?
7    A.  I resigned as the historian of my
8 church. I resigned as a member of the -- I
9 forget what it's called. It's a group that
10 meets throughout the City of Beverly to -- it
11 has to do with historic documents and papers. I
12 can't think of the name of it right now. That's
13 two that I can think of that I was on at the
14 time.
15    Q.  Those resignations were directly as a
16 result of the City's actions?
17    A.  I felt that way. I just didn't want
18 to serve anymore on anything. I just didn't
19 want to be out where people were and asking me
20 what was going on. I just tried to stay close
21 to home.
22    Q.  Do you reside for part of the year in
23 Florida?

LEAVITT REPORTING, INC.

82

1    A.  Yes.
2    Q.  What months are you in Florida
3 typically?
4    A.  Usually December -- usually three
5 months, December, January and February.
6    Q.  For the remainder of the year do you
7 make any trips down to Florida?
8    A.  No.
9    Q.  Do you own property in Florida?
10    A.  Yes.
11    Q.  What type of property do you own? Is
12 it a house?
13    A.  It's a small villa in a condo type
14 environment.
15    Q.  Where in Florida is that?
16    A.  In Venice.
17    Q.  Did your resignations have anything to
18 do with the fact that you spend part of your
19 year in Florida?
20    A.  No. That wouldn't have made any
21 difference.
22    Q.  You also stated that you have some
23 anxiety. Do you have a history of anxiety?

LEAVITT REPORTING, INC.

83

1    A.  Yes.
2    Q.  When does that date back to?
3    A.  Oh God, twenty years probably.
4    Q.  Do you feel that your anxiety was
5 heightened as a result of this?
6    A.  Definitely. No doubt in my mind.
7    Q.  If you can give me some examples, how
8 did that manifest itself, that heightened
9 anxiety?
10    A.  Sleeplessness, diarrhea, nausea, no
11 appetite. Actually I think I was in a
12 depression.
13    Q.  Was that ever diagnosed by anyone?
14    A.  Some time since I've retired from the
15 city I have started taking a medication which is
16 for depression.
17    Q.  What medication is that?
18    A.  I believe it's called Celexa.
19    Q.  Who prescribed that for you?
20    A.  My general practitioner.
21    Q.  What's his or her name?
22    A.  His name was Doctor Robert Oliverio.
23    Q.  Do you recall when you first started

LEAVITT REPORTING, INC.

84

1 taking Celexa?
2    A.  I believe it was probably in 2005.
3 It's just a guess. I'm still on it now.
4    Q.  Is there anything else that was going
5 on in your life that may have triggered these
6 feelings of depression?
7    A.  Absolutely not.
8    Q.  At some point in time did you have a
9 concern about a breast cancer scare or breast
10 lump?
11    A.  Yes, I did. I had that either in -- I
12 think that was 2005 too.
13    Q.  Could that have had anything to do
14 with your feelings of depression?
15    A.  I don't think so. I had two other
16 lumps removed from my breasts in the past and
17 they were both benign. I felt very confident
18 that the lump would not be cancer.
19    Q.  When was that finally resolved or has
20 it been resolved?
21    A.  Yes.
22    Q.  Was it in fact cancer?
23    A.  No.

LEAVITT REPORTING, INC.

85

1    Q.  I'm glad to hear that.  Have you ever
2 treated with a psychologist or a mental health
3 professional?
4    A.  No.
5    Q.  Any other medications that you
6 currently take?
7    A.  I believe the medications that I'm on
8 every day is Lipitor which controls high
9 cholesterol in the blood.  I take the Celexa
10 every day and I have a generic of Xanax that's
11 prescribed to me to be used at my own
12 discretion.
13    Q.  How long have you taken the Lipitor to
14 the best of your recollection?
15    A.  A long time.  I would guess five
16 years.
17    Q.  And the Xanax?
18    A.  Probably ten years.
19    Q.  Miss Atherton, if I could direct your
20 attention to page nine of what's been marked as
21 Exhibit Five, your responses to the
22 interrogatory requests.
23    A.  What number?

LEAVITT REPORTING, INC.

86

1    Q.  I'm sorry.  Page nine, number
2 seventeen.
3    A.  Okay.
4    Q.  You list in response to my question
5 about individuals that may have information
6 relevant to the allegations, members of the
7 League of Women Voters.  Is there anyone
8 specific that you're referring to?
9    A.  I believe that two members --
10 unfortunately one of them just passed away.  Her
11 name was Veta Comish.  I'm not sure how to spell
12 her last name.  She just died.
13       There were always two members of
14 the league that attended all the ordinance
15 review committee meetings.  They were
16 oversighting the ordinance review committee
17 trying to understand why the ordinances had not
18 been implemented since it was the League that
19 did the initial charter, sort of like a --
20 something they were working on for the City's
21 charter.
22       So they had actually prompted the
23 creation of the charter commission.  I believe

LEAVITT REPORTING, INC.

87

1 they were the group that obtained the signatures
2 that were required in order to have a charter
3 commission in the City of Beverly.
4    Q.  Are there any specific individuals
5 that you feel would have knowledge relative to
6 this complaint?
7    A.  I think -- let's see.  I can't think
8 of her last name right now.  There was a woman
9 that attended most of these ordinance reviews.
10 Her first name is Mary but I can't think of her
11 last name right now.
12    Q.  If you think of that information if
13 you can send it through your attorney?
14    A.  Mary Roderick.  She attended all those
15 meetings.
16    Q.  At the top of your list, members of
17 the Beverly Charter Commission.  Could you tell
18 me who you feel would be relevant in that
19 regard?
20    A.  I think as far as the provisions in
21 the charter and the provisions that I'm relying
22 on that my job was not subject to termination by
23 the Mayor, that some of the members of the

LEAVITT REPORTING, INC.

88

1 Charter Commission would remember the
2 conversations that we had concerning how people
3 could be terminated.
4    Q.  Do you know who specifically you're
5 referring to because I'm not sure who made up
6 the charter commission so I'm asking if you know
7 of any specific individuals?
8    A.  Well, I'm trying to remember who was
9 on there, who's still around.  Mary Grant was a
10 member of the Charter Commission and is still
11 around, Timothy Flaherty who is now a Councillor
12 of the City.  Some of them have moved away or
13 gone away or passed away.  Those are two that I
14 can think of who are still around and involved
15 in politics and would have knowledge of the
16 charter.
17    Q.  Members of the City Council at the
18 time you're referring to which it looks like
19 when the ordinances were first enacted?
20    A.  Right.
21    Q.  Do you know who was on the City
22 Council at that time?
23    A.  I believe most of members that are

LEAVITT REPORTING, INC.

89

1  still on the Council were there in 96 and 97.
2      Q.  So that would be the timeframe of 1996
3  and 1997?
4      A.  Right.
5      Q.  Members of the Ordinance Review
6  Commission, do you recall any specific
7  individuals that you feel would provide
8  testimony regarding the allegations in your
9  complaint?
10     A.  These were City Councillors.  The
11 members of the Ordinance Review Commission were
12 five members of the City Council.
13     Q.  Anyone else?
14     A.  No.
15     Q.  What year, if I wanted to find out who
16 was on the City Council that was on the
17 Ordinance Review Commission?
18     A.  In 2001 when I was working with the
19 Council to draft these ordinances I believe it's
20 the same people who are the Councillors right
21 now.
22     Q.  Do you know where -- is there a
23 document or anything that I could look to find

LEAVITT REPORTING, INC.

91

1  believe supports your allegation that he
2  intentionally, willfully, maliciously,
3  recklessly and with gross disregard of your
4  rights acted in a manner inconsistent with your
5  rights?
6          MR. SHAPIRO:  Objection, but see
7  if you can answer.
8      A.  I would just say that his
9  intentionally firing me from a City position
10 that I had been employed for almost seventeen
11 years was certainly in gross disregard of my
12 rights because I believed that I and I still
13 believe to this day that he did not have the
14 power to terminate my employment.
15     Q.  Finally, Miss Atherton, on page
16 twelve, there's a question about whether or not
17 you would return to the position of executive
18 confidential secretary.  Can you tell me whether
19 or not you would and if so under what
20 conditions?
21     A.  Yes, I would accept a position if it
22 paid close to what I was earning and if it was
23 something that I'm trained for.  But I would

LEAVITT REPORTING, INC.

90

1  out who was on the Ordinance Review Commission?
2      A.  Can I speak to Mr. Shapiro?
3          (Discussion off the record).
4          MR. SHAPIRO:  We have suggested
5  that the plaintiff and Counsel will attempt to
6  give some names of these various members that
7  may have information and will be helpful.  And
8  we'll try to provide that in the next week or
9  so.
10     Q.  On page eleven, Miss Atherton, on
11 what's been marked as Exhibit Five, your Answers
12 to Interrogatories, at the top of the page,
13 number twenty-one is a question asking you to
14 state any facts that you believe support your
15 allegation that Mayor Scanlon acted
16 intentionally, willfully, maliciously,
17 recklessly and with gross disregard of your
18 rights.
19         Your answer refers to Mayor
20 Scanlon's deposition testimony.  At the time
21 your complaint was filed Mayor Scanlon at that
22 time had not been deposed.  Is there anything
23 other than Mayor Scanlon's deposition that you

LEAVITT REPORTING, INC.

92

1  want all my back pay for the past years.
2      Q.  Other than the salary being close to
3  what you were previously earning and you being
4  able to have training for the position or being
5  qualified for the position, any other conditions
6  for you to return to the position of executive
7  confidential secretary?
8      A.  I would still want all the same
9  benefits and same rights I had.
10     Q.  Sure.
11         MS. CORBO:  All right.  Could I
12 have five minutes?
13         (Short recess).
14         MS. CORBO:  I don't have any
15 further questions for Miss Atherton so I will
16 put it over to you.
17         MR. SHAPIRO:  No further questions
18 for me.
19         (The deposition was suspended at
20 1:03 p.m.)
21
22
23

LEAVITT REPORTING, INC.

```
1      C E R T I F I C A T E
2
3
4   STATE OF MASSACHUSETTS
5   COUNTY OF PLYMOUTH
6
7           I, Carolyn McGill, a Notary Public in
8   and for the State of Massachusetts, do hereby
9   certify that the foregoing transcript of the
10  deposition of Crystal A. Atherton, having been
11  satisfactorily identified and duly sworn by the
12  Notary Public, on Tuesday, October 16, 2007, is
13  true and accurate to the best of my knowledge,
14  skill and ability.
15          IN WITNESS WHEREOF, I have hereunto set
16  my hand and seal this 16th day of October, 2007.
17
18          _____
19               Carolyn McGill
20
21  My commission expires:
22  April 21, 2011
23
                LEAVITT REPORTING, INC.
```