## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**DOCKET NO.: 05-11323 MLW**

|  |  |
|---|---|
| **CRYSTAL A. ATHERTON** | ) |
| **and ROBERT W. ATHERTON** | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **CITY OF BEVERLY, WILLIAM F.** | ) |
| **SCANLON, JR., in his official and** | ) |
| **individual capacity** | ) |
| **Defendants.** | ) |
|  | ) |

### OPPOSITION OF PLAINTIFF, CRYSTAL ATHERTON,
### TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.     INTRODUCTION

In this action, the Plaintiffs, Crystal Atherton (hereinafter "Atherton") asserts a number of claims against both William F. Scanlon (hereinafter "Scanlon"), and the City of Beverly (hereinafter "the City"), arising out of the termination of Atherton's position as Secretary for the Mayor of the City. The City and Scanlon have moved for Summary Judgment pursuant to Fed. R. Civ. P. 56 on the record, since they allege that no genuine issue of material fact exists to support these claims. However, it remains Atherton's contention that the Beverly Home Rule Charter conferred a property interest in continued employment with the City of Beverly because her employment could only be terminated for "good cause." Thus, Scanlon and the City of Beverly's disregard for Atherton's right to Due Process constitutes a violation of 42 U.S.C. § 1983 (as set forth in Count I of her Complaint). In addition, because the job description proffered by the Defendants involves the secretary and administrative assistant position, Atherton believes that the actual functions of the position are relevant to the Court's inquiry as to whether or not the secretary is a confidential employee or policymaker. The actual functions indicate that Atherton was neither a confidential employee nor a policymaker and she was therefore protected from political discrimination under 42 U.S.C. § 1983 (Count II).

1

The Defendants also allege that there was no physical component to Atherton's termination so that there is no viable claim under Mass. G. L. c. 12, 11I, the Massachusetts Civil Rights Act (Count V). However, Atherton's termination constitutes economic coercion sufficient to state a claim for relief under the Massachusetts Civil Rights Act as she was not an at-will municipal employee. As to Atherton's allegations of Wage Act (Mass. G.L. c. 149, § 148) violations under Massachusetts law, it is asserted that the City failed to pay Atherton her accumulated sick leave benefits (Count X). Based upon the language of the applicable ordinance, Atherton was denied sick leave benefits because her departure from employment was not as a result of her retirement or demise. If the Defendants had complied with the provisions of §8-15, and reinstated Atherton as required for the Defendants failure to comply, Atherton would have received her accumulated sick leave benefits in the natural course of events. Finally, though Defendant Scanlon asserts that he is entitled to qualified immunity as to Atherton's claims against him in an individual capacity, no reasonable official would have violated the municipal charter. It was also clearly established that terminating an employee because her perceived political affiliation and without a hearing as required by the charter was unlawful at the time of Atherton's termination.

Based on the foregoing, it is Atherton — and not the Defendants — that is entitled to prevail on her cross-motion for Partial Summary Judgment as to Liability under Fed. R. Civ. P. 56. Accordingly, Atherton requests that the Motion by Defendants Scanlon and the City of Beverly for Summary Judgment be denied.

## II.    FACTS & PROCEDURAL HISTORY

Atherton relies upon and incorporates by reference herein her Local Rule 56.1 Statement of Facts in Opposition to Defendants' Motion for Summary Judgment, which is referenced herein

as SOF¶ _____.[1]

III.    ARGUMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Id.* (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S. Ct. at 2553. The non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. See O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Walsh v. Town of Lakeville*, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

---

[1]    In order to simplify the process, Plaintiff has numbered her Undisputed Statement of Facts cumulatively.  Paragraphs 1 - 19 were attached to the Plaintiff's Motion for Partial Summary Judgment as to Liability.

A.    THERE IS SUFFICIENT EVIDENCE TO SUPPORT ATHERTON'S DUE
      PROCESS CLAIM THAT SHE COULD ONLY BE TERMINATED FROM
      THE CITY OF BEVERLY FOR "GOOD CAUSE" UNDER THE CHARTER

In their Motion for Summary Judgment, Scanlon and the City contend that the City's

Ordinance at § 3-313 allows for the Mayor to appoint and remove the Executive Secretary.

Furthermore, because the Charter at § 3-3 permits the Mayor to remove any person appointed by

the Mayor without a vote of the City Council as set forth in §3-4, that Atherton as the Executive

Secretary is an employee at will. Therefore, according to the basic argument of the Defendant,

Atherton had no property interest in her employment with the City of Beverly.  However, as will

be shown herein, the Defendants' reading of the applicable Charter provisions is not consonant

with general principles of statutory construction.

As background, in interpreting the language, meaning, and application of city charters,

Massachusetts courts employ the traditional rules of construction for statutes and read the charter

as a cohesive whole.  *Atkinson v. Ipswich*, 34 Mass. App. Ct. 663 (1993). It is therefore axiomatic

that the Court should look first to the language of the charter. "[S]tatutory language is the

principal source of insight into legislative purpose." *Local 589, Amalgamated Transit Union v.

Massachusetts Bay Transp. Auth.*, 392 Mass. 407, 415 (1984), *quoting Bronstein v. Prudential

Ins. Co.*, 390 Mass. 701, 704 (1984). When the words of a statute are clear, they are to be given

their ordinary and natural meanings. *Bronstein v. Prudential Ins. Co.*, 390 Mass. 701, 704 (1984)

*citing Hashimi v. Kalil*, 388 Mass. 607, 610 (1983). In addition, "a statute should be read as a

whole to produce an internal consistency." *Telesetsky v. Wight*, 395 Mass. 868, 873 (1985) .  The

Court should interpret the statutory language " 'considered in connection with the cause of its

enactment, the mischief or imperfection to be remedied and the main object to be accomplished,

to the end that the purpose of its framers may be effectuated.' " *O'Brien v. Director of the Div. of

Employment Sec.*, 393 Mass. 482, 487-488, (1984), *quoting Industrial Fin. Corp. v. State Tax

Comm'n*, 367 Mass. 360, 364 (1975)." *Champagne v. Champagne*, 429 Mass. 324, 326 (1999).

Where a sensible construction is readily available, the Court should not construe the statute in a

4

way that produces an absurd or unreasonable result. *Manning v. Boston Redevelopment Auth.*, 400 Mass. 444, 453 (1987). Finally, legislative intent is to be determined primarily from the words of the statute, given their natural import in common and approved usage, and with reference to the conditions existing at the time of enactment. *Pacific Wool Growers v. Commissioner of Corps. & Taxation*, 305 Mass. 197, 198-199 (1940).

In accordance with Massachusetts law, a Charter is the "constitution" of the city, containing the basic provisions that establish the form, structure, and organization of the government and the powers and duties of the various city officials. *See* Mass. G.L. c. 4, § 7, cl. 5 (A charter is "a written instrument adopted, amended or revised pursuant to the provisions of chapter forty-three B which establishes and defines the structure of city and town government for a particular community and which may create local offices, and distribute powers, duties and responsibilities among local offices and which may establish and define certain procedures to be followed by the city or town government.") ; 18 Massachusetts Practice, "Municipal Law," § 23, fourth ed.; Mayor of Gloucester v. City Clerk of Gloucester, 327 Mass. 460 (1951). As noted by the Defendants, principles of statutory construction also require that if conflicts exist between a city's ordinance and its charter, the charter controls. *Chief of Police of Chelsea v. Mayor of Chelsea*, 21 Mass. App. Ct. 530 (1986); *Dos Santos v. City of Peabody*, 327 Mass. 519 (1951).[2]

Focusing on the language and history of the provisions at issue in this matter, §§ 3-3, 3-4 and § 8-15 of the Charter were adopted by the voters on November 7, 1995. Section 3-313 of the ordinances was adopted in December 15, 2003, just several weeks before Atherton was formerly terminated. (SOF ¶¶ 41 & 42). Section 3-313 was an entirely new ordinance provision at the time it was adopted, as there was no predecessor ordinance that purportedly allowed the

---

[2]    Defendants further state correctly at p.4 of their Memorandum in Support of Summary Judgment that "a literal construction will not be adopted 'when that construction would be inconsistent with other material provisions of the statute and would defeat the aim and object of the legislation.' " Id. at 532, *quoting Lexington v. Bedford,* 378 Mass. 562, 570 (1979). Apparently, Defendants seek a non-literal construction of the Charter, but such a result is unnecessary as a literal reading of the entire charter is sufficient to construe the relevant language.

Secretary to "serve at the pleasure of the Mayor" at least during the period of 1995 through December of 2003. (*Id*.)  Section 3-3 of the Charter initially indicates that the mayor "shall appoint . . . all city officers, department heads and the members of multiple-member bodies." Accordingly, at the time that the charter provisions were adopted by the voters of the City of Beverly, the only persons that were not entitled to a hearing under § 8-15 of the charter were the three classes of persons listed.

Adoption of the Defendants' interpretation to § 3-3 (and by implication § 3-4) of the charter by grafting ordinance § 3-313 to the language of § 3-3 would usurp the express desire of the voters when they adopted the Charter and correctly believed that all employees that were not department heads, city officers and members of multiple-member bodies would receive the right to a hearing as set forth in § 8-15 of the charter.  This is especially so because § 3-313 of the ordinances was not in effect until December of 2003.  Nonetheless, a basic tenet of statutory construction is that the "statutory expression of one thing is an implied exclusion of other things omitted from the statute" *Harborview Residents' Comm., Inc., v. Quincy Hous. Auth.*, 368 Mass. 425, 432, 332 N.E.2d 891 (1975).  Thus, it is axiomatic that if the voters, in adopting the city charter, had intended that other persons would not receive the right to a city hearing under § 8-15, they would have adopted express language listing such other persons or classes of employees. This construction of charter § 3-3 (and by implication § 3-4) is especially true because of the language of charter § 5-3 involving merit principles to be used with respect to city employees. Furthermore, charter § 9-4 regarding the continuation of personnel states, in relevant part, that:

> Any person holding a city office . . . or any person holding full time employment under the city, shall retain such office, or position, or employment, and shall continue to perform the duties of such office, position or employment until provision shall have been made for the performance of those duties by another person or agency; *provided, however, no person in the permanent full time service of the city shall forfeit his or her pay grade, or time in service of the city.  All such persons shall be retained in a capacity as similar to the capacity in which they were serving at the time this charter is adopted as is practicable and any reduction in the personnel needs of the city shall be accomplished through a policy of attrition, unless specific provision is otherwise made in this article.*

6

(emphasis added).[3]

Defendants cannot offer any support for the proposition that the City Council has the authority to adopt an ordinance (such as § 3-313) that contradicts the terms of the Charter as duly adopted by the voters of the City of Beverly.  In fact, Massachusetts courts have consistently required city officials and employees to follow the requirements of their city charter in the conduct of city affairs, otherwise the action taken is void, even if the city official thought that the correct process was being used. *See e.g.*, *United States Leasing Corp. v. Chicopee*, 402 Mass. 228 (1988); *Minnie v. Chicopee*, 344 Mass. 743 (1962); *Mayor of Holyoke v. Chief of Police of Holyoke*, 328 Mass. 253 (1952); *Cape Ann Citizens Assoc. v. City of Gloucester*, 47 Mass. App. Ct. 17, (1999); *Whalen v. Holyoke*, 13 Mass. App. Ct. 446 (1982).  Most instructive in this regard is *Town Council of Agawam v. Town Man. of Agawam*, 20 Mass. App. Ct. 100 (1985), where the Massachusetts Appeals Court concluded that it was impermissible for the town council of Agawam to vote itself the right to confirm an assessor when the applicable charter provisions specifically vested the town manager with the power to appoint the assessor.  In commenting on the attempt by the town council to usurp the authority of the mayor under the charter, the Court stated that:

> The charter provision is explicit and exclusive.  It vests in the town manager the sole power of appointment and by clear implication denies to the town council the right of confirmation. . . .  By arrogating this right to itself, the council has attempted to make a fundamental change in the scheme of appointment established by the charter without resorting to the two valid methods for the amendment of municipal charters. See Home Rule Amendment, §§ 3 & 4, and G.L. c. 43B, § 10 (amendment by two-thirds council vote and majority vote of the registered voters); Home Rule Amendment, § 8 (amendment by legislative vote upon a petition by voters). . . . Such an attempt violates the right of home rule.

*Id*. (citations omitted).

Likewise, in the present case, the desired interpretation of the Defendants would be impermissible

---

[3]    Despite the Defendants' claims to the contrary, the burden to find suitable employment for Atherton was on the city of Beverly (as there is no evidence that the Atherton's employment was affected by attrition.  Nevertheless, Atherton made several attempts to secure a position with the City once she was wrongfully terminated. (SOF ¶¶ 4, 6, 10, 12 and Defendants' Statement of Fact ¶¶ 50 & 51).

as the attempt to disenfranchise Atherton by adoption of an ordinance (in this case § 3-313) would clearly violate the right of home rule. Therefore, while the appointment of a secretary to the mayor would be permissible under the applicable provisions of the charter in harmony with § 3-313, removal of a mayor's secretary without affording the person in that position the right to a public hearing and all the important accoutrements set forth in § 8-15 necessarily violates the provisions of the charter, because there are no exceptions other than the classes of persons exempted therein.[4] Adoption of the Defendants' interpretation — that Atherton is not entitled to a hearing under § 8-15 — would be allowing a right granted under the charter (the city's constitution) to be taken away by ordinance.

Defendants' focus on the two sentences in the middle of § 3-3 which state that "[t]he decision of the mayor in suspending or removing a department head shall be final" and that "[t]he mayor may suspend or remove any person appointed by the mayor in accordance is with the procedure established in section 3-4" is quite interesting in that §3-4(a) is replete with continued reference to the three classes of persons that are subject to these removal provisions. In fact, the phrase "city officer, member of a multiple member body, or head of any city department" is referenced at least five times in § 3-4(a).[5] Defendants argument and interpretation of charter §§3-3 and 3-4 would disregard the repeated citation to these individuals and render the references to these three classes of persons as meaningless surplusage. Disregard of the language in these various statutes, in this way constitutes a distinct departure from well settled rules of statutory construction. Indeed, "[a] basic tenet of statutory construction requires that a statute be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Wolfe v. Gormally*, 440 Mass. 699, 704 (2004) (quotations omitted). *See Volin v.*

---

[4]    Atherton always believed that in case she could not continue as secretary to the Mayor that she could continue in another position pursuant to the provisions of the Charter stated herein.

[5]    Presumably, under Defendants' interpretation, as Atherton is not a department head, § 3-4(a) of the charter would only apply to Atherton as § 3-4(b) only pertains to city department heads relating to public safety.

*Board of Pub. Accountancy*, 422 Mass. 175, 179 (1996), *quoting from Adamowicz v. Ipswich*, 395 Mass. 757, 760 (1985) ("We do not 'interpret a statute so as to render it or any portion of it meaningless' "); *see also Globe Newspaper Co. v. Commissioner of Revenue*, 410 Mass. 188, 192, 571 N.E.2d 617 (1991); *Bartlett v. Greyhound Real Estate Finance Co.*, 41 Mass.App.Ct. 282, 289, 669 N.E.2d 792 (1996); *First Natl. Bank of Boston v. Bernier*, 50 Mass.App.Ct. 756, 759, 741 N.E.2d 95 (2001) (words in statute should not be treated as mere surplusage).  If in fact Mayor Scanlon was complying with the procedures set forth in §§ 3-3 and 3-4 of the charter in removing Atherton from employment with the City, nothing contained within § 3-4 would permit Atherton to obtain an audience with the City Council to hear her written reply.

Defendants' interpretation also disregards the language of charter § 8-15 dealing with removals and suspensions of city employees which states, in pertinent part, that "[a]ny employee of the city, not a city officer or a department head" shall receive a "written notice of the intent to remove and a statement of the cause or causes," and she is entitled to a "request a public hearing" where she "may be represented by counsel, shall be entitled to present evidence, call witnesses and to question any witnesses at the hearing."  Finally, "failure of the appointing authority to take any action within the time periods as stated in this section [§ 8-15] shall be deemed to be a rescission of the original notice and the officer or employee shall, forthwith, be reinstated." Since Atherton was neither a city officer nor a department head, she is entitled to an evidentiary public hearing as contemplated and intended by the charter to determine whether there was sufficient cause to terminate her from employment with the City of Beverly.

Adoption of the Defendants' proposed interpretation would render the repeated references to the three specific classes of persons not entitled to a hearing by the city council as superfluous language. As such, the Court should reject the construction espoused by the Defendants in favor of the more rational and textually based interpretation proposed by Atherton, because the voters intended all employees who were neither department heads, appointed officials nor member of multiple-member bodies to receive the hearing contemplated by § 8-15 of the charter. Focusing

9

on one sentence contained in the middle of § 3-3, without attempting to gleam the intent of the drafters wrongfully takes this sentence out of context. This is especially true since § 9-6 (g) of the charter specifically contemplates only the removal of officers or department heads. *See also* § 9-4 of the charter ("no person in the permanent full time service of the city shall forfeit his or her pay grade, or time in service of the city. *All such persons shall be retained in a capacity as similar to the capacity in which they were serving at the time this charter is adopted as is practicable"*) (emphasis added).

If § 8-15 of the charter is applicable to Atherton's claim, Defendants apparently do not dispute that the denial of the public hearing contemplated therein is violative of her rights under the Fourteenth Amendment to the United States Constitution which provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." Amdt. 14, § 1. In adopting 42 U.S.C. § 1983, Congress created a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Thus, a public employer cannot deprive its employee of a constitutionally recognized liberty interest, or of a substantial property interest in public employment, without affording the employee due process. *Board of Regents v. Roth*, 408 U.S. 564 (1972); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (holding that a public employee classified as a "civil servant" under Ohio law has a property interest in continued employment, of which the State cannot deprive him without due process). Since the Constitution does not create property interests the United States Supreme Court has stated that, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Metivier v. Connor*, 283 F.3d 391 (1st Cir. 2002) (town accountant had no property interest in her job under town charter or Massachusetts law, for town's failure to reappoint her); *Joslyn v. Kinch*, 613 F.Supp. 1168 ( R.I. 1985) (where city charter provided that dismissal of an employee who had completed his probationary period of service had to be for cause, city employee retained

"property interest" in his job).

While state law may create property interests, it is a separate question of federal law whether those interests rise to the level of a legitimate claim of entitlement sufficient to trigger procedural due process protections. *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) ("Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether an interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." (*quoting Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). However, it is well settled "that public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process." *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997). Based upon the foregoing, it is clear that the City improperly terminated Atherton in accordance with §§ 3-3 and 3-4, as Defendant Scanlon noted in his January 5, 2004 letter to Atherton, that he had relied upon these provisions in removing her as secretary. In fact, soon after Defendant Scanlon notified Atherton of his desire to terminate her from her position, she requested a hearing in accordance with § 8-15. Since Atherton has sufficiently articulated an expectation of continued employment as set forth in the "good cause" language in § 8-15 of the Beverly Home Rule Charter, she has sufficiently stated a "legitimate claim of entitlement" under the Due Process Clause.

If the employee has such a state property interest, and that property interest rises to the level of a "legitimate claim of entitlement," then the employer cannot dismiss the employee without affording her due process of law. *See, e.g., Gomez v. Rivera Rodriguez*, 344 F.3d 103, 111 (1st Cir.2003). The employee must therefore demonstrate that she was deprived of that property interest without the minimum amount of process that was due under the Constitution —in this context, the required process includes "some kind of hearing" and "some pretermination opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *see also Gilbert v. Homar*, 520 U.S. 924, 929 (1997). It is well established that due process requires

11

that a public employee with a property interest in continued employment is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present ... [her] side of the story" before she is terminated. *Loudermill* at 546.

Since Atherton had a property interest in her employment, the relevant constitutional question concerns what process was due her at the time she was summarily terminated by Defendant Scanlon. Due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and that affords "the affected individual . . . a fundamentally fair chance to present his or her side of the story." *Puerto Rico Telephone Co. v. Telecommunications Regulatory Bd. of Puerto Rico*, 189 F.3d 1, 19 (1st Cir.1999) (*quoting In re Nineteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 611 (1st Cir.1992)); *see Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. 893 (requiring for due process purposes "the opportunity to be heard 'at a meaningful time and in a meaningful manner' "). "The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.' " *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978). This is a case where Atherton's employment was terminated without any meaningful notice or opportunity to respond. *See, e.g.*, *Kercado-Melendez v. Aponte-Roque*, 829 F.2d 255, 263 (1st Cir.1987) (due process violation where Department of Public Instruction dismissed school district superintendent without prior notice or hearing). In fact, Atherton was never given a hearing at all under § 8-15 of the Charter. (SOF ¶ 50). This is also a case where Atherton was notified of the pending termination but not of the availability of an opportunity to present her objections. *Memphis Light*, 436 U.S. at 14, (finding due process violation where petitioners were notified that their utility services would be discontinued if payment was not made by a certain date but were not informed of the availability or " 'an opportunity to present their objections' to their bills")(*citing Mullane*, 339 U.S. at 314).

12

Based on the foregoing, Defendants' Motion for Summary Judgment should be denied and Plaintiff's Motion for Partial Summary Judgment as to Liability should be allowed in accordance with Fed. R. Civ. P. 56.

> B.     THERE IS AMPLE EVIDENCE TO DENY DEFENDANTS' MOTION
> FOR SUMMARY JUDGMENT WITH RESPECT TO ATHERTON'S
> CLAIM UNDER 42 U.S.C. § 1983 FOR POLITICAL DISCRIMINATION
> IN VIOLATION OF THE FIRST AMENDMENT AND ARTICLE 16

Atherton has brought a claim for political discrimination against Scanlon and the city of Beverly for violating her right against political discrimination under the First Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights. Generally, a governmental entity cannot take an adverse employment action or discriminate against an employee on the basis of that employee's political affiliations and beliefs or the employee's advocacy of political ideas. *Padilla-García v. Guillermo Rodríguez*, 212 F.3d 69, 75 (1st Cir.2000)(reiterating the so-called *Elrod/Branti* test which, in part, states that right to political affiliation does not apply to public employees in policymaking or confidential positions); *Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 55 (1st Cir.1990).  As admitted by Scanlon in his deposition, one of the reasons he terminated Atherton was her affiliation with the his predecessor, Thomas Crean. (Defendants' Statement of Facts ¶ 74 and Plaintiff's Response thereto). Moreover, as noted in Plaintiff's Memorandum for Summary Judgment, (which is incorporated by reference herein to avoid repetition) there is ample evidence that Atherton: had no significant supervision or control over other city employees; had no authority to speak in the name of the Mayor; had no significant influence on programs or policy initiatives within the city; and simply served in a clerical position who could not influence matters subject to partisan differences. *See Vazquez Rios v. Hernandez Colon*, 819 F.2d 319, 325-26 (1st Cir.1987); *Galloza v. Foy*, 389 F.3d 26, 29 (1st Cir. 2004).  In fact, according to the deposition of Linda Giallongo, Atherton's successor as secretary, Giallongo:

- takes notes at meetings, but the secretary has never otherwise attended meetings

13

on behalf of the mayor; (SOF, ¶ 18)

- has never represented the Mayor outside of City Hall; (SOF, ¶ 18)

- does not advise the Mayor as to policy (except as to licensing board in which secretary serves as the role of clerk); (SOF, ¶ 18)

- has never been asked to influence other officials; (SOF, ¶ 18)

- completes payroll paperwork; (SOF, ¶ 18)

- answers constituent phone calls; (SOF, ¶ 18)

- pays bills; (SOF, ¶ 18)

- fills out forms when money is taken in for yard sale permits; (SOF, ¶ 18)

- provides copies of licenses to those making requests; (SOF, ¶ 18)

- sends out form letters regarding appointments/re-appointments from a template or as otherwise directed by Mayor; (SOF, ¶ 18)

- conveys messages to and from Mayor and department heads; (SOF, ¶ 18)

- does not typically sign documents as Mayor signs or she is authorized to sign his name and her initials; (SOF, ¶ 18)

- organizes and summarizes information for the Mayor's review; (SOF, ¶ 18)

- does not serve as a liason between the mayor, media, public interest groups, business and residents although listed in § 3-313. The latter was a function of the administrative assistant and Mayor Scanlon now takes care of those functions; (SOF, ¶ 19)

- does not speak on behalf of the Mayor or otherwise explain the Mayor's policies with the press other than very general information; (SOF, ¶ 18)

- files and reviews correspondence in the Mayor's office; (SOF, ¶ 18) and

- keeps the Mayor's scheduling calendar. (SOF, ¶ 18)

Notwithstanding the above, the description contained within the § 3-313 of the ordinances should bear little weight in the Court's analysis as it describes the functions of two

14

positions, one being the secretary and the other being the administrative assistant to the mayor. (SOF ¶ 37). Neither Atherton nor her successor performed all of the tasks referenced in § 3-313. It is therefore essential that the Court examine the actual functions of the position. Accordingly, for the reasons stated herein (and in Plaintiff's Motion for Summary Judgment) Atherton could not be terminated from her employment as secretary on the basis of political discrimination and Defendant's Motion for Summary Judgment should be denied.

 

      C.      THE RECORD ADEQUATELY DEMONSTRATES THAT ATHERTON'S RIGHTS SECURED BY THE CONSTITUTION OR THE LAWS OF THE UNITED STATES AND THE COMMONWEALTH WERE VIOLATED BY THREATS, INTIMIDATION OR COERCION UNDER G.L. c. 12, § 11I

In Count V, Atherton alleges that the Defendants violated her rights under the Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12, § 11I, and the Defendants threatened, intimidated and coerced her by requesting her resignation and terminating her after she requested a hearing. "To establish a claim under the [MCRA ] the plaintiff[ ] must prove that (1) [his or her] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Reproductive Rights Network v. President of the Univ. of Mass.*, 45 Mass.App.Ct. 495, 505, 699 N.E.2d 829 (1998), *quoting* from *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395, 668 N.E.2d 333 (1996).The MCRA is the state "counterpart" to section 1983 and is basically "coextensive with" the federal statute, *see Chilson v. Polo Ralph Lauren Retail Corp*., 11 F.Supp.2d 153, 158 (D.Mass.1998); *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 473 N.E.2d 1128, 1130-31 (1985).

Atherton has sufficiently alleged, in the present matter, that Scanlon interfered with her rights to due process under 42 U.S.C. § 1983. Furthermore, Scanlon admittedly refused to comply with the provisions of the City Charter for removal of an employee under § 8-15, which

deprived Atherton of her rights under the laws of the Commonwealth of Massachusetts. Therefore, Atherton has met the first two elements to prove her claim under the MCRA.

In *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-647 (2003), the Supreme Judicial Court noted that "coercion may take various forms, and we have not limited its scope to actual or attempted physical force." However, there must be some act by a defendant which, objectively viewed, would cause a person not to exercise a constitutional right or deprive that person of that right. *See Ayali v. Armstrong*, 56 Mass.App.Ct. 740, 749, 780 N.E.2d 926 (2002) ("Whether conduct constitutes threats, intimidation, or coercion under the statute is tested by a reasonable person standard").

Economic coercion, at the very least, can be implied in the instant complaint, since Scanlon refused and otherwise disregarded Atherton's request for a hearing in accordance with the Charter provisions entitling her to a hearing. Atherton's summary termination as an employee for the City of Beverly by Scanlon constitutes "cancellation of a future economic relationship" that would appear to be "sufficient to constitute coercion" under the MCRA. *See Karetnikova v. Trustees of Emerson College,* 725 F.Supp. 73, 77-78 (D. Mass.1989). If the Court is in agreement that Atherton could not be terminated from her employment with the City of Beverly in light of the procedures set forth in § 8-15 of the charter, then Atherton was not an employee at will and she retained a constitutional right to retain her municipal employment. Accordingly, Atherton has sufficient evidence of a claim under the MCRA as a matter of law and the Plaintiffs' Motion for Summary Judgment as to this claim should therefore be denied.

D.    THERE IS SUFFICIENT EVIDENCE IN THE RECORD INDICATING THAT THE DEFENDANTS VIOLATED THE WAGE ACT BY FAILING TO PAY ATHERTON HER WAGES WHEN SHE WAS FORCED TO LEAVE HER EMPLOYMENT WITH BEVERLY

Under Count X of the Complaint, Atherton asserts violations of G.L. c. 149, § 148, the so-called Wage Act for wages that were due at the time of her termination. G.L.c. 149, § 148 was intended primarily "to prevent unreasonable detention of wages" by requiring "regular and

16

frequent payment."  American Mutual Liability Ins. Co. v. Commissioner of Labor & Industries ,

340 Mass. 144, 147 (1959). Although generally characterized as an act requiring the weekly

payment of wages, *see Commonwealth v. Savage*, 31 Mass.App.Ct. 714, 716 (1991), the statute

itself does not mandate weekly payment of wages. Rather, it establishes different deadlines for

the payment of wages to a variety of different types of employees: employers must pay most

employees the wages earned by them "weekly or bi-weekly" within six days of the termination of

the pay period.   As correctly noted by the Defendants, the "Wage Act only ensures the payment

of ordinary wages and wage equivalents, like specifically accrued vacation pay and sick leave

that constitute a significant part of weekly income." Scalli v. Citizens Financial Group, Inc., 2006

WL 1581625, *14 (D.Mass. 2006) (internal quotations omitted).

Defendants assert that Atherton is not entitled to compensation for accumulated sick

leave because she was terminated.  Section 17-47 of the ordinances states that an employee is

only entitled to accrued sick leave upon retirement or termination by demise.  Thus, Defendants

reason that the because Atherton was terminated by the Mayor and not due to retirement, she is

not entitled to the accumulated sick leave buyback.  However the plain language of the ordinance

does not require Atherton to be separated from her employment because of retirement in order to

recover sick leave benefits.  Once Atherton retired on September 1, 2004 she was entitled to the

sick leave benefits contemplated within § 17-47 of the ordinances.

Moreover, in the alternative, it is Atherton's contention that if she were not wrongfully

terminated she would have worked several more years and eventually retired from her municipal

employment.  In effect, the Defendants' should not benefit from their wrongdoing in failing to

comply with the charter requiring her reinstatement for failure to follow the procedures contained

within § 8-15.[6]

---

[6]       Additionally, although the City claimed to have paid Ms. Atherton for her accrued
vacation time and personal days, there were calculating errors and discrepancies involving
Atherton's check so that she refused to accept the payment.

E.    QUALIFIED IMMUNITY WILL NOT PROTECT MAYOR SCANLON FROM LIABILITY WHEN THE CLEAR LANGUAGE OF THE BEVERLY HOME RULE CHARTER REQUIRED A HEARING FOR ATHERTON AND IT WAS CLEARLY ESTABLISHED THAT SHE COULD NOT BE TERMINATED ON THE BASIS OF HER PERCEIVED POLITICAL AFFILIATION WITH THE PREVIOUS ADMINISTRATION

The doctrine of qualified immunity protects government officials who perform discretionary functions from suit and from liability for monetary damages under 42 U.S.C. § 1983. *See Roldán-Plumey v. Cerezo-Suárez*, 115 F.3d 58, 65 (1st Cir. 1997). This defense is designed to create a rebuttable presumption of immunity from personal liability to cover all executive officers that perform discretionary functions. *See Id*.; *Scheuer v. Rhodes*, 416 U.S. 232 (1974).

The general rule regarding qualified immunity is that government officials are immune from suit when their conduct does not violate clearly established statutory authority or constitutional rights, which a reasonable person should have known of at the time of the conduct at issue. *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Furthermore, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Acevedo-García v. Vera-Monroig*, 204 F.3d 1, 10 (1st Cir.2000).

In other words, the test has two prongs. First, the Court must determine, as a matter of law, whether the constitutional right in question was clearly established at the time of the alleged violation. *Hilaire v. Laconia*, 71 F.3d 20 (1st Cir.1995). In the case at bar, Atherton has sufficiently demonstrated that the conduct of the individual Defendants deprived her of her First Amendment rights and denial of Due Process.

If the Court finds that the right being violated was clearly established, the second prong of the qualified immunity determination is whether a similarly situated official reasonably "should have understood that the challenged conduct violated" that right. *Id*. at 24.  In the present case, it was clearly established law in the Commonwealth that the language of a Charter trumps any conflicting ordinance. *See Dos Santos v. City of Peabody*, 327 Mass. 519 (1951).

18

At the time of Atherton's termination in January of 2003, Supreme Court precedent had clearly established that a pre-termination hearing is required before terminating an employee who holds a property interest in her employment, and also clearly established that statutes restricting the terms and procedures under which an employee may be terminated create such a property interest. See Loudermill, 470 U.S. at 541, 105 S.Ct. 1487. Furthermore, under Massachusetts law it was clearly established that provisions of municipal charters should be given their ordinary meaning and that principles of statutory construction applied to such meaning as fully described in the within Memorandum.

Any reasonable official in the position of Mayor would have known that the failure to abide by the Charter and provide Plaintiff with a proper hearing as instructed by § 8-15 of the Charter would have violated her rights to Due Process and that her resulting termination would constitute unlawful retaliation under the First Amendment. Indeed, to the extent Defendants terminated Atherton due to her political activity, such action would be an obvious violation of Atherton's rights under the First and Fourteenth Amendments. Moreover, an objectively reasonable Mayor would have reviewed the applicable Charter provisions and concluded that Atherton was entitled to a hearing under § 8-15. An objectively reasonable Mayor also would have made himself familiar with the Charter for the City which would have informed him of his responsibility in terminating Atherton. Instead, Scanlon took her request for a hearing and simply filed it away.[7] (SOF, ¶ 14). Scanlon is therefore not immune from being sued in his individual capacity. Accordingly, Scanlon's conduct in summarily terminating Atherton is not shielded by the doctrine of qualified immunity and the civil rights violations attributed to Scanlon in his individual capacity should not be dismissed based on Defendants' Motion for Summary Judgment.

---

[7]    Scanlon's animus toward Atherton is readily apparent, as even under §§ 3-3 and 3-4 to which the Defendants claim is applicable in the instant action, Atherton was entitled to hearing before the City Council which she never received.

IV.     CONCLUSION

Based on all of the foregoing reasons (and the reasoning set forth in Plaintiff's Memorandum of Law in Support of Partial Summary Judgment as to Liability with respect to IIIA & IIIB herein), Atherton respectfully requests that Defendants' Motion for Summary Judgment be denied.

<div style="margin-left:50%">

Respectfully Submitted,

Crystal A. Atherton

By her Attorney,


/s/ Jordan L. Shapiro
Jordan L. Shapiro
BBO# 454240
Shapiro & Hender
640 Main Street
Malden, MA 02148
(781) 324-5200

</div>

DATED: April 18, 2008