## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**DOCKET NO.: 05-11323 MLW**

|  |  |
|---|---|
| **CRYSTAL A. ATHERTON**<br>    **Plaintiff,** | )<br>)<br>)<br>) |
| **v.** | )<br>) |
| **CITY OF BEVERLY, WILLIAM F.**<br>**SCANLON, JR., in his official and**<br>**individual capacity**<br>    **Defendants.** | )<br>)<br>)<br>)<br>)<br>) |

### PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Crystal A. Atherton (hereinafter "Atherton"), submits the following Statement of Facts Under Local Rule 56.1 in opposition to Defendants' Motion to Summary Judgment and the Statement of Facts attached thereto:

1.    Admitted, except the Beverly Retirement Board is a separate legal entity from the City of Beverly. *Everett Retirement Board v. Board of Assessors of Everett*, 19 Mass. App. 305 (1985); *see also O'Connor v. County of Bristol*, 329 Mass. 741, 746 (1953) ("Each of the several retirement systems, State, county, city or town, is in general an independent unit, having its own separate assets and liabilities and is under the jurisdiction of its own separate board"; Exhibit 1, Affidavit of Crystal A. Atherton ¶ 22).

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted.

6.    Admitted.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.   Admitted.

11.   Admitted.

12.   Admitted.

13.   Admitted.

14.   Admitted.

15.   Admitted.

16.   Admitted.

17.   Admitted.

18.   Admitted.

19.   Admitted.

20.   Admitted, however Section 3-313 of the Ordinances references two position, Executive Secretary and Administrative Assistant to the Mayor/Chief of Staff. (Exhibit 1, Affidavit of Crystal A. Atherton ¶¶ 18-19)

21.   Admitted, however the functions described in Section 3-313 of the Ordinances and therefore the City's Job Description references two positions within the City of Beverly. (Exhibit 1, Affidavit of Crystal A. Atherton ¶¶ 18-19). In addition, Section 17-52 of the Ordinances permits all employees with confidential employee status under G.L. c. 150E, § 3, the same employee benefits enjoyed by all other employees under their union contracts "including but not limited to vacation pay, sick leave benefits, personal and funeral leave, longevity, health and welfare benefits, on the job injury and educational benefits" to the union in of which they would normally be member. (Exhibit 2, Ordinance Section 17-52; Exhibit 1, Affidavit of Crystal A. Atherton ¶ 26). The union that Atherton would have been able to join was the Beverly Municipal Employees Association of City Hall. (*Id.*)

22.   Admitted.

23.  Admitted.

24.  Admitted.

25.  Admitted.

26.  Admitted.

27.  Admitted.

28.  Admitted.

29.  Denied, Atherton had an exemplary record as an employee with the City of Beverly. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 29)

30.  Admitted to the extent that Atherton believed that Scanlon opposed changes to the Charter. However, denied to the extent that Interrogatory response No. 10 only references Scanlon's conduct specifically in relation to his conduct in the present action as set forth in the Complaint (as they relate to Scanlon's failure to uphold his oath of office and by failing to uphold the provisions of the Charter, Beverly Ordinances and the law of the Commonwealth in dealing with Atherton).

31.  Admitted.

32.  Admitted.

33.  Denied, Atherton never believed she would lose her employment with the City. Atherton only believed that she would lose her position as secretary to the Mayor and be transferred to another position with the same benefits as envisioned and required by the Charter. This is especially the case because the Defendants failed to comply with the Charter and therefore Atherton is entitled to reinstatement under Charter section 8-15. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 30; Defendants' Exhibit 7). Notwithstanding, Atherton further says that her subjective belief (about her job security) is not relevant to the Court's inquiry as to whether she had a property interest under state law for purposes of the Court's Due Process analysis.

34.  Admitted.

35.  Admitted.

36.  Denied to the extent that the Executive Secretary's position was appointed by the Mayor and could be removed or changed by the Mayor, as this is one of the penultimate legal issues for the Court to decide. Furthermore, this paragraph is denied to the extent that it represents actual Atherton's work performance. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 29). Atherton does admit, however, that the paragraph reflects Scanlon's subjective view of Atherton's work performance.

37.  Admitted, however Atherton does not believe that the failure to resign and leave her employment with the City of Beverly when requested by Scanlon constituted insubordination as grounds for termination under Charter Section 8-15, though no evidentiary hearing was provided to Atherton in accordance with the provisions therein. (Exhibit 1, Affidavit of Crystal A. Atherton ¶¶ 24, 30; Exhibit 7, Defendants' Exhibits).

38.  Admitted.

39.  Admitted.

40.  Admitted.

41.  Admitted.

42.  Admitted.

43.  Admitted.

44.  Admitted that Scanlon terminated these persons who were department heads, as permitted under Charter Sections 3-3 and 3-4. (Exhibit 7, Defendants' Exhibits)

45.  While Atherton admits that she was not a member of the Union, she was to receive all benefits set forth in Section 17-52 of the Ordinances which permits all employees with confidential employee status under G.L. c. 150E, § 3, the same employee benefits enjoyed by all other employees under their union contracts "including but not limited to vacation pay, sick leave benefits, personal and funeral leave, longevity, health and welfare benefits, on the job injury and educational benefits" to the union in of which they would

4

normally be member. (Exhibit 2, Ordinance Section 17-52; Exhibit 1, Affidavit of Crystal A. Atherton ¶ 26). The union that Atherton would have been able to join was the Beverly Municipal Employees Association of City Hall. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 26).

46.    Admitted.

47.    Admitted, to the extent that it is obvious that a letter dated and sent by mail on January 5, 2004 would have been received some time after that date.

48.    Admitted.

49.    Denied to the extent that asking Scanlon for a hearing was not the proper process to obtain a hearing as the Charter provisions did not require Atherton to take any further action to seek a hearing under Section 8-15. (Exhibit 7, Defendants' Exhibits). Atherton further denies that she never pursued the opportunity to have a hearing as set forth in Section 8-15, because the letter from Atherton to Scanlon specifically requests a hearing pursuant to Section 8-15. (Exhibit 1, Affidavit of Crystal A. Atherton ¶¶ 8, 9 & 30; Exhibit 22, Defendants' Exhibits).

50.    Denied to the extent that Atherton also requested a position from the Human Resources Department on or about September 7, 2004 and in her letters to Scanlon in December of 2003 and January of 2004. (Exhibit 1, Affidavit of Crystal A. Atherton¶¶ 5, 8 & 9). Furthermore, under §§ 5-3 and 9-4 of the Charter, Atherton was entitled to another position with equivalent benefits in another City Department. (Exhibit 7, Defendants' Exhibits). Finally, assuming the applicability of 8-15, Atherton was entitled to reinstatement in accordance with the provisions of the Charter. (*Id.*)

51.    Admitted to the extent that there were no formal applications. However, Atherton went to the Towns of Wenham and Hamilton and the City of Danvers looking and inquiring about positions. (Defendants' Exhibit 1, Depostion of Atherton pp. 41-42). In addition, Atherton checked the newspapers every day to see if she could find something like a

paralegal job or legal/secretarial. All she ever found in the newspapers were low paying positions. (Defendants' Exhibit 1, Depostion of Atherton pp. 41-42).

52. Admitted, to the extent that a grievance was not required under the City Charter. (Defendants' Exhibit 7, City Charter).

53. Admitted.

54. Admitted.

55. Admitted.

56. Admitted.

57. Admitted.

58. Admitted. However, denies that the Ordinance Section 17-47, regarding sick leave buy back, requires Atherton's employment to be terminated by retirement in order to qualify for this benefit. (Defendants' Exhibit 8).

59. Admitted, but Atherton denies that the Ordinance Section 17-47, regarding sick leave buy back, requires Atherton's employment to be terminated by retirement in order to qualify for this benefit. (Defendants' Exhibit 8).

60. Admitted.

61. Admitted.

62. Admitted.

63. Admitted, that the City has no rule for compensatory time. However, the Wage Act, Mass. G.L. c. 149, § 148 would require Atherton to be paid for all of the time she actually worked. Additionally, Atherton believes that there are provisions in the agreement between the City of Beverly and the Beverly Municipal Employees Association of City Hall. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 32). As Section 17-52 of the Ordinances permits all employees with confidential employee status under G.L. c. 150E, § 3, the same employee benefits enjoyed by all other employees under their union contracts "including but not limited to vacation pay, sick leave benefits, personal and

6

funeral leave, longevity, health and welfare benefits, on the job injury and educational benefits" to the union in of which they would normally be member. (Exhibit 2, Ordinance Section 17-52; Exhibit 1, Affidavit of Crystal A. Atherton ¶ 26). The union that Atherton would have been able to join was the Beverly Municipal Employees Association of City Hall. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 26).

64.    Admitted. Atherton further states that the receipt of the letter permitted her to file suit in accordance with G.L. c. 149, § 148.

65.    Admitted.

66.    Admitted.

67.    Admitted.

68.    Admitted.

69.    Admitted.

70.    Admitted.

71.    Admitted.

72.    Admitted.

73.    Admitted.

74.    Admitted, in particular, by his statements Scanlon admits that he did nothing with respect to Atherton's request for a hearing under the Charter (by just reading and filing her request) and furthermore stated that one of the reasons he did not want Atherton as his secretary was specifically due to her affiliation with his predecessor, Mayor Crean. (Defendants' Exhibit 3, Scanlon pp. 17, 22-24, 73, 75, 92-93)

75.    Admitted.

76.    Admitted.

77.    Admitted.

78.    Admitted.

79.    Admitted.

80.    Admitted.

81.    Admitted.

82.    Admitted.

83.    Admitted.

84.    Admitted.

85.    Admitted.

86.    Admitted.

87.    Admitted.

## PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS IN ACCORDANCE WITH LOCAL RULE 56.1

Plaintiff, Crystal Atherton's Separate Statement of Undisputed Fact are set forth below. Atherton further incorporates her Statement of Undisputed Facts in Support of her Motion for Partial Summary Judgment as to Liability by reference herein. Accordingly, the paragraph numbers for these Undisputed Facts will be numbered cumulatively with the previous Statement of Undisputed Facts in Support of Plaintiff's Motion for Partial Summary Judgment as to Liability:

20.    From October 2002 until her termination in January of 2004, Atherton was employed by the City of Beverly as secretary to Mayor Thomas Crean. Mayor Crean's term of office expired in January of 2004. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 2).

21.    After his election in November of 2003, (for the 2004-2005 term) then Mayor-elect William F. Scanlon (hereinafter "Scanlon"), informed Atherton over the telephone that he wanted Atherton to resign from her secretarial position. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 3).

22.    During this conversation with Scanlon, Atherton did not believe that she could be terminated under the applicable charter provisions. Atherton informed Scanlon that she was interested in another position with the City of Beverly so that she could continue her employment

and years in municipal service. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 4).

23.    On or about December 17, 2003, Atherton received a letter from Scanlon formally asking for her resignation. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 5)

24.    In response, Atherton sent a letter back to Scanlon on or about December 31, 2003, in which she stated that she would not resign and that Section 8-15 of the City Charter prohibited her termination except for cause.    In this letter Atherton also requested a re-assignment to another municipal department or location. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 6).

25.    On January 5, 2004, Scanlon (who had just become Mayor) notified the City Clerk that he was being removed from his position as Secretary.  Atherton was then carbon copied on this notification to the City Clerk. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 7).

26.    In response, Atherton hand-delivered a response on January 12, 2004 to Scanlon's letter requesting her removal in which Atherton formally requested a hearing pursuant to Section 8-15 of the Beverly Home Rule Charter. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 8).

27.    Despite Atherton's request, she never received a hearing in accordance with Section 8-15 of the Beverly Home Rule Charter. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 9).

28.    In December of 2003, Atherton went to speak to Gerald Marcella, who was then the President of the Beverly Municipal Employees Association of City Hall, to discuss the possibility of finding another position with the City of Beverly.  He told Atherton about an open position within the Building Department, and that he would speak to the Building Department Head about her filling the position. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 10).

29.    Atherton was later informed by Mr. Marcella that the Building Department Head did not want her to have this position with the Building Department, because of her dispute with then Mayor-Elect Scanlon. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 11).

30.    In or about January of 2004, Atherton spoke to Roy F. Gelineau, Jr., the City Solicitor, to request that he speak to Scanlon about continuing my employment with the City in a different position than Secretary to the Mayor, particularly the open position within the Building

Department. Atherton never heard back from Mr. Gelineau regarding my request. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 12).

31.     In or about September of 2004, Atherton wrote a letter to the Human Resources Department for the City of Beverly once again requesting a position of employment. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 13).

32.     On September 2, 2004, Atherton formally requested and was approved for a superannuation retirement with the City of Beverly. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 14).

33.     At the time of Atherton's termination from the City of Beverly, in her capacity as secretary, she was not a member of multiple-member body. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 15).

34.     At the time of Atherton's termination from the City of Beverly, in her capacity as secretary, she was not a department head. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 16).

35.     At the time of her termination from the City of Beverly, in my capacity as secretary, she was not a city official. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 17).

36.     Many of the functions and tasks described in Section 3-313 of the Ordinances were assigned to the Executive Assistant/Chief of Staff to Mayor Crean, who was Robert Valliere. Therefore, during my employment as secretary to the mayor, there was an Executive Assistant to the Mayor, who performed some of the functions described in Ordinance Section 3-313. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 18).

37.     Accordingly, Ordinance Section 3-313 describes two positions, Executive Secretary and Administrative Assistant (or the Chief of Staff). (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 19).

38.     During her employment as secretary to the mayor, Atherton never attended confidential meetings. The only meetings Atherton attended involved department heads where she took minutes. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 20).

10

39.    In fact, during the time she worked for Mayor Crean, Atherton never discussed issues with Crean related to the City in order to solicit her opinion. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 21).

40.    Atherton presently serves as an elected member of the Beverly Retirement Board. The Retirement Board is a separate legal entity from the City of Beverly. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 22).

41.    To her knowledge, there was no ordinance in effect from 1995 to December of 2003, that described the functions of the secretary to the Mayor. Certainly, from 1995 to December of 2003, there were no provisions in any Ordinance which caused the secretary to serve at the pleasure or will of the Mayor. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 23).

42.    Section 3-313 of the City of Beverly Ordinances was adopted on December 18, 2003, when it was signed by then Mayor Thomas Crean. (Exhibit 3, Record of Beverly City Clerk indicating passage of 3-313).

43.    Atherton did not believe that, in her capacity as secretary to the Mayor, the failure to resign when requested is insubordination. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 24).

44.    As of this date, the City of Beverly has refused to pay my accumulated sick leave benefits even after she retired, as required by Section 17-47 of the Beverly Revised Ordinances. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 25).

45.    Section 17-52 of the Beverly Ordinances, which became effective in June of 1996, states the following:

> All employees with a confidential employee status, who due to that status are excluded from all labor unions pursuant to M.G.L. c. 150E sec. 3, shall receive the same cost of living raises negotiated by the union of which they would be entitled to be a member if not for their confidential employee status. Nothing in this ordinance shall preclude said confidential employees from receiving merit raises as may be recommended by their supervisor and the Mayor and appropriated by the City Council from time to time. Said confidential employees shall be entitled to the same employee benefits enjoyed by all other employees under their union contracts, including but not limited to vacation pay, sick leave benefits, personal and funeral leave, longevity, health and welfare benefits, on the job injury and educational benefits.

11

(Exhibit 2, Beverly Ordinance 17-52).

46.    Moreover, because of Section 17-52 of the Ordinances, which permitted Atherton all the benefits, "including but not limited to vacation pay, sick leave benefits, personal and funeral leave, longevity, health and welfare benefits, on the job injury and educational benefits" of the Beverly Municipal Employees Association of City Hall, Atherton was also entitled to sick leave benefits in accordance with their Agreement with the City of Beverly. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 26; Exhibit 2, Beverly Ordinance 17-52).

47.    During the time she worked as secretary to the City Solicitor, when she would go to lunch, Atherton would put the telephone answering machine or have someone else answer the telephone. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 27).

48.    Scanlon could not have observed much of Atherton's work and her conduct at work during the time she was at City Hall, as there was a wall between her desk and Scanlon's office. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 28).

49.    To her knowledge there were no deficiencies or negative reviews placed in her personnel file during her almost eighteen (18) years of employment with the City of Beverly. Therefore, she had an exemplary work record with the City of Beverly. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 29).

50.    At the time she was terminated by Mayor Scanlon, Atherton never thought she would lose her employment with the City of Beverly. At worst, Atherton thought she could only be transferred in accordance with the provisions of the Charter. At a minimum, Atherton was entitled to a hearing which she never received. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 30).

31.    When Atherton received the job as secretary to the Mayor, she was never given a fixed term for the position. (Exhibit 1, Affidavit of Crystal A. Atherton ¶ 31).

32.    Atherton believes that, in accordance with the Beverly Municipal Employees Association of City Hall, which was in effect at the time of her termination, there was a provision for compensatory time to be given to union employees. (Exhibit 1, Affidavit of Crystal A. Atherton ¶

12

32)

Respectfully Submitted,

CRYSTAL A. ATHERTON

By her Attorney,


/s/ Jordan L. Shapiro
Jordan L. Shapiro
BBO# 454240
Shapiro & Hender
640 Main Street
Malden, MA 02148
DATED: April 18, 2008                              (781) 324-5200

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO.: 05-11323 MLW

|  |  |
|---|---|
| CRYSTAL A. ATHERTON<br>    Plaintiff,<br><br>v.<br><br>CITY OF BEVERLY, WILLIAM F.<br>SCANLON, JR., in his official and<br>individual capacity<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

AFFIDAVIT OF PLAINTIFF, CRYSTAL A. ATHERTON

I, the undersigned, Crystal A. Atherton, under oath do depose and state as follows:

1.     My name is Crystal A. Atherton, and I am the Plaintiff in the above-captioned matter.

2.     From October 2002 until my termination in January of 2004, I was employed by the City of Beverly as secretary to Mayor Thomas Crean.  Mayor Crean's term of office expired in January of 2004.

3.     After his election in November of 2003, (for the 2004-2005 term) then Mayor-elect William F. Scanlon (hereinafter "Scanlon"), informed me over the telephone that he wanted me to resign from my secretarial position.

4.     During this conversation with Scanlon, I did not believe that I could be terminated under the applicable charter provisions.  I also informed Scanlon that I was interested in another position with the City of Beverly so that I could continue my employment and my years in municipal service.

5.     On or about December 17, 2003, I received a letter from Scanlon formally asking for my resignation.

6.     In response, I sent a letter back to Scanlon on or about December 31, 2003, in which I stated that I would not resign and that Section 8-15 of the City Charter prohibited my

termination except for cause.   In this letter I also requested a re-assignment to another municipal department or location.

7.   On January 5, 2004, Scanlon (who had just become Mayor) notified the City Clerk that I was being removed from my position as Secretary.  I was carbon copied on this notification to the City Clerk.

8.   In response, I hand-delivered a response on January 12, 2004 to Scanlon's letter requesting my removal in which I formally requested a hearing pursuant to Section 8-15 of the Beverly Home Rule Charter.

9.   Despite my request, I never received a hearing in accordance with Section 8-15 of the Beverly Home Rule Charter.

10.   In December of 2003, I went to speak to Gerald Marcella, who was the President of the Beverly Municipal Employees Association of City Hall, to discuss the possibility of finding another position with the City of Beverly.  He told me about an open position within the Building Department, and that he would speak to the Building Department Head about me filling the position.

11.   I was later informed by Mr. Marcella that the Building Department Head did not want me to have this position with the Building Department, because of my dispute with then Mayor-Elect Scanlon.

12.   In or about January of 2004, I spoke to Roy F. Gelineau, Jr., the City Solicitor, to request that he speak to Scanlon about continuing my employment with the City in a different position than Secretary to the Mayor, particularly the open position within the Building Department.  I never heard back from Mr. Gelineau regarding my request.

13.   In or about September of 2004, I wrote a letter to the Human Resources Department for the City of Beverly once again requesting a position.

14.   On September 2, 2004, I formally requested and was approved for a superannuation retirement with the City of Beverly.

2

15.    At the time of my termination from the City of Beverly, in my capacity as secretary, I was not a member of multiple-member body.

16.    At the time of my termination from the City of Beverly, in my capacity as secretary, I was not a department head.

17.    At the time of my termination from the City of Beverly, in my capacity as secretary, I was not a city official.

18.    Many of the functions and tasks described in Section 3-313 of the Ordinances were assigned to the Executive Assistant/Chief of Staff to Mayor Crean, who was Robert Valliere.  Therefore, during my employment as secretary to the mayor, there was an Executive Assistant to the Mayor, who performed some of the functions described in Ordinance Section 3-313.

19.    Accordingly, Ordinance Section 3-313 describes two positions, Executive Secretary and Administrative Assistant (or the Chief of Staff).

20.    During my employment as secretary to the mayor, I never attended confidential meetings. The only meetings I attended involved department heads where I took minutes.

21.    In fact, during the time I worked for Mayor Crean, I never discussed issues related to the City with him so that he could solicit my opinion.

22.    I presently serve as an elected member of the Beverly Retirement Board.  The Retirement Board is a separate legal entity from the City of Beverly.

23.    To my knowledge, there was no ordinance in effect from 1995 to December of 2003, that described the functions of the secretary to the Mayor.  Certainly, from 1995 to December of 2003, there were no provisions in any Ordinance which caused the secretary to serve at the pleasure or will of the Mayor.

24.    I do not believe as secretary to the Mayor that the failure to resign when requested is insubordination.

25.    As of this date, the City of Beverly has refused to pay my accumulated sick leave benefits

3

even after I retired, as required by Section 17-47 of the Beverly Revised Ordinances.

26.    Moreover, because of Section 17-52 of the Ordinances, which permitted me all the benefits, "including but not limited to vacation pay, sick leave benefits, personal and funeral leave, longevity, health and welfare benefits, on the job injury and educational benefits" of the Beverly Municipal Employees Association of City Hall, I was also entitled to sick leave benefits in accordance with their Agreement with the City of Beverly.

27.    During the time I worked as secretary to the City Solicitor, when I would go to lunch, I would put the telephone answering machine or have someone else answer the telephone.

28.    Scanlon could not have observed much of my work and my conduct at work during the time I was at City Hall, as there was a wall between my desk and his office.

29.    To my knowledge there were no deficiencies or negative reviews placed in my personnel file during my almost eighteen (18) years of employment with the City of Beverly. Therefore, I had an exemplary work record with the City of Beverly.

30.    At the time I was terminated by Mayor Scanlon, I never thought I would lose my employment with the City of Beverly. At worst, I thought I could only be transferred in accordance with the provisions of the Charter. At a minimum, I was entitled to a hearing which I never received.

31.    When I received the job as secretary to the Mayor, I was never given a fixed term for the position.

32.    I believe that, in accordance with the Beverly Municipal Employees Association of City Hall, which was in effect at the time of my termination, there is a provision for compensatory time to be given to employees.

4

SIGNED UNDER THE PENALTIES OF PERJURY THIS 18TH DAY OF APRIL, 2008.

CRYSTAL A. ATHERTON

# Exhibit 2

# City of Beverly

In the year one thousand nine hundred and

Ninety Six

## An Ordinance

Amending an ordinance entitled Chapt. 17,"Personnel"
re Article IV.Sec. 17-52 Confidential Employees

Be it ordained by the board of aldermen of the city of Beverly as follows:

Chapter 17, of the Revised Ordinances of the City of Beverly, by adding a new Article IV Sec. 17-52 Confidential Employees as follows:

"All employees with a confidential employee status, who due to that status are excluded from all labor unions pursuant to M.G.L. c. 150E sec. 3, shall receive the same cost of living raises negotiated by the union of which they would be entitled to be a member if not for their confidential employee status. Nothing in this ordinance shall preclude said confidential employes from receiving merit raises as may be recommended by their supervisor and the Mayor and appropiated by the City Council from time to time. Said confidential employees shall be entitled to the same employee benefits enjoyed by all other employees under their union contracts, including but not limited to vacation pay, sick leave benefits, personal and funeral leave, longevity, health and welfare benefits, on the job injury and educational benefits.

This ordinance to take effect as provided by City Charter.

In City Council April 16,1996
First Passage May 6, 1996
To be voted on May 20, 1996 for final passage
Attest: Frances A. Macdonald
        City Clerk

# Exhibit 3

329

ORDER *Final Report*

*Ordinance Review*

PH 11-1-03   7:30pm

IN CITY COUNCIL.

First reading. *Nov. 17, 2003*

PUBLIC HEARING HELD   DEC   1   PM

Second reading. *Dec. 1, 2003.*

Adopted ...... DEC   1   '03

Presented to Mayor

*12/1/03*

Approved

Mayor

Entered Page...... *2/0*

*Dec 1 1974*

Vol. *109*

In City Council

Referred to standing Committee on

Clerk

The Director of Community Services shall have the following specific powers and duties:

a)      Provide coordination and direction to the agencies within the department to insure consistent administration and the efficient delivery of services to citizens and taxpayers.

b)      Meet regularly with the Mayor to develop goals and objectives for each of the agencies within the department and to measure and evaluate the performance of functions by the agencies.

c)      Meet with the multiple member bodies which are responsible for the oversight of the agencies' programs to explain the goals and objectives set by the Mayor for each such agency.

d)      Examine the level of services provided in other communities to ensure the City of Beverly provides nothing less than an equivalent service for its citizens.

e)      Assist constituent agencies in the development of annual operating budgets and capital outlay requests.

f)      Provide assistance to the constituent multiple member bodies in personnel-related matters including appointment, discharge, evaluation and supervision.

g)      Serve as liaison between the multiple member bodies, the divisions, the City Council and the Mayor.

h)      Be responsible for the coordination and supervision of the data processing and management information systems for the city and any of its governmental offices and agencies.


**SECTION 3-313. Confidential Secretary/Administrative Assistant to the Mayor**

**(a). Establishment**. – There shall be a Confidential Secretary/Administrative Assistant to the Mayor.

**(b) Mode of Appointment, Term of Office** - The Confidential Secretary/Administrative Assistant to the Mayor shall be appointed by and responsible only to the Mayor. The Confidential Secretary/Administrative Assistant shall serve at the pleasure of the Mayor.

**(c) Authorities and Responsibilities** - The Confidential Secretary/Administrative Assistant to the Mayor shall have the following duties:

(1) Organize and summarize information and prepare it for the Mayor's review and action;

(2) Meet with department heads regarding day-to-day business, expediting administrative interaction between the Mayor's office and City departments;

(3) Serve as a liaison officer between the Mayor, the media, public interest groups, businesses and residents;

(4) Be familiar with all aspects of the City government and with the functions and activities of the various offices and employees of the City;

(5) Be familiar with the various services rendered by the City to its residents, in order that callers can be informed of the extent of these services and of the schedule for their performance;

(6) Review all correspondence received in the office of the Mayor, and arrange for its routing and for assembling the materials needed by the Mayor to respond to all such correspondence;

(7) Answer all telephone calls placed to the office, respond in an appropriate fashion and direct as appropriate;

## SECTION 3-314. Constables
*(a) Establishment* - There shall be one or more constables as provided in MGL Chapter 41, Sections 91 through 95.

*(b) Mode of Appointment, Term of Office* - The Mayor shall appoint, subject to the review of the City Council as provided in Section 2-10 of the Beverly Home Rule Charter, one or more constables for a term not to exceed three years each.

*(c) Authorities and Responsibilities* - Constables may serve certain civil writs and processes. They have the powers of sheriffs to require aid in the execution of their duties. Constables take due notice of and prosecute all violations of law, respecting the observance of the Lord's Day, profane swearing and gaming. Constables also serve all processes directed to them by the City, for notification of City meetings, or for other purposes.

## SECTION 3-315. Dog Officer (Animal Control Officer)
*(a) Establishment* – There shall be a Dog Officer as provided in MGL Chapter 140, Section 151 *et seq.*

*(b) Mode of Appointment, Term of Office* - The Mayor shall annually, subject to the review of the City Council as provided in Section 2-10 of the Beverly Home Rule Charter, appoint a Dog Officer and one or more assistants, for a term not to exceed three years. The person appointed to such office shall be known as the Animal Control Officer.  (Ord. No. 428, § 1, 10-19-87)

*(c) Authorities and Responsibilities* - The Dog Officer/Animal Control Officer shall be responsible for the enforcement of all laws relating to the care, custody and control of dogs in the